# EXHIBIT 4 – CITED PAGES FROM DEPOSITION OF NAVEEN ULI, M.D.

```
        IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF OHIO
                   EASTERN DIVISION

                        - - -

ALISON O'DONNELL,

           Plaintiff,
    vs.                       Case No. 1:16-cv-2450
                              Judge Donald E. Nugent
UNIVERSITY HOSPITALS
HEALTH SYSTEM, et al.,

           Defendants.

                        - - -

         DEPOSITION OF NAVEEN K. ULI, M.D.
                Monday, August 7, 2017

                        - - -
```

The deposition of NAVEEN K. ULI, M.D., a Defendant herein, called for examination by the Plaintiff under the Federal Rules of Civil Procedure, taken before me, Diane M. Stevenson, a Registered Diplomate Reporter, Certified Realtime Reporter, and Notary Public in and for the state of Ohio, pursuant to notice, at The Spitz Law Firm, 25200 Chagrin Blvd., Suite 200, Beachwood, Ohio, commencing at 12:07 p.m., the day and date above set forth.

Stevenson Reporting Service, Inc.
2197 Macon Court    Westlake, Ohio 44145
440.892.8600    diane@nls.net

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | Were those sessions both completed on the same |
| 3 | | day? |
| 4 | A. | No, they were on two different days. |
| 5 | Q. | Two different days. At the time, that |
| 6 | | encompassed the whole orientation period? |
| 7 | A. | Yes, for our division. |
| 8 | Q. | For your division? |
| 9 | A. | Yes, because all the incoming fellows have |
| 01:21 10 | | separate orientations for the institution, and |
| 11 | | then a separate orientation for the department |
| 12 | | of pediatrics. So the common things, all |
| 13 | | fellows in every single specialty in the |
| 14 | | institution have to go through, and then they |
| 15 | | have something -- then all the pediatric |
| 16 | | fellows in the various subspecialties within |
| 17 | | pediatrics have to have separate set of things, |
| 18 | | like how to access computer things. And then |
| 19 | | there are specific things for the division and |
| 01:21 20 | | I was only in charge of the one for our |
| 21 | | endocrine division. |
| 22 | Q. | Okay. And you said since that orientation |
| 23 | | program has been expanded? |
| 24 | A. | Yes. I mean, it is a work in progress each |
| 25 | | year. And based on the feedback we get from |

|  |  |  |
|---|---|---|
| 1 |  | fellows, we keep adding in things and adding |
| 2 |  | the value, getting more and more outside |
| 3 |  | speakers to come in and give those lectures, so |
| 4 |  | over the years it has grown quite a bit now. |
| 5 | Q. | Now, is this orientation session that you would |
| 6 |  | have given back in July of 2010, was that only |
| 7 |  | for the new fellows -- |
| 8 | A. | Yes. |
| 9 | Q. | -- or did it also include the second- and |
| 01:22 10 |  | third-year fellows? |
| 11 | A. | New fellows. |
| 12 | Q. | So are we talking about two individuals, then? |
| 13 | A. | Two individuals. |
| 14 | Q. | Was Dr. O'Donnell present for both of those |
| 15 |  | sessions? |
| 16 | A. | Yes. |
| 17 | Q. | And I was asking you initially about a job |
| 18 |  | description. Was a job description given to |
| 19 |  | the new fellows during orientation? |
| 01:22 20 | A. | Yes. |
| 21 | Q. | And how is that conveyed to them? Is it |
| 22 |  | something on a document or was it something |
| 23 |  | verbally communicated? |
| 24 | A. | Both verbal and a document. And even that |
| 25 |  | document over the years has morphed into a |

|  |  |
|--|--|
| 1 | Dr. O'Donnell about her being able to speak up |
| 2 | or be more involved with these Wednesday |
| 3 | conferences and she said, "Well, I am shy," and |
| 4 | then she talked about her background and talked |
| 5 | about -- said she has social anxiety, what was |
| 6 | your response to that? |
| 7  A. | Well, that was a big discussion among our own |
| 8 | faculty as to how can they accommodate that. |
| 9 | And all the faculty and me believe, and to this |
| 10 | day believe, that that is a critical part of |
| 11 | fellowship training for many reasons. |
| 12 | One, it tells us the depth of a person's |
| 13 | thinking of a certain problem, we can evaluate |
| 14 | that, and that allows us to evaluate the |
| 15 | fellow's critical thinking skills, the depth of |
| 16 | knowledge, the approach to clinical medicine, |
| 17 | and their problem-solving skills, which are an |
| 18 | integral part of fellowship training, both for |
| 19 | training and for us to evaluate how they are |
| 20 | doing in terms of their various competencies |
| 21 | during the fellowship training. |
| 22 | And secondly, communication is a critical |
| 23 | aspect of a role of a consultant once you get a |
| 24 | job. So we thought that that was really |
| 25 | important and we couldn't really excuse her |

1  you discuss other possible alternatives of
2  evaluation other than what I would call the
3  cold-calling approach and where you just pose a
4  question?
5  　　Did you consider whether or not she could
6  receive the same education and be evaluated in
7  the same way if she was allowed to have some
8  preparation as to these questions before being
9  cold-called?
10 A. No, because that is the expectation of all
11 　　fellows because that is a critical function of
12 　　a consultant.
13 Q. Did you consider whether or not she could have
14 　　been cold-called on or given or have these
15 　　questions raised either by you or another
16 　　faculty member maybe in a more private setting
17 　　instead of being in this larger environment?
18 A. No.
19 Q. Would that have been -- would that have been a
20 　　successful way to evaluate her knowledge on
21 　　these issues?
22 A. I don't think so, because you -- and that is a
23 　　critical function for training and for function
24 　　as an endocrinologist, because you might be
25 　　with a patient and, as you visit the patient,

|   |   |   |
|---|---|---|
| 1 |    | the patient parent asks you questions, and you |
| 2 |    | would be forced to answer there right then, and |
| 3 |    | there is no time to go back and say, "I will |
| 4 |    | answer this later." |
| 5 | Q. | I am sorry, go ahead. |
| 6 | A. | Training and function as a consultant requires |
| 7 |    | that kind of a back and forth and being able to |
| 8 |    | answer questions in the moment. |
| 9 | Q. | Were you ever the attending in the clinic who |
| 10 |   | would assist Dr. O'Donnell in those settings |
| 11 |   | that we talked about where she would see a |
| 12 |   | patient, come into the room and talk to the |
| 13 |   | treating physician? Was that ever you in that |
| 14 |   | role? |
| 15 | A. | Sometimes, yeah. Since we are six, seven of us |
| 16 |   | at that time, it would have been any one of us. |
| 17 | Q. | But sometimes you were in this role? |
| 18 | A. | Sometimes I would be. |
| 19 | Q. | And then you would talk to her and both of you |
| 20 |   | would go back in together and further treat the |
| 21 |   | patient or advise the patient? |
| 22 | A. | Yes. |
| 23 | Q. | I mean, outside of these Wednesday conferences, |
| 24 |   | this specific setting, did you ever observe |
| 25 |   | Dr. O'Donnell having trouble answering |

|    |    |    |
|----|----|----|
| 1  |    | of presentations, and that she was trying to |
| 2  |    | look for a compromise that would suit |
| 3  |    | everybody's needs? |
| 4  |    | Did you discuss any of that with faculty |
| 5  |    | members and whether that was something that |
| 6  |    | could be done, couldn't be done, anything like |
| 7  |    | that? |
| 8  | A. | We had multiple faculty meetings, but I don't |
| 9  |    | know what time frame, were those before or |
| 03:23 10 |  | after. I believe we had at least one or two |
| 11 |    | more after this where the unanimous opinion was |
| 12 |    | that you cannot not grade, not evaluate her, on |
| 13 |    | the other aspects of the Wednesday conferences. |
| 14 |    | There couldn't be a substitute. |
| 15 |    | We needed in-the-moment questions and |
| 16 |    | answers and how people respond to that to |
| 17 |    | really gauge how well the person understands |
| 18 |    | the subject and how well one is able to |
| 19 |    | communicate. |
| 03:24 20 |  | (Plaintiff's Exhibit 33 was marked for |
| 21 |    | identification.) |
| 22 | Q. | Handing you what I have marked as 33, this is a |
| 23 |    | performance alert notice for Alison Matthews. |
| 24 |    | Dr. O'Donnell, in the pediatric endocrinology |
| 25 |    | program. Did you prepare this document? |

|   |    |   |
|---|----|---|
| 1 |    | of that, I was not aware of the diagnosis.  Up |
| 2 |    | until that time it was just not made clear to |
| 3 |    | me that it was a medical diagnosis, it was |
| 4 |    | social anxiety. |
| 5 | Q. | Would your actions have changed if she had used |
| 6 |    | the word "general anxiety disorder" during any |
| 7 |    | of your conversations? |
| 8 | A. | Well, we would have gotten feedback from the |
| 9 |    | psychologist as to what the treatment |
| 10 |   | modalities are, but still would require her to |
| 11 |   | participate in the Wednesday conferences |
| 12 |   | because that is an essential, integral part of |
| 13 |   | the fellowship training. |
| 14 |   | And without us getting feedback, there is |
| 15 |   | no other way we will be able to gauge the |
| 16 |   | competence of a fellow in communication and |
| 17 |   | knowledge and patient care other than putting |
| 18 |   | on the spot and having to be able to do that. |
| 19 |   | But we will be open to any suggestions |
| 20 |   | that the psychologist would have for us in |
| 21 |   | terms of how can you help a person learn better |
| 22 |   | and be able to function in that role? |
| 23 | Q. | Obviously, then, you never had any discussions |
| 24 |   | with Dr. Adon, her treating physician -- |
| 25 | A. | No. |

```
 1  Q.   -- for the disorder during Dr. O'Donnell's time
 2       at the fellowship?
 3  A.   Not at all.
 4  Q.   You did learn at some point, because you had
 5       meetings about it, that she had formally
 6       requested an accommodation?
 7  A.   Yes.
 8  Q.   Were you told or shown any documentation as to
 9       what accommodation she was requesting?
10  A.   Yes, there were two main accommodation
11       requests.  One was that she should be excused
12       from being evaluated and graded during the
13       Wednesday conferences, which I took back to our
14       faculty, and they said that that cannot be done
15       because that is an integral and essential part
16       of fellowship training.  And our ability to
17       evaluate a fellow, that is a major part of how
18       we evaluate fellows.
19            The second request that we got for
20       accommodation was that she be allowed to work
21       exclusively with two of the junior-most faculty
22       because she was much more comfortable working
23       with them, and not have to work with any of the
24       senior faculty.  And the junior faculty did not
25       involve me, it was two of the most junior
```

|   |   |   |
|---|---|---|
|   | 1 | during the accommodation process about whether |
|   | 2 | that could be an adequate alternative to |
|   | 3 | evaluating her based on a different set or a |
|   | 4 | different method of questioning her? |
|   | 5 | A. We did, we discussed alternatives. If we |
|   | 6 | didn't evaluate her based upon the Wednesday |
|   | 7 | conferences, how else can we evaluate those |
|   | 8 | specific aspects? And we said: That is |
|   | 9 | impossible to do. |
| 03:42 | 10 | Q. Well, and specifically in her request there is |
|   | 11 | a mention -- do you recall it stating that she |
|   | 12 | was looking to be evaluated or not evaluated |
|   | 13 | regarding unrehearsed instances of speaking or |
|   | 14 | unrehearsed presentations? |
|   | 15 | A. Yes, again, that is something we can't do |
|   | 16 | because when you see a patient it is |
|   | 17 | unrehearsed. And when you get a consultation |
|   | 18 | request, it is unrehearsed. |
|   | 19 | And when you have to see a patient in the |
| 03:43 | 20 | pediatric ICU at 3:00 and the patient is |
|   | 21 | critically ill, it is unrehearsed, it cannot be |
|   | 22 | rehearsed. |
|   | 23 | So we need to be able to figure out: Is |
|   | 24 | she able to think critically on a sick child? |
|   | 25 | And you need unrehearsed, in-the-moment |

| | | |
|---|---|---|
| 1 | | response and on her own as well as responding |
| 2 | | to questions that I might ask her. |
| 3 | Q. | Now, some components of the Wednesday |
| 4 | | conferences could be rehearsed or prepared for, |
| 5 | | correct? |
| 6 | A. | Absolutely. |
| 7 | Q. | Because you had told or employees were |
| 8 | | informed, if they were given a presentation |
| 9 | | ahead of time, that they might be graded on |
| 10 | | that evaluation -- or graded on that |
| 11 | | presentation? |
| 12 | A. | Yes. |
| 13 | Q. | So they would have known beforehand, correct? |
| 14 | A. | Plus, they have assigned topic presentations |
| 15 | | which the schedules are made weeks and months |
| 16 | | in advance. So they have a topic presentation |
| 17 | | to give on, say, September 15th. |
| 18 | | And then the fellow chooses what topic he |
| 19 | | or she wants to prepare on. And they do a |
| 20 | | PowerPoint, they go in-depth, and they have all |
| 21 | | the time and the opportunity to do an in-depth |
| 22 | | look into that topic and then do a |
| 23 | | presentation. So those are, certainly, |
| 24 | | rehearsed. |
| 25 | Q. | Now, I know you testified that you were not |