IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ALISON O'DONNELL, | ) | CASE NO. 1:16-cv-2480 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | |
| | ) | |
| UNIVERSITY HOSPITALS HEALTH | ) | |
| SYSTEM, et al., | ) | |
| | ) | |
| Defendants. | ) | |

---

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Respectfully submitted,

*/s/ Fred M. Bean*_____
Fred M. Bean (0086756)
**THE SPITZ LAW FIRM, LLC**
25200 Chagrin Blvd., Suite 200
Beachwood, OH 44122
Phone: (216) 291-4744
Fax:    (216) 291-5744
Email: Fred.Bean@SpitzLawFirm.com

*Attorney For Plaintiff Alison O'Donnell*



## TABLE OF CONTENTS

TABLE OF AUTHORITIES....................................................................................................iv

I.       SUMMARY OF ARGUMENTS ...............................................................................1

II.      STATEMENT OF FACTS ........................................................................................2

      A.  O'Donnell's Acceptance Into The Fellowship Program .....................................2

      B.  O'Donnell Has A Documented History Of Suffering From A Severe Social Anxiety Disorder ...................................................................................................2

      C.  After Informing Faculty About Her Disability, O'Donnell Received Disparate Treatment ...............................................................................................................3

      D.  O'Donnell Complained About Discrimination Based On Her Disability And Race And Asked The Faculty Directly To Accommodate Her During Wednesday Conferences ...........................................................................................................5

      E.  O'Donnell Complained To Human Resources And Was Then Disciplined By Uli ..........................................................................................................................7

      F.  In March 2012, O'Donnell Requested An Accommodation And Reported Discrimination .........................................................................................................7

      G.  UH Denied O'Donnell's Request For Accommodation And Failed To Investigate Her Discrimination Complaints ...........................................................8

      H.  O'Donnell Was Forced To Resign From The Fellowship ..................................10

III.    MOTION FOR SUMMARY JUDGMENT STANDARD ......................................11

IV.    O'DONNELL'S FEDERAL CLAIMS ARE NOT TIME-BARRED ................................11

V.     A GENUINE ISSUE OF MATERIAL FACT REMAINS WHETHER DEFENDANTS DISCRIMINATED AGAINST O'DONNELL BASED ON HER DISABILITY ...........................................................................................................12

      A.  The Prima Facie Case.........................................................................................12

      B.  Questions Of Fact Remain Whether UH Denied O'Donnell A Reasonable Accommodation ...................................................................................................13

          1.  O'Donnell Has Presented Evidence That She Was Disabled .................................13

          2.  O'Donnell Was Qualified And Defendants Failed To Engage In The Interactive Process.........................................................................................15

SPITZ LAW FIRM

**C.  Questions Of Fact Remain Whether UH Subjected O'Donnell To Disparate Treatment Based On Her Disability Resulting In Her Constructive Discharge** .......... 16

**VI.  A GENUINE ISSUE OF MATERIAL FACT REMAINS WHETHER DEFENDANTS UNLAWFULLY RETALIATED AGAINST O'DONNELL** ................ 19

**A.  O'Donnell Has Established The First Three Elements Of Her Claims** ........................ 19

**B.  O'Donnell Has Presented Causation Evidence Satisfying The Fourth Element** ........ 21

**VII.  A GENUINE ISSUE OF MATERIAL FACT REMAINS WHETHER DEFENDANTS DISCRIMINATED AGAINST O'DONNELL BASED ON HER RACE** ........................................................................................................................... 22

**VIII.  CONCLUSION** ................................................................................................................ 23

**CERTIFICATE OF SERVICE** ........................................................................................... 24

The Employee's Attorney.™



## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505 (1986) ................................11

*Asmo v. Keane, Inc.*, 471 F.3d 588 (6th Cir. 2006)........................................................ 21

*Bowers v. Hamilton City Sch. Dist. Bd. of Educ.*, 2002 Ohio 1343 (12th Dist.)........................... 17

*Brenneman v. MedCentral Health Sys.*, 366 F.3d 412 (6th Cir. 2004) ......................................12-13

*Brewer v. Cleveland Board of Education* (1997), 122 Ohio App.3d 378, 701 N.E.2d 1023.................................................................................................16

*Buescher v. Baldwin Wallace Univ.*, 86 F.Supp.3d 789 (N.D. Ohio 2015) ................................. 11

*Burlington Northern and Santa Fe Railway Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405 (2006)...............................................................................................20

*Carter v. University of Toledo*, 349 F.3d 269 (6th Cir. 2003) ....................................... 22

*Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548 (1986) .........................................11

*Columbus Civil Service Commission v. McGlone*, 82 Ohio St.3d 569, 1998 Ohio 410, 697 N.E.2d 204 ......................................................................... 16

*DiCarlo v. Potter*, 358 F.3d 408 (6th Cir. 2004)....................................... 13, 21

*Dixon v. Anderson*, 928 F.2d 212 (6th Cir. 1991)........................................................ 12

*Dixon v. Gonzales*, 481 F.3d 324 (6th Cir. 2007) ........................................ 21

*EEOC v. Penton Indus. Pub. Co., Inc.*, 851 F.2d 835 (6th Cir. 1988).......................................... 12

*Fernandez v. City of Pataskala, Ohio*, 2006 WL 3257389 (S.D. Ohio) ..................................... 11

*Greer-Burger v. Temesi*, 116 Ohio St.3d 324, 2007 Ohio 6442, 879 N.E.2d 174....................... 19

*Hancock v. Dodson*, 958 F.2d 1367 (6th Cir.1992)............................................................11

*Hood v. Diamond Products, Inc.*, 74 Ohio St.3d 298, 1996 Ohio 259, 658 N.E.2d 738......................................................................................... 16

*Johnson v. Cleveland City School Dist.*, 2011 Ohio 2778 (8th Dist.) ....................................14

*Johnson v. Kroger Co.*, 319 F.3d 858 (6th Cir. 2003) ................................................. 13



*Kleiber v. Honda of America MFG, Inc.*, 485 F.3d 862 (6th Cir. 2007) ............................................ 15-16

*Mallory v. Noble Corr. Inst.,* 45 Fed.Appx. 463 (6th Cir. 2002) .................................................. 21

*Mauzy v. Kelly Serv. Inc.*, 75 Ohio St.3d 578, 664 N.E.2d 1272 (1996) ..................................... 17

*McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 93 S.Ct. 1817, 36
      L.Ed.2d 668 .......................................................................................................... 16, 22

*McNett v. Hardin Cmty. Fed. Credit Union,* 118 Fed.Appx. 960 (6th Cir. 2004) ........................ 21

*Michael v. Caterpillar Financial Services Corp.*, 496 F.3d 584 (6th Cir. 2007) ........................... 19-20

*Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516 (6th Cir. 2008) ................................................. 21

*Moon v. Transport Drivers, Inc.*, 836 F.2d 226 (6th Cir. 1987) .................................................. 21

*Myers v. Cuyahoga County*, 182 Fed.Appx. 510 (6th Cir. 2006) ................................................. 22

*Nguyen v. Cleveland*, 229 F.3d 559 (6th Cir. 2000) ................................................................... 21

*Randolph v. Ohio Dep't of Youth Servs*., 453 F.3d 724 (6th Cir. 2006) ....................................... 21

*Risch v. Friendly's Ice Cream Corp.*, 136 Ohio App. 3d 109, 736 N.E.2d 30 (1st
      Dist. 1999) ................................................................................................................. 17

*Shefferly v. Health Alliance Plan of Michigan,* 94 Fed.Appx. 275 (6th Cir. 2004) .................... 21

*Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099 (6th Cir. 2008) .............................. 18

*Varnadore v. Secretary of Labor*, 141 F.3d 625 (6th Cir. 1998) ................................................. 12

*Willie v. Hunkar Laboratories, Inc.*, 132 Ohio App. 3d 92, 724 N.E.2d 492 (1st Dist.
      1998) ........................................................................................................................ 17

The Employee's Attorney.™



## I.  SUMMARY OF ARGUMENTS

Dr. Alison O'Donnell is a pediatrician who in June, 2009 was accepted into University Hospital's ("UH") Pediatric Endocrinology Fellowship. O'Donnell suffers from social anxiety disorder. O'Donnell treated for years with Dr. Francoise Adan as well as Dr. Paul Minnilo, a licensed psychologist who provided counseling and other treatment to O'Donnell regarding her disabilities.

Dr. Naveen Uli, the fellowship director, knew that O'Donnell suffered from her anxiety disorder, and O'Donnell informed UH's HR department about her disabilities. Due to her disability, O'Donnell began having difficulties, without accommodation, in certain "Wednesday conferences" due to the conference environment and the way fellows were evaluated at these conferences. O'Donnell informed Uli and the faculty about her need for accommodation at these conferences. Separately, O'Donnell formally requested a disability accommodation, and Adan certified that O'Donnell was disabled and needed an accommodation at these conferences. Uli and the faculty acknowledged that there were alternative ways to evaluate O'Donnell and other ways to gauge the depth of her knowledge or abilities at these conferences. Yet, UH denied O'Donnell's request for reasonable accommodation, only after Uli created a new list of "essential job functions" that was contrary to the existing job description for a fellow in the program. In doing so, Defendants violated the ADA and R.C. § 4112.02.

During the pendency of her fellowship, O'Donnell also complained to UH's human resources department, the department of graduate medical education, as well as to the faculty directly that she was being discriminated against based on her disability and race. UH did not adequately investigate these complaints. Instead, after O'Donnell began complaining about discrimination, she was retaliated against in violation of the ADA, Title VII and R.C. § 4112.02(I), put on a Performance Alert in violation of UH's handbook, and told she would have to extend her fellowship by 12 months. Then, after denying O'Donnell's accommodation request, UH placed her on an indefinite leave of absence and thereafter forced O'Donnell to resign from the fellowship.



## II.   STATEMENT OF FACTS

### A.  O'Donnell's Acceptance Into The Fellowship Program.

UH's Pediatric Endocrinology Fellowship Program gives licensed physicians the chance become board-certified pediatric endocrinologists.[1] It is a three-year program that includes clinical and research-based work.[2] O'Donnell applied for one of two open spots in June, 2009.[3] After interviewing, O'Donnell was sent offer letter on June 25, 2009 accepting her into the fellowship program, which would begin on July 1, 2010 and end on June 30, 2013.[4] During orientation, O'Donnell was given a document titled "Pediatric Endocrinology Fellowship Goals," which, according to Uli, set forth O'Donnell's job functions.[5] O'Donnell was the only African-American fellow.[6]

### B.  O'Donnell Has A Documented History Of Suffering From A Severe Social Anxiety Disorder.

O'Donnell is disabled.[7] She was diagnosed with social anxiety disorder and social phobia by Adan, her treating psychiatrist, on July 2, 2009.[8] Throughout her treatment with Adan, from July, 2009 through January, 2013, O'Donnell was prescribed medications for her disability, including varying doses of Lexapro, an anti-anxiety mediation, and Klonopin, a stronger anti-anxiety medication.[9] Some of the substantial effects of O'Donnell's disability included "physical symptoms of anxiety around social situations, heart racing, sweating, speaking fast, poor concentration, mind going blank and jittery."[10] O'Donnell's disorder impacted both her "personal" and "professional" life.[11]

While treating with Adan, O'Donnell began counseling with Minnillo, a UH staff psychologist, who described O'Donnell's symptoms as being consistent with "social anxiety disorder" on the DSM

---

[1] Exhibit 1: O'Donnell Affidavit @ ¶ 1.
[2] Uli Depo. @ 19-21. (Excerpts of Uli Depo. Transcript and Depo. Exhibits are attached as Exhibit 11).
[3] Uli Depo. @ 27; Uli Depo. @ Ex. 16; Exhibit 1: O'Donnell Affidavit @ ¶ 2.
[4] Uli Depo. @ Ex. 16.
[5] Uli Depo. @ 62-63.
[6] Uli Depo. @ 50.
[7] Chester Depo. @ Ex. 3; Adan Depo. @ 19-20. (Excerpts of Chester Depo. Transcript and Depo. Exhibits are attached as Exhibit 12); (Excerpts of Adan Depo. Transcript and Depo. Exhibits are attached as Exhibit 13).
[8] Adan Depo. @ 19-20, @ Ex. 44.
[9] Adan Depo. @ Ex. 44.
[10] Adan Depo. @ Ex. 44; Adan Depo. @ 22.
[11] Adan Depo. @ Ex. 44; Adan Depo. @ 27.

The Employee's Attorney.™



code.[12] Minnillo testified that O'Donnell's anxiety disorder was "**very pervasive, very profound**."[13] Minnillo confirmed that O'Donnell's disability was life-long, "debilitating" and "disabling."[14]

### C. After Informing Faculty About Her Disability, O'Donnell Received Disparate Treatment.

Early in her fellowship, O'Donnell disclosed to Uli that she suffered from social anxiety disorder.[15] Moreover, Dr. Rose Gubitosi-Klug, a UH faculty member, testified that she often recognized a "stutter" in O'Donnell's speech and noticed her "anxiousness."[16] After this, O'Donnell began receiving disparate treatment compared to her other fellows. *Some* examples include:

(1) Uli did not provide O'Donnell with the same amount of time for orientation as other fellows.[17]

(2) During her first week on-call, Gubitosi-Klug failed to provide assistance to O'Donnell, even though Gubitosi-Klug testified that "we all anticipate in that first week that [fellows] are going to need a lot more support."[18] Gubitosi-Klug did not deny failing to assist O'Donnell, rather, simply could not recall whether she did or not.[19]

(3) Dr. Sumana Narasimhan assigned O'Donnell a presentation without prep time, whereas other fellows were given days or weeks to prepare for presentations, and "did not recall" whether she did this or not.[20]

(4) Narasimhan forced O'Donnell to complete work while O'Donnell was on a pre-excused vacation day. Again, Narasimhan "did not recall" whether she did this or not.[21]

(5) Narasimhan and Uli forced O'Donnell to see patients who were over an hour late to appointments despite protocol to have the patient reschedule, and Narasimhan did not deny this conduct.[22] Rachana Dahiya, the other fellow in O'Donnell's 2010 class, testified that Uli "told Dr. [O'Donnell] that she should have seen a non-urgent consult that she got after hours. However, none of the other fellows routinely see after hours consults. If a consult is called late in the day, the patient is seen the next morning if the issue is not emergent."[23]

(6) Narasimhan refused to precept a diabetic chart for O'Donnell.[24] Narasimhan told O'Donnell to "find someone else" and led O'Donnell out of the room. This was witnessed by another fellow, Alicia Lowes, and a nurse who commented "Why won't [Narasimhan] precept Alison's patient? I have never seen that before!"[25]

---

[12] Minnillo Depo. @ 13, 27, 78; Adan Depo. @ Ex. 44. (Excerpts of Minnillo Depo. Transcript are attached as Exhibit 14).
[13] Minnillo Depo. @ 35 (**Emphasis** added).
[14] Minnillo Depo. @ 74, 109.
[15] Exhibit 1: O'Donnell Affidavit @ ¶ 3; Uli Depo. @ 111, 151.
[16] Gubitosi-Klug Depo. @ 69-70. (Excerpts of Gubitosi-Klug Depo. Transcript are attached as Exhibit 15).
[17] Exhibit 1: O'Donnell Affidavit @ ¶ 4.
[18] Gubitosi-Klug Depo. @ 42.
[19] Gubitosi-Klug Depo. @ 46.
[20] Exhibit 1: O'Donnell Affidavit @ ¶ 5; Narasimhan Depo. @ 44. (Excerpts of Narasimhan Depo. Transcript and Depo. Exhibits are attached as Exhibit 16).
[21] Exhibit 1: O'Donnell Affidavit @ ¶ 6; Narasimhan Depo. @ 45.
[22] Exhibit 1: O'Donnell Affidavit @ ¶ 7; Narasimhan Depo. @ 46-47.
[23] Exhibit 2: Dahiya Notarized Statement 1.
[24] Narasimhan Depo. @ Ex. 40.
[25] Narasimhan Depo. @ Ex. 40.

The Employee's Attorney.™



(7) Narasimhan admittedly referred to O'Donnell by her first name, "Alison" in front of patients and their families instead of "Dr. O'Donnell," but did not do this with other fellows.[26]

(8) Uli criticized O'Donnell for her first-year SITE exam score during her 2010 evaluation, saying it was "well below the national average," however, Dahiya testified that Uli told her "my in-training exam score in my first year of training was not important and would not be held against me."[27]

(9) O'Donnell was given clinical assignments without the same notice as given to other fellows.[28] UH's human resources director, Julie Chester, admits that O'Donnell was disadvantaged by this conduct.[29]

(10) Narasimhan forced O'Donnell to contact patients directly and reschedule them for appointments.[30] Narasimhan admits that she directed O'Donnell on a sticky-note to do this on at least one occasion despite admitting that "[fellows] are not schedulers, so they shouldn't be rescheduling."[31]

(11) Uli accused O'Donnell of not writing her patient notes or charts timely or thoroughly, but O'Donnell's notes were more detailed than the example note provided by Uli.[32] Moreover, Dahiya testified that O'Donnell's charts did not appear any different than any other fellow.[33]

(12) Narasimhan forced O'Donnell to see her clinic patients, and according to Dahiya, no other fellow was required to attend a clinic "for the sole purpose of seeing the patients of another physician."[34]

O'Donnell's co-fellow, Dahiya, testified that "it appears that different standards are used for [O'Donnell] than other fellows" and that O'Donnell "has been treated unfairly by the Pediatric Endocrinology Department."[35] Moreover, after disclosing her disability, O'Donnell was subjected to other disparate treatment including low scores in her performance evaluations from Uli.[36] Then in June, 2011, Uli placed O'Donnell on a Remediation Plan citing perceived deficiencies including "lack of engagement during [Wednesday] conferences," and "need for more detailed documentation."[37]

These "Wednesday conferences" were attended by the six fellows and about seven faculty members and nursing staff.[38] During these conferences, the fellows would be called upon to answer

---

[26] Narasimhan Depo. @ 49; Exhibit 1: O'Donnell Affidavit @ ¶ 8.
[27] Uli Depo. @ 96, Ex. 21; Exhibit 3: Dahiya Notarized Statement 2.
[28] Exhibit 1: O'Donnell Affidavit @ ¶ 9.
[29] Chester Depo. @ 69-71.
[30] Exhibit 1: O'Donnell Affidavit @ ¶ 10.
[31] Narasimhan Depo. @ 65, 72; Exhibit 1: O'Donnell Affidavit @ ¶ 11; Exhibit 4: Sticky Note.
[32] Exhibit 1: O'Donnell Affidavit @ ¶ 12; Exhibit 5: O'Donnell Notes.
[33] Exhibit 2: Dahiya Notarized Statement 1.
[34] Exhibit 2: Dahiya Notarized Statement 1.
[35] Exhibit 2: Dahiya Notarized Statement 1.
[36] Uli Depo. @ Ex. 20, 22.
[37] Uli Depo. @ Ex. 27.
[38] Uli Depo. @ 67.

The Employee's Attorney.™



questions and give presentations.[39] There would be "heated" debate over medical issues and cases, and sometimes the debates would devolve into shouting matches, creating an environment not conducive for someone suffering from social anxiety disorder.[40] Nevertheless, O'Donnell was not "disengaged" during these conferences; rather, as Dahiya testified: "I have been in attendance during the majority of Dr. [O'Donnell's] presentations, and I have not noticed that hers are different than the other fellows."[41] Likewise, when asked how O'Donnell compared to other fellows in these conferences, Gubitosi-Klug testified, "I don't remember them being – I don't remember them being strikingly different."[42]

Finally, Uli, as well Gubitosi-Klug, treated O'Donnell differently as to her research project. Every fellow must complete their own research project as a requirement in order to graduate from the program.[43] O'Donnell initially went to Uli and Gubitosi-Klug about ideas for her project, but they were rejected.[44] Instead, both Uli and Gubitosi-Klug suggested that O'Donnell work with another fellow on her project instead, which would not be sufficient to meet the "individual" requirements of the research project requirement.[45] This prompted O'Donnell to send an email to Uli and Gubitosi-Klug on August 12, 2011 expressing that she was being disparately treated regarding the research project requirement.[46]

**D. O'Donnell Complained About Discrimination Based On Her Disability And Race And Asked The Faculty Directly To Accommodate Her During Wednesday Conferences.**

On September 29, 2011, O'Donnell sent a letter to Uli complaining that he was discriminating against her.[47] O'Donnell insisted that Uli's conduct stop immediately, and informed him that she would escalate her complaints to "higher authorities" if necessary.[48] Uli testified that he received this letter from

---

[39] Exhibit 1: O'Donnell Affidavit @ ¶ 13.
[40] Uli Depo. @ 119; Exhibit 1: O'Donnell Affidavit @ ¶ 14.
[41] Exhibit 2: Dahiya Notarized Statement 1.
[42] Gubitosi-Klug Depo. @ 74.
[43] Uli Depo. @ 24-25; Gubitosi-Klug Depo. @ 29-30.
[44] Exhibit 1: O'Donnell Affidavit @ ¶ 15; Uli Depo. @ 132.
[45] Exhibit 1: O'Donnell Affidavit @ ¶ 16; Uli Depo. @ 131-132; Gubitosi-Klug Depo. @ 98.
[46] Uli Depo. @ Ex. 28.
[47] Uli Depo. @ Ex. 29.
[48] Uli Depo. @ Ex. 29.

The Employee's Attorney.™



O'Donnell.[49] In October, 2011, because the disparate treatment had not stopped, O'Donnell escalated her complaints to William Rebello, the manager of graduate medical education.[50] Rebello testified that O'Donnell complained that Uli was disparately treating her in comparison to her other fellows.[51] In response, Rebello told O'Donnell to talk to Uli about his mistreatment against her.[52]

O'Donnell complained again about discrimination in February, 2012 by sending an email to Claudia Hoyen in UH's human resources department, as well as, Rebello stating in part, "I am writing because I am very concerned that my program is not complying with the responsibilities we agree upon in October."[53] O'Donnell further stated, "I am beginning to suspect that my program is trying to make things so unpleasant for me that I leave."[54] When Rebello received this email, his only act was to send it directly to Uli, the person accused of the discrimination.[55]

O'Donnell also took steps to communicate with the faculty directly about her disabilities. On February 12, 2012, O'Donnell sent an email to the faculty members stating the following:

> It has come to my attention that many of you wish for me to speak more during Wednesday conferences, and are interpreting my silence as ignorance. However, my culture/religion, learning style, shyness, and **anxiety make it extremely difficult for me to just shout out answers**. Therefore, I invite you to ask me questions. In addition, I plan to make more than the required number of presentations. (I have a very interesting topic that I am excited to present on 2/22). Hopefully, this is a compromise that will suit everybody's needs. I believe that a training program should take into account a variety of learning styles-not everybody learns the same way. If you have any other suggestions as to how we can work to solve this issue, please let me know.[56]

Gubitosi-Klug testified that O'Donnell's request to "ask her questions" was reasonable, and admitted that asking questions to O'Donnell was something "we could do and we did do."[57] Narasimhan

---

[49] Uli Depo. @ 136.
[50] Exhibit 1: O'Donnell Affidavit @ ¶ 17; Rebello Depo. @ 12. (Excerpts of Rebello Depo. Transcript are attached as Exhibit 17).
[51] Rebello Depo. @ 17-19, 21-23.
[52] Rebello Depo. @ 24.
[53] Uli Depo. @ Ex. 31.
[54] Uli Depo. @ Ex. 31.
[55] Uli Depo. @ Ex. 31.
[56] Uli Depo. @ Ex. 32. (**Emphasis** added).
[57] Gubitosi-Klug Depo. @ 114-115.

The Employee's Attorney.[TM]



testified that O'Donnell's requests were "great" and she "was happy to ask her questions."[58] Conversely, Uli does not recall having a conversation with faculty about O'Donnell's proposed accommodations.[59]

### E.  O'Donnell Complained To Human Resources And Was Then Disciplined By Uli.

On February 15, 2012, O'Donnell sent an email to Hoyen asking for a meeting, expressing that "Dr. Uli has failed to honor his commitments to me and has again resumed his bullying behavior."[60] Also, O'Donnell complained to Rebello a second time regarding ongoing discriminatory treatment and gave him a written summary of the disparate treatment against her.[61] Rebello testified that O'Donnell "told me that she felt she was being discriminated against" and confirmed the following:

> Q.    Did she mention her race at all during this conversation?
>
> A.    Yes, I mean, she said she was being discriminated against because she is African-American.
>
> Q.    Did she mention any medical conditions, anxiety, or anything else?
>
> A.    Yes. She said that she had social anxiety disorder and it was part of the American Disabilities Act.[62]

O'Donnell informed Rebello that her disability made it "difficult for her in the environment that was there because of the pressure from the attendings to speak up like on rounds or at conferences."[63] O'Donnell also gave Shuck a written summary of her complaints.[64] Then, on February 29, 2012, Uli placed O'Donnell on a Performance Alert, violating UH's Resident Manual because it was not issued "within 7-10 days of identifying an area of concern."[65]

### F.  In March 2012, O'Donnell Requested An Accommodation And Reported Discrimination.

In March, 2012, O'Donnell sought a formal disability accommodation from UH.[66] Adan provided a letter on March 6, 2012 stating that O'Donnell was "under my care and has a diagnosis of generalized

---

[58] Narasimhan Depo. @ 60-61.
[59] Uli Depo. @ 151.
[60] Chester Depo. @ Ex. 1.
[61] Exhibit 1: O'Donnell Affidavit @ ¶ 18; Exhibit 6: Rebello Summary.
[62] Rebello Depo. @ 27.
[63] Rebello Depo. @ 29.
[64] Exhibit 1: O'Donnell Affidavit @ ¶ 19; Chester Depo. @ Ex. 2.
[65] Uli Depo. @ 152-153; Uli Depo. @ Ex. 33; Uli Depo. @ Ex. 37, p. 46; Exhibit 1: O'Donnell Affidavit @ ¶ 20.
[66] Exhibit 1: O'Donnell Affidavit @ ¶ 21.

The Employee's Attorney.™



anxiety disorder."[67] In mid-March, 2012, Chester requested that O'Donnell's physician fill out accommodation paperwork.[68] On March 18, 2012, O'Donnell emailed Valerie Jaggie, the senior HR generalist at UH, regarding the ongoing disparate treatment.[69] On March 20, 2012, O'Donnell sent a similar email to Chester.[70] On May 3, 2012, Adan submitted the completed medical certification to UH, setting forth: (1) O'Donnell had a disability; (2) that there were accommodations that could allow O'Donnell to perform the essential functions of her job; and (3) recommended that O'Donnell "not be evaluated" for unrehearsed performances during the Wednesday conferences.[71]

### G.  UH Denied O'Donnell's Request For Accommodation And Failed To Investigate Her Discrimination Complaints.

Chester admits she and O'Donnell spoke regarding O'Donnell's discrimination complaints.[72] Chester then testified that she spoke with Uli, Gubitosi-Klug and Narasimhan about O'Donnell's discrimination complaints.[73] However, Uli testified that while he met with Chester briefly to discuss O'Donnell's initial complaint in September, 2011, he never met her again to discuss issues of discrimination.[74] Moreover, both Narasimhan and Gubitosi-Klug testified that neither of them even know who Chester is nor did they ever speak with her.[75] Indeed, Chester admitted on April 25, 2012 that she *still* had not yet spoken to Uli about the matter.[76] Thereafter, on May 11, 2012, O'Donnell emailed Chester expressing "concern that nothing seems to be resolving" regarding the ongoing disparate treatment.[77] Chester never responded, and does not recall "what occurred after this."[78]

---

[67] Chester Depo. @ 5; Exhibit 1: O'Donnell Affidavit @ ¶ 22.
[68] Chester Depo. @ Ex. 3, 7.
[69] Chester Depo. @ Ex. 6.
[70] Chester Depo. @ Ex. 7.
[71] Adan Depo. @ Ex. 48.
[72] Chester Depo. @ 28, 33.
[73] Chester Depo. @ 49.
[74] Uli Depo. @ 136-139, 144-145.
[75] Narasimhan Depo. @ 53; Gubitosi-Klug Depo. @ 92-93.
[76] Chester Depo. @ Ex. 10.
[77] Chester Depo. @ Ex. 11.
[78] Exhibit 1: O'Donnell Affidavit @ ¶ 23; Chester Depo. @ 77.



UH denied O'Donnell's accommodation request even though she had complied with everything she was required to submit.[79] During this process, Rebello reached out to Uli for a job description that would provide the essential functions of O'Donnell's job.[80] Uli admitted to Rebello that "Dr. O'Donnell already told him that she had a disability."[81] Moreover, Uli did not send Rebello the Pediatric Endocrinology Fellowship Goals document that was previously given to O'Donnell as her job description; rather, he created a *new* list of what "I consider" the essential functions of the fellow position.[82] Uli testified that this list was simply "what I thought was the most important" at that time.[83] In this new list, one of the "essential functions" included "actively participate in all educational sessions of the division…"[84] These words "actively participate" do not appear <u>anywhere</u> in the Pediatric Endocrinology Fellowship Goals document.[85] Chester confirmed that O'Donnell's original job description did not include "actively participating in educational sessions" as an essential job function.[86]

Still, UH used this "actively participates" language to deny O'Donnell an accommodation, and Chester admitted that the **<u>only</u>** reason why UH understood this "actively participates" language to be an essential function was "because Dr. Uli said it was."[87] Moreover, UH misconstrued O'Donnell's accommodation request because according to Chester, O'Donnell's request was that she "**didn't want to participate** in the conversations."[88] However, after reviewing Adan's medical certification, Chester admitted that the requested accommodation was to not be "evaluated" for unrehearsed presentations.[89]

Despite Chester's admitted "confusion," she admitted that neither she nor anyone at UH ever followed up with Adan for clarification of the accommodation request or other information.[90] Similarly,

---

[79] Exhibit 1: O'Donnell Affidavit @ ¶ 24; Chester Depo. @ 42.
[80] Chester Depo. @ Ex. 8.
[81] Rebello Depo. @ 42.
[82] Chester Depo. @ Ex. 8-9; Uli Depo. @ 61-62.
[83] Uli Depo. @ 163.
[84] Chester Depo. @ Ex. 8.
[85] Chester Depo. @ Ex. 9.
[86] Chester Depo. @ 56-59, 61.
[87] Chester Depo. @ 60-61.
[88] Chester Depo. @ 60. (**Emphasis** added).
[89] Chester Depo. @ 60; Adan Depo. @ Ex. 48.
[90] Chester Depo. @ 88.

The Employee's Attorney.™



Adan testified that no one from UH reached out to her office regarding O'Donnell.[91] Moreover, UH did not consider any alternative accommodations for O'Donnell.[92] Chester testified that she was unable to say that UH engaged in the *interactive process* of determining whether O'Donnell could be accommodated:

> Q.  Do you understand the interactive process to include exploring not just the specific accommodation requested by the employee, but exploring possible alternatives or modifications to the request if it would accommodate and not be an undue burden to the employer?
>
> A.  Yes.
>
> Q.  Do you believe that was done in Dr. O'Donnell's case?
>
> A.  Again, I don't recall and I don't remember any of the specifics on her request.[93]

On June 14, 2012, Chester sent a letter to O'Donnell that denied her accommodation request and placed her on a leave of absence.[94] Prior to being placed on leave, Uli had already began excluding O'Donnell from fellowship events.[95] Moreover, in late May, 2012, Uli attempted to force O'Donnell into agreeing to repeat a full year of her fellowship.[96] This act violated the UH Resident Manual because it was less than six weeks prior to the end of the academic year.[97]

### H.  O'Donnell Was Forced To Resign From The Fellowship.

Because UH would not accommodate her disability, O'Donnell was forced to pursue a new job with UH Ashtabula Pediatrics.[98] On September 12, 2012, O'Donnell received a letter from Ashtabula confirming her employment, scheduled to start on December 1, 2012.[99] In order to take this position, O'Donnell was forced to resign from the fellowship.[100] Relying on this, O'Donnell submitted a resignation letter, effective December 16, 2012; but thereafter, UH prohibited O'Donnell from joining Ashtabula.[101]

---

[91] Adan Depo. @ 55-56.
[92] Chester Depo. @ 88.
[93] Chester Depo. @ 89-90.
[94] Chester Depo. @ Ex. 14.
[95] Uli Depo. @ Ex. 34.
[96] Uli Depo. @ 142.
[97] Uli Depo. @ Ex. 37, p. 47.
[98] Exhibit 1: O'Donnell Affidavit @ ¶ 25.
[99] Exhibit 1: O'Donnell Affidavit @ ¶ 26; Exhibit 7: Ashtabula Memo of Understanding.
[100] Exhibit 1: O'Donnell Affidavit @ ¶ 27; Exhibit 8: Boardman Email.
[101] Uli Depo. @ Ex. 35; Exhibit 1: O'Donnell Affidavit @ ¶ 28; Exhibit 9: Ashtabula Termination Letter.

The Employee's Attorney.™



### III.   MOTION FOR SUMMARY JUDGMENT STANDARD

The United States Supreme Court held in *Celotex Corp. v. Catrett*, that the moving party bears the initial burden of informing the district court of the basis for its motion.[102] Only if the moving party meets its initial burden does the burden then shift to the non-moving party who "must set forth specific facts showing that there is a genuine issue for trial."[103] Summary judgment shall be denied "[i]f there are ...'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'"[104] In determining whether a genuine issue of material fact exists, **a court must assume as true the evidence of the nonmoving party and draw all *reasonable* inferences in the favor of that party.**[105] Finally, if the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder.[106]

### IV.   O'DONNELL'S FEDERAL CLAIMS ARE NOT TIME-BARRED.

None of O'Donnell's federal claims are time-barred. Defendants admit that her constructive discharge is *not* time-barred. Moreover, constructive discharge is not a "claim" but is a form of adverse employment action,[107] which applies to *all* of O'Donnell's federal claims. As such, Defendants *agree* that there is no time-bar regarding *any* of O'Donnell's claims as they relate to her constructive discharge.

Separately, O'Donnell remained an employee of the fellowship until December 16, 2012. Defendants cannot dispute that at any time between July 1, 2012 and December 16, 2012, UH could have ended O'Donnell's leave of absence, accommodated her disability and allowed her to return. As such, the clock for O'Donnell to file an EEOC charge based on UH's failure to accommodate did not stop on July 1, 2012, rather it continued until December 16, 2012. These types of *continuing* violations toll the deadline

---

[102] 477 U.S. 317, 323, 106 S.Ct. 2548 (1986).
[103] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505 (1986).
[104] *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir.1992). (**Emphasis** added).
[105] *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.
[106] *Id.*
[107] *See Buescher v. Baldwin Wallace Univ.*, 86 F.Supp.3d 789, 807 (N.D. Ohio 2015); *Fernandez v. City of Pataskala, Ohio*, 2006 WL 3257389, *17 (S.D. Ohio).

of an EEOC charge until the end date of the wrongful conduct.[108] Indeed, the act of denying O'Donnell

an accommodation and forcing her into a leave of absence is in-and-of itself an adverse action against

O'Donnell that lasted from July 1, 2012 until December 16, 2012 when O'Donnell was constructively

discharged. There was no other intervening event between the date O'Donnell was placed on leave and

her employment ending, and thus, this was a continuing violation against O'Donnell that UH could have

chosen to end at any time. They did not, and as such, the *earliest* date applying to O'Donnell's denial of

accommodation and wrongful placement on leave cannot be prior to December 16, 2012. Thus,

O'Donnell's EEOC charge, filed on May 1, 2013 was well within the 300-day limit for her federal claims.

Moreover, Defendants' pre-selected date of July 1, 2012 as the date O'Donnell started her leave

is not without questions of fact. Indeed, UH's own paperwork sent to O'Donnell stated that UH needed a

completed "certification of physician" in order to approve O'Donnell's leave, and UH requested that this

form be returned by **July 10, 2012**.[109] This document stated that if UH did not receive the completed form

back from O'Donnell, "[her] **leave request will be denied**."[110] This evidence establishes that O'Donnell's

leave was still in the "request" phase, not approved. O'Donnell eventually returned the completed form,

but well after the first week of July, 2012. As such, O'Donnell's leave was not even finalized and approved

until after July 5, 2012, which would make her EEOC charge timely within 300 days.

## V.  A GENUINE ISSUE OF MATERIAL FACT REMAINS WHETHER DEFENDANTS DISCRIMINATED AGAINST O'DONNELL BASED ON HER DISABILITY.

### A.  The Prima Facie Case

Counts I, II and VII of O'Donnell's Complaint set forth allegations that she was disparately treated

and denied reasonable accommodation based on her disability in violation of the ADA, 42, U.S.C.A. §

12101 *et seq.* and R.C. § 4112.02. As stated by the Sixth Circuit Court of Appeals in *Brenneman v.*

---

[108] *See Varnadore v. Secretary of Labor*, 141 F.3d 625 (6th Cir. 1998); *Dixon v. Anderson*, 928 F.2d 212 (6th Cir. 1991); *EEOC v. Penton Indus. Pub. Co., Inc.*, 851 F.2d 835 (6th Cir. 1988).
[109] Chester Depo. @ Ex. 15.
[110] Chester Depo. @ Ex. 15. (**Emphasis** added).

The Employee's Attorney.™



*MedCentral Health Sys.*, disability discrimination claims under the ADA and R.C. § 4112.02 "can be analyzed together because they use the same evidentiary standards."[111] To survive summary judgment, O'Donnell is required to either "present direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discriminatory treatment."[112] In this case, there is a plethora of evidence showing: (1) that Defendants wrongfully denied O'Donnell a reasonable accommodation and failed to even engage in the required interactive process; and (2) treated O'Donnell less favorably than other fellows after she informed faculty, including Uli, about her disability.

**B. Questions Of Fact Remain Whether UH Denied O'Donnell A Reasonable Accommodation.**

In order to establish a prima facie case for failure to accommodate, a plaintiff must show that (1) she is disabled; (2) she is otherwise qualified for the position, with or without reasonable accommodation; (3) her employer knew or had reason to know about her disability; (4) she requested an accommodation; and (5) the employer failed to provide the necessary accommodation.[113] In their Motion, Defendants dispute only the first two elements of O'Donnell's prima case, as there is no dispute that UH knew of O'Donnell's disability, that she requested an accommodation, and that UH denied the accommodation.

### 1. O'Donnell Has Presented Evidence That She Was Disabled.

There is over-whelming *undisputed* evidence that O'Donnell was disabled. An individual is considered "disabled" for purposes of a discrimination claim brought under R.C. § 4112.02 if she has "a physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working; a record of a physical or mental impairment; or being regarded as having a physical or mental impairment."[114] O'Donnell has presented evidence from **three** separate physicians who all agree that she is disabled; conversely, Defendants have presented **zero** evidence countering this. On point,

---

[111] 366 F.3d 412, 418 (6th Cir. 2004).
[112] *Johnson v. Kroger Co.*, 319 F.3d 858, 864-65 (6th Cir. 2003).
[113] *DiCarlo v. Potter*, 358 F.3d 408 (6th Cir. 2004).
[114] R.C. § 4112.01(A)(13).

The Employee's Attorney.™



the Eighth District Court of Appeals in *Johnson v. Cleveland City School Dist.* rejected an employer's argument that physician statements do not determine whether an individual is disabled under the anti-discrimination laws, holding, "such statements can create a genuine issue of material fact."[115]

First, O'Donnell's treating psychiatrist, Adan, has testified and certified that O'Donnell is disabled. Adan diagnosed O'Donnell with social anxiety disorder on July 2, 2009.[116] According to Adan, O'Donnell's substantial limitations include "physical symptoms of anxiety around social situations, heart racing, sweating, speaking fast, poor concentration, mind going blank and jittery."[117] O'Donnell's disorder impacted both her "personal" and "professional" life.[118] On May 3, 2012, Adan certified for O'Donnell's accommodation request that she had a "disability that substantially limits one or more major life activities."[119] Defendants have not presented any evidence countering Adan's testimony or diagnoses.

Second, Minnillo testified that O'Donnell's anxiety disorder was "very pervasive, very profound."[120] Minnillo confirmed that O'Donnell's disability was one that she would struggle with for the rest of her life, and was "**debilitating**" and "**disabling**."[121] Again Defendants have not presented any evidence countering Minnillo's testimony or his medical diagnoses regarding O'Donnell.

Third, O'Donnell's current treating psychiatrist, Dr. Jennifer Rosenberg, has also provided evidence that O'Donnell is disabled. Rosenberg has treated O'Donnell for his anxiety disorder and states in her report: "I believe she does well when she has special accommodations [that] allow her to manager her anxiety."[122] Again, Defendants have presented no evidence attempting to counter or disagree with Rosenberg's report or diagnoses, in fact, Defendants did not depose Rosenberg.

---

[115] 2011 Ohio 2778, ¶ 57 (8th Dist.).
[116] Adan Depo. @ 19-20, @ Ex. 44.
[117] Adan Depo. @ Ex. 44; Adan Depo. @ 22.
[118] Adan Depo. @ Ex. 44; Adan Depo. @ 27.
[119] Adan Depo. @ Ex. 48.
[120] Minnillo Depo. @ 35
[121] Minnillo Depo. @ 74, 109. (**Emphasis** added).
[122] Exhibit 10: Rosenberg Report.

The Employee's Attorney.™



This evidence at the very least creates a genuine issue of material fact, if not conclusively establishes, that O'Donnell was disabled for purposes of her ADA and R.C. § 4112.02 claims.

### 2. O'Donnell Was Qualified And Defendants Failed To Engage In The Interactive Process.

The <u>only</u> evidence Defendants can put forth supporting their position that O'Donnell's requested accommodation would have impacted an essential function of her job is because Uli submitted his *own personal* list of essential functions that was contrary to the job description previously given to O'Donnell.[123] Certainly, this does not erase all genuine issues of material fact.

For one, O'Donnell has presented evidence that she was given a document titled Pediatric Endocrinology Fellowship Goals, and according to Uli, this was O'Donnell's job description.[124] This fact alone creates a genuine issue of material fact regarding whether this document set forth the essential functions of her job versus this later created list, only drafted by Uli *after* he learned that O'Donnell had accused him of discrimination. Indeed, Chester admitted under oath that Uli's newly drafted list of essential functions was different than the original job description and the latter did not include "actively participating in educational sessions" as an essential job function.[125] Again, this creates a question of fact.

Separately, a question of fact remains whether UH engaged in the interactive process to determine whether O'Donnell could be accommodated. Indeed, a person is "qualified" if she can perform the essential functions of her job "**with** or without **reasonable accommodation**."[126] Moreover, once the employee makes the initial request for a disability accommodation,[127] the burden shifts to the employer, to engage in the interactive process of determining whether the employee needs an accommodation.[128] The Sixth Circuit Court of Appeals explained this burden in *Kleiber v. Honda of America MFG, Inc.*:[129]

> The ADA's regulations indicate that, "[t]o determine the appropriate reasonable accommodation for a given employee, it may be necessary for the employer to initiate an

---

[123] Rebello Depo. @ 42; Chester Depo. @ Ex. 8-9; Uli Depo. @ 61-62.
[124] Uli Depo. @ 62-63; Chester Depo. @ Ex. 9.
[125] Chester Depo. @ 56-59, 61.
[126] *See* Def. MSJ. @ 12. (**Emphasis** added).
[127] Defendants admit that O'Donnell made this initial request. *See* Chester Depo. @ 42; Adan Depo. @ Ex. 48.
[128] *Kleiber v. Honda of America MFG, Inc.*, 485 F.3d 862 (6th Cir. 2007).
[129] *Id.*

The Employee's Attorney.™



informal, interactive process with the employee. 29 C.F.R. § 1630.2(o)(3). The purpose of this process is to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." Accordingly, the interactive process requires communication and good-faith exploration of possible accommodations. Even though the interactive process is not described in the statute's text, the interactive process is mandatory, and both parties have a duty to participate in good faith.

Here, Chester *admits* that a question of fact remains whether UH engaged in the interactive process of exploring all accommodations for O'Donnell.[130] Chester *admits* UH did not consider any alternative accommodations that could have been provided to O'Donnell.[131] Chester *admits* no one at UH ever followed up with Adan for any clarification of the accommodation request or other information.[132] Moreover, Gubitosi-Klug and Narasimhan *admitted* that the accommodations requested directly by O'Donnell were reasonable and plausible, yet, by Uli never discussed these alternative accommodations with the faculty.[133] Thus, genuine issues of material fact remain and summary judgment should be denied.

**C.  Questions Of Fact Remain Whether UH Subjected O'Donnell To Disparate Treatment Based On Her Disability Resulting In Her Constructive Discharge.**

O'Donnell has presented evidence creating a genuine issue of material fact that she was discriminated against based on her disability. To establish a prima facie case for disability discrimination based on circumstantial evidence, a plaintiff must demonstrate that (1) he is disabled, (2) the employer took adverse employment action, at least in part, because the employee is disabled, and (3) the employee, though disabled, can safely and substantially perform the job's essential functions, with or without reasonable accommodation.[134] The second element can also be met by presenting evidence that "a comparable, nonprotected person was treated more favorably."[135]

<u>As to the first and third elements</u>, O'Donnell has already established above that she was disabled and was otherwise qualified for her job with reasonable accommodation.

---

[130] Chester Depo. @ 89-90.
[131] Chester Depo. @ 88.
[132] Chester Depo. @ 88.
[133] Gubitosi-Klug Depo. @ 114-115; Narasimhan Depo. @ 60-61; Uli Depo. @ 151.
[134] *Hood v. Diamond Products, Inc.*, 74 Ohio St.3d 298, 1996 Ohio 259, 658 N.E.2d 738; *Columbus Civil Service Commission v. McGlone*, 82 Ohio St.3d 569, 1998 Ohio 410, 697 N.E.2d 204.
[135] *Brewer v. Cleveland City Schools Bd.* (1997), 122 Ohio App.3d 378, 385, 701 N.E.2d 1023, applying *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668.

As to the second element, O'Donnell has presented evidence that she suffered multiple adverse employment actions, including being denied reasonable accommodation, being placed on an involuntary leave of absence, and finally, her constructive discharge. The first has already been discussed above. The second is undisputed because UH told O'Donnell on June 14, 2012 when her accommodation was denied, she would be put on a leave of absence—there is no evidence that O'Donnell chose to take this leave.[136] Finally, O'Donnell has presented evidence that she was constructively discharged on December 16, 2012.

A "constructive discharge" can be an adverse employment action for a discrimination or retaliation claim.[137] Constructive discharge "is in essence a claim that the employer's conduct was so egregious that the employee was forced to sever the employment relationship involuntarily."[138] To prove constructive discharge, O'Donnell need only raise a question of fact that Defendants' actions were so intolerable that a reasonable person under such circumstances would have felt compelled to resign.[139] In determining whether a constructive discharge has occurred, courts generally apply an objective test.[140]

In their Motion, Defendants argue that O'Donnell cannot raise a question of fact regarding her constructive discharge because "she was not demoted, her salary was not reduced, her job duties did not change…[etc.]"[141] This is true, however, Defendants' conduct against O'Donnell was actually much worse…they placed her on an involuntary leave instead of accommodating her disability, basically informing her that she could not return to work unless she was no longer suffering from her social anxiety disorder.[142] As such, a reasonable juror could find that UH placed O'Donnell in a "no win" situation because how could O'Donnell magically recover from a "life-long" and "disabling" anxiety disorder and return to work *without* reasonable accommodation, which UH already said it would not provide?[143]

---

[136] Chester Depo. @ Ex. 14.
[137] *Bowers v. Hamilton City Sch. Dist. Bd. of Educ.*, 2002 Ohio 1343 (12th Dist.).
[138] *Risch v. Friendly's Ice Cream Corp.*, 136 Ohio App. 3d 109, 112, 736 N.E.2d 30 (1st Dist. 1999).
[139] *Willie v. Hunkar Laboratories, Inc.*, 132 Ohio App. 3d 92, 106, 724 N.E.2d 492 (1st Dist. 1998).
[140] *Mauzy v. Kelly Serv. Inc.*, 75 Ohio St.3d 578, 588, 664 N.E.2d 1272 (1996).
[141] *See* Def. MSJ @ 21.
[142] Chester Depo. @ Ex. 14.
[143] Minnillo Depo. @ 74, 109; Chester Depo. @ Ex. 14.

The Employee's Attorney.™



O'Donnell's case is directly on point with the Sixth Circuit Court of Appeals' holding in *Talley v. Family Dollar Stores of Ohio, Inc.*[144] In *Talley*, the plaintiff claimed that she was constructively discharged because her working conditions were intolerable "when she was denied a reasonable accommodation."[145] The Court agreed, determining that the defendant's undue hardship argument was a triable issue of fact, and denied summary judgment on whether the denial of reasonable accommodation was a sufficient basis to support Talley's constructive discharge. Specifically, the Court held:

> Assuming that Talley was denied a reasonable accommodation that forced her to work in excess of her medical restrictions, **a reasonable jury could infer that the defendants knew that Talley's working conditions would become intolerable to a reasonable person suffering from her particular disability**. The plaintiff has presented sufficient evidence from which a jury could find that her failure to return to work and eventual discharge was a foreseeable and intended result of the company's action in refusing to allow her to use a stool and refusing to hold a meeting to resolve the issue.

> \* \* \*

> We find that the plaintiff has produced sufficient evidence that may lead a jury to conclude that the defendants intended for Talley to resign and that it was foreseeable that she would when they (1) denied her use of the stool after years of being able to use it, (2) refused to read a doctor's note that she delivered upon their request, (3) failed to organize a meeting to discuss the issue, and (4) failed to contact her regarding the status of the meeting or with other alternatives to resolve the issue. Consequently, there is a genuine issue of material fact regarding whether her working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.

> As our sister circuit recognized in *Johnson v. Shalala*, "**a complete failure to accommodate, in the face of repeated requests, might suffice as evidence to show the deliberateness necessary for constructive discharge**." 991 F.2d 126, 132 (4th Cir.1993).[146]

From there, the Court held, "[W]hen an employee makes a repeated request for an accommodation and that request is both denied and **no other reasonable alternative is offered, a jury may conclude that the <u>employee's resignation was both intended and foreseeable</u>**."[147]

Similarly here, O'Donnell requested a reasonable accommodation and was denied, *admittedly* without the exploration of other possible alternative accommodations. Then, UH placed O'Donnell on an

---

[144] 542 F.3d 1099 (6th Cir. 2008).
[145] *Id.* @ 1107.
[146] *Id.* @ 1109. (**Emphasis** added).
[147] *Id.* (<u>**Emphasis**</u> added).

The Employee's Attorney.™



involuntary indefinite leave, which left O'Donnell with no option but to start exploring other job opportunities—thus, her resignation was both "intended and foreseeable" to UH.

Separately, O'Donnell can establish the second element of her prima facie case by showing that she was disparately treated based on her disability versus similarly-situated employees. O'Donnell has provided direct testimony, which Defendants have not disputed, from Dahiya that O'Donnell "has been treated unfairly" and that "different standards are used for her than for the other fellows."[148] Dahiya's statement sets forth specific examples of differential treatment towards O'Donnell in comparison to her counterparts. Moreover, O'Donnell presented 12 different examples where she was disparately treated, including the incident witnessed by Lowes.[149] In their Motion, Defendants fail to address the disparate treatment element of O'Donnell's disability claims, but even if they had, O'Donnell has presented 12 specific examples of disparate treatment, and only a *single* example would suffice to create a genuine issue of material fact. For these reasons, summary judgment should be denied as to Counts I, II and VI.

## VI.  A GENUINE ISSUE OF MATERIAL FACT REMAINS WHETHER DEFENDANTS UNLAWFULLY RETALIATED AGAINST O'DONNELL.

### A.  O'Donnell Has Established The First Three Elements Of Her Claims.

The Court should deny summary judgment as to Counts III, V, VII and IX. To establish a case of retaliation, a plaintiff must show that (1) she engaged in protected activity, (2) the defendant was aware of the protected activity, (3) the defendant took an adverse action against the employee, and (4) there is a causal connection between the protected activity and adverse action.[150] A plaintiff's burden of establishing an adverse action is "less onerous in the retaliation context than in the anti-discrimination context."[151]

Here, there is no dispute as to elements one and two of O'Donnell's claim—she complained about race and disability discrimination and Defendants knew about her complaints.[152]

---

[148] Exhibit 2: Dahiya Notarized Statement 1.
[149] Narasimhan Depo. @ Ex. 40.
[150] *Greer-Burger v. Temesi*, 116 Ohio St.3d 324, 2007 Ohio 6442, 879 N.E.2d 174.
[151] *Michael v. Caterpillar Financial Services Corp.*, 496 F.3d 584 (6th Cir. 2007).
[152] Uli Depo. @ Ex. 29; Rebello Depo. @ 12, 17-19, 21-23, 27; Exhibit 6: Rebello Summary; Chester Depo. @ Ex. 2.

The Employee's Attorney.™



As to element three, O'Donnell has presented evidence of several "adverse actions" taken against her, namely not investigating her discrimination complaints, placing her on an improper Performance Alert, denying her reasonable accommodation, forcing her into a leave of absence and her constructive discharge. Unlike a discrimination claim, "the antiretaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace."[153] "This more liberal definition permits actions not materially adverse for purposes of an anti-discrimination claim to qualify as such in the retaliation context."[154] In *Burlington Northern & Sante Fe Railway Co. v. White*, the United States Supreme Court applied this standard: "A plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well **might have dissuaded a reasonable worker from making or supporting a charge of discrimination**'."[155]

In the present matter, O'Donnell has presented evidence supporting each of these adverse actions. First, UH did not adequately investigate O'Donnell's discrimination complaints—an act that would surely "dissuade a reasonable worker from making or supporting a charge of discrimination."[156] Second, Uli placed O'Donnell on a retaliatory Performance Alert that violated UH's Resident Manual.[157] Third, there is no dispute that UH denied O'Donnell a reasonable disability accommodation, and moreover, O'Donnell has presented evidence that UH should have granted her an accommodation.[158] Fourth, following O'Donnell's discrimination complaints, UH placed O'Donnell on an involuntary leave, effectively preventing her from continuing her fellowship.[159] Fifth, O'Donnell has set forth evidence that she was constructively discharged. Any one of these adverse actions raises a genuine issue of material fact.

---

[153] *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405 (2006).
[154] *Michael*, *supra*, 496 F.3d @ 596.
[155] *Burlington, supra,* 548 U.S. @ 68 (**Emphasis** added).
[156] Uli Depo. @ 136-139, 144-145; Narasimhan Depo. @ 53; Gubitosi-Klug Depo. @ 92-93; Chester Depo. @ 49, 77.
[157] Uli Depo. @ 152-153; Uli Depo. @ Ex. 33; Uli Depo. @ Ex. 37, p. 46.
[158] Chester Depo. @ Ex. 14.
[159] Chester Depo. @ Ex. 14-15.

The Employee's Attorney.™



**B.  O'Donnell Has Presented Causation Evidence Satisfying The Fourth Element.**

"To establish a causal connection, a plaintiff must proffer evidence sufficient to raise the inference that his protected activity was the likely reason for the adverse action."[160] Although no one factor is dispositive in establishing causation, evidence that defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's protected activity is relevant.[161] Temporal proximity **alone** can satisfy the causation element, as explained by the Sixth Circuit Court of Appeals in *Mickey v. Zeidler Tool and Die Company.*[162] Moreover, even if temporal proximity itself is insufficient to find a causal connection, "a temporal connection couple with other indicia of retaliatory conduct may be sufficient to support a finding of a causal connection."[163]

In their Motion, Defendants *admit* that there is close temporal proximity between O'Donnell's discrimination complaints and their adverse actions, but state, "temporal proximity is meaningless" without evidence or law supporting this position.[164] O'Donnell agrees that her discrimination complaints, especially those made in February, 2012 to Rebello, Shuck and Chester were close in time to the retaliatory conduct that followed including the February 29, 2012 Performance Alert.[165]

Similarly, O'Donnell has presented evidence, other than temporal proximity, regarding the causal element of her claims. For one, O'Donnell has set forth that non-complaining fellows were treated differently. Indeed, there is no evidence that any other fellow made similar complaints, yet O'Donnell has set forth examples where she was treated less favorably by Uli, Narasimhan and Gubitosi-Klug versus her counterparts.[166] Moreover, there is a direct causal connection between O'Donnell's complaints and her

---

[160] *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007).
[161] *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000); *Moon v. Transport Drivers, Inc.*, 836 F.2d 226, 230 (6th Cir. 1987).
[162] 516 F.3d 516 (6th Cir. 2008). *See also DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004); *Asmo v. Keane, Inc.*, 471 F.3d 588 , 593 (6th Cir. 2006; *McNett v. Hardin Cmty. Fed. Credit Union*, 118 Fed.Appx. 960, 965 (6th Cir. 2004); *Shefferly v. Health Alliance Plan of Michigan,* 94 Fed.Appx. 275, 285 (6th Cir. 2004); *Mallory v. Noble Corr. Inst.,* 45 Fed.Appx. 463, 472-73 (6th Cir. 2002).
[163] *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir. 2006).
[164] See Def. MSJ @ 19.
[165] Exhibit 1: O'Donnell Affidavit @ ¶ 18-19; Chester Depo. @ Ex. 2; Uli Depo. @ Ex. 33; Exhibit 6: Rebello Summary.
[166] *See* BIO, supra @ 3-4.

denied accommodation, which is directly linked to her constructive discharge. Specifically, the **only** reason relied upon by Defendants for denying O'Donnell an accommodation is their position that Uli submitted this new list of essential functions, one of which disqualified O'Donnell from the requested accommodation.[167] Uli submitted this new list **after** he already learned that O'Donnell made discrimination complaints against him. Thus, a reasonable jury could infer that Uli submitted this new list of essential functions, instead of the original job description ***because*** of O'Donnell's complaints.

Moreover, once a jury finds a causal connection between O'Donnell's complaints and her denial of accommodation, this same inferential chain leads directly to her constructive discharge because O'Donnell would not have been placed on a leave of absence ***but for*** being denied reasonable accommodation, and therefore, O'Donnell would not have been forced to resign from the fellowship ***but for*** being placed on this involuntary leave. As such, there is evidence raising a question of fact that O'Donnell's constructive discharge was directly the result of her discrimination complaints against Uli and other faculty members. Thus, summary judgment as to Counts III, V, VII and IX is inappropriate.

## VII.  A GENUINE ISSUE OF MATERIAL FACT REMAINS WHETHER DEFENDANTS DISCRIMINATED AGAINST O'DONNELL BASED ON HER RACE.

O'Donnell's race discrimination claims, Counts IV and VIII, are under Title VII, 42 U.S.C. § 2000e-2 and R.C. § 4112.02. O'Donnell's state law claim should be considered as if it were brought under Title VII because the Ohio requirements are the same as under federal law.[168] In order to establish a prima facie case, O'Donnell must present evidence that: (1) she belongs to a racial minority; (2) she suffered an adverse employment action; (3) she was qualified; and (4) she was treated differently than similarly situated non-protected employees."[169] The first element is not in dispute and O'Donnell has previously

---

[167] Chester Depo. @ 60-61.
[168] *Carter v. University of Toledo*, 349 F.3d 269 (6th Cir. 2003).
[169] *Myers v. Cuyahoga County*, 182 Fed.Appx 510, 517 (6th Cir. 2006); *see also McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792, 802, 93 S.Ct. 1817.

The Employee's Attorney.™

presented evidence that she suffered an adverse employment action and was otherwise qualified for her fellowship position. As such, the Court need only analyze the fourth element of O'Donnell's race claims.

Here, O'Donnell has presented evidence that she was treated differently than similarly-situated non-African-American fellows. First, O'Donnell was the only African-American fellow in the program.[170] Second, there is direct evidence that Uli made racially-discriminatory comments to O'Donnell about African-American hair being "wild and unruly."[171] Separately, a question of fact remains whether any or all of the disparate treatment evidenced in the record, including the 12 specific instances of unequal treatment, were causally related to O'Donnell's race, being that she was on the only African-American fellow and there is evidence that her non-African-American counterparts were treated more favorably in those specific instances—anyone of which creates a question of fact.[172] For these reasons, the Court should deny summary judgment as to Counts IV and VIII.

## VIII.  CONCLUSION

Based on the foregoing reasons, O'Donnell respectfully requests that the Court deny Defendants' Motion for Summary Judgment in its entirety.

Respectfully submitted,

*/s/ Fred M. Bean*
Fred M. Bean (0086756)
**THE SPITZ LAW FIRM, LLC**
25200 Chagrin Blvd., Suite 200
Beachwood, OH 44122
Phone: (216) 291-4744
Fax:    (216) 291-5744
Email:  Fred.Bean@SpitzLawFirm.com

*Attorney For Plaintiff Alison O'Donnell*

---

[170] Uli Depo. @ 50.
[171] Uli Depo. @ 174-175.
[172] *See* BIO, supra @ 3-4.

The Employee's Attorney.™



### CERTIFICATE OF SERVICE

I hereby certify that on December 12, 2017, a copy of the foregoing was filed via the Court's

electronic filing system and made available to all parties.

/s/ Fred M. Bean_____
Fred M. Bean (0086756)
**THE SPITZ LAW FIRM, LLC**

The Employee's Attorney.™

