1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - -

ALISON O'DONNELL,

            Plaintiff,

         vs.                    Case No. 1:16-cv-2450
                                Judge Donald E. Nugent

UNIVERSITY HOSPITALS
HEALTH SYSTEM, et al.,

            Defendants.

- - -

DEPOSITION OF NAVEEN K. ULI, M.D.
Monday, August 7, 2017

- - -

        The deposition of NAVEEN K. ULI, M.D., a

Defendant herein, called for examination by the

Plaintiff under the Federal Rules of Civil

Procedure, taken before me, Diane M. Stevenson,

a Registered Diplomate Reporter, Certified

Realtime Reporter, and Notary Public in and for

the state of Ohio, pursuant to notice, at The

Spitz Law Firm, 25200 Chagrin Blvd., Suite 200,

Beachwood, Ohio, commencing at 12:07 p.m., the

day and date above set forth.

Stevenson Reporting Service, Inc.
2197 Macon Court   Westlake, Ohio 44145
440.892.8600  diane@nls.net

PLAINTIFF'S
Exhibit 11

```
 1   A.    I was chosen.

 2   Q.    So what was the specific title, director of --

 3   A.    It is a fellowship director.

 4   Q.    Fellowship director?

 5   A.    Also known as a program director.

 6   Q.    Now, did you continue to stay in practice --

 7   A.    Yes.

 8   Q.    -- as well?

 9   A.    Yes.

12:25 10  Q.    This was just adding on to your duties?

11   A.    Yes, yes.  Only about between 12 and 15 percent

12         of my effort is the fellowship director.

13   Q.    12 to 15 percent?

14   A.    Yes.  And the rest is all clinical and

15         research.

16   Q.    So you were taking over as the fellowship

17         director, but the fellowship, itself, had

18         existed prior to this?

19   A.    Way before I joined the institution.

12:25 20  Q.    All right.  So when you came in as fellowship

21         director, there were already some existing

22         fellows who would now be on their second and/or

23         third year of the fellowship, correct?

24   A.    That's right.

25   Q.    And then you would have been involved in the
```

```
 1          selection of the new first-year fellows?
 2  A.      Yes.
 3  Q.      Was this a three-year program?
 4  A.      Yes, it is a three-year program.
 5  Q.      Is that pretty standard for fellowships across
 6          the board, three years?
 7  A.      For all pediatric fellowships, they are three
 8          years -- the adult fellowships tend to be two
 9          years -- because all pediatric fellowships have
10          a requirement for research.  But adult
11          fellowships that is not a requirement, it is
12          optional.
13  Q.      Tell me about this research requirement.
14          Explain it to me.  What exactly does a fellow
15          have to do?
16  A.      There is a broad latitude of what kind of
17          experiences a fellow can do.  There are some
18          that are basic scientists who do really basic
19          science, bench research.  And for them they
20          might spend two years on a very, very high
21          level basic science research project in the lab
22          with cells and animals, and things like that.
23              On the other end of the spectrum, one
24          could do public health projects or do clinical
25          research on children, our patients.
```

1        So you could do clinical research on

2       patients or you could do public health projects

3       or you could do basic science with bench

4       research, laboratory research.

5  Q.   Then how does this research culminate in

6       something, I guess, that can be evaluated to

7       meet the requirement?  I mean, does a paper

8       have to be written, a presentation?  What does

9       this research ultimately culminate into?

12:27 10  A.   So the board requirement is that it has to

11       result in what is called a work product, a

12       scholarly work product.  That could be a first

13       authored manuscript that is published already

14       or it could be a report, a work product report.

15         What most of our fellows do is by the time

16       they leave, they have a manuscript in

17       preparation, which is then something that will

18       fulfill their obligation.  It might not be

19       submitted by the time they are done with their

12:28 20       fellowship because of the time it takes to

21       complete the research and write up the

22       publication.

23         But the expectation is that when they are

24       done they will have a work product and, in

25       fact, the board requires that.  That is one of

24

1          For the most part, we direct our fellows

2      to projects that we are interested in and we

3      are doing, and we have the expertise and we

4      have the resources, and it is difficult to

5      expect a fellow at that stage of their

6      professional career to think of or conceive a

7      project out of -- from the ground up.

8          So we tend to steer them in certain

9      directions, depending upon where the ideas are,

12:31 10    the resources are, the patients are, and the

11     time is conducive to complete that project.

12  Q.   And then each fellow is expected, whether they

13     have received direction or ideas from the

14     faculty or not in order to meet the

15     requirements, board requirements, each fellow

16     then has to complete his or her own project?

17  A.   Yes, sometimes we have had fellows that

18     continue a previous project.  Suppose a

19     previous fellow has done a project and that

12:31 20    person took it to a certain stage and had some

21     results, and if there was the potential for

22     taking it to the next stage, and then you had a

23     new fellow come in and you say, "Here is a

24     right project and all of the research, take it

25     to the next step into a different direction

1       perhaps," and we have had that happen, also.

2  Q.    But can two fellows who say, "Hey, it is going

3       to be a lot of work for us each to do our own,

4       let's do a project together, and we will just

5       both slap our names on it," they can't do that?

6  A.    Unless each of them does a substantial amount

7       of work on their own.  And that is feasible in

8       big labs; for example, there is a massive

9       project of some sort, and then each fellow gets

12:32 10     a slice of it, and they all mesh well with the

11       others, they kind of delve deep into each

12       other's work, and that is certainly feasible.

13          But as long as there is something unique

14       that Fellow X did that is not the same as what

15       Fellow Y did.

16  Q.    Yes, okay, that is what I am getting at.  Even

17       if it all goes towards the same project, there

18       has to be something to show, sort of, so that

19       you can differentiate one fellow from the other

12:32 20     to show what work that they have done which is

21       unique to work that somebody else has

22       performed?

23  A.    That's right.

24  Q.    They can't both just do a project that it looks

25       like one person did and there are just two

27

1    Q.    And how many fellows at any one time are in the

2          fellowship?

3    A.    It is two per year times three.  So at any

4          given point we will have no more than six.

5    Q.    No more than six.  And you said two per year?

6    A.    Two per year.

7    Q.    So are these spots reserved for -- well, I

8          guess, would they be open to -- it wouldn't

9          just have to be somebody coming off of

10         residency?

11   A.    It could be.

12   Q.    It would always be?

13   A.    Yes, because if it is somebody in the United

14         States and who wants to practice in the United

15         States, then the way it works is you have to

16         have finished your pediatric residency to enter

17         into fellowship, because then if you want to

18         stay in the U.S. and you want to get board

19         certified, you can only do that if you have

20         your primary boards first, and then get your

21         specialty boards.

22            So that means that people entering a

23         fellowship will be, by definition, people who

24         have finished a residency program in

25         pediatrics.

```
1   Q.   Do you recall the names of those individuals?

2   A.   I don't.

3   Q.   Let me ask you this:  The four fellows who were

4        now going to be second- and third-years, both

5        of which would have been -- did you participate

6        in the acceptance of all four of those into the

7        program?

8   A.   If it was 2010, I would have because I took

9        over as fellowship director in 2007.  So they

10       would not have been picked by my previous, the

11       previous program director.

12  Q.   Okay.  So when Dr. O'Donnell started as a

13       first-year, all six of the fellows would have

14       been fellows that came into the program while

15       you were the fellowship director?

16  A.   That's right.

17  Q.   And you understand that Dr. O'Donnell is

18       African-American?

19  A.   Yes, I do.

20  Q.   Out of any of the other five fellows, were any

21       of them African-American?

22  A.   No.

23  Q.   Were any of them Caucasian?

24  A.   At least three would have been Caucasian, if I

25       am not mistaken.  And Dr. Dahiya is of Indian
```

61

```
 1        fellows, we keep adding in things and adding

 2        the value, getting more and more outside

 3        speakers to come in and give those lectures, so

 4        over the years it has grown quite a bit now.

 5   Q.   Now, is this orientation session that you would

 6        have given back in July of 2010, was that only

 7        for the new fellows --

 8   A.   Yes.

 9   Q.   -- or did it also include the second- and

10        third-year fellows?

11   A.   New fellows.

12   Q.   So are we talking about two individuals, then?

13   A.   Two individuals.

14   Q.   Was Dr. O'Donnell present for both of those

15        sessions?

16   A.   Yes.

17   Q.   And I was asking you initially about a job

18        description.  Was a job description given to

19        the new fellows during orientation?

20   A.   Yes.

21   Q.   And how is that conveyed to them?  Is it

22        something on a document or was it something

23        verbally communicated?

24   A.   Both verbal and a document.  And even that

25        document over the years has morphed into a
```

```
 1            bigger and bigger document.
 2                 (Plaintiff's Exhibit 9 was introduced for
 3            identification.)
 4       Q.   Let me hand you what I have previously marked
 5            as Exhibit 9.  Do you recognize that document?
 6       A.   Yes.
 7       Q.   Is this a document that you created?
 8       A.   Yes, it is one of several documents.
 9       Q.   So this says, "Pediatric endocrinology
01:23 10          fellowship goals," correct?
11       A.   That's correct.
12       Q.   And there is not a date on this specific
13            document.  But I will represent that this is a
14            document that my client had in her possession
15            that she says she received during her
16            fellowship.  Would that be accurate?  Would
17            this have been a document you would have given
18            Dr. O'Donnell?
19       A.   Yes.
01:23 20     Q.   Is this a document that you would have provided
21            her during the orientation?
22       A.   Yes.
23       Q.   Was this the document that was -- that upon her
24            starting the fellowship was meant to convey her
25            responsibilities as a fellow?
```

63

1    A.    Yes.

2    Q.    So this was the job description, at least at

3          the time, correct?

4    A.    Yes.  This would have been one of several

5          documents provided.

6    Q.    One of several documents that you would have

7          given her during the orientation?

8    A.    Yes.

9    Q.    I am assuming at that time we saw the link to

01:24 10         the *Resident Manual*, was the *Resident Manual*

11         given out in paper form, or was it just

12         electronic?

13   A.    That, I don't know, because the *Resident Manual*

14         is a thick ring binder thing.

15   Q.    We will look at it.  So yeah, it is pretty

16         thick.  And that wasn't necessarily specific to

17         your --

18   A.    No, it is for the entire institution.

19   Q.    -- department.  All right, yes.

01:24 20         So you were mostly giving out documents

21         that Dr. O'Donnell would need and be expected

22         to adhere to that were specific to pediatric

23         endocrinology?

24   A.    That's right, yes.

25   Q.    Okay.  All right.  Exhibit 9, the document that

67

```
 1        endocrine problem that we see tons of and they
 2        have already seen a bunch of those problems,  a
 3        routine thyroid follow-up, for example, or a
 4        routine growth follow-up, so those patients
 5        might actually have them seen starting in July.
 6             But, typically, we don't schedule patients
 7        on their own, and that starts in the month of
 8        August.
 9  Q.    Okay.  Now, over the course of this case, I
10        have learned a little bit about what has been
11        referred to as "Wednesday conferences."  And
12        these Wednesday conferences involve both the
13        fellows as well as faculty, correct?
14  A.    Yes.
15  Q.    How many people would typically be at these
16        Wednesday conferences?
17  A.    All us, unless somebody is on vacation, all the
18        faculty and all the fellows are there.
19  Q.    Are we talking over 20 people?
20  A.    Not necessarily.  At that time there would be
21        six or seven faculty and then six fellows.  And
22        we also have our diabetes nurses who join us
23        when we discuss diabetes patients, which is not
24        all the time, which is just a half an hour of
25        that two-hour block.  So it is every Wednesday
```

96

1      for materials, objective and hypothesis, and

2      present to our division within the next three

3      weeks."

4          So she would have been in that three-month

5      research block where we expect they will be

6      expected to go around and meet with the various

7      faculties and run various ideas for research.

8  Q.   For research?

9  A.   Yes.

02:03 10  Q.   Okay.  The exam, the SITE exam, other than you

11      saying that her score would need to improve to

12      make her successful for when she took the

13      boards, did the exam, itself, have any other

14      bearing on the fellowship or meeting the

15      requirements of the fellowship?

16 A.   Not at all.  It is not a requirement in the

17      sense that we don't hold people back for that.

18      It is just a very good way to gauge, for

19      fellows to gauge.  As they go from year to

02:03 20      year, the scores go up.  I would say the

21      national average for the first-year fellows is

22      lower than the national average for second-year

23      fellows, and so on.

24          So if they take the test and they compare

25      themselves to the national average, they know

111

```
 1            like it was signed by you and Dr. Matthews in
 2            August of 2011, correct?
 3    A.      That's right.
 4    Q.      So you and Dr. Matthews actually had a
 5            conversation --
 6    A.      Yes.
 7    Q.      -- going over this plan?
 8    A.      Yes.
 9    Q.      And you covered all the different topics on
02:29 10            here?
11    A.      Yes.
12    Q.      During this discussion, at any point did she
13            talk with you about her anxiety disorder?
14    A.      She didn't.  At one of the meetings she said
15            she has social anxiety.  And the other thing
16            she mentioned at that meeting was her family
17            and cultural upbringing that prevented her from
18            speaking out of turn, and her innate shyness
19            and social anxiety.
02:30 20    Q.      Did she ever tell you that she was diagnosed
21            with an anxiety disorder?
22    A.      No, she did not.  I found that out later.  Not
23            the particular diagnosis, but that she was
24            seeing a health care provider, and that came
25            through Julie, the meeting that we had with
```

1   about certain things and, I will add:  Faculty

2   question each other.

3 Q. I am sorry, you will add faculty what?

4 A. Faculty question each other.

5 Q. Question each other?

6 A. Yes.

7 Q. Okay.  So would it be fair to say that there

8   were heated discussions during these

9   conferences sometimes?

02:40 10 A. There might be, yeah.

11 Q. Between faculty members who may disagree on one

12   person's viewpoint on this issue of medicine

13   versus another?

14 A. Absolutely, yeah.

15 Q. Did Dr. O'Donnell write this response in your

16   presence when you met with her on August 9,

17   2011?

18 A. No, she took it, and then a few days later she

19   handed it in with those handwritten letters.

02:41 20 Q. Handed it in to you?

21 A. Yes.

22 Q. Then what did you do with this document at that

23   time?

24 A. I believe I discussed that with my faculty.

25 Q. You discussed it with the faculty?

1      meeting with me today.  I certainly understand

2      how my proposed research project on," whatever

3      that word is, "adipokines in breast milk could

4      be very complicated and, therefore, not an

5      appropriate fellow project.

6           "However, I still have a few concerns

7      about just doing someone else's ready-made

8      project, especially other fellow's project.  I

9      spoke with Nidhi and Rachana, who are other

02:56 10    fellows, today on their research process and

11     they both stated although the overall concept

12     of their project was a faculty idea, they were

13     the ones who refined it to the final focus.  I

14     am very concerned I am not going to have this

15     experience."  Then she goes on.

16          So isn't it true that Dr. O'Donnell at

17     some point expressed concern that she was going

18     to be doing a research project that belonged to

19     another fellow and, essentially, wasn't her own

02:57 20    project?

21  A.  Yes, it looks like that, yeah.  So the

22     adipokine project she was talking about would

23     require us to have access to a cohort of

24     patients that is followed by the neonatology

25     team, Dr. Maureen Hack.

1       And Dr. Cuttler, division chief, told us

2   outright that we just didn't have access to

3   that patient because Dr. Hack was extremely

4   protective of her cohort.  She would not let

5   other investigators investigate them.  So it

6   was a non-starter, it just wasn't feasible.

7 Q.  It wasn't feasible.  And she says, "Although I

8   am disappointed that my adipokine isn't going

9   to work, my main concern is I am being asked to

02:57 10  help other fellows with their projects rather

11  than having my own."

12      So was she being asked to help other

13  fellows with their project rather than having

14  her own project by this point in August of

15  2011?

16 A.  Not at all.  As I said, a certain fellow has

17  enough time to take a project to a certain

18  level, and then that project can be twisted to

19  a different one.  And we had that happen

02:58 20  multiple times.

21      So at least three or four fellows have

22  used the same kind of equipment to measure the

23  same thing but in different populations.  So

24  one can use a starting point, and then take it

25  in different directions with different setup

1  Q.   Do you recall in September of 2011 getting a

2       letter from Dr. O'Donnell where she complained

3       that she was being subjected to harassment and

4       discrimination by you and others in the

5       department?

6  A.   Yes.

7            (Plaintiff's Exhibit 29 was marked for

8       identification.)

9  Q.   I will hand you what I have marked as

03:02 10      Exhibit 29.  Do you recognize this document?

11 A.   Yes, I do.

12 Q.   How did you receive this document?

13 A.   That, I am not sure.

14 Q.   Did you speak with Dr. O'Donnell about this

15      document?

16 A.   No.  I believe I got a call from Julie Chester

17      in HR, either around this or just before or

18      just after this, who then told me that she and

19      HR would interview me as well as Dr. Narasimhan

03:03 20      separately.

21 Q.   Dr. Narasimhan?

22 A.   Dr. Narasimhan, yes.

23 Q.   So were you interviewed?

24 A.   Yes.

25 Q.   By who?

137

```
 1    A.     By Julie Chester.

 2    Q.     When did that happen?

 3    A.     Shortly after this.  I don't recall the exact

 4           date.

 5    Q.     So, I mean, do you believe it was in October?

 6           Do you believe it was still in 2011 or are we

 7           into 2012?

 8    A.     I believe it was 2011.

 9    Q.     2011, okay.  You were interviewed.  Were you

03:04 10          interviewed solely regarding the allegations in

11           this letter, or were you interviewed about

12           other issues?

13    A.     That was a separate one.  Then we were a group

14           of us, Julie Chester, myself, Dr. Jerry Shuck

15           and Will Rebello had a meeting about the

16           accommodations requested.

17                 And I believe at one of those meetings

18           Claudia Hoyen was also there.

19    Q.     But that was separate from your interview with

03:04 20          Julie Chester?

21    A.     I believe it was separate, yes.

22    Q.     So during your meeting with Julie Chester, was

23           that just about the issues that were outlined

24           in Exhibit 29?

25    A.     Yes.
```

138

1  Q.   Tell me, did Julie Chester ask you questions in
2       review?
3  A.   I believe she did, yeah, asked me about where
4       this comes from and what kind of relationship I
5       had.
6  Q.   And you denied any harassment or discrimination
7       by yourself against Dr. O'Donnell, correct?
8  A.   Yes, I did.
9  Q.   Did you also deny that you had observed any
03:05 10      harassment or discrimination by anyone else
11       against her?
12 A.   Yes, I did.
13 Q.   Did Julie Chester indicate any additional
14       information that she may have had regarding
15       Dr. O'Donnell's complaint that wasn't in this
16       letter?  Did she share any information with
17       you?
18 A.   I don't recall.  At a joint meeting where the
19       four or five of us were there, it was brought
03:05 20      to the attention of the entire group that the
21       request for accommodations comes from the
22       recommendations from her treating doctor.
23 Q.   Now, did that happen around the same time, or
24       was that later after this letter?
25 A.   After this, not too long after, though, I

139

1     think.

2   Q.   When you spoke with Ms. Chester, did she

3     indicate any knowledge or further depth about

4     some of the things in here, such as what

5     Dr. O'Donnell meant by, "You failed to provide

6     me with these minimum requirements"?

7   A.   I don't think that was discussed.

8   Q.   That didn't come up?

9   A.   No.

03:06 10   Q.   Did Julie Chester share with you any specific

11     complaints or specific examples of differential

12     or harassing treatment that Dr. O'Donnell was

13     alleging against you or any of the other

14     faculty?

15   A.   No.

16   Q.   Did you ever hear from Ms. Chester, or anyone

17     else, Dr. O'Donnell complaining about the

18     amount of orientation she received as opposed

19     to other fellows?

03:06 20   A.   I did.  I did.

21   Q.   When did you first learn about that complaint?

22   A.   It must have been around the same time.

23   Q.   Did you learn of a complaint by her that the

24     notice that she was receiving as to clinic

25     assignments was vastly less than her

1              that she was delaying her chart note.

2    Q.       Okay.

3    A.       The was a chart note that was three months

4              late.

5    Q.       Did you have a discussion with Dr. O'Donnell at

6              one point about her possibly repeating an

7              academic year or otherwise extending her

8              fellowship?

9    A.       Yes.

03:10 10  Q.   Was there talk about extending it by 12 months?

11   A.       Yes.  And that was based on feedback from the

12             faculty.  And the main reason why we decided

13             that she needed a 12-month extension was that a

14             lot of the faculty felt that her knowledge

15             level at the second year was way below that of

16             a first-year fellow.

17                  So we thought that adding an extra year

18             gives her the additional time to expand her

19             knowledge base and get up to bar.

03:10 20  Q.   She rejected that, correct?

21   A.       Yes.  She was willing to accept a six-month

22             extension, but she did not want a 12-month

23             extension.

24   Q.       So she rejected 12 months; there was some talk

25             about six months?

151

1   A.   No, I had a personal meeting way before this

2        where she mentioned it.

3   Q.   Where she had brought these up?

4   A.   Yes, especially her family upbringing is that

5        people are not allowed to speak out of turn is

6        what she specifically told me.

7   Q.   It says, "Therefore, I invite you to ask me

8        questions.  In addition, I intend to make more

9        than the required number of presentations, (a

03:22 10     very interesting topic I am excited to present

11       on 2/22).  Hopefully, this is a compromise to

12       suit everybody's needs.

13            "I believe that a training program should

14       take into account a variety of learning styles,

15       not everyone learns the same way.  If you have

16       any suggestions how we can work to solve this,

17       please let me know."

18            Did you speak with Dr. O'Donnell about

19       this e-mail or about what she was proposing in

03:22 20     this e-mail?

21  A.   I don't recall.  I can't remember.

22  Q.   Did you speak with any of the faculty members

23       about this e-mail and about Dr. O'Donnell,

24       saying that she invited questions and that she

25       planned to make more than the required number

152

1    of presentations, and that she was trying to

2    look for a compromise that would suit

3    everybody's needs?

4         Did you discuss any of that with faculty

5    members and whether that was something that

6    could be done, couldn't be done, anything like

7    that?

8  A.  We had multiple faculty meetings, but I don't

9    know what time frame, were those before or

03:23 10  after.  I believe we had at least one or two

11   more after this where the unanimous opinion was

12   that you cannot not grade, not evaluate her, on

13   the other aspects of the Wednesday conferences.

14   There couldn't be a substitute.

15        We needed in-the-moment questions and

16   answers and how people respond to that to

17   really gauge how well the person understands

18   the subject and how well one is able to

19   communicate.

03:24 20        (Plaintiff's Exhibit 33 was marked for

21   identification.)

22  Q.  Handing you what I have marked as 33, this is a

23   performance alert notice for Alison Matthews.

24   Dr. O'Donnell, in the pediatric endocrinology

25   program.  Did you prepare this document?

153

```
      1    A.     The template comes from the institution.  So
      2           Dr. Jerry Shuck forwarded this to me, and this
      3           is the template that all programs have to use
      4           whenever they go through a performance alert
      5           notice.
      6                  One can add to this, but you are to
      7           highlight what points is the performance noted.
      8    Q.     And then those are your comments and your
      9           signature on the last page, correct?
03:25 10    A.     Yes.
     11    Q.     Saying that you discussed this in the presence
     12           of Dr. Kaminski with Dr. O'Donnell on 2/29 of
     13           2012, correct?
     14    A.     Yes.
     15    Q.     And then Dr. O'Donnell refused to sign it,
     16           stated -- and it looks like this is where there
     17           was also discussion about the 12-month
     18           extension versus the six-month extension,
     19           correct?
03:25 20    A.     That's right, yes.
     21    Q.     And what led you to -- well, you said you got
     22           this document from Jerry Shuck --
     23    A.     Yes.
     24    Q.     -- and then completed it from there, correct?
     25    A.     Yes.
```

163

1        consulting a document for these different

2        bullet points?

3    A.  This probably comes from multiple sources,

4        including the wording in some of our evaluation

5        forms.  So there are evaluations, for example,

6        these ones here, Exhibit 20, so pulled

7        sentences from there.  In fact, they seem to be

8        verbatim from that document.

9    Q.  They seem to be --

03:39 10 A.  Verbatim from that document.

11   Q.  Verbatim from some of the evaluation forms?

12   A.  Yes.

13   Q.  Okay.  So you may have consulted one of the

14       evaluation forms and then, basically, copy and

15       pasted into bullet point fashion in this

16       e-mail?

17   A.  Yes.

18   Q.  And, obviously, if we look back at any one of

19       those evaluation forms, these bullet points

03:40 20      don't encompass everything from those

21       evaluation forms, just certain things, correct?

22   A.  That's correct, but what I thought was the most

23       important.

24   Q.  So you went through and you picked out what you

25       consider to be most important from those

1      where before coming to Cleveland I worked for

2      three years in Brooklyn, New York, and my boss

3      there told me that there is big contingent of

4      Caribbean immigrants there.

5           And being a pediatric endocrinologist,

6      there is one thing that I had to realize, that,

7      culturally, the Caribbean population, the women

8      used hair products that had placental extracts

9      in them.  And so when we get a patient

04:04 10   referred, a girl, a young girl with breast

11     development, premature breast development, you

12     have to ask about, specifically ask, if the

13     family uses hair products that have placenta in

14     them.

15          And he said only in his career he has had

16     multiple such presentations, and so you have to

17     know your cultural background of your patients,

18     otherwise you cannot do a good job, and you are

19     going to miss critical information.

04:04 20        That was a point that I was trying to make

21     to Dr. O'Donnell, that when you have referral

22     of a patient with African descent referred to

23     you for early development of breasts in a girl,

24     you specifically have to ask the question

25     whether the family uses cosmetics, hair

1          products that have placental extracts in them.

2  Q.   So is it your testimony that you did make that

3        comment, but that was your explanation as to

4        why had you made it, or you didn't make the

5        comment?

6  A.   I didn't make the comment specifically about

7        the hair, but I know exactly where that comes

8        from, from a discussion of a particular

9        patient.

04:05 10  Q.   Did you use the word wild and unruly --

11  A.   No.

12  Q.   -- to refer to African-American's hair?

13  A.   No, not at all.  Not at all.

14  Q.   Were there ever any occasions where you

15        instructed Dr. O'Donnell to cover another

16        fellow, go cover their clinic or cover their

17        assignments because that fellow was unable to

18        go?

19  A.   I might have.  And that is, again, no different

04:06 20        than we do for other fellows.

21  Q.   So you may have?

22  A.   Might have, yeah.

23  Q.   Can you think of a specific time?

24  A.   I can't think of a specific, no.  But that

25        happened many times where a fellow who was

190

1                      CERTIFICATE
2        State of Ohio,        )
                              ) SS:
3        County of Cuyahoga.)

4             I, Diane M. Stevenson, a Registered
         Diplomate Reporter, Certified Realtime
5        Reporter, and Notary Public in and for the
         state of Ohio, duly commissioned and qualified,
6        do hereby certify that the within-named
         witness, NAVEEN K. ULI, M.D., was by me first
7        duly sworn to testify the truth, the whole
         truth and nothing but the truth in the cause
8        aforesaid; that the testimony then given by him
         was by me reduced to stenotypy in the presence
9        of said witness, afterwards transcribed by
         means of computer-aided transcription, and that
10       the foregoing is a true and correct transcript
         of the testimony as given by him as aforesaid.
11
              I do further certify that this deposition
12       was taken at the time and place in the
         foregoing caption specified, and was completed
13       without adjournment.

14            I do further certify that I am not a
         relative, employee or attorney of any party, I
15       am not, nor is the court reporting firm with
         which I am affiliated, under contract as
16       defined in Civil Rule 28(D), or otherwise
         interested in the event of this action.

17
              IN WITNESS WHEREOF, I have hereunto set
18       my hand and affixed my seal of office at
         Westlake, Ohio, the 3rd day of November 2017.

19

20                 Diane M. Stevenson
21                         Diane M. Stevenson, RDR, CRR
                           Registered Diplomate Reporter
22                         Certified Realtime Reporter
                           Notary Public in and for
23                         The State of Ohio

24
         My Commission expires December 9, 2020.
25

 **University Hospitals**
Case Medical Center

 Rainbow Babies
& Children's Hospital

**Division of Pediatric Endocrinology
and Metabolism**

11100 Euclid Avenue
Room 737 / Mailstop RBC 6004
Cleveland, OH 44106-6004
216 844 3661 Phone
216 844 8900 Fax

Date:  June 25, 2009

To:  Alison Matthews, M.D
     13700 Shaker Boulevard, #213
     Cleveland, OH  44120

From: Naveen K. Uli, M.D.
      Director, Pediatric Endocrinology Training Program

Re:   Fellowship Program

This memo is to acknowledge our offer and your acceptance of a position in our Pediatric Endocrinology Fellowship Program at Rainbow Babies & Children's Hospital/ Case Western Reserve University, beginning on July 1, 2010.  This is a three-year program.  Therefore, assuming satisfactory progress, your fellowship will span until June 30, 2013.

You will enter our program in your fourth post-graduate year (PGY-4).  The expected salary for a PGY-4, as of July 2009 is $51,693/year.

_____                    _____
Naveen K. Uli, M.D.                         Alison Matthews, M.D

NKU:p



PLAINTIFF'S
EXHIBIT
16
ULI

University Hospitals at Case Medical Center is the primary affiliate of Case Western Reserve University School of Medicine.

**Case Western Reserve University / University Hospitals Case Medical center**
**UH Rainbow Babies & Children's Hospital**

**Fellowship in Pediatric Endocrinology**
FELLOW CLINICAL EVALUATION – LEVEL SPECIFIC COMPETENCIES

Fellow's Name  Alison Matthews

Date/Academic Year: July-December 2010/ 1

Evaluator  Naveen ULI

| | Level of Training | Color Code |
|---|---|---|
| | _X_ I Year Fellow: | Rose |
| | ___ II Year Fellow: | Yellow |
| | ___ III Year Fellow: | Green |

PLAINTIFF'S EXHIBIT 20  ULI  PENGAD 800-631-6989

The ACGME has identified 6 areas (Core Competencies) in which fellows must develop competency during the course of training.  Please check the boxes that best represent the frequency with which the fellow demonstrated the described knowledge/skills/attitudes during this rotation.

| Competency: Patient Care<br>Fellows must be able to provide patient care that is compassionate, appropriate and effective for the treatment of health problems and the promotion of health | <25% of time | 25-49% of time | 50-75% of time | 76-95% of time | >95% of time | Unable to evaluate |
|---|---|---|---|---|---|---|
| Obtains a focused history for each of the specialty diagnoses we see | | | ✓ | | | |
| Obtains a directed physical examination for each of the specialty diagnoses we see | | | ✓ | | | |
| Formulates and prioritizes a differential diagnosis based on patient information, current scientific evidence and sound clinical judgment | | | ✓ | | | |
| Synthesizes evidence in making therapeutic decisions and employs the therapeutic management of choice for a given working diagnosis | | ✓ | | | | |
| Provides appropriate health maintenance and preventative measures based on age, gender, risk factors, and developmental stage | | | | ✓ | | |
| Utilizes medical literature and information technology to inform and support patient care decisions and to educate patients | | ✓ | | | | |
| Identifies appropriate community resources to address patient needs | | | | | | |
| Obtains appropriate laboratory and radiographic studies to evaluate differential diagnoses and establish final diagnosis | | | | | | |
| Obtains results of laboratory and radiographic studies in a timely fashion | | ✓ | | | | |
| Accurately interprets test results, including results of endocrine stimulation tests | | | ✓ | | | |
| Demonstrates ability to read bone age X-rays | | | ✓ | | | |
| Counsels and educates patients and families regarding diagnostic and management plans | | | | ✓ | | |

Comments: Efficient in focusing on pertinent positives and negatives in obtaining history, but should be careful in not missing not potentially useful information. Should approach differential diagnostic considered from a broad perspective narrowing down the possibilities as you go forward

UH000055

## petency: Medical Knowledge

s must demonstrate knowledge about established and evolving biomedical, l and epidemiological sciences and the application of this knowledge to care

| | <25% of time | 25-49% of time | 50-75% of time | 76-95% of time | >95% of time | Unable to evaluate |
|---|---|---|---|---|---|---|
| nstrates sound foundation of knowledge for each of the subspecialty ses we see | | ✓ | | | | |
| stands unique challenges experienced by children and families with ic diseases | | | | ✓ | | |
| rstands basic and clinical science underpinnings of endocrine axes and rine disorders | | ✓ | | | | |
| ally evaluates current medical information | | ✓ | | | | |
| fies areas for improvement of self-knowledge and demonstrates a gness to be a life-long learner | | | | ✓ | | |
| es knowledge with attention to clinical outcome, cost-effectiveness, enefit, and patient preference | | | ✓ | | | |
| itates education of students and other health care professionals | | | ✓ | | | |

nents: Start with textbooks (Sperling/Sarafoglou/ Basic Science of Endocrinology) then find review articles, then go on to primary literature in depth.

## npetency: Practice-based Learning

ws must be able to investigate and evaluate their patient care practices, ise and assimilate scientific evidence and improve patient care practices

| | <25% of time | 25-49% of time | 50-75% of time | 76-95% of time | >95% of time | Unable to evaluate |
|---|---|---|---|---|---|---|
| ires knowledge through utilization of appropriate resources (e.g. literature, attendings, electronic sources, conferences) | | | ✓ | | | |
| cally evaluates current scientific literature | | | ✓ | | | |
| pts feedback appropriately and acts on areas identified for ovement | | | | | ✓ | |
| s opportunities to strengthen knowledge and skills | | | | ✓ | | |
| ins information from their own patient population and the larger lation from which their patients are drawn to formulate decisions | | | ✓ | | | |
| information technology to manage information, access on-line ical information and support own education | | | | ✓ | | |
| lies knowledge of study designs and statistical methods to the appraisal inical studies and other information on diagnostic and therapeutic tiveness | | | ✓ | | | |

uments: While evaluating literature (both informally and formally), look for reputed journals, comment on patient population, experimental design ient numbers, statistical analysis (and their validity), and results. If things — not clear, pull up articles referenced in the article to give you a better derstanding of the background of the study. Read the authors and nclusions and decide for yourself is their conclusion a valid UH000066

| Competency: Systems-Based Practice<br>Fellows must demonstrate an awareness of and responsiveness to the larger context and system of health care to provide care that is of optimal value | <25% of time | 25-49% of time | 50-75% of time | 76-95% of time | >95% of time | Unable to evaluate |
|---|---|---|---|---|---|---|
| Practices cost-effective health care and resource allocation that does not compromise quality of care. Considers cost benefit analysis in providing clinical care | | | ✓ | | | |
| Advocates for quality patient care and assists patients in dealing with system complexities | | | | ✓ | | |
| Is familiar with documentation criteria for different levels of care | | | ✓ | | | |
| Utilizes clinical guidelines/care paths effectively when appropriate | | | | ✓ | | |
| Recognizes potential conflicts of interest between individual patients and their health care organizations and advocates on the patient's behalf | | | ✓ | | | |
| Understands how types of medical practice and delivery systems differ from one another, including methods for controlling health care costs and allocating resources | | | ✓ | | | |

Comments:

| Competency: Interpersonal and Communication Skills<br>Fellows must demonstrate interpersonal and communication skills that result in effective information exchange with patients and colleagues | <25% of time | 25-49% of time | 50-75% of time | 76-95% of time | >95% of time | Unable to evaluate |
|---|---|---|---|---|---|---|
| Communicates effectively with patients and families | | | | ✓ | | |
| Maintains accurate, timely, complete and legible medical records | | | ✓ | | | |
| Identifies self and other members of the health care team & explains roles | | | | ✓ | | |
| Use appropriate language at the proper developmental level/educational level for patient, care givers, and family members | | | | ✓ | | |
| Uses effective listening skills to elicit information | | | | | ✓ | |
| Communicates with patient and caregiver in the appropriate setting | | | | | ✓ | |
| Communicates with referring providers through face-to-face meetins, dictated letters and, if warranted, phone calls in a concise and timely fashion | | | ✓ | | | |

Comments: ① Outpatient chart note dictations should be more comprehensive. Expand on your assessment section (pull individual problems apart and at the same time look at the big picture). Consider writing your assessment/problem list and recommendations as numbered lists. ② Should discuss charts with attending *[illegible handwriting]* WUH000057

| petency: **Professionalism**<br>s must demonstrate a commitment to professional responsibilities,<br>nce to ethical principles, and sensitivity to a diverse patient population | <25%<br>of time | 25-49%<br>of time | 50-75%<br>of time | 76-95%<br>of time | >95%<br>of time | Unable to<br>evaluate |
|---|---|---|---|---|---|---|
| onstrates compassion and respect for others | | | | | ▓ | |
| onstrates sensitivity and responsiveness to patients' culture, ethnicity, ;ender, and disabilities | | | | | ▓ | |
| with honesty and integrity | | | | | ▓ | |
| ;es in ethical medical practices | | | | | ▓ | |
| onstrates productive work habits including punctuality, effective time ;ement, initiative and organization | | | | ✓ | | |
| :s effectively with other members of the health care team | | | | ✓ | | |
| s ownership and responsibility for patient care | | | | ✓ | | |
| onds positively to constructive criticism | | | | | ✓ | |
| :rstands role of peer review as it relates to professional accountability | | | ✓ | | | |
| :rstands role of expected professional behavior of a consultant | | | | ✓ | | |
| onstrates a commitment to on-going professional development igh regular attendance at conferences and reading medical literature | | | | | ✓ | |

iments:

**SUMMARY COMMENTS:**

Strengths: (1) Allison has gotten more comfortable wit the clinic and ~~outp~~ in patient workload and is more relaxed now. I Case presentations have improved significantly. (2) Allison's interactions with her patients are warm and caring.

UH000058

Areas for growth and development:

① Literature review - should be more methodical and structured should read original article and should not just be satisfied with abstracts.

② clinic dictations should be more comprehensive

③ Discuss clinic charts with attendings face to face every week

Specific goals for next 6 months:

① In-training exam in March.

② March - April → meet with all members of faculty to investigate ideas for potential research projects.

③ Evidence - based literature review at Journal Club (April, May or June 2011)

Patient encounter observed in its entirety on (date): _____  (Required at once/year)

The fellow's performance was ____above ____at ✓ below the level expected for his/her level of training

Should this fellow's performance receive special review by the Pediatric Endocrinology Education Committee? Yes___ No____

The evaluator(s) should discuss the evaluation with the individual fellow.  After this discussion occurs, please have the fellow and the faculty evaluator sign below.

Faculty Evaluator _____ Naveen Uli____ Date 2/24/11

Fellow Evaluated _____ Matter____ Date 2/24/11

*Please return completed form to Naveen K. Uli, Division of Pediatric Endocrinology and Metabolism, RB&C 737*

UH000059

## FELLOW ACKNOWLEDGEMENT OF REVIEW OF EVALUATIONS

Date: 5/18/11

Fellow: Alison Matthews

Dr. Uli and I met and reviewed the overall content and individual comments from my faculty, endocrine nurse, and patient family evaluations that were completed for the period January – June / July – December of 2010.

☑ We reviewed my results from the recent Specialty In-Training Examinations conducted in March 2011.

Signed:

*Alison Matthews*

Fellow:

Naveen Uli, MD
Program Director

PENGAD 800-631-6989
PLAINTIFF'S EXHIBIT
21
ULI

**Additional Notes:**

① SITE score: We discussed that Alison's scores are well below the national average and she needs to improve this in order to be successful in passing Ped Endo Boards at the end of her fellowship. She indicated she did not prepare for this test, and is generally a poor test taker. We decided that Prep ENDO questions might be a good way of preparing for Boards. Encouraged her to focus her chapter (textbook) reading based on ABP content outline.

② Clinic chart dictations: These have gotten better, with more content and reflect her decision making process better than the past.

UH000304

3) Inadequate participation at Wednesday conferences:
I and other faculty members have noticed she is less
attentive and more sleepy/disinterested these past few weeks.
She stated she has had no family/personal problems. She also
stated she moonlights only occasionally + once a month or
even less than that. She reportedly has been reading background
articles and working on clinic charts late into the night,
with resultant decrease in sleep.

4) Research project: She was initially thinking of working with
Dr Maureen Hack to analyze long term outcomes of premie
babies, but thinks it might not be very feasible. She has
spoke with Dr Gubitosi-Klug about pursuing project in
premies, looking at vitamin D levels and working with
Dr Dee Costello. Encouraged her to prepare background
materials, objectives + hypothesis and present to our
division in the next 3 weeks.

**Case Western Reserve University / University Hospitals Case Medical center**
**UH Rainbow Babies & Children's Hospital**

**Fellowship in Pediatric Endocrinology**
FELLOW CLINICAL EVALUATION – LEVEL SPECIFIC COMPETENCIES

Fellow's Name   ALISON MATTHEWS

Date/Academic Year:   June 2011 / 3yr fellow

Evaluator   N. Wy

| Color Code | |
|---|---|
| **Level of Training** | **Color Code** |
| ✓ I Year Fellow: | Rose |
| ___ II Year Fellow: | Yellow |
| ___ III Year Fellow: | Green |

The ACGME has identified 6 areas (Core Competencies) in which fellows must develop competency during the course of training. Please check the boxes that best represent the frequency with which the fellow demonstrated the described knowledge/skills/attitudes during this rotation.

| **Competency: Patient Care** Fellows must be able to provide patient care that is compassionate, appropriate and effective for the treatment of health problems and the promotion of health | <25% of time | 25-49% of time | 50-75% of time | 76-95% of time | >95% of time | Unable to evaluate |
|---|---|---|---|---|---|---|
| Obtains a focused history for each of the specialty diagnoses we see | | | ✓ | | | |
| Obtains a directed physical examination for each of the specialty diagnoses we see | | | ✓ | | | |
| Formulates and prioritizes a differential diagnosis based on patient information, current scientific evidence and sound clinical judgment | | | ✓ | | | |
| ...thesizes evidence in making therapeutic decisions and employs the therapeutic management of choice for a given working diagnosis | | ✓ | | | | |
| Provides appropriate health maintenance and preventative measures based on age, gender, risk factors, and developmental stage | | | ✓ | | | |
| Utilizes medical literature and information technology to inform and support patient care decisions and to educate patients | | | ✓ | | | |
| Identifies appropriate community resources to address patient needs | | | ✓ | | | |
| Obtains appropriate laboratory and radiographic studies to evaluate differential diagnoses and establish final diagnosis | | | ✓ | | | |
| Obtains results of laboratory and radiographic studies in a timely fashion | | ✓ | | | | |
| Accurately interprets test results, including results of endocrine stimulation tests | | ✓ | | | | |
| Demonstrates ability to read bone age X-rays | | | ✓ | | | |
| Counsels and educates patients and families regarding diagnostic and management plans | | | ✓ | | | |

PLAINTIFF'S EXHIBIT 22 ULI  PENGAD 800-631-6989

Comments:  Need to expand critical thinking abilities when coming up with differential diagnoses, incorporating current medical knowledge in patho physiology, diagnostic / management tools.

UH000014

## petency: Medical Knowledge

s must demonstrate knowledge about established and evolving biomedical, l and epidemiological sciences and the application of this knowledge to care

| | <25% of time | 25-49% of time | 50-75% of time | 76-95% of time | >95% of time | Unable to evaluate |
|---|---|---|---|---|---|---|
| nstrates sound foundation of knowledge for each of the subspecialty ses we see | | ▨ | ▨ | | | |
| stands unique challenges experienced by children and families with ic diseases | | | ▨ | | | |
| stands basic and clinical science underpinnings of endocrine axes and rine disorders | | ✓ | ▨ | | | |
| ally evaluates current medical information | | ✓ | ▨ | | | |
| fies areas for improvement of self-knowledge and demonstrates a gness to be a life-long learner | | ✓ | ▨ | | | |
| es knowledge with attention to clinical outcome, cost-effectiveness, enefit, and patient preference | | ▨ | ▨ | | | |
| tates education of students and other health care professionals | | | ▨ | | | |

nents: Should expand knowledge beyond content of "Sperling"

## petency: Practice-based Learning

s must be able to investigate and evaluate their patient care practices, se and assimilate scientific evidence and improve patient care practices

| | <25% of time | 25-49% of time | 50-75% of time | 76-95% of time | >95% of time | Unable to evaluate |
|---|---|---|---|---|---|---|
| ires knowledge through utilization of appropriate resources (e.g. 'literature, attendings, electronic sources, conferences) | | ✓ | ▨ | | | |
| ally evaluates current scientific literature | | ✓ | ▨ | | | |
| pts feedback appropriately and acts on areas identified for ovement | | | | ✓ | | |
| s opportunities to strengthen knowledge and skills | | | ✓ | | | |
| ins information from their own patient population and the larger lation from which their patients are drawn to formulate decisions | | | ✓ | | | |
| information technology to manage information, access on-line ical information and support own education | | | ✓ | | | |
| lies knowledge of study designs and statistical methods to the appraisal inical studies and other information on diagnostic and therapeutic tiveness | | | ▨ | | | ✓ |

ments: Need to evaluate literature in a very critical manner, paying attention to primary literature → research methods, validity of conclusions.

| Competency: Systems-based Practice<br>Fellows must demonstrate an awareness of and responsiveness to the larger context and system of health care to provide care that is of optimal value | <25% of time | 25-49% of time | 50-75% of time | 76-95% of time | >95% of time | Unable to evaluate |
|---|---|---|---|---|---|---|
| Practices cost-effective health care and resource allocation that does not compromise quality of care.  Considers cost benefit analysis in providing clinical care | | | | | ✓ | |
| Advocates for quality patient care and assists patients in dealing with system complexities | | | | ✓ | | |
| Is familiar with documentation criteria for different levels of care | | | ✓ | | | |
| Utilizes clinical guidelines/care paths effectively when appropriate | | | | ✓ | | |
| Recognizes potential conflicts of interest between individual patients and their health care organizations and advocates on the patient's behalf | | | ✓ | | | |
| Understands how types of medical practice and delivery systems differ from one another, including methods for controlling health care costs and allocating resources | | | ✓ | | | |

Comments:

| Competency: Interpersonal and Communication Skills<br>Fellows must demonstrate interpersonal and communication skills that result in effective information exchange with patients and colleagues | <25% of time | 25-49% of time | 50-75% of time | 76-95% of time | >95% of time | Unable to evaluate |
|---|---|---|---|---|---|---|
| Communicates effectively with patients and families | | | | ✓ | | |
| Maintains accurate, timely, complete and legible medical records | | | | ✓ | | |
| Identifies self and other members of the health care team & explains roles | | | | | ✓ | |
| Use appropriate language at the proper developmental level/educational level for patient, care givers, and family members | | | | ✓ | | |
| Uses effective listening skills to elicit information | | | | | ✓ | |
| Communicates with patient and caregiver in the appropriate setting | | | | | ✓ | |
| Communicates with referring providers through face-to-face meetins, dictated letters and, if warranted, phone calls in a concise and timely fashion | | | | ✓ | | |

Comments:

UH000016

| petency: Professionalism<br>vs must demonstrate a commitment to professional responsibilities,<br>nce to ethical principles, and sensitivity to a diverse patient population | <25%<br>of time | 25-49%<br>of time | 50-75%<br>of time | 76-95%<br>of time | >95%<br>of time | Unable to<br>evaluate |
|---|---|---|---|---|---|---|
| onstrates compassion and respect for others |  |  |  |  | ✓ |  |
| onstrates sensitivity and responsiveness to patients' culture, ethnicity, gender, and disabilities |  |  |  |  | ✓ |  |
| with honesty and integrity |  |  |  |  | ✓ |  |
| ges in ethical medical practices |  |  |  |  | ✓ |  |
| onstrates productive work habits including punctuality, effective time gement, initiative and organization |  |  |  | ✓ |  |  |
| cs effectively with other members of the health care team |  |  |  | ✓ |  |  |
| s ownership and responsibility for patient care |  |  |  | ✓ |  |  |
| onds positively to constructive criticism |  |  |  |  | ✓ |  |
| erstands role of peer review as it relates to professional accountability |  |  | ✓ |  |  |  |
| erstands role of expected professional behavior of a consultant |  |  |  | ✓ |  |  |
| ionstrates a commitment to on-going professional development gh regular attendance at conferences and reading medical literature |  |  |  | ✓ |  |  |

iments:

**SUMMARY COMMENTS:**

Strengths:

Caring physician
Good communication skills

UH000017

Areas for growth and development:

*Comprehensiveness in clinical evaluation*
*Depth of literature review*
*Getting research project*

Specific goals for next 6 months:

*· Work on medical knowledge, case presentations*

Patient encounter observed in its entirety on (date): _____ (Required at once/year)

The fellow's performance was ____above ____at ✓ below the level expected for his/her level of training

Should this fellow's performance receive special review by the Pediatric Endocrinology Education Committee? Yes___ No___

The evaluator(s) should discuss the evaluation with the individual fellow. After this discussion occurs, please have the fellow and the faculty evaluator sign below.

Faculty Evaluator_____ Date_____

Fellow Evaluated_____ Date_____

*Please return completed form to Naveen K. Uli, Division of Pediatric Endocrinology and Metabolism, RB&C 737*

UH000018





**Case Western Reserve University / University Hospitals Case Medical Center
UH Rainbow Babies & Children's Hospital**

FELLOWSHIP IN PEDIATRIC ENDOCRINOLOGY

REMEDIATION PLAN FOR ALISON MATTHEWS

I met with Alison Matthews on June 29, 2011 to discuss the following matters:

Clinical evaluations from 6 faculty members for the period January through June 2011 (NU, TZ, LC, DSK, MK, SN):
Deficiencies noted were as follows:
    Inadequate progress over her first year as a fellow in clinical knowledge and skills
    Need for more detail in collecting necessary clinical information and thinking through differential diagnoses
    Need for more detailed documentation of clinical information and decision making
    Need for timeliness in reviewing out-patient charts with attendings
    Lack of engagement during divisional conferences
    Literature search and critical topic reviews need to be more detail-oriented and at the level of a fellow

Performance on the Sub-specialty In-Training Examination:
Score 46% (68 out of 148 questions)
    Well below national average ($58 \pm 8$; n=82)

Evaluation of topic presentation (levothyroxine treatment for urticaria):
Need to be more focused and detailed

Research project:
Need to finalize project on vitamin D status of newborns

**The remediation plan discussed was as follows:**
1. Should put more attention to detail in clinical evaluations (history, examination, laboratory assessment, diffrenetial diagnoses, and management plans), documentation of chart notes and communications with families of patients and other staff.
2. Should prioritize chart reviews with attendings within 2-3 weeks of clinic encounter.
3. Expand knowledge base beyond Sperling textbook, seek review articles and primary literature.
4. In-depth topic reviews, paying attention to the methods sections of papers, statistical tools used and validity of conclusions reached.
5. Be more vocal during divisional conferences in case discussions and literature reviews. Should be an active participant.
6. Actively participate in textbook review sessions.
7. Over the next 2 weeks, write detailed background material for research project, with extensive literature review. Discuss with TZ, RGK, LC and myself.



PLAINTIFF'S EXHIBIT
27
ULI
PENGAD 800-631-6989

**Additional resources identified to assist Alison:**
1. I will meet with her once every 2 weeks (more frequently if she needs it or wants it) to discuss a variety of clinical cases in-depth.
2. Prep-Endo questions to help her with preparation for SITE and Boards.

**How progress will be tracked:**
1. My own observations and input from other faculty regarding performance at and after clinics, during clinical on-call service and at divisional rounds.
2. Performance on the SITE in March 2012.
3. Input from divisional nurses and ward house-staff.

_____     Date: 08 / 09 / 2011

Naveen Uli, MD

I agree that I met with Dr. Uli and we discussed the above mentioned matters.

_____     Date: 8 / 9 / 2011

Alison Matthews, MD

I agree to present cases / review topics during divisional conferences; however due to the hostile nature of these conferences in general - I feel it is un-reasonable (and not educational) to volunteer to speak when I am not presenting as this would be ~~offering~~ inviting verbal abuse ~~by~~ from some faculty members.

Although I agree to comply with the above plan, my signature does not represent agreement with the listed deficiencies. In my opinion, the apparent lack of knowledge on my part is due to being a quiet person and not communicating effectively. I will work on my communication skills, but I strongly disagree with the opinion that my overall knowledge is lacking. I will participate in the individualized review sessions

UH000287

and complete the prep questions, but as will not accept any penalities or restrictions being placed upon me. as I feel that I have been wrongly accused and in general have been mistreated by this program. A detailed outline of my grievences is attached.

UH000288



**From:** Matthews, Alison
**Sent:** Sunday, October 02, 2011 10:25 AM
**To:** Hoyen, Claudia; Rebello, William
**Subject:** another update

Thanks again for meeting with me last week. I just wanted to forward you this email that was sent in August 2011. It shows evidence that I was asked to help other fellows with their research projects, even though Dr. Uli denied that this ever happened.

Thanks,
Allison Matthews

---

**From:** Matthews, Alison
**Sent:** Fri 8/12/2011 5:16 PM
**To:** Gubitosi-Klug, Rose
**Cc:** Uli, Naveen
**Subject:** research again- sorry :)

Thanks again for meeting with me today. I certainly understand how my proposed research project on adipokines in breast milk could be very complicated and therefore not an appropriate fellow project. However, I still have a few concerns about just doing someone else's ready-made project- especially another fellow's project. I spoke with Nidhi and Rachana today about their research process, and they both stated that although the overall concept of their project was a faculty idea, they were the ones who refined it to the final focus. I am very concerned that I am not going to have this experience. While I certainly can see the merits of working on a project that is already IRB approved and funded, I still worry that by doing so the project will not be viewed as 'Allison's research project' . Rather, it would be 'X's project that Allison is helping with'. This is especially true when you suggested I help the other fellows with their projects. Although I know time is a big issue, I am extremely concerned that I am not being given the same opportunities as previous fellows. I do have meetings set up with Kyla and Abby to discuss things that they are working on, but I want to make sure that I am not being deprived of a full research experience. Again, although I am a bit disappointed that my adipokine project isn't going to work; my main concern is that I am being asked to help other fellows with their projects rather than having my own. In the past, has a fellow ever been asked to help another fellow with their research as their main project? If not, why is this considered an appropriate thing for me?

Thanks,
Allison


PLAINTIFF'S
EXHIBIT
28
ULI
PENGAD 800-631-6989

10/10/2011

UH000350

Alison M. Matthews, MD
13700 Shaker Blvd, #210
Cleveland, Oh 44120

September 29, 2011

Naveen K. Uli, MD
Pediatric Endocrinology & Metabolism
Rainbow Babies and Chidren's Hospital
Cleveland, Oh 44106

Dear Dr Uli:

This letter is to inform you of the transgressions made against me by yourself and the
Pediatric Endocrinology Fellowship program. I have been subjected to harassment and
discrimination. These behaviors are prohibited by University Hospitals Anti-Harassment
and Discrimination policy and Ohio Revised code 4112.02. Effective immediately, I
request that you cease and desist all harassment and discrimination against me.

As program director, it is your responsibility to provide a work environment that is free
from harassment, fear of retaliation, and undue stress. You have failed to provide me with
even these minimum requirements. I hereby request that you take immediate action to
rectify the situation. Failure to comply will result in my taking this matter to higher
authorities.

Sincerely,

Alison Matthews

Alison M. Matthews



PLAINTIFF'S
EXHIBIT
59
PENGAD 800-631-6989
ULI

## Uli, Naveen

| | |
|---|---|
| **From:** | Rebello, William |
| **Sent:** | Sunday, February 12, 2012 8:01 PM |
| **To:** | Uli, Naveen; Shuck, Jerry |
| **Subject:** | FW: endocrine fellowship |

**Sensitivity:** Confidential

FYI

---

**From:** Matthews, Alison
**Sent:** Sat 2/11/2012 10:40 AM
**To:** Hoyen, Claudia
**Cc:** Rebello, William
**Subject:** endocrine fellowship

I am writing because I am very concerned that my program is not complying with the responsibilities we agreed upon in October. If you recall, we agreed that I would receive an evaluation each month and immediate feedback about things I did well and things needing improvement. This has generally not happened. (Dr. Uli did meet with me once in December and said that I was doing well in general; and I have gotten some occasional praise for patient encounters and a presentation) However, what is even more disturbing to me is that I have received an evaluation from a faculty member for July-December in which the scores were quite low. When I questioned her about this, she stated that I have showed great improvement and that she expects that she will be giving me very high marks on my next evaluation; however because it was a 6 month evaluation she had to take into account my performance earlier in the year. In addition, she largely based the evaluation on a single patient encounter that we had together- I find this a bit unfair. As time has continued, I am beginning to suspect that my program is trying to make things so unpleasant for me that I leave. They have not provided me with concrete measures of achievement and when I question them, they give vague criticisms which makes it impossible for me to succeed. I would very much like to complete this program despite how unpleasant I find the department. Any help you can provide would be much appreciated.

Thanks,
Allison



PLAINTIFF'S
EXHIBIT
31
ULI
PENGAD 800-631-6989

2/14/2012

UH000310

**Uli, Naveen**

| | |
|---|---|
| **From:** | Matthews, Alison |
| **Sent:** | Sunday, February 12, 2012 8:17 AM |
| **To:** | Uli, Naveen; Koontz, Michaela; MacLeish, Sarah; Glick, Abigail; Kaminski, Beth; Cuttler, Leona; Gubitosi-Klug, Rose; Kerr, Douglas; Narasimhan, Sumana; Zimmerman, Teresa |

**Subject:** wednesday conference

Dear faculty,
It has come to my attention that many of you wish for me to speak more during Wednesday conferences, and are interpreting my silence as ignorance. However, my culture/religion, learning style, shyness, and anxiety make it extremely difficult for me to just shout out answers. Therefore, I invite you to ask me questions. In addition, I plan to make more than the required number of presentations. (I have a very interesting topic that I am excited to present on 2/22). Hopefully, this is a compromise that will suit everybody's needs. I believe that a training program should take into account a variety of learning styles-not everybody learns the same way. If you have any other suggestions as to how we can work to solve this issue, please let me know.

Thanks,
Allison



2/14/2012

---

### UNIVERSITY HOSPITALS GRADUATE MEDICAL EDUCATION PROGRAMS
### PERFORMANCE ALERT NOTICE

---

Resident: <u>ALISON MATTHEWS</u>     Program: <u>PEDIATRIC ENDOCRINOLOGY</u>

This Performance Alert Notice is to officially inform you of our concern regarding your performance as a resident. Based upon information provided by members of the faculty, your performance in the following marked competencies and/or your conduct has been identified as marginal or unsatisfactory.

☐ **PATIENT CARE.**  Resident does not consistently provide patient care that is compassionate, appropriate, and effective for the treatment of health problems and the promotion of health.  Resident is expected to:
  ☐ communicate effectively and demonstrate caring and respectful behaviors when interacting with patients and their families
  X **gather essential and accurate information about his/her patients**
  X **make informed decisions about diagnostic and therapeutic interventions based on patient information and preferences, up-to-date scientific evidence, and clinical judgment**
  X **develop and carry out patient management plans**
  ☐ counsel and educate patients and their families
  ☐ use information technology to support patient care decisions and patient education
  ☐ perform competently all medical and invasive procedures considered essential for the area of practice
  ☐ provide health care services aimed at preventing health problems or maintaining health
  ☐ work with health care professionals, including those from other disciplines, to provide patient-focused care

☐ **MEDICAL KNOWLEDGE.**  Resident does not consistently demonstrate knowledge about established and evolving biomedical, clinical, and cognate (e.g., epidemiological and social-behavioral) sciences and the application of this knowledge to patient care.  Resident is expected to:
  X **demonstrate an investigatory and analytic thinking approach to clinical situations**
  X **know and apply the basic and clinically supportive sciences which are appropriate to his/her discipline**

☐ **PRACTICE-BASED LEARNING AND IMPROVEMENT.**  Resident is not able to consistently investigate and evaluate this/her patient care practices, appraise and assimilate scientific evidence, and improve his/her patient care practices. Resident is expected to:
  ☐ analyze practice experience and perform practice-based improvement activities using a systematic methodology
  X **locate, appraise, and assimilate evidence from scientific studies related to his/her patients' health problems**
  ☐ obtain and use information about own population of patients and the larger population from which his/her patients are drawn
  X **be responsive to feedback on performance**
  ☐ apply knowledge of study designs and statistical methods to the appraisal of clinical studies and other information on diagnostic and therapeutic effectiveness
  ☐ use information technology to manage information, access on-line medical information; and support his/her own education

1



PLAINTIFF'S
EXHIBIT
33
PENGAD 800-631-6989
VLI



EXHIBIT
C
tabbies
UH000061

□ facilitate the learning of students and other health care professionals

□ **INTERPERSONAL AND COMMUNICATION SKILLS.** Resident does not consistently demonstrate interpersonal and communication skills that result in effective information exchange and teaming with patients, their patients families, and professional associates. Resident is expected to:
  □ create and sustain a therapeutic and ethically sound relationship with patients
  □ use effective listening skills and elicit and provide information using effective nonverbal, explanatory, questioning, and writing skills
  X **work effectively with others as a member or leader of a health care team or other professional group**

□ **PROFESSIONALISM.** Resident does not consistently demonstrate a commitment to carrying out professional responsibilities, adherence to ethical principles, and sensitivity to a diverse patient population. Resident is expected to:
  X demonstrate: respect, compassion and integrity; a **responsiveness to the needs of patients** and society that supercedes self-interest; accountability to patients, society, and the profession; and a commitment to excellence and on-going professional development
  □ demonstrate a commitment to ethical principles pertaining to provision or withholding of clinical care, confidentiality of patient information, informed consent, and business practices
  □ demonstrate sensitivity and responsiveness to patients' culture, age, gender, and disabilities

□ **OTHER ESSENTIAL ATTRIBUTES NOT BEING MET THAT ARE NECESSARY TO ACHIEVE QUALIFICATION IN CHOSEN SPECIALTY**

X     **Obtain certification in general pediatrics by the American Board of Pediatrics**

2

UH000062

UH000063

**Program Director comments regarding specific marginal or unsatisfactory performance:**

1. Alison has continued to have difficulty obtaining a complete history with all essential elements, formulating a comprehensive assessment and differential and plan, in a consistent manner with every patient she encounters in the in-patient and clinic setting.

2. Although she has steadily improved her fund of endocrine knowledge, she is not functioning at the level of a second year fellow.

3. Sometimes her interpretations of clinical data and laboratory investigations are incomplete.

4. She continues to have difficulty communicating clearly to families and co-workers.

5. Maintenance of patient records and reporting of lab results continue to be unacceptably delayed.

6. She does not respond well to constructive criticism and recommendations for improvement.

**Program Director Recommendations:**

A. Based on the evaluations received from members of the faculty for the period July – December 2011, the specific areas that need attention are as follows:

1. Obtaining complete patient history, formulating comprehensive assessment and plan.
2. Appropriate interpretation of data, based on clinical information and results of investigations ordered.
3. Broadening differential diagnoses by strengthening endocrine fund of knowledge and applying it consistently.
4. Timely completion of charts, with appropriate addenda, reflecting results of ancillary investigations; timely communication with referring physicians.
5. Communication with patients needs to be comprehensive, incorporating information from clinical interactions; laboratory and radiologic data, and after discussing with supervising attending.
6. Positive responsiveness to constructive criticism and recommendations for improvement.
7. Active participation in weekly case conferences and textbook tutorials.
8. Seek opportunities to perform in-depth reviews and presentations on a wide range of endocrine topics.
9. Board certification examination in general pediatrics to be taken in the fall of 2012.

B. Clinical evaluations were discussed at a meeting by members of the faculty on 2/22/12. Several attendings noted the effort Alison had been putting over the past several months, with improvement in her knowledge base. The consensus, however, was that she is not performing at the level expected of a second year fellow in pediatric endocrinology. **The program director and members of the faculty recommend extending her fellowship by 12 months** (new completion date will be June 30, 2014). This will allow adequate time for Alison to develop the core competencies that are mandatory to become eligible for sub-specialty certification by the American Board of Pediatrics.

C. We encourage Alison to pursue all opportunities to strengthen her clinical skills and knowledge in the basic science and clinical aspects of pediatric endocrinology. This includes printed and online resources that are available in the division, department and institution. In addition, members of the faculty are available for one-on-one sessions, if Alison wants to continue them.

D. Alison needs to demonstrate continued improvement in her core competencies on her bi-annual faculty evaluations. In addition, I (program director) will seek input from members of the faculty who supervise her in clinics and on the endocrine in-patient service. Advancement to the next year of training is contingent upon demonstration of satisfactory progress, as assessed by members of the attending faculty by February 2013. Certification of satisfactory completion of fellowship training will also be based on consensus of the divisional faculty.

3

**Resident & Program Director Acknowledgement:**

On this date, I have met with the Program Director regarding my performance in the residency training program. I have read this Performance Alert Notice and the above recommendations by the Program Director. I understand that failure to correct these areas of marginal/unsatisfactory performance could result in any or all of the following: failure of a specific rotation, failure to advance to the next year of training, academic deficiency and remediation, probation, or possible termination of residency training. I understand that this is not a disciplinary action and no appeal is available to me.

_____         _____
Resident Signature                                                            Date

_____         _____
Program Director Signature                                              Date

Original to **permanently** remain in Resident's file; copy to the Resident.

L:\1994\RFM Performance Alert Notice Form 072906.doc

( 2/29/2012 )

    I discussed this Performance Alert with Dr Alison Matthews in presence of Dr Beth Kaminski.

    After reviewing its contents, Dr Matthews refused to sign it. She stated that she would consider a 6 month extension of her fellowship, but refused extension for 12 months.

N. Wu MD

4

UH000064

**From:** Dahiya, Rachana
**Sent:** Fri 6/22/2012 10:19 PM
**To:** Matthews, Alison
**Subject:** FW: Camp check-in this Sunday, June 24, 2012, 1-4 PM

Dr Uli did not include you in this email even though you helped out the past 2 years.
Just thought I would let you know.

**From:** Uli, Naveen
**Sent:** Thu 6/21/2012 5:47 PM
**To:** Kerr, Douglas; Zimmerman, Teresa; Narasimhan, Sumana; Gubitosi-Klug, Rose; Koontz, Michaela;
Kaminski, Beth; Glick, Abigail; MacLeish, Sarah
**Cc:** Bansal, Nidhi; Dahiya, Rachana ; Lowes, Alicia ; Batajoo, Ruby
**Subject:** Camp check-in this Sunday, June 24, 2012, 1-4 PM

Dear all:
I would appreciate any help for camp check-in this Sunday, June 24, between 1 PM and 4 PM.

Thanks,
**Naveen**
Visit us at www.UHhospitals.org.
The enclosed information is STRICTLY CONFIDENTIAL and is intended for the
use of the addressee only. University Hospitals and its affiliates disclaim
any responsibility for unauthorized disclosure of this information to anyone
other than the addressee.
Federal and Ohio law protect patient medical information, including
psychiatric_disorders, (H.I.V) test results, A.I.Ds-related conditions,
alcohol, and/or drug_dependence or abuse disclosed in this email. Federal
regulation (42 CFR Part 2) and Ohio Revised Code section 5122.31 and
3701.243 prohibit disclosure of this information without the specific
written consent of the person to whom it pertains, or as otherwise permitted
by law.



PLAINTIFF'S
EXHIBIT
34
ULI

**From:** Matthews, Alison <Alison.Matthews@UHhospitals.org>
   **To:** AMatth4932 <AMatth4932@aol.com>
**Subject:** FW: Would appreciate help at camp check-in this Sunday June 17 (12 noon - 4 PM)
   **Date:** Fri, Jun 22, 2012 10:43 pm

**From:** Dahiya, Rachana
**Sent:** Fri 6/22/2012 10:22 PM
**To:** Matthews, Alison
**Subject:** FW: Would appreciate help at camp check-in this Sunday June 17 (12 noon - 4 PM)

Or this one!

**From:** Uli, Naveen
**Sent:** Thu 6/14/2012 8:44 PM
**To:** Zimmerman, Teresa; Narasimhan, Sumana; Gubitosi-Klug, Rose; Kerr, Douglas; Koontz, Michaela; Kaminski, Beth; Glick, Abigail; MacLeish, Sarah; Dahiya, Rachana ; Bansal, Nidhi; Lowes, Alicia ; Batajoo, Ruby
**Subject:** Would appreciate help at camp check-in this Sunday June 17 (12 noon - 4 PM)

Dear all:

Please let me know if any of you are able to help out at camp check-in this Sunday between 12 noon and 4 PM, so that can tally an approximate headcount.

Any help, even for 1-2 hours is graetly appreciated.

**Naveen**

Visit us at www.UHhospitals.org.

The enclosed information is STRICTLY CONFIDENTIAL and is intended for the use of the addressee only. University Hospitals and its affiliates disclaim any responsibility for unauthorized disclosure of this information to anyone other than the addressee.

Federal and Ohio law protect patient medical information, including psychiatric_disorders, (H.I.V) test results, A.I.Ds-related conditions, alcohol, and/or drug_dependence or abuse disclosed in this email. Federal regulation (42 CFR Part 2) and Ohio Revised Code section 5122.31 and 3701.243 prohibit disclosure of this information without the specific written consent of the person to whom it pertains, or as otherwise permitted by law.

:

Allison Matthews
13700 Shaker Blvd. #210
Cleveland, OH 44120

12/16/2012

To Whom It May Concern:

I hereby tender my resignation from the Pediatric Endocrinology Fellowship program, effective December 31, 2012.

Thank You,

*Alison Matthews*

Allison Matthews



PLAINTIFF'S
EXHIBIT
35
UU
PENGAD 800-631-6989

UH000085



# RESIDENT MANUAL



PLAINTIFF'S
EXHIBIT
37
PENGAD 800-631-6989
ULI



**University Hospitals Case Medical Center
Resident Manual**

**Effective July 1, 2012**

| Document Owner(s) | Organization Role | Signature | Date |
|---|---|---|---|
| Eric Bieber, M.D. | Chief Medical Officer | | |
| Jerry Shuck, M.D. | DIO, DME | | |
| Julie Chester | Director, HR | | |
| William Rebello, M.B.A | Manager, GME Department | | |

**Note:**  The content of a manual does not constitute nor should it be construed as a promise of employment or as a contract between University Hospitals Case Medical Center and any of its employees.

University Hospitals Case Medical Center's Office of Graduate Medical Education at its option, may change, delete, suspend, or discontinue parts or the policy in its entirety, at any time without prior notice.

**RESIDENT MANUAL**
**TABLE OF CONTENTS**

University Hospitals Case Medical Center ................................................................ I

RESIDENT MANUAL ........................................................................................... I

1.      INTRODUCTORY STATEMENTS ................................................. 10

1.1     INSTITUTIONAL COMMITMENT ................................................ 10

1.2     WELCOME ................................................................................. 11

1.3     INTRODUCTION ........................................................................ 12

1.4     MISSION, VISION, VALUES ...................................................... 13

1.5     HISTORICAL OVERVIEW .......................................................... 14

1.6     DIVERSITY ................................................................................ 16

1.7     PURPOSE OF THIS MANUAL ................................................... 17

2.      APPOINTMENT ......................................................................... 17

2.1     ELIGIBILITY .............................................................................. 17

2.2     VISA POLICY ............................................................................ 18

2.3     EMPLOYMENT CONTRACTS ................................................... 19

2.4     RENEWAL OF APPOINTMENT ................................................. 19

2.5     NON-RENEWAL OF APPOINTMENT ......................................... 19

2.6     COMPLETION OF TRAINING ................................................... 19

2.7     CLOSURE/REDUCTION OF PROGRAM ................................... 19

2.8     TRANSFER ............................................................................... 19

2.9     RESTRICTIVE COVENANTS ................................................... 19

2.10    DISASTER POLICY .................................................................. 20

3.1     ACCOMMODATION FOR DISABILITY ..................................... 22

3

| | | |
|---|---|---|
| 3.2 | BACKGROUND CHECKS | 22 |
| 3.3 | PAYROLL | 22 |
| 3.4 | TAXES AND OTHER WITHHOLDINGS | 22 |
| 3.5 | I.D. BADGES | 23 |
| 3.6 | VACATION | 23 |
| 3.7 | HOLIDAYS | 23 |
| 3.8 | DISCOUNTS | 23 |
| 3.9 | LICENSURE | 23 |
| 3.9.1 | MEDICAL LICENSURE | 23 |
| 3.9.2 | DENTAL LICENSURE: LIMITED RESIDENT'S LICENSE | 24 |
| 3.9.3 | CONTROLLED SUBSTANCE LICENSURE | 24 |
| 3.10 | CHANGE IN NAME/ADDRESS | 24 |
| 3.11 | DRUG FREE WORKPLACE | 24 |
| 3.12 | SAFETY SERVICES | 24 |
| 3.13 | PROTECTIVE SERVICES | 25 |
| 3.14 | BLOOD BORNE PATHOGEN TRAINING | 25 |
| 3.15 | SMOKING POLICY | 25 |
| 3.16 | HARASSMENT AND DISCRIMINATION | 26 |
| 3.17 | EMPLOYEE ASSISTANCE COUNSELING | 26 |
| 3.18 | CORPORATE HEALTH SERVICE | 26 |
| 4. | DISPUTES, DISCIPLINE & CONFLICT | 27 |
| 4.1 | ACADEMIC AND PROFESSIONAL DISCIPLINARY ACTIONS | 27 |
| 4.1.1 | SUSPENSION. | 27 |
| 4.1.2 | PROBATION | 27 |
| 4.1.3 | DISMISSAL | 28 |

**4.1.4  NON-RENEWAL OF RESIDENT'S CONTRACT** ................................................ **28**

**4.1.5  DENIAL OF CERTIFICATE OF COMPLETION** ................................................. **28**

**4.2     DISCIPLINARY ACTION PROCESS** ..................................................................... **29**

**4.2.1  RECOMMENDATION** ......................................................................................... **29**

**4.2.2  REVIEW OF RECOMMENDATION** ..................................................................... **29**

**4.3     ACTIONS REPORTABLE TO THE MEDICAL BOARD** ...................................... **29**

**4.4     NON-ACADEMIC CORRECTIVE ACTIONS** ........................................................ **30**

**4.5     RESIDENT DUE PROCESS** ............................................................................... **30**

**4.5.1  RESIDENT APPEALS PROCESS** ..................................................................... **30**

**4.5.2  RESIDENT GRIEVANCE PROCESS** ................................................................. **31**

**4.6     DISPUTES BETWEEN RESIDENT AND MEDICAL SUPERVISORS** ............... **32**

**5.      STANDARDS OF CONDUCT** .............................................................................. **33**

**5.1     RESIDENT SUPERVISION** ................................................................................. **33**

**5.2     DUTY HOURS & ON CALL ACTIVITIES** ........................................................... **33**

**5.2.1  DUTY HOURS** ................................................................................................... **33**

**5.3     EXTRA DUTY & MOONLIGHTING** ..................................................................... **35**

**5.4     CONFIDENTIAL INFORMATION, HIPAA AND MEDIA STATEMENTS** ........... **37**

**5.4.1  PROTECTED HEALTH INFORMATION** ............................................................ **37**

**5.4.2  HIPAA** ................................................................................................................ **37**

**5.4.4  INTERNET POLICY** ........................................................................................... **38**

**5.5     ADVOCACY EFFORTS** ...................................................................................... **38**

**5.6     COMPUTERS & ELECTRONIC DATA** ............................................................... **38**

**5.7     MARKETING & COMMUNICATIONS** .................................................................. **39**

**5.8     COMPLIANCE AND ETHICS** .............................................................................. **39**

**5.9     DRESS CODE** .................................................................................................... **40**

5.10    PROFESSIONAL BEHAVIOR ....................................................................... 40

5.11    SAFETY TRAINING ................................................................................... 40

5.12    OBLIGATION TO TREAT ........................................................................... 40

5.13    PHYSICIAN IMPAIRMENT .......................................................................... 40

6.       BENEFITS & INSURANCE MATTERS ....................................................... 41

6.1      PROFESSIONAL LIABILITY INSURANCE ..................................................... 41

6.2      WELLNESS MATTERS .............................................................................. 41

6.3      CONTINUATION OF MEDICAL COVERAGE: COBRA .................................... 41

7.       TIME-OFF BENEFITS ............................................................................... 42

7.1      LEAVES OF ABSENCE .............................................................................. 42

7.2      SICK TIME .............................................................................................. 42

7.3      MATERNITY/PATERNITY LEAVE ................................................................ 42

7.4      ADDITIONAL LEAVE OF ABSENCE CONSIDERATIONS ............................... 42

8.       INSTITUTIONAL POLICIES ....................................................................... 43

8.1      POLICY AND PROCEDURE MANUALS ........................................................ 43

8.2      CHAPERONES DURING INTIMATE EXAMINATIONS .................................... 43

8.3      COMMUNICABLE DISEASES ..................................................................... 43

8.4      LEGAL MATTERS .................................................................................... 45

8.5      E-MAIL RECORD RETENTION .................................................................... 45

9.       EVALUATIONS ........................................................................................ 45

9.1      EVALUATION OF FACULTY ....................................................................... 45

9.2      EVALUATION OF A RESIDENT'S PERFORMANCE ....................................... 46

9.2.1   ACADEMIC AND PROFESSIONAL STANDARDS .......................................... 46

9.2.2   PERFORMANCE REVIEW ACTIONS .......................................................... 46

10.      MEDICAL RECORDS ............................................................................... 48

**10.1 ELECTRONIC MEDICAL RECORDS** .................................................. **48**

**10.2 GUIDELINES FOR MEDICAL RECORD COMPLETION** ................................... **48**

**10.3 GUIDELINES FOR DOCUMENTATION IN THE MEDICAL RECORD** .............. **49**

**10.4 GUIDELINES FOR ENTRIES INTO THE MEDICAL RECORD** ....................... **49**

**10.5 PHYSICIAN ORDERS** .................................................................. **50**

**10.6 PRESCRIBING CONTROLLED SUBSTANCES OVER THE TELEPHONE** ..... **50**

**11. HOSPITAL RESOURCES, PATIENT CARE RELATED MATTERS** ................. **50**

**11.1 PATIENTS RIGHTS AND RESPONSIBILITIES** ................................. **50**

**11.2 PATIENT ACCESS SERVICES** ........................................................ **51**

**11.2.1 PATIENT ADMITTING** ................................................................ **51**

**11.2.2 ADMITTING PROCESS** .............................................................. **51**

**11.2.3 EMERGENCY ADMISSION** .......................................................... **51**

**11.2.4 WHAT TO TELL YOUR PATIENT PRIOR TO ADMISSION** ........................... **52**

**11.2.5 PRE-REGISTRATION/VERIFICATION/CERTIFICATION** ................................ **52**

**11.2.6 PREADMISSION ASSESSMENT AND TEACHING (PAT)** ............................... **52**

**11.2.7 DISCHARGE OF PATIENTS** ........................................................ **52**

**11.3 DEATH OF PATIENTS** ................................................................ **52**

**11.3.1 DEATH ON HOSPITAL PREMISES** ............................................... **53**

**11.3.2 DEAD ON ARRIVAL CASES** ........................................................ **53**

**11.3.3 MORTICIANS** ......................................................................... **53**

**11.3.4 CORONER CASES** .................................................................... **53**

**11.3.5 CONSENT FOR ORGAN OR TISSUE DONATION** ............................... **53**

**11.3.6 AUTOPSIES** .......................................................................... **54**

**11.3.6.1 OBTAINING CONSENT TO PERFORM AN AUTOPSY** ................................ **54**

**11.3.6.2 AUTOPSY OFFICE** .................................................................. **54**

11.3.6.3 NOTIFICATION OF CLINICIANS OF AUTOPSIES .......................................... 54

11.3.6.4 INFORMATION TO CLINICIANS REGARDING AUTOPSIES ........................ 54

11.3.6.5 OUTSIDE INQUIRIES CONCERNING AUTOPSY FINDINGS ........................ 54

11.4    DEATH CERTIFICATE ................................................................... 54

11.5    SERVICE TO INPATIENTS .............................................................. 55

11.6    INTRANET - INTERNET - E-MAIL - ELECTRONIC DATA ........................... 55

11.7    RADIATION SAFETY ..................................................................... 55

11.8    VISITORS ................................................................................. 55

11.9    PATIENT THERAPY LEAVE OF ABSENCE ........................................... 56

11.10   INSTITUTIONAL RESOURCES FOR PATIENTS ..................................... 56

11.11   AUTOLOGOUS BLOOD TRANSFUSION ............................................. 56

11.12   BLOODLESS MEDICINE & SURGERY PROGRAM ................................. 57

11.13   CHILD PROTECTION PROGRAM AND CHILD ABUSE AND NEGLECT........ 57

11.14   INTERPRETER SERVICES .............................................................. 57

11.15   NURSING SERVICES .................................................................... 58

11.16   NUTRITION SERVICES .................................................................. 59

11.17   PHARMACY SERVICES .................................................................. 59

11.18   VOLUNTEER SERVICES ................................................................ 59

11.19   REHABILITATION SERVICES .......................................................... 60

11.20.1 REFERRAL PROCESS ................................................................... 60

11.20   SOCIAL WORK SERVICES .............................................................. 60

11.21   PATIENT TRANSPORTATION SERVICES ........................................... 61

12.     RESIDENT RESOURCES & ACTIVITIES ............................................ 61

12.1    ACCESS TO CASE WESTERN RESERVE UNIVERSITY .......................... 61

12.2    PARKING ................................................................................... 61

12.3   THE PHYSICIAN PORTAL ................................................................. 61

12.4   TELECOMMUNICATION ................................................................... 61

12.5   CONFERENCES, ROUNDS, LECTURES, ETC. ................................ 62

12.6   RESIDENT PARTICIPATION ON HOSPITAL COMMITTEES ........... 62

12.7   ASSOCIATION OF RESIDENTS & FELLOWS ................................. 62

12.8   HOUSE OFFICERS WELCOME ASSOCIATION ............................. 63

12.9   MINORITY HOUSESTAFF ASSOCIATION ...................................... 63

12.10  FOOD SERVICES ......................................................................... 63

12.10.1 ATRIUM CAFETERIA .................................................................. 63

12.10.2 VENDING MACHINES ................................................................. 63

12.10.3 EINSTEIN BAGEL CO. ............................................................... 63

12.10.4 JAVA JIVE ESPRESSO BAR ...................................................... 63

12.10.5 ON-CALL MEALS ...................................................................... 64

12.11  LIBRARY FACILITIES ................................................................... 64

12.12  ON-CALL ROOMS ........................................................................ 64

12.13  UNIFORMS AND LAUNDRY .......................................................... 64

12.14  HOSPITAL-ISSUED SCRUB SUITS............................................... 64

12.15  UHCMC GME PROGRAM CONTACTS .......................................... 65

12.16   MAP OF UHCMC CAMPUS.......................................................... 67

ACKNOWLEDGEMENT ............................................................................. 70

APPENDICES

1.    **INTRODUCTORY STATEMENTS**

1.1    **INSTITUTIONAL COMMITMENT**

As part of their mission in providing health care services, University Hospitals Case Medical Center ("UHCMC") and University Hospitals Health System ("UH" or "University Hospitals") recognize the need and benefits of graduate medical education. It is our firm belief that sponsoring of graduate medical education programs furthers our mission in the provision of quality care, responding to the community needs and the assurance of future generations of health care professionals necessary to continue to deliver health care to the community.

University Hospitals is committed to providing the necessary educational, financial, and human resources to support Graduate Medical Education. University Hospitals is committed to excellence in its Graduate Medical Education programs and care of patients. We further believe that GME programs, properly structured, monitored and evaluated, can and do lead to improved quality care, relationships between health care providers, the patient and patient's family and may lead to a greater awareness on the part of the consumers of health care as to their responsibilities for their own health.

Additionally, the presence of quality educational programs has the distinct advantage of providing a mechanism for the recruitment and retention of high quality individuals in the medical care arena interested in furthering and improving health care delivery. Graduate Medical Education programs provide a firm basis and play an integral part in the ability of University Hospitals to meet and further its purposes consistent with the philosophy, mission and goals of the institution.
University Hospitals commits itself to the provision of organized GME programs in which Residents develop personal, clinical and professional competence under careful guidance and supervision. These programs will assure the safe and appropriate care of patients and the progression of Resident responsibility, consistent with each physician's clinical experience, knowledge and skill.

University Hospitals commits itself to the provision of a scholarly environment. Faculty will engage in scholarly activity, including research, and will make available to Residents opportunities to participate in and learn from the scholarship of the medical community.
University Hospitals commits itself to providing committed and competent professionals to the teaching faculty of the GME Programs. Members of the teaching faculty will be appointed by the Department Chairperson and will be selected for their professional ability and commitment to teaching, medical education, patient care, and the scientific and humanistic basis of medicine.

The GME programs will emphasize coordinated delivery of care with a community orientation. Special emphasis will be placed on training primary care providers. As appropriate, University Hospitals will take advantage of opportunities to work with other education institutions in fulfilling its educational role.

University Hospitals will also ensure that all of its graduate medical education programs meet or exceed all Institutional and Special Requirements promulgated by the Accreditation Council of Graduate Medical Education (ACGME) and its individual Residency Review Committees.

| | | |
|---|---|---|
| Fred C. Rothstein, M.D.            Date | | Jerry M. Shuck, M.D.            Date |
| President and Chief Executive Officer | | Director, Graduate Medical Education and |
| | | Designated Institutional Official |

Ernest J. Novak, Jr.            Date
Chairman of the Board,
University Hospitals Case Medical Center



**1.2    WELCOME**

To The New Members of the House Staff:

Welcome to University Hospitals Case Medical Center. As one of the premier teaching hospitals in the country, we are pleased to have you as a member of our House Staff as you begin your career in medicine.

This Manual has been prepared to provide you with general information about the Hospital and the UH System. For specific facts relating to policies and procedures, please consult the Formulary and the Hospital and System Policy and Procedure Manuals, located on each patient division, and on the University Hospitals Intranet. If you are viewing this Manual electronically through our Intranet, we have linked you directly to those policies which are of special importance in this Manual. Instructions concerning the particular clinical services to which you are assigned will be given to you by the Program Director of the service.

This is an exciting time in your life, and one that offers many opportunities for continued growth. We hope your association with University Hospitals will prove to be a rewarding and satisfying experience.

We wish you every success.


Fred C. Rothstein, M.D.
President and CEO



Eric J. Bieber, M.D.
Chief Medical Officer



Jerry M. Shuck, M.D.
Director, Graduate Medical Education

200653 v9
July 1, 2012

CONFIDENTIAL                                 UH000401

**1.3    INTRODUCTION**

Throughout this Resident Manual (the "Manual"), the terms "intern," "resident physician," "house officer" and "house staff, " and "fellow," are referred to as "resident."  Residents have an obligation to the patient care program of University Hospitals Case Medical Center and to the effectiveness of the educational program to which they have been appointed.

The most important criterion of the service of the residents is the performance of their professional duties.  Professionalism includes honesty, integrity, respect, and compassion, which includes introducing yourself to patients, explaining your role, and treating patients as if they were members of your family.

The proper discharge of the responsibilities of residents requires their full time effort while on duty.  All residents shall remain within the Hospital as required by their patient care responsibilities and shall be immediately available if on call.

The Department Chairs and Residency Program Directors have the responsibility and authority at all times to assure the residents' effectiveness in the programs.

University Hospitals Case Medical Center comprises a group of long established hospitals which, in a primary affiliation with the Health Science Schools of Case Western Reserve University (Medicine, Dentistry, Nursing, and Social Work), furnish an integrated program to provide the highest quality medical care for the sick and injured, to advance knowledge regarding the cause, to prevent and treat disease and disability, and to educate men and women in the healing professions.

University Hospitals Case Medical Center (UHCMC or the Hospital) and Case Western Reserve University (CWRU) are operated by separate Boards of Directors, and have separate administrations. In addition to UHCMC, University Hospitals Health System (UH) also owns or operates other hospitals throughout Northeast Ohio and although those hospitals may have separate administrations, they are subject to the ultimate authority of UH.  Appointments to the attending staff of UHCMC (as well as appointments to the staffs of the other UH hospitals) are made by the Board of Directors of that hospital upon recommendation by its Clinical Council.  All members of the attending staff at UHCMC are on the CWRU faculty.

The medical activities are the responsibility of the Clinical Council.  This group consists of the Chief Medical Officer, the Chairs of Anesthesiology, Dermatology, Emergency Medicine, Family Medicine, Medicine, Neurology, Neurological Surgery, Obstetrics and Gynecology, Ophthalmology, Orthopedics, Otolaryngology-Head & Neck Surgery, Pathology, Pediatrics, Psychiatry, Radiology, Surgery, Urology, the Director of the Seidman Cancer Center, the Director of the Genetics Center, the President, Executive Vice President, General Managers, Director of Graduate Medical Education and the Senior Vice Presidents of the Hospital (subject to change from time to time).  Two Directors and the Dean of the Medical School are *ex officio* members.

Standing committees of the Clinical Council study matters referred to them and make recommendations to the Council.  One of these standing committees is the Graduate Medical Education Committee (GMEC), chaired by the Director of GME.  This committee monitors the accreditation of each residency and fellowship program sponsored by UHCMC and has responsibility for advising all aspects of residency education.    GMEC consists of Clinical Chairs, Program Directors, senior hospital administrators, and resident representatives.

University Hospitals Case Medical Center has developed the following statement of Mission, Vision and Values.  We encourage all physicians to use this as a guide to their behavior.

200653  v9
July 1, 2012

12

**1.4    MISSION, VISION, VALUES**

**University Hospitals Mission:**

<u>To Heal</u>.   <u>To Teach</u>.   <u>To Discover</u>.

University Hospitals Health System will be the premier integrated health system
by providing access to the highest quality healthcare at a competitive price.

**University Hospitals Health System Vision:**

We will lead our industry in developing and delivering the next generation of consumer-driven health
care.

<u>Superior Quality</u>. We will pursue breakthrough medical advancements and practices to deliver superior
clinical outcomes.

<u>Personalized Experience.</u> Our care will focus on our patients as individuals. We will provide every patient
an experience customized to their medical, emotional, social, and spiritual needs.

**University Hospitals Values:**

<u>Excellence</u>. We have a continuous thirst for excellence and are always seeking ways to improve the
health of those who count on us.

<u>Diversity</u>. We embrace diversity in people, thought, experiences and perspectives.

<u>Integrity</u>. We have a shared commitment to do what is right.

<u>Compassion</u>. We have genuine concern for those in our community and treat them with respect and
empathy.

<u>Teamwork</u>. We work collaboratively as an integrated team to improve patient care and performance.



**1.5    HISTORICAL OVERVIEW**

University Hospitals Case Medical Center is also known as University Hospitals of Cleveland (UHC) and can be traced back to the Civil War. The Ladies Aid Society of the First Presbyterian Church (Old Stone Church) operated a "Home for the Friendless" to assist persons displaced by the Civil War. Seeing the need for a hospital to provide medical care for the poor of Cleveland, a group of civic leaders and parishioners of Old Stone Church formed the Cleveland City Hospital Society, which was incorporated on May 21, l866, "to found a hospital for the reception, care, and medical treatment of sick and disabled persons." The first hospital opened in l866 in a small frame house on Wilson Street and was referred to as the "Wilson Street Hospital." By l875, the hospital had outgrown the building and was relocated to the former Marine Hospital facility (located at East 9th and Lakeside Avenue), which the trustees leased from the federal government. When the City of Cleveland decided to build its own hospital (City Hospital) in l888, the name was changed to Lakeside Hospital.

In l897, Lakeside Hospital signed a formal affiliation agreement with Western Reserve University School of Medicine. About the same time construction began on a new hospital modeled after the pioneering pavilion design of Johns Hopkins University Hospital. The new multi-pavilion Lakeside Hospital was opened in l898 and the Lakeside Training School for Nurses was established the same year. In other parts of the city, the Babies and Children's Dispensary was established in l906 and joined Rainbow Cottage (l887) and Lakeside Hospital in providing medical care for the children of Cleveland. The Maternity Home (hospital) was established in l89l to provide obstetrical services and care for women; it was renamed MacDonald Hospital in l936.

In 1925, Lakeside Hospital joined with Babies and Children's Hospital and the Maternity Hospital to form University Hospitals of Cleveland. A year later Rainbow Hospital, located in South Euclid, affiliated with UHC. In the mid-1920's, construction began on new hospital facilities as well as a new School of Medicine, the Institute of Pathology and Maternity Hospital (MacDonald Women's Hospital) (l929) in the University Circle area. In l93l, the new Lakeside Hospital and Leonard C. Hanna House were dedicated. Two decades later, Howard M. Hanna Pavilion (l956) for psychiatric care was opened and, in l962, the Joseph T. Wearn Laboratory for Medical Research was dedicated. The Benjamin Rose Hospital (1953), one of the nation's first geriatric hospitals, affiliated with UHC in 1957. In 1969, it became part of University Hospitals of Cleveland and its name changed to Abington House. The Robert H. Bishop, Jr. Building, housing operating rooms, radiology services and a new cafeteria was opened in l967. In l97l, a new children's hospital was built, housing both Babies and Children's Hospital and Rainbow Hospital. In l974, both hospitals were combined under one Board of Trustees as Rainbow Babies and Children's Hospital. The 190-bed Leonard and Joan Horvitz Tower, opened on April 15, 1997, became the most technologically advanced and family oriented pediatric facility in the nation.

New additions to the medical complex in the l970s and l980s included the Mabel Andrews Wing (1972) of the Institute of Pathology, the George M. Humphrey Building (l978), and the Harry J. Bolwell Health Center (l986). University Hospitals of Cleveland's main campus includes: Alfred and Norma Lerner Tower (l994), Samuel Mather Pavilion (l994) and Lakeside Pavilion for adult medical and surgical care; MacDonald Women's Hospital (l89l); Rainbow Babies and Children's Hospital (l887); University Psychiatric Center at Hanna Pavilion (l956), and Bolwell Health Center (l986). University Hospitals of Cleveland and its academic affiliate, Case Western Reserve University School of Medicine, form Ohio's largest biomedical research center. In 1999, the Research Institute of University Hospitals of Cleveland was created. The state of the art research facility is now a joint collaboration between the hospital and the School of Medicine known as the Case Research Institute.

In 2006, as part of a broad strategy to build a strong "UH brand," we created a new name and logo that clearly and consistently communicate our identity to our patients, their families and the communities we serve.  The name of our health care system is now University Hospitals Health System ("UH").

University Hospitals Case Medical Center ("UHCMC") is part of UH, a regional healthcare delivery system that includes University Hospitals Case Medical Center, University Hospitals Geneva Medical Center, University Hospitals Geauga Medical Center, University Hospitals Conneaut Medical Center, University Hospitals Regional Hospitals-with both a Richmond Medical Center and Bedford Medical Center campus, University Hospitals Ahuja Medical Center, University Hospitals Physician Services (includes both University Hospitals Medical Group and University Hospitals Medical Practices), University Hospitals MacDonald Women's Hospital, University Hospitals Rainbow Babies & Children's Hospital, and University Hospitals Seidman Cancer Center.  University Hospitals also includes a broad range of ambulatory centers, skilled nursing facilities, wellness, elderhealth and home care services that house the services of our hospitals, physicians, and other healthcare providers and are located at and branded as University Hospitals Bainbridge Health Center, University Hospitals Berea Health Center, University Hospitals Euclid Health Center, University Hospitals Madison Health Center, University Hospitals Rockside Health Center, University Hospitals Chesterland Health Center, University Hospitals Chagrin Highlands Health Center, University Hospitals Mentor Health Center, University Hospitals Westlake Health Center, University Hospitals Landerbrook Health Center, University Hospitals Willoughby Health Center, University Hospitals Suburban Health Center, University Hospitals Twinsburg Health Center, University Hospitals Concord Health Center, University Hospitals Medina Health Center, University Hospitals Foley ElderHealth Center at Fairhill Center for Aging, University Hospitals Rainbow Pediatric Specialty Center, University Hospitals Management Services Organization, University Hospitals Home Care Services, and University Hospitals CompCare for the management of job related injuries.  Additionally, UH operates St. John Medical Center (f/k/a Saint John WestShore) and has a contractual relationship with Southwest General Health Center.

University Hospitals has outlined a vision for the future of health care in its strategic plan known as Vision 2010, which called for investments of more than $1 billion over five years.  The plan reaffirms a strong commitment to the UHCMC campus with new facilities and the expansion of services, along with new construction and enhancements to our suburban ambulatory centers.  Major facilities projects include a new Cancer Hospital (opening 2011), a new Neonatal Intensive Care Unit (NICU) at University Hospitals Rainbow Babies & Children's Hospital (open 2009), and a new Center for Emergency Medicine (opening 2011) – all adjacent to the UHCMC main campus.  In addition, UH is also nearing completion of the state-of-the-art University Hospitals Ahuja Medical Center, due to open early 2011.

Our logo also reflects the UH brand promise of "patient-centered care" while it provides a new visual identity as part of a broader strategy to build our reputation as a healthcare leader.  Our color – red – communicates confidence and boldness.  The shield symbolizes protection, strength and the academic dimension of UH.  The singular UH signifies the synergy between our academic and medical aspects and reinforces how the public knows us: "UH."  The three horizontal pillars in the shield represent our mission: "To Heal. To Teach. To Discover."  The curved line and dot represent a person and our commitment to people – our patients, our employees and our community.  This person also exhibits health, hope and vitality and brings the logo to life with a confident and forward-looking tonality.

The name and logo unify all of our facilities, programs and services to make it easier for our community – patients, academic medical colleagues, donors and others – to better recognize us and become more aware of all that we have to offer to our community.  Our name and logo will remind everyone that the care provided by University Hospitals is unique and special.

***The mission of University Hospitals Case Medical Center has remained constant for over 140 years -- To Heal, To Teach, and To Discover.***

**1.6     DIVERSITY**

We are respectful of the evolving landscape and believe we have a responsibility to cultivate and nurture diversity within our walls and externally so we may better serve the population.  While excellent medical care has been at the forefront of everything we do, our list of core values also includes diversity, integrity, compassion and teamwork.

At the direction of the board, our leadership was charged with incorporating diversity into the culture of the organization.  In order to make sure the initiative was successful, the board insisted we change, starting at the top.

This led to creation of the Diversity Council to champion the effort, and Dr. Edgar B. Jackson Jr., a retired African-American physician, returned to become our special advisor. The board composition quickly began changing in 2006 as Latinos, African-Americans and women made up two-thirds of the new appointees. Today, minorities represent 28 percent of the board.

Our administrative and medical leadership focused on diversity. They are committed to finding the best and brightest people with diverse backgrounds to come to this organization and fill leadership roles.
Finding more people of color to enter the clinical care arena as physicians and nurses and eliminate disparities in health care are priorities at UH.  Studies consistently show that people of color will seek health care when people who look like them are providing their care.

We are serious about diversity at University Hospitals and demand the same level of commitment from our employees, physicians, and the suppliers who do business with us.

**Diversity Statement**

University Hospitals' commitment to diversity is extended to our patients and families, our workforce, our business partners and to the communities we serve.  We recognize and celebrate the value of diverse cultures, beliefs and identities of the individuals, groups and organizations with whom we work to achieve our mission.

**1.7     PURPOSE OF THIS MANUAL**

The information contained in this Manual is presented for the benefit of the residents of University Hospitals Case Medical Center (UHCMC).  The intent of this Manual is to provide and direct the resident to necessary information concerning the policies, procedures and practices of the UHCMC Graduate Medical Education. UHCMC reserves the right to revise, withdraw, suspend or discontinue its policies, procedures and practices at any time.

This Manual is incorporated into the resident's contract of employment and sets forth many matters that the resident is obligated to obey or observe, but does not in itself contain every obligation a resident must obey and observe. Residents are obligated to follow all of the policies and procedures (and any later-adopted successor policies) of UH and UHCMC.  Please note that various policies and procedures are referenced throughout this Manual.  In the event there is any inconsistency between the terms of this Manual and the policies and procedures of UH and UHCMC, the policies and procedures of UH and UHCMC shall control.

In no way should this Manual be considered as the only, or final, source of information on the policies, procedures and practices of University Hospitals Case Medical Center.  Residents are to refer to the specific UHCMC and UH Policies and Procedures Manuals for all issues concerning employment or patient care, and are encouraged to ask their Program Directors, the GME Office, and Human Resources for additional information or clarification on any such matters.

In no way should this Manual be considered as the only, or final, source of information on the policies, procedures and practices of University Hospitals Case Medical Center.  Residents are to refer to the specific UHCMC Policies and Procedures Manuals for all issues concerning employment or patient care, and are encouraged to ask their Department Chairs for additional information or clarification on any such matters.

**2.     APPOINTMENT**

**2.1     ELIGIBILITY**

The following is the policy of University Hospitals Case Medical Center regarding the recruitment, eligibility and selection of residents.  Each applicant must file an application, provide references including a Dean's letter and, finally, appear for a series of interviews.

       A.      **Eligibility**.  Applicants with one of the following qualifications are eligible for appointment to accredited residency programs:

          1.   Graduates of medical schools in the U.S. and Canada accredited by the Liaison Committee on Medical Education (LCME).

          2.   Graduate of colleges of osteopathic medicine in the U.S. accredited by the American Osteopathic Association (AOA).

          3.   Graduates of medical schools outside the U.S. and Canada who meet one of the following qualifications:

              a.   Have a currently valid certificate issued by the Education Commission for Foreign Medical Graduates (ECFMG).

              b.   Have a full and unrestricted license to practice medicine in a U.S. licensing jurisdiction.

          4.   Graduates of medical schools outside the U.S. who have completed a Fifth Pathway program provided by an LCME accredited medical school.

     5.   Graduates of dental schools in the U.S. and Canada accredited by the Commission on Dental Accreditation who have been accepted into the Case Western Reserve University School of Dental Medicine program in Advanced Educational Dentistry, Pediatric Dentistry or Oral and Maxillofacial Surgery.

B.    **Selection**.

    1.   Programs at University Hospitals Case Medical Center select from among eligible applicants on the basis of their preparedness, ability, aptitude, academic credentials, communication skills, and personal qualities such as motivation and integrity. Programs shall not discriminate with regard to gender, race, age, religion, color, national origin, disability, sexual orientation or veteran status.

    2.   In selecting from qualified applicants programs participate in an organized matching program, where available, such as the National Resident Matching Program (NRMP).

C.    **Additional Items of Note**

    1.   All residency candidates must have passed USMLE/COMLEX Step 1 and all sections of USMLE Step 2 prior to the initiation of residency training and employment by UHCMC.

    2.   All residents must have attempted USMLE/COMLEX Step 3 prior to the beginning of their final year of residency.

    3.   All residents must have passed USMLE/COMLEX Step 3 prior to completion of training to enable the Program Director to attest that the resident is capable of independent practice after training.

    4.   All fellowship candidates must have passed USMLE/COMLEX Step 3 prior to the initiation of fellowship training and employment in an accredited fellowship program by UHCMC.

## 2.2    VISA POLICY

    It is UH policy to comply with the immigration laws of the United States, and all residents must obtain and maintain an immigration status that permits employment by the Hospital in a clinical capacity[1]. UHCMC participates in the application for J-l visas as well as H1-B visas under certain conditions.

    UHCMC supports the pursuit of H-1B visas for graduates of medical schools accredited by the Liaison Committee on Medical Education ("LCME"). Other Foreign Medical Graduates ("FMG") will be considered for the H1-B visa on a case-by-case basis. The GMEC reserves the right to determine qualifications for eligibility for a H-1B visa based upon criteria such as but not limited to an area of need for the hospital (i.e. difficult to fill position; shortage) and the perceived academic potential of the applicant. UHCMC does not discriminate against particular individuals seeking visa status, including based on race, color, national origin, sex, religion, age, or disability. FMG H-1B visa candidates must have a valid certificate from the Educational Commission for Foreign Medical Graduates (ECFMG) and have passed United States Medical Licensing Exam ("USLME") Step 3 at the time of application.

    If, at any time, a resident fails to timely obtain or retain the requisite visa status from the United States Citizenship and Immigration Services (USCIS) the resident will be subject to dismissal or leave of absence, with or without pay, in accordance with applicable USCIS regulations. For any individual UHCMC is required to bear the cost of repatriation, the Resident shall provide UHCMC at least two weeks advance notice of any specific costs associated with such repatriation that UHCMC should bear. To the extent permitted by law, Resident shall follow UHHS System wide Policy HR-18 or its successor with respect to reimbursement for such repatriation costs. Residents who are visa holders may not moonlight.

### 2.3    EMPLOYMENT CONTRACTS

By one month prior to appointment, or reappointment, residents will receive a Resident/Fellowship Contract from the Director of Graduate Medical Education.  This contract must be signed and returned prior to the appointment date as a condition precedent of being employed by UHCMC. All appointments are for one year or less, and may be renewed at the discretion of UHCMC.

### 2.4    RENEWAL OF APPOINTMENT

All reappointment contracts carry the condition that residents must complete their present year of training in a satisfactory manner for the reappointment to be valid at the beginning of the new academic year beginning July 1.  Advancement to the next post graduate year (PGY) level is based upon the recommendation of the Program Director and approved by UHCMC.

### 2.5    NON-RENEWAL OF APPOINTMENT

If at any time a Program Director or Clinical Chairperson determines that a resident is not meeting the standards of the program he/she may recommend non-renewal of the Resident's appointment. Circumstances which might result in non-renewal of appointment are outlined under Academic and Disciplinary Actions in this Manual.

### 2.6    COMPLETION OF TRAINING

Before departing UHCMC at the conclusion of your residency/fellowship training, you must complete obligations to your Program Director and also to UHCMC.  An official clearance sheet must be completed and turned into the Office of Graduate Medical Education (Office of GME) along with your ID badge at Lakeside 3018.  This form can be obtained from your own department, or from the Office of GME.  It will show evidence of your completed medical records, and that you have returned all hospital property such as keys, equipment, parking pass, radiation dosimeter, keys, scrubs, etc.  The form also requests a forwarding address, and reminds you of your right to continuing health insurance coverage through COBRA.

Residents should consult with their Program Director to determine all requirements to graduate have been fulfilled and should seek information on eligibility for specialty boards.  Information on specialty boards may also be found online at www.abms.org.

UHCMC's official certificates of completion are presented to departing residents by the directors of each program.

### 2.7    CLOSURE/REDUCTION OF PROGRAM

If University Hospitals Case Medical Center intends to reduce the size of, or close, a residency program, the residents will be informed as soon as possible.  In the event of such a reduction or closure, the UHCMC will make every effort to allow residents already in the program to complete their education. If any residents are displaced by the closure of a program or a reduction in the number of residents, residents will be assisted in identifying a program in which they can continue their education.

### 2.8    TRANSFER

Residents who apply for transfer from another GME program are subject to all elements of the Eligibility and Selection Policy, as well as additional requirements.

### 2.9    RESTRICTIVE COVENANTS

University Hospitals Case Medical Center strictly prohibits the request for any resident to sign non-competition guarantees.

**2.10    DISASTER POLICY**

To complement the UHCMC Institutional Disaster Plan, a plan is developed specifically for GME to assure educational continuity for the residents. In recent years the disasters experienced in Northeastern Ohio have been limited to electrical outages from storms, power grid failures, and heavy snow storms. Terrorism directly involving UHCMC, potential earthquakes and tornados, and possible man-made casualties, however, must be considered. These, and any other unforeseen disasters, will be managed according to the following guidelines.

A.  Statement of Policy

In the event of a widespread emergency affecting operations of some or all University Hospitals Case Medical Center, the institution has adopted an emergency plan to guide the institutional response to the specific situation.  The Disaster Plan for GME is intended to complement the existing institutional plan, while taking into consideration the educational continuity for the residents. UHCMC is committed to ensuring a safe, organized and effective environment for training of its residents.

1.  UHCMC recognizes the importance of physicians at all levels of training in the provision of emergency care in the case of a disaster.

2.  Decisions regarding initial and continuing deployment of residents in the provision of medical care during an emergency will be made taking into consideration the importance of providing emergency medical care, continuing educational needs of the trainees, and the health and safety of the trainees and their families.

B.  Timeline

1.  Upon the occurrence of the emergency situation and immediately following up to 72 hours:

a.  Residents will be deployed as directed by the Designated Institutional Official. Ongoing decision-making regarding deployment of residents to provide needed clinical care will be based on both the clinical needs of the institution and the safety of the residents.

b.  Those involved in making decisions during this period are:
    -  Designated Institutional Official (DIO)
    -  Chief Medical Officer
    -  Department Chairs
    -  Program Directors

c.  To the extent possible within the constraints of the emergency, decision-makers shall inform and consult with the Law Department, Program Directors, and the Chair of the Association of Residents and Fellows.

d.  The ACGME will be apprised of situations and follows the guidelines as set forth in ACGME Policy H.

2.  By the end of the first week following the occurrence of the emergency situation, if the emergency is ongoing:

a.  An assessment will be made of:
    i.   the continued need for provision of clinical care by the residents, and
    ii.  the likelihood that training can continue on site

b.  The assessment will be made by:
    i.    Chief Medical Officer
    ii.   DIO
    iii.  A Committee of the GMEC

3. By the end of the second week following the occurrence of the emergency situation, if the emergency is ongoing:

   a. The DIO will request an assessment by individual program directors and department chairs as to their ability to continue to provide training;

   b. The DIO will request suggestions for alternative training sites from program directors who feel they will be unable to continue to offer training at UHCMC; and

   c. The DIO will contact ACGME to provide a status report with consideration to possible program reconfigurations and resident transfers.

   d. Those involved in decision making during this period are:
      - DIO
      - Individual Department Chairs
      - Individual Program Directors

   e. Residents who wish to take advantage of the Leave of Absence Policy or be released from the contract will be accommodated.

4. During the third and fourth weeks following the occurrence of the emergency situation, if the emergency is ongoing:

   a. Program directors at alternative training sites will be contacted by UHCMC Program Directors to determine feasibility of transfers as appropriate;

   b. UHCMC Program Directors will notify the DIO of any proposed transfers;

   c. Transfers will be coordinated with ACGME; and

   d. The DIO will be responsible for coordinating the transfers with ACGME.

5. When the emergency situation is ended:

   a. Plans will be make with the participating institutions to which residents have been transferred for them to resume training at UHCMC;

   b. Appropriate credit for training will be coordinated with ACGME and the applicable Residency Review Committees; and

   c. Decision as to other matters related to the impact of the emergency on training will be made.

Lines of authority for deployment of ACGME-accredited residents during the first 72 hours of a disaster:



## 3.    EMPLOYMENT MATTERS

### 3.1    ACCOMMODATION FOR DISABILITY

UHCMC is committed to achieving equal education opportunity and full participation for all residents.  UH complies with the Americans with Disabilities Act of 1990 and the Americans with Disabilities Act Amendment Act of 2008 and accompanying regulations which protect qualified applicants and employees with disabilities from discrimination in hiring, promotion, discharge, pay, training, fringe benefits and other aspects of employment on the basis of disability.

If there is a need for an accommodation related to a disability, the resident should inform the Program Director who will then engage in a dialogue with the resident regarding the requested accommodation. Additional information, including supporting medical documentation, may be requested. Ultimately, a determination will be made regarding whether a reasonable accommodation can be made. A "reasonable accommodation" is any change or adjustment to a job or work environment that permits a qualified applicant or employee with a disability to participate in the job application process, to perform the essential functions of a job, or to enjoy benefits and privileges of employment equal to those enjoyed by employees without disabilities.

### 3.2    BACKGROUND CHECKS

All candidates for employment as a resident are required to have a background check which consists of three components:

- A court record database search done in compliance with the Fair Credit Reporting Act
- A fingerprint search conducted on the first day of employment during orientation, by either the Ohio Bureau of Criminal Identification and Investigation (BCII) or the Federal Bureau of Investigation (FBI); and
- A search of multiple federal databases to determine whether a person is excluded from participating in a federal program

Fingerprint background checks may take several weeks to be processed; residents are permitted to begin work activity before the results are received.  If a disqualifying conviction or exclusion is subsequently returned, that person's employment will be terminated.  This will occur even if the resident has successfully completed some period of the residency program before the results are received. Termination can occur as a result of the information obtained on the preliminary State of Ohio criminal history record check or the fingerprint criminal history check. See **UH Policy HR-8** for complete details.

### 3.3    PAYROLL

Residents are on University Hospitals' payroll and will be paid the amount appropriate to the resident's contracted post-graduate year (PGY) level as stated in his/her contract.  Stipend amounts are reviewed annually and amended from time to time.  For information on the compensation schedule, please consult the Office of GME.  Payroll is prepared for a bi-weekly period ending on Saturday.  Pay is dispersed through direct deposit on the following Thursday, with the exception of a holiday week.  See also Section 5.3 - Extra Duty and Moonlighting.

### 3.4    TAXES AND OTHER WITHHOLDINGS

You must use **Employee Direct Access** (EDA) to complete an initial Withholding Allowance Certificate (W-4), for the purpose of withholding Federal Income Tax, a State of Ohio Withholding Exemption Certificate (IT-4), for the purpose of withholding State Income Tax, and a new W-4 and IT-4 when there is a change in family status.  You must also complete an I-9 form at orientation and provide supporting documentation of identity and eligibility to work in the United States. You can use EDA, accessible from any computer 24/7, to track social security deductions, federal, state, and city income tax withholding, as well as deductions for any other withholds you elect.

## 3.5    I.D. BADGES

Photo identification badges are issued by HR Services during the onboarding/orientation process. You are expected to wear your I.D. badge at all times while on duty. The proper way to wear your badge is above your waist with the photo/name side showing. A $5.00 non-refundable replacement fee will be charged for stolen, lost or damaged I.D. badges. For a replacement badge, contact HR Services at ext. 40355. HR Services is located in the Medical Center Building (MCCO) at 220 Circle Drive. The hours of operation are: 8:00 a.m. – 5:00 p.m., Monday thru Friday. **UH Policy HR-29** governs the applicability of ID badges.

## 3.6    VACATION

Vacations are granted and scheduled at the discretion of the department to which the resident is assigned. Vacation allowance is three to four weeks with departmental approval. Note that, unlike other UH employees, residents do not accumulate paid time off (PTO).

## 3.7    HOLIDAYS

Holidays are granted and scheduled at the discretion of the department to which the resident is assigned. The Hospital recognizes the following holidays:

| | | |
|---|---|---|
| New Year's Day | Independence Day | Thanksgiving Day |
| Memorial Day | Labor Day | Christmas Day |

## 3.8    DISCOUNTS

Subject to then applicable cafeteria policies, you receive a 10% discount on cafeteria purchases for designated "wellness" items by presenting your hospital I.D. badge. Discounts are also available on selected merchandise in the Atrium Gift Shop.

## 3.9    LICENSURE

### 3.9.1    Medical Licensure

Under Ohio law, an individual pursuing a residency or fellowship in Ohio must be licensed by the State Medical Board of Ohio. The individual may either hold a Certificate (permanent license) to practice medicine and surgery in Ohio, or apply to the Board for a Training Certificate (temporary license). The Office of GME will provide the necessary application forms for the Training Certificate, but responsibility for timely completion and fee payment lies with the applicant. A Training Certificate is valid only for a period of one year, but may be renewed annually for a maximum of six years.

The Training Certificate allows residents to follow the schedule of prescribed services, rotations, and clinical activities that have been issued by their Program Directors. Please be advised of the following limitations regarding temporary licensure:

1. A resident without a permanent Ohio Medical license cannot "moonlight."

2. A resident without a permanent Ohio Medical license cannot sign any legal documents that must be filed with the Probate Court in connection with involuntary hospitalization of psychiatric patients.

Permanent licensure can be initiated by contacting the State Medical Board of Ohio, Columbus, Ohio, at 614-466-3934. The Office of GME must be kept informed of any change in licensure status. Failure to renew a license or training certificate by the date due shall result in the resident being immediately suspended from the residency program. The resident shall not

200653 v9
July 1, 2012

23

UH000413

receive credit for any program-related activities or be paid between the time renewal was due and actual renewal.

**3.9.2    Dental Licensure: Limited Resident's License**

Under Ohio law an individual in a dental residency program must be licensed by, or hold a Limited Resident's License granted by, the Ohio State Dental Board (Board).

Any person receiving such Limited Resident's License may practice dentistry at UHCMC only in connection with programs operated by Case Western Reserve University School of Dentistry or UHCMC and as designated on the License, and only under the direction of a licensed dentist who is a member of the UHCMC staff, or a dentist holding a current limited teaching license, and only on bona fide patients of such programs. If the residency program is changed, a new application for a Limited Resident's License must be submitted to the Board.

Limited Resident's License applications must be reviewed and approved by the Board. The license is valid from July 1st of the year of issue, through the termination of the residency program.

**3.9.3    Controlled Substance Licensure**

Each resident must have a Drug Enforcement Administration (DEA) Controlled Substance Registration Number. A temporary DEA number, which is issued to each resident by the Hospital and terminates at the conclusion of the resident's training, is a combination of the Hospital DEA and the resident's unique alphanumeric suffix. Federal law mandates that use of this temporary DEA is strictly limited to the care of patients served by residents as part of their training program. To obtain a permanent DEA number, contact the Drug Enforcement Administration in Washington D.C., at (202) 633-1000. Residents are prohibited from writing any prescriptions for controlled substances outside a formal treatment relationship.

## 3.10    CHANGE IN NAME/ADDRESS

**Employee Direct Access** (EDA) provides direct access to your personal information and saves you time by eliminating the need to access, complete, and deliver paper forms. Efficient distribution of W-2 forms, benefits information, and other important hospital mailings is dependent upon the data an employee has provided.

## 3.11    DRUG FREE WORKPLACE

UH has a strong commitment to the health and safety of its employees, as well as its patients and prohibits the unlawful manufacture, distribution, dispensing, possession or use of controlled substances in and on property owned or operated by UH. No employee may engage in health system related work while under the influence of alcohol, illegal drugs, or prescription drugs which may impair judgment and/or job performance when taken as directed. UH has both a **Drug Free Workplace Policy** as well as mandatory drug screening as a regular part of the pre-employment physical **Post-Offer/Pre-Employment Evaluation.** Though your residency program may begin, your employment is conditional based upon the successful completion of a drug screening.

## 3.12    SAFETY SERVICES

UHCMC strives to provide its employees, patients, and visitors with a safe and healthy environment. The **Safety Services** office, with experts in chemical, environmental, fire and occupational safety, can offer assistance with the handling of such things as hazardous materials response, and Sick Building Syndrome investigation. The Case Medical Center Hospital Safety office is located in the MCCO Services Bldg, 6th floor, and is open from 8:00am - 5:00pm, M-F. Main Office number 216-844-1437.

### 3.13    PROTECTIVE SERVICES

The services provided by the **Department of Protective Services** are integrated with other hospital departments to provide a safe and secure environment for patients, visitors, staff, and employees.  In case of an emergency or any of the services below, phone Protective Services at ext. 44357.

- Escort Services to parking facilities for all persons when requested.
- Investigative Services in response to specific situations and assigned through the Chief of Protective Services to the Investigator of the department.
- Lost and Found located in the office of Protective Services.
- Safety Presentations by Protective Services personnel available to all departments educating employees on personal safety and protection of personal and hospital property.
- Special Event Security provided by officers assisting with security related matters unique to specific events.
- Witness Wills through officers present upon request by Medical Staff.
- Controlled Access and Egress to the Hospital through the coding of identification badges for all employees and contractors and vendors.
- Patrol of UHCMC facilities 24 hours a day, 7 days a week. Buildings include Andrews, Bishop, Bolwell, Horvitz Tower, Hanna House, Humphrey, Lakeside, Lerner Tower, MacDonald, Mather Pavilion, Rainbow Babies and Children's Hospital, Foley, Wearn, Modular Trailers on Cornell Road, and all hospital owned parking garages.

Loss of hospital, patient, or personal property under any circumstances should be reported to **Protective Services**. (ext. 44357).  Although the Hospital can assume no financial responsibility for personal losses, every reasonable safeguard will be provided.    Thefts or any other incidents should be reported immediately to Protective Services for investigation.   Also, suspicious persons should be reported immediately for investigation.

Residents should exert a constant interest in the personal safety of patients and in the proper protection of their property.  Please help Protective Services provide a safe and secure environment for all patients, visitors, and employees.

### 3.14    BLOOD BORNE PATHOGEN TRAINING

The Occupational Safety and Health Administration requires that health care workers receive training on the blood borne pathogen standards **annually**. This is to assure knowledge about blood borne pathogens, methods to protect against occupational exposure, and procedures to follow in case exposure occurs.    This can be accomplished by physicians via the on-line training program, **Blood Borne Pathogen Education for Physicians**. More information can be accessed by signing on to the **UH Infection Control intranet site**, then click the Facility Specific Policies tab, then UH CMC.

### 3.15    SMOKING POLICY

#### 13.15.1 Environment.

UH is a smoke-free environment. To provide a healthier and safer environment for patients, visitors, staff, and employees, smoking or the possession of any lighted material is not permitted in the buildings or on the immediate designated grounds of any UH facility.  See the UH **Smoking Cessation Policy.** All employees are required to adhere to this policy to ensure a healthier and safer place in which to work.   This policy will be enforced with all employees through the corrective action policy.

### 13.15.2 Hiring Policy.

UH is committed to the health and wellness of our employees, our patients, and our community. As part of these efforts, we only hire candidates that do not use tobacco products. You must be tobacco free to be eligible for employment. Your employment is expressly contingent on confirming your non-tobacco use and satisfactorily completing and passing, as determined in UH's sole discretion, a pre-employment health assessment and drug screening for tobacco.

## 3.16     HARASSMENT AND DISCRIMINATION

UH is committed to providing a working environment that is free from all forms of discrimination and conduct that can be considered harassing, coercive or disruptive, including sexual and other forms of harassment. (See the UH **Anti-Harassment and Non-Discrimination Policy**.) If you believe you have been subjected to discrimination or harassment of any kind, you should report it immediately in writing to your Program Director or the Director of GME. If not available or you believe it would be inappropriate to contact that person, you should immediately contact the Human Resources Department. In addition, you may contact the UH Compliance Hotline at 1-800-227-6934 where you may make an anonymous report.

## 3.17     EMPLOYEE ASSISTANCE COUNSELING

Residents may seek consultation through the **Employee Assistance Program** (EAP) to discuss any personal issue that may be causing problems at work or home. These problems may include: family, marital and relationship, emotional problems, depression, grief, eating disorders, gambling, stress (personal or work), behavioral health, financial difficulties, legal problems, addiction (alcohol and drug). EAP is a counseling/referral service available to residents and/or their immediate household members, whose personal problems are affecting their sense of well-being and/or their job performance. EAP services are **private and confidential**, in accord with state law and institutional policies.

Although there is **no cost** for EAP costs associated with referral resources outside of EAP are the individual's responsibility and may be covered in part or in whole by your health insurance. An EAP clinician will meet with you, answer your questions, and help develop a plan to deal with issues of concern. Call 216-844-1982, or (-216-844-4948, to schedule an appointment.

## 3.18     CORPORATE HEALTH SERVICE

Corporate Health (MCCO 4th floor; phone 216-844-1602 or 844-1453) is open Monday through Friday, except holidays, from 7:30 A.M. to 4:00 P.M. An appointment is generally not needed unless you are having a pre-placement physical, or seeing the Medical Director. Corporate Health provides a variety of health-related services, including post-offer pre-placement physical examinations, evaluation and treatment of workplace injuries and illnesses, which include exposure to blood and/or body fluids (e.g., sharps injuries, splashes, exposures to communicable disease, falls, etc.), exposure surveillance and updating immunizations. At various times throughout your employment with University Hospitals, you will be asked to report to the Corporate Health Service for screening such as the annual PPD skin test for tuberculosis surveillance. You may also, because of your work duties or area, be asked to have other specific screening tests and exams, many of which are mandated by state or federal agencies. It is the responsibility of Corporate Health Service to determine:

- When an employee with an injury or infection requires work restriction or work exclusion.

- When an employee is ready to return to work after an injury or infectious illness.

- Eligibility for Family and Medical Leave Act (FMLA) or other concerns related to FMLA. Corporate Health receives all FMLA or Medical Leave forms, including the employee's certification of physician or practitioner providing the medical diagnosis and need for a leave and the leave of absence request from the Program Director. The Clinical Care Advocate in Corporate Health must approve FMLA/Medical Leave, after receiving and reviewing the submitted forms.

Residents should report all work-related injuries or serious, unprotected exposure to communicable disease immediately, to their Program Director before going to the Corporate Health

Service.  If Corporate Health is closed, report to the Emergency Department (ED) for appropriate initial evaluation.  Residents seen in the ED for work-related injuries or exposures must follow-up in the Corporate Health on the next working day.  No appointment is necessary.  The "First Report of Injury/Employee Incident Report" must be completed by the resident and Program Director, and forwarded to the office listed on the form in a timely manner. **See Workers' Compensation Employee Incident Reporting**.

## 4.     DISPUTES, DISCIPLINE & CONFLICT

### 4.1    Academic and Professional Disciplinary Actions

**A.**     Disciplinary Actions are typically utilized for serious situations of academic incompetence or unprofessional conduct requiring definitive actions.  These actions include suspension, probation, dismissal, nonrenewal of the resident's contract, and denial of a certificate of completion of training, and should follow the process in Section 4.2, below.  Neither the residency program nor Graduate Medical Education is under any obligation to pursue a remediation action prior to recommending a Disciplinary Action.  A Disciplinary Action becomes a permanent part of the resident's training record and entitles the resident to due process through the Resident Appeals Process.

**B.**     Where a resident receives notice of a Disciplinary Action under the terms in this Manual, inclusive of any amendments to this Manual that are in effect on the date of receipt of the notice, this Manual shall govern, irrespective of any later amendments or revisions to the Manual.

### 4.1.1    Suspension.

A resident may be suspended from all program activities and duties by his/her Program Director, Clinical Department Chair or Director of GME.  Program suspension may be imposed for conduct that is deemed to be grossly unprofessional, incompetent, erratic, potentially criminal, noncompliant with UHCMC or UH policies, procedures, Code of Conduct, federal health care program requirements, or conduct threatening to the well-being of patients, other residents, faculty, staff, employees or the resident.

**A,     Summary Suspension**.  The suspension of all or any portion of the privileges of a resident, effective immediately upon imposition, whenever action must be taken immediately in the best interest of patient care or the Hospital.

**B.     Automatic Suspension**.  An automatic suspension is imposed and effective immediately upon action by the Ohio State Medical Board that results in revocation or suspension of the resident's license or temporary certificate.  During the suspension, the resident will be on "unpaid leave status" and, in order to continue health benefits, will need to pay the premium directly since, in the absence of a paycheck, deduction of that premium is not possible.  If the license or temporary certificate is reinstated, the resident may apply for readmission into the program.  If readmission into the program is denied, the resident is entitled to the resident Resident Appeals Process.

### 4.1.2    Probation.

Probation is a notification to the resident that dismissal from the program can occur at any time during or at the conclusion of the probationary period.  In most cases, remedial actions are utilized prior to placement on probation; however, a resident may be placed on probation without prior remediation action if recommended by the Program Director.  Probation is typically the final step before dismissal occurs.  However, dismissal prior to the conclusion of a probationary period will occur if there is further deterioration in performance or additional deficiencies are identified or if grounds for suspension or dismissal exist.

### 4.1.3   Dismissal.

If it is determined that a resident's deficiency is of sufficient gravity to warrant dismissal, the resident may be dismissed without first being offered an opportunity for remediation.

a.   A resident may be dismissed from the Residency Training Program for serious acts, which include but are not limited to the following:

1)   Serious acts of incompetence

2)   Impairment

3)   Unprofessional behavior

4)   Falsifying information

5)   Noncompliance with Hospital policies

b.   Immediate dismissal will occur if the resident is listed as an excluded individual by any of the following:

1)   Department of Health and Human Services Office of the Inspector General's "List of Excluded Individuals/Entities"

2)   General Services Administration "List of Parties Excluded from Federal Procurement and Non-Procurement Programs"

3)   Convicted of a crime related to the provision of health care items or services for which one may be excluded under 42 USC 1320a-7(a).

c.   The resident does not need to be on suspension or probation for dismissal to take place.

### 4.1.4   Non-renewal of Resident's Contract.

**A.**      If a Residency Program Director or Department Chairman determines that a resident is not meeting the standards of the program, he/she may make a recommendation for non-renewal of the resident's contract.

**B.**      The Program Director or Clinical Chairperson must submit the recommendation for non-renewal in writing to the Director of GME and will include the basis on which the action is being taken.  If the Director of GME determines that there is sufficient reason not to renew the appointment, he/she will notify the Program Director, who will so inform the resident in writing no later than four months prior to the end of the resident's current contract.  In accordance with the Accreditation Council for Graduate Medical Education (ACGME) guidelines, if the primary reason(s) for non-renewal occur(s) within four months prior to the end of the contract, UHCMC will make every effort to ensure that the program provides the resident as much written notice of the intent not to renew as circumstances will reasonably allow prior to the end of a resident's appointment.

### 4.1.5   Denial of Certificate of Completion.

A Residency Program Director or Department Chair may recommend the resident be denied a certificate of completion of training as a result of overall unsatisfactory performance during the final academic year of training.  The recommendation, if approved by the Director of GME, should allow for the resident to receive notification in writing by the Program Director as soon as possible and at least six (6) weeks prior to scheduled completion of program; however, documented extenuating circumstances may result in a shorter notice period.

## 4.2    Disciplinary Action Process

### 4.2.1    Recommendation.

The Residency Program Director, Clinical Department Chair, or Director of GME may recommend suspension, probation, dismissal, non-renewal of the resident's contract, or denial of a certificate of completion of training.  The recommendation will be made in writing, accompanied by any written documents necessary to support the recommendation, and will be filed with the Director of GME.  The recommendation will include a time frame for a Leave of Absence or Suspension.  Where summary suspension is of an urgent nature, the recommendation to Director of GME should follow immediately thereafter.

### 4.2.2    Review of Recommendation.

a.      If the Director of GME rejects the recommendation, the Disciplinary Action will not be instituted.  If the Director of GME imposes no other sanction or action, the record of the event will be expunged from the resident's file.

b.      If the Director of GME upholds the recommendation, he/she will notify the Program Director who will inform the resident in writing, either in person or by certified mail, return receipt requested, of the Disciplinary Action.  The notice must specifically state the grounds for the Disciplinary Action and inform the resident of his/her right of appeal as set forth below, in the Resident Appeals Process.  The writing also informs the resident that he/she may appeal the decision by submitting within ten (10) calendar days after receiving the notice, a written request to the Director of GME either in person or by certified mail, return receipt requested, for a hearing before an Appeals Committee.

c.      The action shall become effective immediately.  If the resident will not be permitted any clinical privileges, nor be permitted to attend Conferences or Rounds, then:

- The resident's keys, pass codes, entry cards, and hospital ID cards will be turned in and pass codes will be disabled.

- Any Disciplinary Action that results in loss of privileges that are later be reinstated will result in an extension of the resident's educational program.

- Any Disciplinary Action (except for Automatic Suspension which results from an Ohio State Medical Board action) that results in loss of privileges will result in the resident's salary and benefits continuing through the Resident Appeals Process only so long as the resident properly files an appeal no later than ten (10) calendar days after receipt of the written notice of the recommendation of the Director of GME.

## 4.3    Actions Reportable to the Medical Board

### 4.3.1    The Hospital must report to the State Medical Board of Ohio a Disciplinary Action taken against a resident within sixty (60) days of the date the Resident Appeals Committee Chair confirms the decision in writing.  This includes: any action resulting in the revocation, restriction, reduction, or termination of the Hospital's authorization for the resident to provide health care services for violations of professional ethics, or for reasons of medical incompetence, medical malpractice, or drug or alcohol abuse; a summary action; an action that takes effect notwithstanding any appeal rights that may exist; and, an action that results in a resident surrendering his/her health care services responsibilities while under investigation and during proceedings regarding the action being taken or in return for not being investigated or having proceedings held.

### 4.3.2    Exceptions to this reporting requirement:  A resident's personal issues, a desire to change to a different training program or training facility, or exceptional difficulty in the residency program may result in Non-renewal of resident's Contract, Denial of a Certificate of Completion, or a resident's resignation or withdrawal from the program.  Where any one of these actions meets all of the following criteria, no report will be made to the State Medical Board:  (a)

resident and Program Director mutually agree to the Non-renewal of resident's Contract, Denial of a Certificate of Completion, or a resident's resignation or withdrawal from the program; (b) the action is not for the purpose of avoiding a Disciplinary Action or investigation; and, (c) the CMO, Associate CMO or President of UHCMC must approve the decision that there is no basis for reporting the action.

**4.4    Non-Academic Corrective Actions**

Residents are also subject to UHCMC's and University Hospitals' Human Resources Policies and Procedures.  Copies of all applicable policies and procedures are available on the UHCMC Intranet or through he Office of Graduate Medical Education or the Department of Human Resources.

**4.5    RESIDENT DUE PROCESS**

**4.5.1    RESIDENT APPEALS PROCESS**

The Resident Appeals Process affords the resident a means to exercise his/her right to due process when an academic or other professional Disciplinary Actions is taken against the resident.

1.      To appeal a Disciplinary Action, the resident must submit, within ten (10) calendar days after receiving the notice, a written request to the Director of GME either in person or by certified mail, return receipt requested, for a hearing before an Appeals Committee.  No electronic requests will be accepted.

2.      Upon receipt of a written request for a hearing, the Director of GME appoints an Appeals Committee consisting of seven individuals, five of whom have a vote.  The Director of GME will chair the Committee.  If the resident requesting the hearing is from the same Department as the Director of GME, the Chief Medical Officer (or his/her designee) will function as the Chair.  The voting members will include: 1) a resident who is a member of the GMEC or a Chief resident from a Clinical Department different from that of the resident requesting the hearing, 2) two Residency Program Directors from different Departments than that of the resident requesting the hearing; 3) a representative from Human Resources; and 4) a Medical Staff Member from a different Clinical Department than that of the resident requesting the hearing and that of the two Program Directors on the Appeals Committee.  The non-voting members will be the Director of GME and a resident from a different Department, at a similar level of training as the resident requesting the hearing.  The non-voting resident member may participate in all aspects of the deliberations prior to the vote.

3.      The Director of GME, or his/her designee, determines the date, time, and place of the hearing and appoints the Manager or Coordinator of the Office of GME to serve as Secretary, to keep minutes of the hearing.

4.      No later than ten (10) business days after receipt of the resident's request for a hearing, the Director of GME or his/her designee notifies the resident by certified mail, return receipt requested, of the date, time, and place of the hearing.

5.      The hearing shall be held no fewer than twenty (20) and no more than thirty (30) business days after receipt of the resident's request for a hearing.  A hearing for a resident who is under suspension shall be held no later than ten (10) calendar days from the date of receipt of the request for a hearing, unless extended by mutual consent.

6.      Once the resident's request for an appeal hearing is received, until the date of the hearing, the resident may examine and duplicate any written materials that relate in any way to the Disciplinary Action upon a request to the Residency Program Director[1] or his/her designee.  No later than five (5) business days prior to the scheduled hearing date, the parties shall provide each other with (a) the names of a maximum of no more than three (3) witnesses each intends to

---

[1] The Clinical Department Chair may, at each or any step, take the place of the Program Director.

call to appear in person at the hearing and (b) the written testimonials of an unlimited number of witnesses (if any) for review by the Appeals Committee.

7.      The resident's personal presence is required at the hearing. The resident may be aided or represented by another resident in the Hospital's graduate medical education program or by a member of the Hospital's Medical Staff. None of the parties to the appeal shall be aided or represented at this hearing by an attorney.

8.      The Residency Program Director and the resident may each make an opening statement at the hearing. The Residency Program Director shall then present his/her case supporting the Disciplinary Action. The resident shall then present his/her case opposing the Disciplinary Action. The Residency Program Director and the resident may each take no longer than sixty (60) minutes to make his/her entire presentation including an opening statement, presentation of written evidence, examination of witnesses, cross-examination of witnesses and make a closing argument at the hearing.

9.      The Rules of Evidence that govern proceedings in a court of law will not apply at any stage of the appeal or hearing.

10.     The Appeals Committee shall take no more than thirty (30) minutes to deliberate and its decision is by a majority vote of its members and is based solely upon the written and oral evidence presented by the Residency Program Director and the resident at the hearing. A written copy of the decision is forwarded to the Director of GME.

11.     Within five (5) business days after the hearing, the Committee Chair prepares and sends to both the Residency Program Director or Clinical Department Director and the resident by certified mail, return, receipt requested, a letter that confirms the decision, and affirms, modifies or reverses the Disciplinary Action.

12.     The decision of the Appeals Committee is final and binding upon both the Program Director and the resident.

13.     A resident who has appealed a Disciplinary Action as provided herein may resume clinical practice only if recommended in writing by the Appeals Committee.

14.     The resident's failure to exercise any right provided by the Appeals Process constitutes an irrevocable waiver of such right.

### 4.5.2   RESIDENT GRIEVANCE PROCESS

This procedure affords the Resident a means to exercise his/her right to formally file a Grievance related to the work environment or issues related to the program or faculty. It is available to all residents who are members of the resident Staff of UHCMC; it is not applicable to residents who are on rotation at UHCMC from affiliated institutions.

**A.**      If a Resident has reason to believe that established Hospital policies and procedures, including applicable personnel policies (with the exception of any action, policy, practice or procedure connected with the periodic evaluation of a Resident, or a Disciplinary Action or appeal, as set forth in this *Manual*) were denied him/her or were erroneously applied to him/her, or if a Resident has a problem (collectively, hereinafter a "Grievance") with any employee of the Hospital, any member of the Hospital's Medical Staff, or any other individual affiliated or associated with the Resident's residency training program, the resident may file a Grievance, in accordance with the following:

1.      The Resident must make an appointment to discuss the Grievance with the Manager of Graduate Medical Education ("Manager of GME"). The Manager of GME explains the established policies and procedures to assist the Resident in determining whether a formal Grievance should be filed. The Resident maintains authority over the final decision as to whether a Grievance exists and/or whether a formal Grievance is filed.

2.      If, after discussing the Grievance with the Manger of GME, the Resident believes that a Grievance exists, then the Resident must submit a written notice of the Grievance (the "Grievance Notice") to the Manager of GME and the Resident's respective Program Director. The Grievance Notice must be set forth in reasonable and sufficient detail, an explanation of the Resident's Grievance. The Manager of GME may provide copies of all Grievance Notices to the Resident's Clinical Department Chair, the Director of GME, the UH Law Department and Human Resources. If due to the nature of the Grievance, the Resident reasonably believes that it is inappropriate to file Grievance with the Program Director, the Resident must submit the Grievance directly to the Director of GME.

3.      The Program Director will meet with the Resident to discuss the Grievance. A written response  will be provided to the Resident by the Program Director within ten (10) business days after the receipt of the Grievance Notice, unless the Resident otherwise agrees.  All agreements to extend the ten (10) day response period must be in writing.

4.      If the Resident is not satisfied with the Program Director's resolution, the Resident must submit the Grievance Notice to the Director of GME within five (5) business days of receiving the response .

5.      The Director of GME will meet with the Resident to discuss the Grievance. A written response will be provided to the Resident by the Director of GME within ten (10) business days after receipt of the Grievance Notice unless the Resident otherwise agrees. All agreements to extend the ten (10) day response period must be in writing.

6.      If the Resident is not satisfied with the Director of GME's resolution, the Resident must submit the Grievance Notice to Human Resources within five (5) business days of receiving the response, for investigation and follow up. Human Resources will provide a written response to the resident after their investigation is complete and within a reasonable time after receiving the Grievance Notice.

B.      The confidential process for reporting potential violations of the UH Code of Conduct, UH policies or the law is another mechanism for the resident to make a report. The Compliance Hotline is available at all times and can be reached by calling 1-800-227-6934.  See UH Policy **Making Compliance and Ethics Reports**.

## 4.6    DISPUTES BETWEEN RESIDENT AND MEDICAL SUPERVISORS

**4.6.1.**   University Hospitals Case Medical Center adheres to the AMA Council of Ethical and Judicial Affairs, Ethical Opinion 9.055, which states, in part, "Resident Physicians should refuse to participate in patient care ordered by their superiors in cases in which the orders reflect serious errors in clinical or ethical judgment, or physical impairment, that could result in a threat of imminent harm to the patient or to others."

**4.6.2.**   In such a circumstance, the resident may refuse to provide the care ordered by the supervisor, provided the omission will not threaten the patient's immediate welfare.  Residents should communicate their concerns, immediately, to the physician issuing the orders, and to the Program Director or Department Chair.  Residents who raise such a complaint will not be subject to retaliatory or punitive action, if the complaint was made in good faith, in the interest of patient care.

**4.6.3.**   The Program Director and/or the Department Chair shall immediately notify the Chief Medical Officer Office regarding the resident's concerns.  The Chief Medical Officer may take such action as he deems reasonable, in his sole discretion, to investigate and resolve the situation, subject to the rights and obligations of the parties as set forth above.  See **UH Policy CP-10 – Chain of Command for Questioning Medical Management of Patients.**

5.     **STANDARDS OF CONDUCT**

5.1    **RESIDENT SUPERVISION**

Pursuant to UHCMC Medical Staff Rules and Regulations, residents are assigned patient care responsibilities commensurate with the individual's level of training, experience and capability. In all matters of an individual patient's care, residents are supervised by the attending physician or an appropriate Licensed Independent Practitioner (LIP) with appropriate clinical privileges who maintains responsibility for the care of the patient. Attending physicians and LIPs will supervise residents in a manner consistent with the mandates of the resident's ACGME program requirements and in a manner consistent with all Federal and State laws, rules and regulations. Supervision does not imply constant observation.

5.2    **DUTY HOURS & ON CALL ACTIVITIES**

5.2.1  **Duty Hours**.

UH strives to meet the institutional and program requirements of the Accreditation Council of Graduate Medical Education (ACGME) to ensure that the learning objectives of its residency programs are not compromised by excessive reliance on residents to fulfill patient care service obligations of the hospital, attending physicians, physician practices or faculty. Providing residents with a sound academic and clinical education must be carefully planned and balanced with concerns for patient safety and resident well-being. Didactic and clinical education has priority in the allotment of residents' time and energies. Duty hour assignments recognize that faculty and residents collectively have responsibility for the safety and welfare of patients.

1. "Duty hours" includes *all* clinical and academic activities performed *on behalf of* University Hospitals Case Medical Center ("UHCMC"), including time spent on rotations away from UHCMC receiving training for your UHCMC program, whether moonlighting internally *on behalf of* UHCMC or performing duties required by a Resident's training program ("Program"), or whether for extra pay or not. Each site you work at *on behalf of* UHCMC is referred to in this manual as a "Duty Site." Any location you perform work that is (1) not required by your Program, AND (2) *not on behalf of* UHCMC (i.e., UHCMC is not acting as your employer), is not considered a Duty Site.

a. "Duty Sites" of UHCMC include but are not limited to Case Medical Center, Rainbow Babies and Children's Hospital, MacDonald Women's Hospital, Seidman Cancer Center, and any UHCMC hospital sites in the community (e.g., hospital based locations at UH Health Centers for Rainbow, Case Medical Center, MacDonald Women's, and/or Seidman Cancer Center, Case Medical Center at Richmond Psychiatry Department, W. O. Walker Center, etc.). Any questions about whether or not a location qualifies as a Duty Site should be addressed with the GME office.

b. "Clinical and academic activities" are defined as activities involving patient care (both inpatient and outpatient), administrative duties related to patient care, the provision for transfer of patient care, time during in-house call, research time required by the Program, and scheduled academic activities such as conferences.

c. "In house call" is defined as those duty hours beyond the normal workday when residents are required to be immediately available on site inside of the assigned institution (UH Case Medical Center or other applicable Duty Site).

d. Program *required* or *strongly encouraged* attendance at conferences, journal club, and other ancillary activities constitute duty hours.

e. Duty hours do not include reading and preparation time spent away from the Duty Site.

2.  Duty hours must be limited to 80 hours per week when averaged over a four-week period inclusive of all in-house call activities and all moonlighting.

3.  Residents must be provided at least 1 out of 7 days free from Duty hours and any on call services (whether in house or at home), when averaged over a four-week period. "One day" is defined as one continuous 24-hour period. At home call cannot be assigned on these free days.

4.  Duty periods of PGY 1 residents cannot exceed 16 hours in duration. PGY 2 residents and above must not exceed twenty-four (24) hours of continuous duty in the hospital.  No additional clinical responsibilities may be assigned after twenty-four (24) hours of continuous in-house duty.

5.  PGY 1 residents should have ten (10) hours and must have eight (8) hours, free of duty between scheduled duty periods.  Intermediate level residents should have ten (10) hours free of duty and must have eight (8) hours between scheduled duty periods. . Intermediate level residents must have at least fourteen (14) hours free of duty after twenty-for (24) hours of in-house call.

### 5.2.2  On Call Activities.

The objective of on-call activities for PGY 2 and above residents is to provide residents with continuity of patient care experiences throughout a twenty-four (24) hour period.

1.  In-house call must occur no more frequently than every third night, averaged over a four-week period.

2.  "At-home call" (a/k/a "pager call") is defined as call taken from outside a Duty Site.

3.  The frequency of at-home call is not subject to the every third night limitation. However, at-home call must not be so frequent as to preclude rest and reasonable personal time for each resident.

4.  When residents are called into the hospital from home, the hours residents spend in-house are counted toward the 80-hour limit.

5.  The Program Director and the faculty must monitor the demands of at-home call in their Programs and make scheduling adjustments as necessary to mitigate excessive service demands and/or fatigue.

### 5.2.3 Monitoring

All Programs are required to monitor duty hours using a method as may be approved from time to time by Graduate Medical Education Committee (GMEC).  Residents are required to report duty hours on a monthly basis to their Program Director or his/her assigned designee.  The Program Director or assigned designee will report results via email to the Graduate Medical Education office on a monthly basis.  Duty hours reporting will be discussed at every GMEC meeting.  Any communication of violations will result in a meeting between the Director of GME and Program Director to address the cause of and remedy for the violation.

The GMEC is committed to assuring that residents are able to report concerns regarding duty hours without fear of retaliation.  If a resident is uncomfortable reporting Duty Hours issues to the Program Director; residents may report issues by:

1.  Meeting with the Manager of GME office;

2.  Meeting with the Director of GME;

3. Contacting the Association of Residents & Fellows who will supply a report to the GMEC; or

4. Bring a grievance procedure pursuant to Section 4.5.2 of this Manual.

Requests for approval to petition the ACGME for a duty hours exception is made by the Program Director to the DIO; and if approved, the petition to the ACGME must be made pursuant to its requirements.

## 5.3    EXTRA DUTY & MOONLIGHTING

### 5.3.1    Extra Duty

At UHCMC, any activity performed by a resident that is in excess of what is minimally required by the resident's Program Director, the GMEC, the GME Office, and the ACGME to complete a resident's training is considered "Extra Duty," whether for pay or not (e.g., also includes volunteer experiences).  For ACGME purposes, some Extra Duty may be considered "Moonlighting," while some may not, depending on how that Extra Duty relates to the Resident's program as described in this section.  Extra Duty can include work performed internally as part of a Resident's job at UHCMC, but it also can include work performed by the Resident on the behalf of other employers.

Extra Duty is considered to be part of a Resident's Program (and thus not Moonlighting) if (1) it is in furtherance of a Resident's training in their Program, (2) performed on behalf of UHCMC, (3) created by and subject to the oversight of the Program and Resident's Program Director, (4) in excess of the minimum Program requirements and (5) part of a Resident's typical program related experience.  For example, acting as a chief resident for a Program, or picking up an additional shift during a rotation to meet a staffing need that also furthers a Resident's competency in their program (as determined by the Resident's Program Director) may be considered to be Extra Duty that is considered to be part of a Resident's Program.

All Extra Duty performed internally on behalf of CMC is considered "Duty Hours" as described in Section 5.2.

Subject to all approvals required by UHCMC, any Extra Duty on behalf of UHCMC shall be paid in accordance with fair market value rates as determined by the UHHS Authorized Representative as defined in accordance with UHHS Systemwide policy PT-5.

*Extra Duty not approved in accordance with this Policy Manual can result in (1) the Immediate termination of a resident's employment, and/or (2) the removal of the resident from their Training Program.  The Resident has the responsibility to seek appropriate approvals for Extra Duty, and the Program Director has the responsibility to appropriately approve Extra Duty.*

*To assist the Resident and Program Director, the Resident and Program Director may utilize the "Application for Extra Pay" attached hereto as APPENDIX B (as amended from time to time by the GME Office).*

*It is anticipated that UHCMC may develop and maintain, as amended from time to time, a rate sheet authorizing standardized pay grade for Extra Pay that will be signed and dated by the appropriate UHCMC administrators, approved as to form by an individual in the UHHS Law Department, and communicated or posted to the Residents.*

### 5.3.2    Moonlighting

At UHCMC, Extra Duty is considered to be "Internal Moonlighting" and thus not part of a Resident's Program when it (1) is Extra Duty, (2) is performed internally on behalf of UHCMC (3) not created by or subject to the oversight of the Resident's Program Director, and  (3) not in furtherance of a competency in a Resident's program

Any work performed on the behalf of a non-UHCMC employer (e.g., University Hospital Health System, University Hospitals Medical Group, University Hospitals Physician's Services, any University Hospitals community hospital, Southwest General, MetroHealth, and any other employer outside of UHCMC, ) is considred to be "External Moonlighting".

Moonlighting is discouraged because it clearly competes with the opportunity to achieve the full measure of the educational objectives of the residency.  Additionally, the added time burden takes away from study because it reduces rest and the ability for a more balanced lifestyle.  Nevertheless, many residents wish to use their time away from their training program ("Program") to meet financial obligations.

Moonligting must not interfere with the ability of the residents to achieve the goals and objectives of their Program. The Program Director should monitor resident performance to assure that factors such as resident fatigue are not contributing to diminished learning or performance, or detracting from patient safety. The Program Director must monitor the number of hours and the nature of the workload of residents engaging in moonlighting experiences. Any adverse effects will result in the removal of the resident from the ability to participate in Moonlighting experiences by the Program Director.  Residents must not be required to engage in "Moonlighting."

At University Hospitals, Moonlighting is **NOT** permitted if:

1. The resident is a foreign national and holds a Visa of any kind, whether sponsored through Educational Commission for Foreign Medical Graduates ("ECFMG") or not.

2. The resident does not have a full medical license and DEA number that would permit him/her to Moonlight.  For Internal Moonlighters, this means that residents on Ohio Medical Board Training Certificates may only Moonlight in the event they have appropriate levels of supervision and their Program Director has verified that the resident has the appropriate level of training and competence to perform Moonlighting activities. For External Moonlighters, only residents who have unrestricted Ohio Medical Board licenses (e.g., are not on Training Certificates) and DEA licenses may Moonlight.

3. The resident is an External Moonlighter working outside of UHCMC and is:

    a.      working for another University Hospitals employer (i) without an appropriate contract approved by the UH Law Department directly with that University Hospitals organization and/or, (ii) has not secured his/her own documentation of malpractice insurance coverage (professional liability coverage) to cover the External Moonlighting experience; or

    b.      working for a non-UHCMC employer and the Resident has not secured his/her own malpractice insurance coverage (professional liability coverage) for which he/she has received prior approval from the UH Department of Insurance and Risk Management that such coverage is sufficient to cover Resident's professional liability for the External Moonlighting.  The Main Contact number for the UH Department of Insurance and Risk Management is (216) 767-8531.

4. The resident is a PGY 1.  *Any exceptions to this rule must be expressly approved by the Director of GME.*

5. By doing so, the resident will exceed their Duty Hours.  See Section 5.2.1 of this Manual regarding Duty Hours.

6. The resident has not received the consent of their Program Director.

***Moonlighting not approved in accordance with this Policy Manual can result in (1) the immediate termination of a resident's employment, and/or (2) the removal of the resident from their Training Program. The Resident has the responsibility to seek appropriate approvals for Moonlighting, and the Program Director has the responsibility to appropriately approve Moonlighting.***

*To assist the Resident and Program Director, the Resident and Program Director may utilize the "Application for Extra Pay" attached hereto as APPENDIX B (as amended from time to time by the GME Office).*

*It is anticipated that UHCMC may develop and maintain, as amended from time to time, a rate sheet authorizing standardized pay grade for Extra Pay that will be signed and dated by the appropriate UHCMC administrators, approved as to form by an individual in the UHHS Law Department, and communicated or posted to the Residents.*

## 5.4 CONFIDENTIAL INFORMATION, HIPAA and MEDIA STATEMENTS

### 5.4.1 PROTECTED HEALTH INFORMATION

Medical records are considered Protected Health Information that are privileged and confidential documents, and the information must be safeguarded against unauthorized release according to Hospital policies and procedures relating to Protected Health Information. All hospital personnel are expected to treat patient-related information in a confidential manner, sharing it only with those who have a need to know, whether in written, oral, electronic, or any other format. Hospitals and physicians can be held liable for the improper or unauthorized disclosure of medical information. As such, discussion of patient-related information should be conducted only in appropriate settings, and especially not in elevators or other public areas.

Information regarding a patient's care and treatment shall not be divulged without the written consent of the patient, parents or guardians of minors, or executors of estates of deceased individuals. All medical correspondence shall be handled by the Release of Information personnel, including:

1.  All insurance forms.
2.  Request for various medical certificates.
3.  Request for case summaries and other specified medical record information.
4.  Letters to schools, unions, or places of employment.
5.  Birth certificates/Proof of Birth letters.

### 5.4.2 HIPAA

The Health Insurance Portability and Accountability Act (HIPAA), was passed by Congress in 1996, and provides federal protection for Protected Health Information (PHI) held by covered entities. The protection is balanced so that it permits the disclosure of PHI needed for patient care and other relevant purposes. As all Hospital employees are affected by HIPAA and subject to its penalties for non-compliance, it is important that everyone keep abreast of the requirements and understand the overall impact and intent of the legislation. Residents are expected to be familiar with the UH policies on Protected Health Information (PHI). **See Use and Disclosure of PHI for Treatment, Payment or Healthcare Operations, UH Policy PH-24 and the other policies located under PHI (Protected Health Information).**

### 5.4.3 STATEMENTS TO THE MEDIA

No resident shall give out any information relative to the Hospital or concerning any patient in the Hospital to a representative of the press. Such communications are issued by Corporate Communications. **See also Release of Information and Media Relations, UH Policy GM-41.**

200653  v9
July 1, 2012

37

UH000427

### 5.4.4   INTERNET POLICY

**A.**      Failure to comply with the UH Internet policy can subject workforce members to criminal penalties, including fines and imprisonment, as well as UH sanctions up to and including termination.

**B.**      Patients have the right to absolute privacy of their clinical records.  All access should be by clinical care providers only and never by curiosity seekers or friends, neighbors, relatives or co-workers not involved in the patients clinical care.  You are privileged to access patient records with which you have legitimate clinical links.  At the time sign-on codes are assigned, you will be asked to sign a confidentiality statement.  The statement verifies your understanding of what constitutes a breach of access and the consequences of such a violation.  All computer access is through to use of an individually assigned sign-on code and unique password.  For security reasons your computer sign-on code is never to be shared or borrowed.  Use of a sign-on code establishes user identity and all transactions are tracked and logged to determine appropriateness of those transactions.  Reports are continually being run to track users and their access.  Audit trails are maintained to allow for periodic audits of clinician transactions.

**C.**      Confidential patient types may also be present on UHCMC computer systems.  These VIP, employee, and psychiatric patients have shielded access and present the user with a warning screen requesting documentation of the reason for access to the patient record.  Both the access and the reason the record was entered will print in a report to the Chief Medical Officer Office.

**D.**      Access to any patient data is subject to the University Hospitals Policies on Computer and Electronic Data Security.

## 5.5   ADVOCACY EFFORTS

- Residents have a responsibility to alert their faculty and other appropriate institutional authorities about any aspect of patient care they perceive to be substandard.

- Residents must not join any organization that could consider striking or withholding patient care services as a bargaining strategy.

- Residents, acting as individuals or through their selected representatives, will be accorded appropriate opportunities to register their concerns about the educational environment, their working conditions, and/or the learning resources available to them.  Likewise, they will be kept informed about any planned or potential changes in the resources that may affect the quality or nature of the institution's training programs.

UHCMC offers several mechanisms for addressing resident concerns, whether patient care issues or about working conditions.  The Association of Residents & Fellows, the Minority Housestaff Association, and Hospital Administration are dedicated to support the concerns of all residents.

## 5.6   COMPUTERS & ELECTRONIC DATA

### 5.6.1   Internet & Electronic Data Usage

All computers and systems provided by UH as well as all data they contain or generate (including electronic records, documents, applications, audit logs, and files of any kind) remain the property of UH.  UH management reserves the right to access, search, copy, retrieve, analyze, or otherwise use the data contained in or generated by these computers and systems.  See the following UH Policies:

200653_v9
July 1, 2012

CONFIDENTIAL

UH000428

Internet Use

Copyrighted Computer Software

Use of Cellular Equipment for Business Purposes

Computer Modem Use

Remote Computer Access

Unique User Identifier Computer Signon Assignment

Laptop PC and Portable Device Security

Access to Electronic Records/Computers for Inquires/Investigations

### 5.6.2   Email Usage

1.   Email is available for use throughout the hospital complex. A number of administrative reports are on-line through this function as well as hospital news.   Users registering for email functionality should receive a manual explaining the use of email.

2.   UHCMC encourages employee use of electronic mail, the University Hospitals' Intranet and the Internet when it creates a more efficient work environment.

3.   Sending and receiving email, Intranet or Internet messages regarding personal matters is not permitted.

4.   Under no circumstances will the email system, the Intranet or the Internet be used as a forum for inappropriate, offensive or discriminatory usage.

5.   An employee should not consider the contents of his or her email account (UHCMC, UH or Internet) private.

6.   The password used to restrict access to all employees' email account is a mechanism for preventing an unauthorized person from gaining access to University Hospitals' information rather than maintaining privacy of employee messages.

7.   The email system, including the contents of messages and accounts, will be monitored.

**See also E-mail Communication of Protected Health Information, UH Policy GM-78.**

### 5.7   MARKETING & COMMUNICATIONS

Because of your constant relationship with patients and their visitors, your role in establishing a positive reputation for the Hospital is important.  Patients are seldom qualified to judge the technical quality of medical care they receive.  To patients, the most important thing is usually the personal concern of each individual they contact in the Hospital.  The patients are extremely conscious of the many little things that add up to kindness, sympathy and understanding.   University Hospitals, through the compassion and caring of its physicians, nurses, and support staff, has consistently achieved excellent patient satisfaction ratings.

The Hospital's **Marketing and Corporate Communications** Department (MCD) is responsible for handling inquiries and requests from newspapers, magazines, and radio and television stations.  Refer any such request to MCD.  During evening and night shifts, the Nursing Supervisor on duty may release basic condition reports, as permitted by law, on public record cases.  Other requests should be referred to the MCD staff person on call.

### 5.8   COMPLIANCE AND ETHICS

The Compliance and Ethics Program at University Hospitals is a comprehensive strategy to ensure employees and medical staff comply with applicable rules, regulations, and laws, as well as the *Corporate Code of Conduct* and *Corporate Integrities Guidelines.*  The Program focuses on the establishment of standards, organizational accountability, and the self-monitoring,

200653  v9
July 1, 2012

CONFIDENTIAL

UH000429

detection, and resolution of problems. The ultimate goal of the Program is to create an environment and culture within University Hospitals where all employees and medical staff share a commitment to carrying out our mission in an ethical, legal and professional manner. As a new resident, and annually, you are required to complete Compliance Training. Of particular interest to physicians are the UH policies on **Vendor Gifts, Meals, Other Business Courtesies and Consulting Payments** and **Medical Vendor Gifts and Meals to Healthcare Professionals**.

In the event of suspected violations of Laws, or the UH Compliance & Ethics Program, violations should be reported to the UH Compliance Officer at 216-767-8223, by calling the confidential UH Compliance Hotline at 1-800-227-6934. No retaliation will be taken against any person who makes a good faith report of a suspected compliance violation, and UH will maintain, as appropriate, confidentiality and anonymity with respect to such reports.

## 5.9    DRESS CODE

Dress, grooming, and an overall professional appearance are important aspects of patients' expectations, and project an image of quality healthcare. Residents, as well as all hospital employees, must abide by the UH policy on **Professional Appearance**. When scrubs are worn outside of clinical areas, a white coat or similar cover-up should be worn.

## 5.10    PROFESSIONAL BEHAVIOR

It is the duty of all workforce members to promote standards of professional behavior. UH will not tolerate disruptive behaviors that may lead to undermined morale, diminished productivity, ineffective or substandard care/service or distress to others. The **UH policy on Professional Behavior**, provides written standards for setting a positive UH professional image and a healthy work environment.

## 5.11    SAFETY TRAINING

Pursuant to standards and regulations from Joint Commission (JC), Ohio Department of Health (ODH) and Occupational Safety & Health Administration (OSHA), as well as other governmental agencies, all UHCMC employees must participate in an annual Safety Inservice each calendar year. As this is mandatory, failure to do so may result in corrective action. You may obtain a schedule from Human Resources Safety & Training office.

## 5.12    OBLIGATION TO TREAT

A primary mission of the hospital is to serve and heal all persons who need its help. In addition to general legal and ethical requirements, hospitals participating in the Medicare program are required to provide examinations and treatment to individuals with emergency medical conditions, or women in labor, regardless of their ability to pay. **See EMTALA Index of Policies, UH Policy CP-80.**

## 5.13    PHYSICIAN IMPAIRMENT

To provide a safe environment, UHCMC residents have a responsibility to report to work in a fit condition. The care of our patients requires excellent performance by all staff at all times. Residents are required to meet the Hospital's requirements for Fitness for Duty as determined by Corporate Health or Employee Assistance.

The determination that a resident may need a Fitness for Duty evaluation will be based upon his/her work performance, and any other indicators observed by supervisory or non-supervisory personnel. Program Directors shall consult with the EAP Coordinator for information about requesting a Fitness for Duty evaluation.

Fitness for Duty – A confidential and mandatory referral process, which evaluates an employee's ability to perform his/her job functions when pronounced changes, which negatively impact his/her work performance, are demonstrated. Fit employees are those physically and mentally

able to perform the standards required of his/her position.  Types of impairment covered by Fitness for Duty include:

1.  <u>Psychological Impairment</u>.  Significant changes in behaviors and/or psychological state.  This may include but not be limited to:  threats of harm against self or others, destruction of property or threats of destruction, dramatic mood swings, explosive anger or acting-out behaviors, extreme disclosure of personal information, and disorganized thoughts.  When related to suspected substance abuse, including alcohol, refer to the UH policy on **Substance Abuse**.

2.  <u>Physical Impairment</u>.  Significant changes in physical ability to perform job duties and meet the physical standards that impact current job responsibilities.  They may include, but are not limited to, diminished ability to walk, lift, climb, operate equipment, see, hear, or any physical deterioration that compromises a resident's ability to perform his/her job.

Call 216-844-1982, or 216-844-4948, for consultation or to schedule an appointment with an EAP coordinator.

## 6.    BENEFITS & INSURANCE MATTERS

### 6.1    PROFESSIONAL LIABILITY INSURANCE

The Hospital furnishes professional liability insurance to residents without cost to them.  This insurance covers residents during the time they are acting within the scope of their duties as residents (Not moonlighting) on behalf of UHCMC, following schedules that have been issued by their Program Directors.  Residents are covered for legal actions relating to their residency training, which may be initiated after they leave the program.

### 6.2    WELLNESS Matters

UH believes that wellness goes beyond physical health.  It includes financial security, satisfaction at work, and balance in your personal life – all the things that affect your sense of well-being. **WELLNESS Matters** brings together tools and resources to support you in all these ways.  Click a headers below to see how UH strives to create an environment where employees and their families are supported and encouraged to take action to improve their health, and financial, work, and life well-being.

| WORK Matters | HEALTH Matters | FINANCE Matters | LIFE Matters |
|---|---|---|---|
| Employee Discounts & Perks | Eligibility | Retirement | Adoption Assistance |
| Best Benefits Club | Medical | Life Ins & AD&D | Tuition |
| | Health Savings Account | Disability | Reimbursement |
| | Prescription Drugs | Long-Term Care | Back-up Care |
| | Dental | Eldercare Benefit | Managing Disability |
| | Vision | Retiree Medical | Beneficiary |
| | Flexible Spending Account | Group Auto and Home | Assistance |
| | Fitness Center Near You | College 529 Savings | Travel Assistance |

Some programs require co-pays, waiting periods or minimal period of employment.  Resident are not eligible for PTO, but instead receive 3-4 weeks of vacation and up to 30 days of sick time each year.  These days may have to be exhausted before certain benefits for time off are triggered.

### 6.3    CONTINUATION OF MEDICAL COVERAGE: COBRA

On termination of your contract with UHC, you may arrange for continued coverage under the Consolidated Omnibus Budgeted Reconciliation Act, which guarantees an employee the right to uninterrupted coverage by his/her employer's medical insurance for up to 18 months after termination.  Regular coverage ends on the last day of the month in which you leave the employ of UHCMC.  If you

elect to continue coverage, you must pay the entire cost.  Information on **COBRA** is available through the Benefits Office.

## 7.    TIME-OFF BENEFITS

### 7.1    LEAVES OF ABSENCE

Residents are eligible for some or all of the Leaves of Absence outlined in Appendix A to this manual.  For Leaves of Absence (excluding military leave) paid benefit time is to be used before going unpaid.  See UH Policy on **Leaves of Absences** and Appendix A to this Manual, as well as the following UH policies relative to other leaves or time off:

> HR-19 – **Family and Medical Leave of Absence (FMLA)**
> HR-79 – **Jury Duty**
> HR-80 – **Bereavement Leave**

### 7.2    SICK TIME

Paid sick time, not to exceed thirty total days in any consecutive 12-month period, may be granted at the discretion of the Program Director.  However, the Program Director may not grant more than seven consecutive days of paid sick time.  If you are disabled beyond seven days, you may be eligible for short-term disability benefits.  If you are eligible and your claim is approved by UH Disability Management Services, you will be paid as indicated in the STD policy, provided you have given appropriate notice and have submitted the required documentation.

### 7.3    MATERNITY/PATERNITY LEAVE

7.3.1    It is the resident's responsibility to notify the Program Director at least 30 days in advance of an anticipated maternity/paternity leave.  The program in which the resident is participating must approve any leave of absence in writing with the terms of the leave to resident with a copy to the GME office.

a.    Maternity leave.   Residents receive full pay for the first seven days following the birth.  Thereafter, if they qualify for short-term disability they will receive 60% of their pay for either up to five or seven weeks, after the seven day elimination period.  The length of time allowed for the short-term disability is based on specific medical information.

b.    Paternity leave.   Residents receive full pay for the first week after the birth of child.  Thereafter, they have the option to either use the balance of their vacation time or go unpaid for up to five weeks.

7.3.2    If a resident is eligible for FMLA, up to twelve weeks of maternity and paternity leave is available.  FMLA must be applied for at the same time a maternity/paternity leave is requested.  It begins on the date of birth of a child or placement of an adopted or foster child in the home.  UH policy covers the **FMLA** process.

7.3.3    Time taken off for a maternity/paternity leave and/or FMLA may extend the training period, as necessary, to comply with appropriate accreditation guidelines.

### 7.4    ADDITIONAL LEAVE OF ABSENCE CONSIDERATIONS

Leaves of absence in addition to those noted above are available in accordance with UHCMC and UH policies and procedures and your program.  All leaves are subject to the prior written approval of your Program Director.

Residents remain eligible for health benefits during the time he/she is on unpaid leave. During the time the employee is not receiving pay, the usual payroll deduction is not made.  The employee, therefore, is responsible for direct payment of benefits costs.  A check for the appropriate amount must be received by the benefits office before the 15th of each month to assure uninterrupted coverage.  Besides

consulting the Office of GME, any leave of any kind must be coordinated through the Care Advocate in Corporate Health and the Benefits Office.

## 8.  INSTITUTIONAL POLICIES

### 8.1  POLICY AND PROCEDURE MANUALS

All UH and UHCMC policies are available online.  Division and department-specific manuals contain guidance concerning standing orders for each clinical service, medications, laboratory and X-ray routines, isolation, fluid intake, transfusion, and infusion procedures, permits and legal forms, visiting regulations, and many other policies, guidelines and routines pertinent to your professional activities. These manuals should be reviewed at the start of your clinical service.  Residents are held responsible for the performance of their duties in conformance with these policies and routines.  The manuals are also available online, as are Department order sets and clinical care pathways.

### 8.2  CHAPERONES DURING INTIMATE EXAMINATIONS

In accordance with chapter 4731-26 of the Ohio Administrative Code, all physicians, residents, physician's assistants, podiatrists and anesthesia assistants must offer a patient the opportunity to have a chaperone or third person present in the examination room during an intimate examination. See **CHAPERONES DURING INTIMATE EXAMS, UH Policy GM-34** for definitions and application of the UH policy.

### 8.3  COMMUNICABLE DISEASES

Pursuant to the applicable sections of the Ohio Administrative Code, the listed communicable diseases that follow are declared to be dangerous to the public health and are reportable to the local health jurisdiction in which the case or suspected case resides, or if the residence is unknown, to the Ohio Department of Health.  At UHCMC, any health care provider with knowledge of a case or suspect case of a disease which is required by law to be reported, including all class "A", class "B", and class "C" categories of disease shall notify the UHCMC Infection Control Department at ext. 41924 and leave the patient's name, hospital number and name of disease, as well as the name of the person reporting and a phone and/or pager number.  Please page the infection control nurse with any questions.  Pager numbers are listed on the ext. 41924 phone mail.  **See also Communicable Diseases in the Workplace for Health Care Workers Performing Invasise Procedures, UH Policy CP-29.**

### Class A

Class "A" diseases are of major public health concern due to the severity of disease or potential for epidemic spread and must be **initially and immediately provided by telephone** in which the case or suspected case presents, or a positive laboratory result occurs.

(1) Anthrax
(2) Botulism, foodborne
(3) Cholera
(4) Diphtheria
(5) Influenza "A" – novel virus infection
(6) Measles
(7) Meningococcal disease
(8) Plague
(9) Rabies, human
(10) Rubella (not congenital)
(11) Severe acute respiratory syndrome ("SARS")

(12) Smallpox
(13) Tularemia
(14) Viral hemorrhagic fever ("VHF")
(15) Yellow fever
(16) Any unexpected pattern of cases, suspected cases, deaths or increased incidence of any other disease of major public health concern, because of the severity of disease or potential for epidemic spread, which may indicate a newly recognized infectious agent, outbreak, epidemic, related public health hazard or act of bioterrorism.

## Class B-1

Class "B-1" diseases need timely response because of potential for epidemic spread and must be reported **by the end of the next business day** in which the case or suspected case presents, or a positive laboratory result occurs:

(a) Arboviral neuroinvasive and non-neuroinvasive diseases:
  (i)   Eastern equine encephalitis virus disease
  (ii)  LaCrosse virus disease (other California serogroup virus disease)
  (iii) Powassan virus disease
  (iv)  St. Louis encephalitis virus disease
  (v)   West Nile virus infection
  (vi)  Western equine encephalitis virus disease
  (vii) Other arthropod-borne disease
(b) Chancroid
(c) Coccidioidomycosis
(d) Cyclosporiasis
(e) Dengue
(f) E. coli O157:H7 and other enterohemorrhagic (Shiga toxin-producing) E. coli
(g) Granuloma inguinale
(h) Haemophilus influenzae (invasive disease)
(i) Hantavirus
(j) Hemolytic uremic syndrome ("HUS")
(k) Hepatitis A
(l) Hepatitis B (perinatal)
(m) Influenza-associated pediatric mortality

(n) Legionnaires' disease
(o) Listeriosis
(p) Malaria
(q) Meningitis
  (i)  Aseptic (viral)
  (ii) Bacterial
(r) Mumps
(s) Pertussis
(t) Poliomyelitis (including vaccine-associated cases)
(u) Psittacosis
(v) Q fever
(w) Rubella (congenital)
(x) Salmonellosis
(y) Shigellosis
(z) Staphylococcus aureus, with resistance or intermediate resistance to vancomycin ("VRSA", "VISA")
(aa) Syphilis
(bb) Tetanus
(cc) Tuberculosis ("TB"), including multi-drug resistant tuberculosis ("MDRTB")
(dd) Typhoid fever

## Class B-2

Class "B-2" diseases are of significant public health concern and must be reported **by end of the business week** in which the case or suspected case presents, or a positive laboratory result occurs:

(a) Amebiasis
(b) Botulism
  (i) Infant
  (ii) Wound
(c) Brucellosis
(d) Campylobacteriosis
(e) Chlamydia infections (urethritis, epididymitis, cervicitis, pelvic inflammatory disease, neonatal conjunctivitis, pneumonia, and lymphogranuloma venereum)
(f) Creutzfeldt-Jakob disease ("CJD")
(g) Cryptosporidiosis
(h) Cytomegalovirus ("CMV") (congenital)
(i) Ehrlichiosis/anaplasmosis;
(j) Giardiasis
(k) Gonococcal infections (urethritis, cervicitis, pelvic inflammatory disease, pharyngitis, arthritis, endocarditis, meningitis and neonatal conjunctivitis)
(l) Hepatitis B (non-perinatal)
(m) Hepatitis C
(n) Hepatitis D (delta hepatitis)

(o) Hepatitis E
(p) Herpes (congenital)
(q) Influenza-associated hospitalization
(r) Leprosy ("Hansen Disease")
(s) Leptospirosis
(t) Lyme disease
(u) Meningtis, including other bacterial
(v) Mycobacterial disease, other than tuberculosis ("MOTT")
(w) Rocky Mountain spotted fever ("RMSF")
(x) Streptococcal disease, group A, invasive ("IGAS")
(y) Streptococcal disease, group B, in newborn
(z) Streptococcal toxic shock syndrome ("STSS")
(aa) Streptococcus pneumoniae, invasive disease ("ISP")
(bb) Toxic shock syndrome ("TSS")
(cc) Trichinosis
(dd) Typhus fever
(ee) Varicella
(ff) Vibriosis
(gg) Yersiniosis

### Class C

Class "C" diseases must be reported **by the end of the next business day** in accordance with this rule and rules 3701-3-03, 3701-3-04, and 3701-3-05 of the Administrative Code unless paragraph © (7) of this rule applies – outbreak, unusual incidence, or epidemic of other infectious diseases from the following sources:

(1) Community
(2) Foodborne
(3) Healthcare-associated

(4) Institutional
(5) Waterborne
(6) Zoonotic

(7) If the outbreak, unusual incidence, or epidemic, including but not limited to, histoplasmosis, pediculosis, scabies, and staphylococcal infections, has an unexpected pattern of cases, suspected cases, deaths, or increased incidence of disease that is of a major public health concern pursuant to Class A(16), above, then such outbreak, unusual incidence, or epidemic shall be reported in accordance with paragraph (A) of rule 3701-3-05 of the Administrative Code.

## 8.4    LEGAL MATTERS

Residents may periodically receive requests for information regarding a legal claim, or potential claim, involving a patient and the Hospital.  If you receive such a request you should immediately contact your Residency Program Director and the Hospital's Law Department (216-767-8050).  The resident is not to provide any written or verbal response to such a request without authorization.  This will ensure compliance with the Hospital's procedures for release of information only to authorized persons. Residents may not witness wills or other legal documents for patients.  Requests for such assistance should be referred to the Administration Offices or the Nursing Supervisor in charge.  See the UH policies relative to **Subpoenas and Court Orders** and **Legal Services**.

## 8.5    E-MAIL RECORD RETENTION

In order to encourage appropriate management of email records, all email will be automatically deleted from the mail server and user mailboxes 60 days after the creation date. This includes the inbox, sent items, unread items, deleted items, drafts and messages stored in any subfolder on the mail server.

Emails that are needed for business, legal or regulatory reasons for longer periods will need to be printed out and maintained in a hard copy or archived. The email archive system retains emails that are needed for business, legal or regulatory reasons, for longer periods.  Automatic archiving is not allowed as it circumvents the objectives of the policy. Other records maintained on electronic media (except email) may not be discarded except as set forth UH Policy **Records Management**.

The policy requires you to review your e-mails on a regular basis and move appropriate e-mails out of your Outlook inbox/drafts/sent items/deleted items folders to appropriate Retention Folders, print the e-mails you want to keep, or save them to your P: drive; otherwise, the system will move your e-mails to the Outlook System Cleanup folders on a weekly basis where they will be deleted after 60 days from the date they were originally received. To determine what e-mails are appropriate to keep in the 3-year or 10-year Retention Folders, review the Records Management Policy and complete the mandatory EMail Records Retention Online Training.

**Employees, including residents, who use email, the Intranet or the Internet improperly will be subject to corrective action according to UH Policy HR-72.**

## 9.    EVALUATIONS

## 9.1    EVALUATION OF FACULTY

All residents are required by the ACGME to complete periodic evaluations of the faculty with whom they work.  The number of faculty evaluations each resident completes will vary depending on service assignments and/or the size of the attending staff.  Faculty evaluations, which are retained in the individual Clinical Departments, are an important component of the professional review of each faculty member.

200653  v9
July 1, 2012

45

UH000435

### 9.2 Evaluation of a Resident's Performance

Residents will be periodically evaluated by their Program Directors at the frequency mandated by the Program Requirements for resident Education of the specialty in which the resident is training. Evaluations will be communicated to the resident in a timely manner and a record of the evaluation will be permanently maintained in the Clinical Department.  If a resident requires an explanation or interpretation of his/her education records, he/she should make such a request directly to the Residency Program Director or to the Clinical Department Chair.

#### 9.2.1 Academic and Professional Standards

A.    Resident evaluations will be based, in part, on the resident consistently meeting the academic and professional standards of the Residency Training Program, as well as the standards and policies of the Hospital.  At any time during the Residency Training Program, the Residency Program Director, Clinical Department Chair or Director of GME may determine that the resident is not meeting the standards of the program, or the profession for reasons that may include, but are not limited to:

1.    Conduct that is detrimental or potentially detrimental to Hospital patients or employees;

2.    Demonstrated inability to work with others or behavior that is reasonably likely to be disruptive to Hospital operations;

3.    Activities or professional conduct reasonably likely to be in violation of the Medical Staff Bylaws, Medical Staff Rules and Regulations, or Hospital policies and procedures;

4.    Deficiencies in attendance, punctuality, and availability; or

5.    Failure or inconsistency in adhering to institutional standards of conduct, rules and regulations, including program standards, and hospital and clinic rules with respect to scheduling, charting, chart completion, record keeping, and timely entries to Case Logs.

B.    Additionally, residents are expected to demonstrate proficiency in all of the seven ACGME core competencies:

1.    Patient care

2.    Medical knowledge

3.    Practice-based learning and improvement

4.    Interpersonal and communication skills

5.    Professionalism

6.    Systems-based practice

7.    Practice-based learning

#### 9.2.2 Performance Review Actions

A.    When a resident receives a Performance Review Action it is an opportunity for the resident to address expected standards that need improvement.  A Performance Review Action is not reportable to the State of Ohio Medical Board; it is not a Disciplinary Action (defined on next page); it cannot be appealed; and it becomes part of the resident's permanent file.

1.    **Performance Alert Notice.**  A Performance Alert Notice is the formal written notification to a resident concerning areas of marginal or unsatisfactory performance. The Program Director or Faculty Member should initiate a Performance Alert Notice and inform the resident within 7-10 days of identifying an area of concern.

2.    **Remediation**.  A remediation period is an opportunity for the resident to correct academic deficiencies and to develop and demonstrate appropriate levels of proficiency for patient care and advancement in the program.  Being placed in remediation is notice to the resident of his or her failure to progress satisfactorily as reflected by evaluations and/or other assessment modalities.  It is not to be used in lieu of a Disciplinary Action.

    a.    Remediation may include, but is not limited to, one or more of the following:

        1) Limitations or restrictions on the amount and level of the resident's patient care activities;

        2) Repeating one or more rotations;

        3) Participation in a special program;

        4) Continuing scheduled rotations with or without special conditions;

        5) Supplemental reading assignments;

        6) Attending undergraduate or graduate courses and/or additional clinics or rounds;

        7) Extending the period of training;

        8) Referral to the Employee Assistance Program (see **UH Policy HR-85** which shall apply to all aspects of the referral, process and determination); and/or

        9) Repeat training year - may be used in limited situations such as:

        10) Overall unsatisfactory performance during the entire academic year;

        11) Overall unsatisfactory performance for at least 50% of rotations during the academic year; or

        12) Cumulative time off in excess of amount permitted by the department or the training program during the current academic training year.

        13) The resident will be notified of his/her requirement to repeat the academic year at least six (6) weeks prior to the end of the academic year.

    b.    If remediation is required, the resident shall be informed in a meeting with the Residency Program Director or Clinical Department Chair.  The resident's deficiencies will be identified, a remedial program plan will be established, and a frame for completion of the remedial program will be discussed, documented and signed by the resident.  A copy of the remediation plan will be given to the resident, and a copy will be placed in the resident's file.  At the end of the remedial period, the resident will receive an evaluation.

    c.    The remediation measure(s) assigned and the period of time that the measures remain in place are determined by the Program Director or his/her designee.  During or following a period of remediation, any resident who fails to correct a deficiency may be dismissed.

3.    **Time Out Leave of Absence**.  A "Time Out LOA" is an unpaid absence, for a predetermined period of time, elected by the resident or offered by the Program Director, for the purpose of the resident addressing medical or personal matters that are believed to be contributing to academic and/or professional issues within the training program.  The Time Out LOA is not a Disciplinary Action and cannot be taken in lieu of remediation or a Disciplinary Action.  If the resident qualifies, and FMLA is more appropriate, FMLA may be taken (see UH **FMLA Policy**, which shall apply to all aspects of the FMLA process).  FMLA cannot be used to extend a Time Out LOA.

10.    **MEDICAL RECORDS**

The importance of complete and accurate medical records and an orderly and efficient system of charts control (to assure accessibility) cannot be overemphasized.  At the beginning of the resident's service, personal instructions in the use of dictation equipment and the policies of the Hospital will be given by Health Information Services (HIS).  Should a problem arise in connection with medical records, the staff of HIS will be glad to assist you at any time.

### 10.1    ELECTRONIC MEDICAL RECORDS

University Hospitals is one of the largest health systems to develop an electronic medical record that will be interoperable across all UH hospitals, physician offices and outpatient clinics. The EMR will be 80% fully live by the end of 2010.

An electronic medical record is a computerized, real-time medical chart.  It enhances patient care and safety by providing special alerts for physicians and caregivers, and is one central source of a patient's personal health information.  Fewer than 10 percent of hospitals across the country have an electronic medical record that is fully functional.  One Patient. One Record.

**Electronic Medical Record** (EMR) training is required.  If you have not signed up for training, please visit the **EMR Homepage** to review current training information, and if necessary, see your manager or supervisor who can assist you with enrollment.  The following policies should be consulted regarding use of medical records.

> **Master Integrated Interdisciplinary Documentation / Charting in the EMR**
>
> **Master EMR Order Management**
>
> **Electronic Medical Record Training**
>
> **Medical Record Abbreviations**

**IT IS IMPORTANT TO NOTE THAT ONCE CURRENT PROCESSES FOR PHYSICIAN ORDERS, REFERRALS, ENTRIES TO THE RECORD, AND OTHER ACTIVITIES ASSOCIATED WITH THE MEDICAL RECORD ARE REPLACED BY THE NEW EMR, PARTS OF THIS MANUAL RELATED TO THOSE SAME AREAS WILL NEED TO BE UPDATED.  WHILE THE OFFICE OF GME DOES ITS BEST TO MAKE APPROPRIATE CHANGES AS THEY OCCUR, SHOULD YOU NOTE THE SHANGE HAS NOT BEEN MADE OR THAT A HYPERLINK IS NOT WORKING, PLEASE NOTIFY US.**

### 10.2    Guidelines for Medical Record Completion

Medical records are privileged and confidential documents and must be safeguarded according to Hospital and Health Information Services ("HIS") policies and procedures.  The handling of medical records shall be governed by the following guidelines:

10.2.1   Medical records must be available to HIS personnel day or night.  They must:

    a.   Remain in specified patient care areas.

    b.   Be readily accessible in case of emergency.

10.2.2   Medical records may be removed from HIS only for the following purposes:

    a.   For direct patient care, either for admission to the Hospital, for an appointment in the Clinics, or other diagnostic or therapeutic services.

    b.   For case study or other uses by a Department or individuals authorized to requisition medical records.  Medical records for study or dictation may be requisitioned by residents for use only within HIS.

10.2.3   Medical records may not be removed from the Hospital for any reason except for legal purposes, and then only in the custody of authorized HIS personnel.  Unauthorized

removal of original medical records from the premises will result in corrective action according to the UH **Corrective Action** policy and the Medical Staff Bylaws, Rules & Regulations.

10.2.4   Medical records must be kept intact on in-patient floors and in the clinics, and must not be taken apart or pages removed or rearranged.

### 10.3   GUIDELINES FOR DOCUMENTATION IN THE MEDICAL RECORD

The Hospital maintains a "unit" record (containing all inpatient, outpatient, and Emergency Department information).  Residents are reminded that medical records are legal documents, and the physicians may at some future date be cross-examined in court under oath on the notes he/she has written.  Personal opinions, or non-medical judgments, should not be expressed in the medical record on any matters except those that pertain to the medical care of the patient.  See policies **UH Policy Master Integrated Interdisciplinary Documentation and Charting in the Electronic Medical Record** and **Master EMR Order Management** for complete rules on medical record documentation.

### 10.4   Guidelines for Entries into the Medical Record

University Hospitals utilizes the Electronic Medical Record (EMR) with Knowledge Based Charting ("KBC") as a part of the patient's medical record to provide and communicate integrated, interdisciplinary, individualized care. Documentation not in the currently active EMR (e.g., physical assessment and reassessment) is completed using the Hospital's paper forms.  It is your responsibility to know and understand all of the rules relative to medical records which are found in the policies linked in <u>Section 10.3</u>, above, as well as those policies which describes who is responsible for record completion, the time frames involved and the steps taken when records become delinquent.

10.4.1  Incomplete medical records remain on the patient division for 24 hours following discharge to allow for dictation of discharge summaries.  Charts should be obtained from the head nurse or unit secretary (unless removed for follow-up care to the patient).  If the record is still incomplete when sent to HIS, it may not be removed until completed, except when needed for direct patient care.

10.4.2  Final diagnoses and procedures should be dictated with the discharge summary at the time of the patient's discharge from an inpatient division.  The principal diagnosis is the condition established to be chiefly responsible for occasioning the admission of the patient to the hospital for care.  Other diagnoses are all conditions that coexist at the time of admission, or develop subsequently, which affect the treatment received and/or length of stay. Diagnoses that relate to an earlier episode which have no bearing on this hospitalization are to be excluded.

10.4.3  The Hospital uses a direct-dial dictating system for Operative Reports and Discharge Summaries and can be used on any phone.  Operative reports should be dictated immediately following surgery.  Clinical resumes should be completed immediately following discharge. Directions for proper dictating procedures will be given to residents at the time of their orientation.

10.4.4  Incomplete medical records are considered delinquent 21 days following availability of the chart for completion in HIS.  The Delinquent Record summary by Department will be faxed or emailed to the Residency Program Director for distribution to their resident staff.

10.4.5  Failure to complete records in a timely manner will result in the resident being placed in suspension status. Only after all available charts are completed and the resident has obtained clearance from HIS will the resident be removed from suspension status.  Be advised that during the course of a medical career, any hospital to which a former resident may apply for privileges will seek verification of training.  Standard verification questionnaires request information on record keeping practices. Delinquent records while a resident may be an impediment to obtaining privileges, as well as an embarrassment, throughout one's professional career.

## 10.5    PHYSICIAN ORDERS

Residents may write patient care orders if they have a training certificate or full and unrestricted license issued by the Ohio State Medical Board. Orders need not be countersigned by the supervising attending physician. Additional order writing delineations are described in the **UHCMC Medical Staff Rules and Regulations** and **Policies and Procedures**.

The Electronic Medical Record ("EMR") must be used for order entry. Those authorized to enter orders in the EMR must enter their own orders directly into the EMR.  See **Master EMR Order Management** for details relative to who can give and accept orders and the circumstances under which a resident's orders may be verbal, telephone, written and faxed.

| | |
|---|---|
| Who May Order | Order Status at Changes in Level of Care or Service |
| Admission Orders | Order Clarification |
| Verbal, Telephone, Written, Faxed Orders | Unacknowledged Orders at Discharge |
| Consult Orders | Discharge Orders |
| PRN Orders | What to Do in EMR Downtime |
| Notification of New Orders | Medical Student Orders |

Residents are prohibited from writing any order for himself/herself, a member of his/her immediate family, relatives, or those who are not his/her patient.  All physician orders are entered electronically for all inpatients. Orders entered directly by the physician will automatically be signed electronically.  Orders taken by nursing staff will be entered under the issuing physician's name and are to be electronically signed on-line by the issuing physician.  In the event that EMR is unavailable, orders must be written clearly, legibly and completely in permanent ink and signed by the attending physician or resident responsible for the patient's care.  All orders written must be done so on Physician's Order Sheet and must include the date and time written, the physician's or resident's signature.  Supplemental verbal discussion of orders between the physician and nurse or other professional is encouraged to provide clarity.  Orders must be specific for diagnostic or treatment procedure and include generic name of medication.  The time (when appropriate), frequency, duration, and date to be carried out should be included.  For medication orders, dosage and route of administration must be noted.

## 10.6    PRESCRIBING CONTROLLED SUBSTANCES OVER THE TELEPHONE

Physicians who prescribe controlled substances have to know and understand multiple laws, regulatory policies, professional attitudes, and ethics about those prescription practices.   Under no circumstances should residents prescribe controlled substances over the telephone for any patient, unless the resident personally knows the patient as a result of providing medical treatment to him/her as part of the resident's training program.  In addition, prior to prescribing any controlled substance over the telephone, the resident should first review the patient's medical record to verify any pharmacy's, patient's, or other individual's request for the prescription.  The appropriate response to a telephone request for controlled substances from anyone claiming to be the patient of a UHCMC attending physician is as follows:

1.    Take the patient's name and phone number, and the name of the patient's attending physician;

2.    Call the attending physician with the information; and

3.    Let the attending physician instruct you on how to respond to the request.

## 11.    HOSPITAL RESOURCES, PATIENT CARE RELATED MATTERS

## 11.1    PATIENTS RIGHTS AND RESPONSIBILITIES

UH recognizes that all patients have basic individual rights and responsibilities; and, as such, will endeavor to support and respect the basic human dignity of each patient as well as the civil, constitutional

and statutory rights of each patient. UH respects the patient's right to participate in decisions about his/her care, treatment, and services, and to give or withhold informed consent. The patient or designated surrogate may exercise his/her rights without fear of coercion, discrimination or retaliation. See UH's policy on **Patient Rights & Responsibilities**.

### 11.2    PATIENT ACCESS SERVICES

Patient Access Services has developed the following information to assist the residents' efforts in arranging patient admission to University Hospitals Case Medical Center.  If you require further information, please call ext. 43702.  Patient Access Services provides the following services:

- Reservation and Preadmission is responsible for entry of all inpatient and outpatient reservations received from physicians' offices.

- Registration/Preregistration conducts patient interviews with all admissions, ambulatory surgeries, limited outpatient clinic, and ancillary visits.

- Financial Counseling/Precertification does verification and certification of benefits for all inpatient, observation, Ambulatory Surgery Unit admissions, and limited ancillary areas.

- Division Assignment/Bed Assignment is responsible 24/7 for the management of the bed control for all patients admitted to UHCMC.

#### 11.2.1  Patient Admitting

It is the policy of University Hospitals Case Medical Center to:

- Grant all patients impartial access to treatment at any UH facility regardless of gender, race, age, religion, color, national origin, sexual orientation, disability, or veteran status.

- Demonstrate no distinction with regard to race, color, creed, religion, sexual orientation or national origin in the eligibility for, or in the manner of, assignment of patient care or provision of patient care.

#### 11.2.2  Admitting Process

All patients coming to the hospital for in-house stays, are processed at the Patient Access Services (Admitting) Office which is located on the first floor of the Mather Pavilion Room 1155.  OB patients report directly to Labor & Delivery on MacDonald 2nd floor.  To schedule advance admission, fax a standard reservation form to ext. 7355.  Patient Access phone numbers are 844-3929 or 844-3707

#### 11.2.3  Emergency Admission

| | |
|---|---|
| For adult emergency admissions call: | 844-3701 - 844-3702 |
| For pediatric emergency admissions call: | 844-3705 |

Please have the following information available prior to calling to admit an emergency patient.

| | |
|---|---|
| Patient Name | How Transported |
| Patient Hospital # | Patient DOB |
| Admitting Physician | Coming From |
| Your Beeper/Phone | Surgery Time |
| Referring Physician Name/Phone | Insurance Information |
| Referring Facility | Estimated Time of Arrival |
| Diagnosis | Covered by Attending |
| Whether Covered by House Staff/Resident | Whether on Dialysis |

Emergency admissions should be scheduled according to patient needs.  Special attention should be given to providing the referring physician's name to ensure continuity of care

and follow-up.  Likewise, an emphasis is placed on identifying the facility from which the patient is being referred.

### 11.2.4  What to Tell Your Patient Prior to Admission

- Bring insurance cards to the Patient Access Services Office even if the information has been provided over the phone.

- Bring a list of medications or special dietary requirements to be given to the nurse on the floor.

- Please do not bring valuables.  The cashier's office will cash personal checks, and there are ATM machines on site.

- Credit card payment is acceptable for payment of self-pay portion of the hospital bill.

### 11.2.5  Pre-Registration/Verification/Certification

The hospital obtains preadmission approval for all inpatient admissions when a reservation form is received at least 24 hours prior to the expected date of admission.  Critical to the success of this admitting process is assuring that the thorough and accurate representation of insurance and clinical criteria for the proposed hospital stay is on the reservation form.  The reservation form should contain current insurance information as well as clinical information that sufficiently supports the number of inpatient days the physician is seeking to have approved for the admission in question.

All outpatient procedures, surgeries, etc., must be pre-certified by either the department or physician office requesting/performing the service. The Patient Access Department is prepared to help with the insurance verification/certification questions.  Call 844-8399 for assistance.  If pre-certification cannot be obtained the admitting physician will be notified to postpone or cancel the procedure pending financial clearance.

### 11.2.6  Preadmission Assessment and Teaching (PAT)

PAT is an optional service provided to surgical services for evaluation and management of patients with significant medical co-morbidity, in addition to the problem for which they are having their surgery.  Patients will be seen and interviewed by an Anesthesiologist, by appointment, and lab work will be completed.  Additional testing or consultations may be recommended which may be necessary to decrease the risk of surgery.  PAT is located in the Humphrey Building.  For more information on preadmission testing, please call 216-844-1066.

### 11.2.7  Discharge of Patients

Discharge time is 11:00 a.m.  A patient may be discharged only on the written order of the attending physician or of the resident.  If applicable, see UH policies addressing **Discharge Planning Involving Post Hospital Providers** and **Discharging Minors to Persons Other than Parents**.

If a patient wishes to leave the hospital against medical advice ("AMA"), the attending physician shall be notified for a private patient and the resident for a staff patient.  See **UHCMC Policy Discharge Against Medical Advice.**

### 11.3    DEATH OF PATIENTS

It is the duty of the residents concerned to be present at every death occurring on their Service, if at all possible.  Residents are responsible for making a notation of the exact time of death on the medical record, along with any pertinent information, resuscitative attempts or medications administered, as well as notifying the patient's attending physician of the death of the patient.  All possible aid and comfort should be shown to the family.

### 11.3.1  Death on Hospital Premises

A resident may pronounce a patient dead. The pronouncing physician will make the appropriate notations on the medical record along with any pertinent information including resuscitative attempts or medications administered. See **Management of Death on Hospital Premises**.

### 11.3.2  Dead on Arrival Cases

The following alternatives are presented as ways in which dead on arrival (DOA) cases may be handled in the Emergency Department.

- Bodies brought to the Hospital DOA are pronounced dead by Emergency Services. The Morticians notify the Office of the Coroner of all DOA deaths.

- If the Coroner claims jurisdiction, the Morticians arrange for transportation of the body to the County Morgue.  No Death Certificate is completed by Hospital staff.  A Coroner's Report Form should be completed by the physician pronouncing death.

- If Coroner releases body and if no autopsy is granted, the body is taken to Pathology where it is called for by a funeral director.  In such cases, it is the responsibility of the patient's physician to complete the Death Certificate.

- If Coroner releases body and autopsy is authorized by the responsible relative, the Death Certificate may be completed by either Hospital or the Coroner as determined by the Coroner at the time of release of the body.

### 11.3.3  Morticians

The Morticians are an integral and important facet of the operations of UHCMC.  They are licensed funeral directors and embalmers with many years of experience.  They act as a liaison between the funeral directors, the hospital administrators and the clinicians.  They have responsibilities to each of these groups but are under the direct supervision of the Director of the Autopsy Service and the administrator for anatomic pathology.  They are on call 24 hours a day and can be reached at all times by calling ext. 41836, pager 30209 or the telephone operators. Nursing staff will notify the Morticians, who will facilitate the death certificate.

### 11.3.4  CORONER CASES

Mortician Service staff on duty can provide assistance to residents and attending physicians in determining whether a case should be reported to the coroner and in completing the report.  See **Coroner Cases.**

### 11.3.5  CONSENT FOR ORGAN OR TISSUE DONATION

In recognition of the need for and the benefits resulting from the increased availability of organs and tissues for transplantation, research, and medical education, the Hospital cooperate with LifeBanc, a federally funded nonprofit agency which coordinates the recovery of organs, tissues and eyes for transplantation in conjunction with the Cleveland Eye Bank and other tissue teams/banks.  To determine suitability for organ and tissue donation, the nurse responsible for the patient's care or the patient's physician will contact **OneCall for Life** for each patient: anticipated to meet brain death criteria; declared brain dead; for whom withdrawal of all life-sustaining measures will be undertaken; and for all other deaths.  UHCMC Policy 7.2, **Organ and Tissue Donation,** details the required procedure.

### 11.3.6  AUTOPSIES

#### 11.3.6.1    Obtaining Consent to Perform an Autopsy

Hospital policy mandates that every inpatient death will result in a request for autopsy. Consent for autopsy is obtained from the next of kin as specified by statute and UH Policy GM-46 **- Consent to Perform an Autopsy**.  It is the responsibility of clinicians to request autopsies, however, the Morticians, who all have extensive experience in dealing with bereaved families, can be counted on as an important resource in obtaining autopsy consents.  If no request for autopsy is made, the reason for not requesting the autopsy must be listed on the autopsy consent form.

#### 11.3.6.2    Autopsy Office

The Autopsy Office located in Pathology B-32 (ext. 43479), facilitates and coordinates the functions of the several components of the service and serves as liaison between the clinicians, residents and pathologists.  It is responsible for the transmission of all information concerning autopsies to interested clinicians.  Residents are invited to familiarize themselves with autopsy procedure by visiting the service during normal business hours.

#### 11.3.6.3    Notification of Clinicians of Autopsies

The Morticians or Pathology residents will notify the clinicians whose names are listed on the autopsy permit when the autopsy is about to begin.  Chief residents may request to be notified at the time of autopsies of patients expiring on their respective services.

#### 11.3.6.4    Information to Clinicians Regarding Autopsies

The Autopsy Office will send the attending physician listed in the autopsy permit a copy of the Provisional Anatomical Diagnosis.  Any inquiries by physicians in regard to past or current autopsy reports should be directed to the Autopsy Office, ext. 43479.  The Morticians will give only information concerning the time of performance and sign-out of any autopsy.  For more information concerning special circumstances, please contact the Autopsy Director at ext. 43478.

#### 11.3.6.5    Outside Inquiries Concerning Autopsy Findings

Matters relating to subpoenaed autopsy findings and reports, as well requests for copies of Provisional and/or Final Anatomic Diagnoses by next of kin, must be referred to HIS, Release of Medical Information Section.  See **Disposition of Protected Health Information (PHI) on Death of Patient.**

### 11.4   DEATH CERTIFICATE

Death Certificates are initiated outside the Hospital by funeral directors. Residents may only complete medical information on the death certificate; it must be signed by the attending physician.  See **Management of Death on Hospital Premises**.  If the case falls under the jurisdiction of the Coroner because of violence, casualty, occupational hazard or other cause specified by statute, the Mortician will assist in making the required report to the Coroner.  If the Coroner claims jurisdiction, the Coroner will complete the death certificate. See **Coroner's Cases**.

The immediate cause of death, intervening causes of death and the underlying cause of death must be written in terms of acceptable causes of death.  In general, causes of death are pathologic lesions, physical traumas (including therapeutic procedures), toxic exposures (including effects of therapeutics) or infections. Mechanisms of death, including congestive heart failure, asphyxia, or

arrhythmia, should not be used when their cause is known. Under no circumstances should trite catch-all mechanisms such as asystole or cardiorespiratory arrest be used on a death certificate. No abbreviations are permitted in the causes of death. Death certificates must be completed in black ink only.

### 11.5    SERVICE TO INPATIENTS

Residents assigned to inpatients units must evaluate admissions or transfers to critical care areas within 4 hours, and within 12 hours for patients in general care divisions. Residents must evaluate inpatients and write progress notes at least daily. When a patient is seen with an attending, the resident should chart that in the progress note.

Residents should answer pages as soon as possible, and respond to emergency consultations and Emergency Department requests within 30 minutes. Residents are encouraged to consult with an attending or senior resident any time he/she is uncertain about a patient care issue.

### 11.6    INTRANET - INTERNET - E-MAIL - Electronic data

UH provides Internet access to UH workforce members to help them perform their legitimate UH clinical and business duties. UH computers, hardware, software, systems and networks must be used only for legitimate business purposes and may not be used for personal, illegal, or unapproved purposes. See **Internet Use**. Internet use and E-mail is monitored.

### 11.7    RADIATION SAFETY

The **Radiation Safety Office** (RSOF) responsibility is to ensure that any equipment or medical procedure that use ionizing radiation do so safely and that the Hospital complies with all federal, state and local regulations that pertain to radiation. Its staff can be reached by calling ext. 1295. All residents will receive basic instruction regarding radiation safety during an orientation period. If you will be mainly in the departments of Radiology, Radiation Oncology and Operative Services and/or participate in or be a passive observer in fluoroscopic procedures, you must comply state regulations which require specialized training in fluoroscopy radiation safety. Click on the links below for important information.

- **Radiation Safety Program for Radioactive Materials**

- **Quality Assurance Program for X-Rays**

- **Radioactive Waste**

Residents who work around radiation may also be issued small personnel dosimeters to be worn at chest or collar level. The dosimeters measure how much radiation you have been exposed to. New dosimeters are exchanged for old either monthly or once in three months, depending on the department. Old dosimeters must be returned in a timely manner, usually five business days from when the new ones are provided. Failure to do so may invite a $20.00 fine and disciplinary action. Lost and damaged dosimeters are also subject to a $20.00 replacement fee. The money may be deducted from a paycheck. Personnel dosimeters covered in the UHCMC Policy on **Staff Radiation Monitoring**. Pregnancy is, with some exceptions, no bar to working with radiation. Call the RSOF for more details.

### 11.8    VISITORS

The hours and regulations for visiting are published and given to all patients. Recommendations for individual exceptions to the regulations should be made to the Nursing Supervisor. Residents have the obligation to discuss and answer questions about a patient's condition with those who have a legal right to know. Information concerning a patient is privileged and confidential and should not be divulged to anyone except individuals specifically designated by the patient. Non-designated friends, relatives and visitors are not entitled to such information, but their inquiries must be handled in a friendly and tactful manner. See **Verification of Identity and Authority Before Disclosing PHI**. Please check with the nurse in charge if you are unsure what can be shared and with whom.

### 11.9    PATIENT THERAPY LEAVE OF ABSENCE

A patient may be granted a therapeutic Leave of absence limited to one census period only upon the order of the patient's physician, and provided that the patient's physician and patient complete the Patient Therapy Leave of Absence form, the physician explains the terms and conditions of the Leave of Absence to the patient, and witnesses the patient's signature. The physician may specify in one order the dates and times of more than one leave of absence. A Leave of Absence extending beyond one census period requires approval by the Finance Department. See UHCMC Policy 6.6.12 Leave of Absence, Patient.

### 11.10   INSTITUTIONAL RESOURCES FOR PATIENTS

The Blood Bank-Transfusion Medicine Service includes the transfusion service and a donor room and apheresis facility, which serves all areas of the hospital complex. The transfusion service and reference laboratory are located in room 2254, second floor of Mather Pavilion (adjacent to the Mather Operating Rooms). The Donor Apheresis Center, comprising a donor room and apheresis facility is located in room B08 in the basement of Hanna House.

The **Blood Bank-Transfusion Medicine** Service provides a full range of blood component transfusion services (please refer to the Blood Bank Menu or the Blood Bank Transfusion Medicine Service Physician Order Record Form for a listing of available services and blood components) and is staffed and open 24 hours a day, seven days a week. It is important to emphasize the requirement that each Request for Components submitted to the Blood Bank must be accompanied by an appropriate Indication Code and the ordering physician's signature and identification number. Blood Bank physician coverage is provided for questions and assistance 24 hours a day, seven days a week. An on-call Transfusion Medicine resident and an on-call attending Blood Bank physician can be reached by calling ext. 42800. See the following UHCMC policies: **Requesting Blood and Blood Components**, **Emergency Red Blood Cell Transfusions** and **Storing and Returning Issued Blood and Blood Components**.

The administration of blood and blood components must follow the regulations delineated in the Code of Federal Regulations, under the Food and Drug Administration as well as guidelines outlined in the American Association of Blood Banks *STANDARDS FOR BLOOD BANKS AND TRANSFUSION SERVICES*. Refer to the **Nursing Practice Manual** and the **UHCMC Clinical Policies and Procedures** for specific instructions for transfusion of blood and blood components. Included in these *Manuals* are procedures to follow when an adverse reaction to transfusion occurs. These reactions must be reported to the Blood Bank at ext. 42800 for required documentation and instructions for further action if needed.

The *Circular of Information for the Use of Human Blood and Blood Components* is available upon request at the Blood Bank, room 2254, second floor of Mather Pavilion. This serves as the "package insert" for all transfusions. Familiarity with the contents of *The Circular of Information* is recommended to insure appropriate transfusion practices.

The **Donor Apheresis Center** (DAC), ext. 41680, performs various specialized donor procedures. Patients who wish to store autologous blood for scheduled surgery are encouraged to do so through the DAC. A physician's order is required. In addition, the Donor Apheresis Center performs and encourages plateletpheresis donations for transfusion to Hospital patients. Families and friends are encouraged to donate for these patients. Information regarding donations can be obtained by calling ext. 41680, Monday through Friday between 8 a.m. and 5 p.m.

### 11.11   AUTOLOGOUS BLOOD TRANSFUSION

The Blood Bank of University Hospitals encourages patients to consider autologous blood transfusion. Those patients who desire and are able to provide their own blood should consult with their private physician or University Hospitals Blood Bank. Units of blood can be stored for 35 to 42 days prior to surgery. Autologous blood donors should be under 80 years of age and donate their last unit at least one week and preferably two weeks prior to the date of their scheduled surgery. Call 844-1680 for specific details.

**11.12   BLOODLESS MEDICINE & SURGERY PROGRAM**

The Center for Bloodless Medicine and Surgery at University Hospitals' Rainbow Babies & Children's Hospital focuses on blood conservation. The NICU/PICU functions as Blood Conservation Units, and the Pediatric Pre-Surgical Referral Service and collaborative anesthesia network within a family-centered care environment that involves the patients and their families in the decision making process.  This has lead to a multi-disciplinary approach in areas such as craniofacial, orthopedics, cardio-thoracic, hematology/oncology, and neonatology, the development of protocols and procedures to prepare our children for surgery, and intra-operative cell salvage strategies to capture and re-infuse the patient's own blood volume.   A pre-surgical evaluation service allows staff to become involved with patients before they are even admitted.  For more information, phone 216-844-3492.

**11.13   CHILD PROTECTION PROGRAM AND CHILD ABUSE AND NEGLECT**

Ohio law requires that all health care providers, including residents, report suspected child abuse or neglect.  In Ohio, reports of abuse and neglect may be made to the county children's services agency (in Cuyahoga County, the Department of Children and Family Services at 696-KIDS), and/or to the police. A Uniform Report form must also be completed.  In order to report, the physician need not be able to prove that abuse or neglect has occurred.   Mandated reporters are protected from civil and criminal liability, even if the allegation is subsequently determined to be unfounded, provided that a report is made in good faith.  Failure to report suspected abuse and/or neglect is a fourth degree misdemeanor and may result in jail or fine.  An abused child is defined in the Ohio Revised Code as one who "exhibits evidence of any physical or mental injury or death, inflicted by other than accidental means, or an injury or death which is at variance with the history given of it."  Neglect is the failure to provide basic requirements for a child's development, such as food, clothing, medical attention, or supervision.  This law applies to all children up to the age of 18, or to 21 if they are developmentally disabled.  See **Child Abuse and Neglect**.  Also see **Temporary Emergency Custody of Children**.

Assistance is available to residents who believe that a child or adolescent they are treating may have been neglected or abused.  The Child Protection Service, in the Division of General Academic Pediatrics at Rainbow Babies & Children's Hospital provides medical consultation.  Consultation includes medical evaluation of the child, advice regarding diagnostic testing, and recommendations regarding safe disposition.  Prepubertal children who are alleged to be victims of sexual abuse may be evaluated by a member of the Child Protection Service as inpatients or, as time and circumstances dictate, may be referred to Care Clinic for medical assessment.  Social work consultation should be obtained whenever a medical consultation for abuse or neglect is requested.  (See "*Social Work Services*," in this *Manual*, for instructions regarding how to access these services).  The social work staff will perform a psychosocial assessment, gather information, assist with reporting, support the child and family, and coordinate services.

The Child Protection Team can be reached at 216-844-3761 for consultation and/or referrals to Care Clinic.

**11.14   INTERPRETER SERVICES**

Family members and friends **may not** translate for a patient when medical information is being discussed.  Federal law requires all language interpreters used by hospitals to be proficient in their field and competency-tested, so that they can ensure that the medical information being shared with the patient has been translated accurately.  In addition, offering a third party interpreter to patients allows the patient to keep personal medical information confidential.

**11.14.1   Foreign Language Services**

**A.**     *Language Line* is a language translation service available 24 hours a day, seven days a week.  *Language Line* may be used anytime a non-English speaking patient wishes to communicate with healthcare providers (or vice versa) for a brief or unscheduled discussion, or during urgent care situations.  This service is especially useful when obtaining informed consent for surgery or medical procedures, initiating new treatments or medications, or explaining a diagnosis or prognosis.  To call the

*Language Line*, use a UHCMC hospital telephone, and dial x4INTE (44683). Please see the unit manager or call the hospital operator for the required information and specific instructions for using the service. You will be asked to provide an organization name, hospital ID number and personal code to process the call. To hear a recorded demonstration of a typical call scenario at no charge, call 1-800-821-0301.

**B.** If a discussion with a non-English speaking patient is being scheduled in advance and may be lengthy, schedule a translator from the International Relations Department. In-person translator services work well for scheduled doctor appointments, family meetings, patient education and training sessions. Services are only available M-F 8:30AM –5:00PM, holidays excluded, 216-844-5677. After hours, over the phone interpretation services only, at pager #33150. UHCMC's International Relations Department provides translation services to patients enrolled in their program <u>only</u> and there is no fee.

**C.** *MARTII* is a system, which provides real-time video-based communication with an interpreter or over-the telephone interpretation depending on the language requested.

For each of the above services see the UH policy on **Foreign Language Translators**.

### 11.14.2 Hearing or Sensory-Impaired Persons

Hospitals are required to offer third party interpreter services to **Hearing or Sensory-Impaired Persons** as well, to ensure the information is accurately translated and a patient's confidentiality is protected. The following options are available to patients and personal representatives at University Hospitals:

- Use of qualified sign language or oral interpreters may be arranged for hearing impaired patients by calling the Cleveland Hearing and Speech Center at 216-231-8787, or Deaf Services of Cleveland at 216-382-9828.
- MARTTI System
  - Access by reservation at Bolwell 3300A, 216-844-7191
  - Access by reservation at Horowitz 3rd Floor; pager 30532
  - Access in ED at 216-844-1644
  - Access in Mather PACU at 216-844-2260
- Handwritten Notes
- The Ohio Relay Service is a free service provided at 1-800-750-0750.
- TTY machines are available, free of charge to any patient requesting their use. TTY machines may be obtained through the UHCMC Telecommunications Department during business hours of 8AM – 5PM, weekdays, at 216-844-5588. Requests for TTY machines may also be placed in advance on line via the UH Intranet: http//intranet.uhhs.com/telecom.asp.
- Lip reading

### 11.15 NURSING SERVICES

University Hospitals Case Medical Center has achieved Magnet status, a highly coveted designation recognizing nursing services and quality nursing care. The goal of Nursing Services is three-fold: to give quality care to patients, to provide an exemplary learning climate for students and staff, and to promote a spirit of inquiry in nursing. The nursing staff is committed to the concept of collaboration in the delivery of quality patient services and welcomes opportunities to work collaboratively with residents and physicians to achieve this goal.

Nursing Services is decentralized to promote clinical specialization and accountability for nursing care as close to the point of service as possible. A vice president or director of nursing directs nursing and patient care services in each of the clinical services: medicine, surgery, psychiatry, pediatrics and women's health. Head nurse managers directors of nursing and the Chief Nursing Officer (CNO) are accountable for high quality patient care. The CNO is the corporate officer responsible for assuring a consistent standard of nursing care throughout UHCMC. Advanced practice nurses; clinical nurse specialists, nurse practitioners, and nurse midwives with graduate preparation and additional certifications provide patient care, education, and leadership in all areas to develop and maintain high standards of nursing practice. Many nurses hold clinical appointments in the Case Western Reserve University School of Nursing and provide learning experiences for nursing staff and students.

### 11.16   NUTRITION SERVICES

The Department of Nutrition Services is responsible for the overall nutritional care of all patients. Registered, licensed dietitians provide that nutritional care which includes screening patients to identify those at actual or potential risk, development of care plans to address problems identified, education of patients for home management of established dietary treatment regimes, and referral for ambulatory follow-up as necessary.  The department is also responsible for the preparation and distribution of food to all hospitalized patients.  A selective menu is utilized and every effort is made to accommodate special requirements.  Commonly used normal and therapeutic diets are described in the University Hospitals Diet Manual, available at each division nursing station.

Dietitians are available for consult about individual patient's nutritional status/therapy plan and should be consulted whenever a patient requires dietary modification other than or in addition to those described in the Diet Manual.  Orders for home-going patient education should be written at least 36 hours in advance of anticipated discharge of the patient to allow adequate time for full instruction. Inpatient dietitians can be contacted by calling the Nutrition Services office located in each patient care building or by individual pager.  Dietitians are available for the following ambulatory areas:  Adult, Rainbow Practice, Women's Health Center and the Seidman Cancer Center.  These dietitians provide follow-up care as well as ongoing outpatient counseling.

Kosher vending machines at UHCMC offer a hot, kosher certified meal within 60 seconds.  Current 24 hr locations accept both cash and credit card and are in Lerner Tower Basement Vending Room and Atrium Café Vending Room.  More locations to come!

### 11.17   PHARMACY SERVICES

The Department of Pharmacy Services has the responsibility for the procurement, storage, distribution and control of all medications for patients of the University Hospitals Case Medical Center. Pharmaceuticals are dispensed to hospitalized patients, patients of the Hospital's outpatient clinics and Emergency Departments, employees (and dependents) and medical staff (and dependents).  Information and assistance on the clinical use, pharmacokinetics, administration, and adverse reactions of medications, as well as the topics below, can be found at **Pharmacy Services**.

- Policies and procedures

- Copy of the U. H. Formulary policies and procedures,

- Listing of the U. H. Formulary by either generic or brand name,

- Alphabetical listing of all antimicrobial usage criteria and treatment spreadsheets,

- Alphabetical listing of the usage criteria for specific, non-antimicrobial drugs,

- Emergency information about drug purchasing availabilities or drug data.

**UHCMC Policy 5.9 – Pharmacy Services** was developed by the Department of Pharmacy Services, reviewed by the Pharmacy and Therapeutics Committee, and approved by the Clinical Council and appear.

### 11.18   VOLUNTEER SERVICES

The Auxiliary of University Hospitals Case Medical Center is a **Volunteer Services** organization whose mission is to develop special projects, programs, and initiatives that support the hospital's mission: "To Heal, To Teach, To Discover." The proceeds from Auxiliary supported projects are given to needed areas in the form of grants that are awarded at least once each year. The **Auxilary** currently has responsibility for the following income generating projects:

- Java Jive

- Baby Prints, newborn baby photo program in MacDonald Women's Hospital
- Atrium Gift Shop
- Atrium vendor sales

Through the funds that it generates, the Auxiliary currently supports the Hospitality Suite, the Pet Pals program, and Be Our Guest program, programs in the Seidman Cancer Center, Rainbow Babies & Children's Hospital, and many other very important efforts at UHCMC.

### 11.19   REHABILITATION SERVICES

**Rehabilitation Services** include: Occupational Therapy (OT), Physical Therapy; (PT), Speech-Language Pathology (SLP), Audiology, Art Therapy, Music Therapy, Lymphedema Therapy, and Pain Management Therapy.  Patients are seen in a number of practice settings including the acute hospital, skilled nursing, inpatient rehab and/or outpatient.  All these settings are available at UHCMC in addition to a number of community based outpatient sites.

#### 11.19.1 Referral Process

1.    All inpatient referrals for require a physician order entered thru the EMR

2.    Referral pads are available for Outpatient referrals

The **Rehabilitation Service** Line includes Occupational Therapy (OT), Physical Therapy; (PT), Speech-Language Pathology (SLP), and Audiology). Patients are seen in a number of practice settings including the acute hospital, skilled nursing, inpatient rehab or outpatient. All these settings are available at UHCMC in addition to a number of community based outpatient sites.  Click the appropriate left-menu items for a description of **Adult** and **Pediatric** rehabilitation services.

#### 11.20.1 Referral Process

1.    All inpatient referrals for require a physician order.

2.    Referral information should include:

| | |
|---|---|
| Patient Name | Physician Name |
| Date of Birth | Diagnosis |
| UHC Number | Description of the problem to be treated/precautions |

### 11.20   SOCIAL WORK SERVICES

Social Workers are assigned throughout the hospital to assist patients and their families with personal, emotional, marital, family, or other problems that are often related to illness and their ability to gain maximum benefit from health care services.  In addition to counseling, social workers collaborate with physicians, nurses, and other health care workers in medical care plans for patients.  With their thorough knowledge of available health and welfare resources in the community, they can help with arrangements for rehabilitation services, care in the home, nursing homes, tutoring, specialized infant and children's services, or other post-hospital assistance.  The social worker must be notified in case of child abuse, or when an infant is to be discharged to a child caring agency or institution.  See the UHCMC policy relative to **Social Work Services**.

Business Hours:

The Social Work Department's hours are Monday through Friday 8:30 a.m. - 4:00 p.m. (also on site Saturdays 8:30 a.m.- 5:00 p.m.).  During these hours, social workers are available via individual pagers or the centralized office in their management centers:

| | | |
|---|---|---|
| Med/Surg: | (Lakeside & Hanna House Division)…………..Ext. 43869 | |
| Pediatrics: | (RB&C Divisions) ……………..……………….....Ext. 43375 | |

| | |
|---|---|
| OB/Gyn: | (MacDonald Hospital for Women Divisions)….Ext. 43364 |

Emergency Department:    A Social Worker covers the Emergency Department 24/7 via pager # 35107.

Inpatient Divisions:  A standby social worker is available during non-business hours (this includes evenings, weekends and non-business holidays) via the following pagers:

| | | |
|---|---|---|
| Adult: | (Lakeside & Hanna House Divisions) …….…Pager 35138 |
| Pediatrics: | (RB&C Divisions)…………………….………Pager 35139 |
| Psychiatry: | …………………………………………………Pager 35138 |

### 11.21    PATIENT TRANSPORTATION SERVICES

The hospital has a highly detailed 24/7 teletracking system for the transportation of patients and visitors, as well as the movement of specimens, throughout UHCMC.  By dialing 7 "MOVE" (77688) and following the voice prompts, a request will be initiated.  Any questions concerning the use of the system should be directed to the Transport Operations Office at ext. 47851.  For immediate service, please use the team leader pager at pager number 34093.

## 12.    RESIDENT RESOURCES & ACTIVITIES

### 12.1    ACCESS TO CASE WESTERN RESERVE UNIVERSITY

Residents of UHCMC will receive a Case ID card at hospital orientation.  The Case ID card allows access to the Veale athletic facilities, the Biomedical Research Building (BRB), at 10900 Euclid Avenue, and the School of Medicine Buildings excluding access to the Wolstein Building and the upper floors of the BRB.  Additionally all residents will be granted a Case email address and access to library services at Case.  Please contact your program coordinator or the GME office on how to set-up computer access to the Case network.

### 12.2    PARKING

The **Parking Office** is located in the Humphrey Building, Room 1535**.**  Parking is available for all residents in Lot 61 located on Circle Drive.  The cost can be payroll deducted if a resident is on campus for six consecutive months or more.  Rotating residents are advised to pay Cash or Check at the Parking Office for the time needed.  You must display a parking tag/sticker on your vehicle.  Apply for a parking permit online at **Parking Permit Application.**  When parked at UHCMC, you assume all responsibility and observe all **Parking Rules & Regulations**, including the prompt payment of any fines that may occur for any infraction.  Failure to pay any fines may result in the fine deducted from your paycheck, or having your vehicle wheel locked or impounded.  The Parking Permit and Key Card must be returned to the Parking Office in order to cancel your parking assignment and payroll deduction.  Any questions or concerns in regards to parking should be brought to the attention of the Parking Office at ext. 47275 (4PARK).

### 12.3    THE PHYSICIAN PORTAL

The Physician Portal is an internet-based patient care communication tool for UH physicians. This tool enables every resident to be updated on important system, hospital, and medical news.  A resident can access their email, the UH phone book, medical calculations, PACS, and eSig.

### 12.4    TELECOMMUNICATION

Telephone System

The Telecommunications Department is comprised of a complex network of processor and computer supported telecommunications systems distributed throughout a multi-building environment. The largest of these systems supports direct inward and direct outward dialing from most telephones, bypassing the hospital operator.  Patient telephones may be used to reach other hospital telephones or to access the digital paging system.

The resident's quarters are equipped with telephones that residents may use to conduct their

business. General telephone information can be found on the University Hospitals' Intranet web site. Select "**Corporate Directory**" from the "On-line Tools" drop-down menu. (See Pager instructions on the University Hospitals' Intranet Web Page.)

The Hospital Operators make a determined effort to direct incoming calls to the correct extension. However, if you customarily cannot be reached at a hospital extension, frequent callers can access your digital pager at any time from their own touchtone telephone. Paging Information and Instructions are available online at University Hospitals connect, by clicking on "How To" at the *Corporate Directory*.

The audible overhead paging system is designed for emergency business use only. Calls during the business day will be directed to your department. The Hospital Operator will not accept messages.

**Emergency Calls**
Cardiac Arrest/Medical Emergency/Triple...............5555
Fire....................................................................5555
Security/Protective Services.....................(HELP) 4357

**Telecommunication Numbers**
Telephone Information Line..................................41405
Telephone Repair.................................................41482
Teletypewriter, (TTY)...........................................41544
Hospital Operator...................................................0

### 12.5    CONFERENCES, ROUNDS, LECTURES, ETC.

There are regularly scheduled Conferences, Seminars, Rounds, Lectures, Demonstrations, etc., presented throughout the year under the auspices of both the Hospital and the School of Medicine. Notification of these meetings is published in advance.

### 12.6    RESIDENT PARTICIPATION ON HOSPITAL COMMITTEES

Residents are encouraged to be active contributors to the Association of Residents and Fellows and the Minority Housestaff Association. Leadership of these two associations are asked to select resident representatives to the following institutional committees: Graduate Medical Education Committee, the Institutional Review Board, Library, and Transfusion Committees.

### 12.7    ASSOCIATION OF RESIDENTS & FELLOWS

The Association of Residents & Fellows (ARF) was formed at University Hospitals by a group of Chief residents in 1991. Their goal was to form a democratically elected advocacy group that could present resident concerns to the administration in a formal fashion. A request for interested residents is sent to all UHCMC residents and representation from every department is encouraged. The Director of GME, representing administration, attends all regular meetings.

Since its inception, ARF has contributed to the enrichment of residency life at UHCMC in many ways. In addition to maintaining a dialogue with administration, participating residents are asked to serve on various committees at both the hospital and the medical school. ARF sponsored seminars inform residents on such vital issues as contract preparation and the fundamentals of entering the managed care practice arena. Further, ARF-sponsored socials, varying from informal pizza parties to holiday affairs, foster the interaction of residents from every department.

With strong influence from ARF, the Academic Center for Residents and Fellows was opened on the third floor of Lakeside in 1994. This dedicated space provides a pleasant environment away from service areas where residents can confer, study, and make the most of free time. The Center features a lounge, locker space, a conference room, a study room with computers and Internet access, and kitchen facilities with chilled spring water and coffee brewing. The Office of GME is also located here. UHCMC residents have the access to the Center twenty-four hours a day via the coded entry door.

200653  v9
July 1, 2012

CONFIDENTIAL

UH000452

Membership in ARF is strictly voluntary. Funding for its activities is currently provided from three sources: Each resident contributes $1 per pay period, or $26 per year; hospital administration matches those contributions with an equal amount.

### 12.8    HOUSE OFFICERS WELCOME ASSOCIATION

HOWA is a group of residents' spouses, who offer each other support during the hectic residency years. In addition to monthly meetings featuring speakers and serious discussion, their other activities include a Book Club, Service Club, Gourmet Group, and a children's playgroup.

### 12.9    MINORITY HOUSESTAFF ASSOCIATION

This group was formed in the fall of 1996, with its members establishing the following goals:

- To participate in the active recruitment of minority housestaff at UHCMC.
- To provide community service to the minority population of Cleveland.
- To offer social and peer group support for UHCMC minority housestaff and medical students at CWRU.

### 12.10    FOOD SERVICES

#### 12.10.1 Atrium Cafeteria

| Monday through Friday: | 6:30 a.m. – 8:00 p.m. |
|---|---|
| Breakfast: | 6:30 a.m. – 10:00 a.m.* |
| Lunch: | 10:30 a.m. – 2:00 p.m.* |
| Dinner: | 2:00 p.m. – 8:00 p.m.* |
| Saturday and Sunday: | 6:30 a.m. – 7:00 p.m. |
| Breakfast: | 6:30 a.m. – 10:30 a.m. |
| Lunch/Dinner: | 11:00 a.m. – 7:00 p.m. |

*Grab-and-go quick serve, beverages, and coffee are available from open until close. A selective menu that includes sandwiches, snacks, salads, and beverages are available during all open hours. A selection of hot entrees are available during normal meal times. See the **Weekly Menu**.

#### 12.10.2 Vending Machines

Vending machines are available and open 24 hours per day in the cafeteria and other satellite locations. A bill changer is available for your convenience in the main cafeteria. Items available for purchases are snacks, beverages, ice cream, and full meals.

#### 12.10.3 Einstein Bagel Co.

| Monday through Friday | 6:30 a.m. to 2:00 p.m. |
|---|---|
| Saturday, Sunday and Holidays | CLOSED |

Einstein Bagel Co. is located in the Atrium opposite Bishop Cafeteria and offers specialty coffees made from "the finest beans the world has to offer." Muffins, scones, bagels, soups, salads and special recipe cookies baked fresh daily.

#### 12.10.4 JAVA JiVE Espresso Bar

| Monday through Friday | 6:30 a.m. to 5:00 p.m. |
|---|---|
| Saturday, Sunday and Holidays | CLOSED |

JAVA JiVE is sponsored by the Auxiliary of University Hospitals and a portion of the proceeds is returned to the Hospital for special projects.  JAVA JiVE is located in the Bolwell Health Center Lobby and offers a variety of coffees, including iced, frozen, brewed, and flavored, as well as fresh baked goods.  They also offer grind-to-order beans, which are roasted fresh every week.

### 12.10.5 ON-CALL MEALS

Residents may swipe their UHCMC identification badge in the Atrium Cafeteria to cover the partial cost of meals when on-call.  Only residents who take in-house call will receive on-call meal money on their UHCMC identification badge.

### 12.11  LIBRARY FACILITIES

The Core Library, located at Lakeside 3119, is the central library facility of UH.  It includes a print reference journal/book collection and access to numerous satellite libraries throughout UH.  The Core Library home page on the UH Intranet includes links to Access Medicine, MD Consult, MicroMedex, OVID Online, PubMed, and 800 full text online journals. Instruction in using online resources is available to groups and individuals. Request forms for interlibrary loans are available on the webpage as well as link to e-books and other online resources.  Core Library staff also provide database searches, interlibrary loans and help in accessing information resources from home or office.  The library is open to residents at all times, and is staffed from 8:30 am to 5:00 pm, Monday-Friday.  For help or information, call ext. 41208.

### 12.12  ON-CALL ROOMS

Every effort is made to ensure acceptable accommodations in a pleasant and restful environment to residents while on call.  Every room is marked with a standardized sign noting its department.  It is the responsibility of that department to assign its rooms to interns, residents or students.  Security measures other than those already in place are also the responsibility of the individual departments.

### 12.13  UNIFORMS AND LAUNDRY

The official uniform for residents is a white lab coat worn over appropriate attire.  The Hospital will furnish each resident with three lab coats on the day of orientation.  Residents requiring scrubs must consult their individual training departments for instructions on obtaining them.  For initial laundry service, a laundry form should be filled out at the Uniform Room in the sub-basement of Lakeside.  Coats will be permanently marked with the resident's laundry number.  Laundry service is available once a week.

### 12.14  Hospital-Issued Scrub Suits

May be worn only while carrying out specific clinical responsibilities.  See **UHCMC Policy 19.5, Hospital Issued Scrub Suits.**  Unless a scrub suit is contaminated unauthorized removal of hospital-issued scrub suits from UHCMC property is theft. No one is permitted to a wear hospital-issued scrub suit off UHCMC property. Violators will be subject to disciplinary action in accordance with Policy **HR-72, Corrective Action**.

## 12.15   UHCMC GME PROGRAM CONTACTS

| DEPARTMENT | PROGRAM DIRECTOR | COORDINATOR | PHONE | MAIL STOP |
|---|---|---|---|---|
| Anesthesiology | Heather McFarland, MD | Chris Adamovich | 47335 | BHS 5077 |
| Anesthesiology - Pain | Salim Hayek, MD, PhD | Terrah Northern | 42685 | |
| Anesthesiology - Critical Care | Mark Zahniser, MD | | 48077 | LKS 5007 |
| Pediatric Anesthesiology | Paul Tripi, MD | Kenella Norwood | 47340 | |
| Cardiology | Brian Hoit, MD | Joanna Benson | 47603 | LKS 5038 |
| Clinical Cardiac E.P. | Mauricio Hong, MD | | | |
| Interventional Cardiology | Michael Cunningham, MD | | | |
| Dermatology | Susan Nedorost, MD | Kris Myers | 45794 | LKS 5028 |
| Emergency Medicine | Barry Brenner, MD | Amy Lovano | 43610 | HMP5099 |
| Endocrinology | Baha Arafah, MD | Carroll Campbell | 43144 | LKS 5030 |
| Family Medicine | Wanda Cruz Knight, MD | Leslie Estremera | 45483 | BHC5036 |
| Preventative Medicine | Kurt Stange, MD PhD | | 43944 | |
| Gastroenterology | Gregory Cooper, MD | Linda Shenk | 45386 | WRN 5066 |
| Geriatrics | Taryn Lee, MD | | 35890 | MPV 6033 |
| Genetics | Shawn McCandless, MD | Portia Tuck | 47236 | LKS 6055 |
| Hematology/Oncology | Joseph Bokar, MD | Kelly Sliter | 983-4946 | LKS 5079 |
| Infectious Disease | Robert Salata, MD | Martha Salata | 41761 | FOL 5083 |
| Internal Medicine | Keith B. Armitage, MD | Deena Segal | 42562/43811 | LKS 5029 |
| Nephrology | Lavinia Negrea, MD | L Tanya Stanfield | 48060 | LKS 5048 |
| Neurology | David Preston, MD | Kris Stacy | 45550 | HH 5040 |
| Clinical Neurophysiology | | Doris Evans | 43100 | LKS 6058 |
| Neuromuscular Medicine | Bashar Kitirji, MD | | | |
| Vascular Neurology | Cathy Sila, MD | | | |
| Neurosurgery | Nicholas Bambakidis, MD | Lois Hengenius | 43472 | HH 5042 |
| Obstetrics/Gynecology | Nancy Cossler, MD | JoAnn Laurent | 48551 | MAC 5034 |
| Ophthalmology | Jonathan Lass, MD | Marianne Reeves | 48577 | WRN 5068 |
| Orthopedics | Patrick Getty, MD | Ellen Greenberger | 43233 | HH 5043 |
| Otolaryngology | Jim Arnold, MD | Mary Cerveny | 48433 | LKS 5045 |
| Pathology | David Kaplan, MD | Jeannie St. Marie | 46046 | PATH 5077 |
| Cytopathology | | | 44896 | |
| Hematopathology | Howard Meyerson, MD | | 41807 | |
| Pediatrics | Martha Wright, MD | Sue Dominick | 48431 | RBC 6002 |
| | Robin Strosaker, MD | Belinda Wagner | 41171 | |

| DEPARTMENT | PROGRAM DIRECTOR | COORDINATOR | PHONE | MAIL STOP |
|---|---|---|---|---|
| **Pediatric Fellowships** | | | | |
| Peds Behavioral | Nancy Roizen, MD | Cortney Byrne | 40205 | WLK 6038 |
| Peds/Cardiology | Ravi Ashwath, MD | Rebecca Dunsworth | 66519 | RBC 6011 |
| Peds/Critical Care | Katherine Mason, MD | Cortney Byrne | 40205 | RBC 6010 |
| Peds/Emergency Medicine | Deanna Dahl-Grove, MD | Rebecca Dunsworth | 66519 | COR 6097 |
| Peds/Endocrinology | Naveen Uli, MD | Rebecca Dunsworth | 66519 | RBC 6004 |
| Peds/Gastroenterology | Atiye Nur Aktay, MD | Cortney Byrne | 40205 | RBC 6004 |
| Peds/Hem/Onc | Alex Huang, MD | Cortney Byrne | 40205 | RBC 6054 |
| Peds/Infectious Disease | Grace McComsey, MD | Cortney Byrne | 40205 | RBC 6008A |
| Peds/Neonatology | Mary Nock, MD | Rebecca Dunsworth | 66519 | RBC 6010 |
| Peds/Nephrology | Elizabeth Vogt, MD | Rebecca Dunsworth | 66519 | |
| Peds/Neurology | Nancy Bass, MD | Cortney Byrne | 40205 | RBC 6090 |
| Peds/Pulmonary | James Chmiel, MD | Cortney Byrne | 40205 | RBC 6006 |
| Peds/Rheumatology | Nora Singer, MD | Rebecca Dunsworth | 66519 | RBC 6008A |
| Peds/Sports Medicine | Amanda Weiss Kelly, MD | Rebecca Dunsworth | 66519 | RBC 6019 |
| **Plastic Surgery** | Hooman Soltanian, MD | Lisa DiNardo | (440) 646-2174 | LKS 5044 |
| **Psychiatry** | | | | |
| Adult | Susan Stagno, MD | Elizabeth Yanda | 43450 | WLK 5080 |
| Addiction | Christina Delos Reyes, MD | Kate Kilbane | 43658 | |
| Child & Adolescent | Mary Ellen Davis, MD | Kate Kilbane | 43658 | WLK 5040 |
| Forensic | Philip Resnick, MD | Joyce Parker | 48749 | WLK 5040 |
| Geriatric | Philip Dines, MD | Kate Kilbane | 43658 | |
| Psychosomatic Medicine | Joseph Locala, MD | Kate Kilbane | 43658 | |
| **Pulmonary/Critical Care** | Rana Hejal, MD | Natalie Wheeler | 30871 | LKS 5067 |
| **Diagnostic Radiology** | Mark Robbin, MD | Cindy Patena | 43113 | BSH 5056 |
| **Radiation Oncology** | Janice Lyons, MD | Gail Swingle | 42536 | LTR 6068 |
| **Neuroradiology** | Kristine Blackham, MD | Kathy Grossmyer | 41542 | BSH 5056 |
| **Nuclear Radiology** | James K. O'Donnell, MD | Spring Galloway | 43319 | BSH 5056 |
| **Vascular Interventional Radiology** | Jon Davidson, MD | | 43061 | BSH 5056 |
| **Rheumatology** | Ali Askari, MD | Carmie Jefferson | 42289 | FOL 5076 |
| **Sleep Medicine** | Kingman Strohl, MD | Natalie Wheeler | 30871 | LKS 5067 |
| **General Surgery** | Jeffrey Marks, MD | Chuck Sullivan | 43027 | LKS 5047 |
| **Colorectal Surgery** | Brad Champagne, MD | Karen Young | 47981 | LKS 5047 |
| **Urology** | Edward Cherullo, MD | Tamika Williams | 48570 | LKS 5046 |
| **Vascular Surgery** | Jerry Goldstone, MD | Sandra Barnes | 41313 | LKS 7060 |
| Advanced Educational General Dentistry | Fady F. Faddoul, DDS | Colleen Friday | 368-0775 | Dental School |
| Pediatric Dentistry | Gerald Ferretti, DDS | Nadine Hayes | 47909 | Dental School |
| Craniofacial Surgery | Manish Valiathan MDS., DDS., MSD | | 368-0673 | Dental School |
| Oral Surgery | Faisal Quereshy, DMD | Colleen Friday | 368-6731 | Dental School |
| **Graduate Medical Education** | Jerry M. Shuck, MD | Director | 43872 | LKS 5049 |
| **Office** | Will Rebello | Manager | 43889 | |
| | Regina Steffen | Specialist | 47320 | |
| | Lillian Stokes | Admin Assistant | 43872 | |
| | Billie Kyriakides | Student Coordinator | 286-6940 | |
| | Barbara Zuik | Coordinator | 75583 | |

CONFIDENTIAL

UH000456

## 12.16  MAP OF UHCMC CAMPUS



Index

**A**

ADMITTING PROCESS 51
ADVOCACY EFFORTS 38
APPOINTMENT 17
ASSOCIATION OF RESIDENTS & FELLOWS 62
AUTOPSIES 54

**B**

BACKGROUND CHECKS 22
BENEFITS 41
BLOOD BORNE PATHOGEN TRAINING 25
BLOODLESS MEDICINE 57

**C**

CHAPERONES 43
CLOSURE/REDUCTION OF PROGRAM 19
COBRA 41
COMMUNICABLE DISEASES 43
COMPLETION OF TRAINING 19
COMPLIANCE AND ETHICS 39
CONFERENCES, ROUNDS, LECTURES, ETC 62
CONTRACTS 18
CONTROLLED SUBSTANCE LICENSURE 24
CORPORATE HEALTH SERVICE 26

**D**

DATA USAGE 38
DEATH CERTIFICATE 55
DEATH OF PATIENTS 53
DISASTER POLICY 19
DISCHARGE OF PATIENTS 53
DISMISSAL 28
DISPUTES BETWEEN RESIDENT AND
    MEDICAL SUPERVISORS 32
DIVERSITY 16
DIVERSITY 16
DRESS CODE 40
DUE PROCESS 30
DUTY HOURS 33

**E**

ELIGIBILITY 17
E-MAIL RECORD RETENTION 45
EMERGENCY ADMISSION 52
EMPLOYEE ASSISTANCE COUNSELING 26
EVALUATIONS 46

**F**

FOOD SERVICES 63

**G**

GRIEVANCE PROCESS 31

**H**

HIPAA 37
HOLIDAYS 23
HOUSE OFFICERS WELCOME ASSOCIATION 63

**I**

I.D. BADGES 23
INTERNET POLICY 38
INTERPRETER SERVICES 58

**L**

LEAVES OF ABSENCE 42
LEGAL MATTERS 45
LIABILITY INSURANCE 41
LIBRARY 64

**M**

MATERNITY/PATERNITY LEAVE 42
MEDICAL LICENSURE 23
MEDICAL RECORDS 48
MINORITY HOUSESTAFF ASSOCIATION 63
MOONLIGHTING 35
MORTICIANS 53

**N**

NURSING SERVICES 58
NUTRITION SERVICES 59

**O**

OBLIGATION TO TREAT 40
ON CALL ACTIVITIES 34
ON-CALL MEALS 64
ON-CALL ROOMS 64

**P**

| | |
|---|---|
| PARKING | 61 |
| PATIENT ACCESS SERVICES | 51 |
| PATIENT TRANSPORTATION | 61 |
| PAYROLL | 22 |
| PERFORMANCE ALERT NOTICE. | 47 |
| PHARMACY | 59 |
| PHARMACY SERVICES | 59 |
| PHYSICIAN IMPAIRMENT | 40 |
| PHYSICIAN ORDERS | 50 |
| PHYSICIAN PORTAL | 62 |
| PRESCRIBING CONTROLLED SUBSTANCES | 50 |
| PROTECTED HEALTH INFORMATION | 37 |
| PROTECTIVE SERVICES | 25 |

**R**

| | |
|---|---|
| RADIATION SAFETY | 55 |
| REHABILITATION | 60 |
| REMEDIATION. | 47 |
| RESIDENT APPEALS PROCESS | 30 |

**S**

| | |
|---|---|
| SCRUB SUITS | 64 |
| SICK TIME | 42 |
| SOCIAL WORK | 60 |
| SUPERVISION | 33 |

**T**

| | |
|---|---|
| TELECOMMUNICATION | 62 |

**U**

| | |
|---|---|
| UNIFORMS AND LAUNDRY | 64 |

**V**

| | |
|---|---|
| VACATION | 23 |
| VISA POLICY | 18 |
| VISITORS | 56 |
| VOLUNTEER SERVICES | 60 |

**ACKNOWLEDGEMENT**

I HEREBY ACKNOWLEDGE RECEIPT OF THE UNIVERSITY HOSPITALS CASE MEDICAL CENTER RESIDENT MANUAL (THE "MANUAL").   BY SIGNING BELOW, I FURTHER ACKNOWLEDGE AND AGREE THAT I READ AND UNDERSTAND THE MANUAL AND AGREE, AS A CONDITION OF MY RESIDENCY, TO BE BOUND BY AND COMPLY WITH THE MANUAL.

FURTHER, I SPECIFICALLY AGREE THAT I HAVE READ AND UNDERSTOOD THE TERMS UPON WHICH I CAN MOONLIGHT OR PERFORM EXTRA DUTY FOR PAY AS DESCRIBED IN SECTION 5.3, AND UNDERSTAND THAT IF I AM WORKING ON VISA STATUS I AM NOT ELIGIBLE TO MOONLIGHT.  I UNDERSTAND THAT MY FAILURE TO COMPLY WITH THE TERMS OF 5.3. CAN RESULT IN MY IMMEDIATE DISMISSAL FROM MY PROGRAM.

Name of Resident
_____

Signature of Resident
_____

Date
_____

Department
_____

**Appendix A-1**
**Summary of Leave Types**
**Current as of 4/20/2010 – See Leave of Absence Policy for Most Current Information**

| Leave Name | Eligibility | Maximum Leave Length | Approval | Job protection Track: Hrs/Days |
|---|---|---|---|---|
| **Family Medical Leave Act (FMLA)** | 12 months of service with 1,250 hours of worked time in the previous 12 month period | 12 weeks within a rolling 12 month period | Leave approved through Corporate Health based upon health criteria under FMLA | 12 weeks regardless of paid or unpaid Track by hours |
| FMLA Military Caregiver Leave | 12 months of service with 1,250 hours of worked time in the previous 12 month period | 26 weeks within a rolling 12 month period | Leave approved through Corporate Health based upon health criteria under FMLA | 26 weeks regardless of paid or unpaid Track by hours |
| FMLA Military Exigency Leave (regular or intermittent) | 12 months of service with 1,250 hours of worked time in the previous 12 month period | 12 weeks within a rolling 12 month period | Leave approved through Manager and HR Services | 12 weeks regardless of paid or unpaid Track by hours |
| FMLA Intermittent | 12 months of service with 1,250 hours of worked time in the previous 12 month period | 12 weeks within a rolling 12 month period | Leave approved through Corporate Health based upon health criteria under FMLA | 12 weeks regardless of paid or unpaid Track by hours |
| Medical Leave | After initial employment period (90 days) Not eligible for intermittent or reduced work schedule | 26 weeks – less the number of weeks of FMLA taken | Leave approved through Corporate Health based upon health criteria | 30 days job protection 26 weeks total leave (inclusive of any FMLA time) Track by days |
| Personal Leave | Upon hire with compelling reason | 4 weeks | Manager approval or Manager and HR approval for exceptions | 30 calendar days of job protection Track by days |
| Education | 12 months of service | 9 Months | Manager approval | 30 calendar days of job protection Track by days |
| Medical Mission | All eligible on a voluntary basis | Length of mission | Manager approval based on staffing needs | 30 calendar days of job protection Track by days |
| Military Leave | Called to active duty | Length of active duty plus reinstatement time allowed | Advance notice to manager | Meets re-employment requirements and is qualified for their previous position. Track length of service, re-employment request date and if employee became disabled during active duty |
| **Worker's Compensation Leave** | See Workers' Compensation Policy HR-37 | See Workers' Compensation Policy HR-37 | See Workers' Compensation Policy HR-37 | See Workers' Compensation Policy HR-37 |

**Appendix A-2**
**Compensation and Benefits Summary**
Current as of 4/20/2010 – See Leave of Absence Policy for Most Current Information

| Leave Name | Benefit Continuation | Benefit Automatic Discontinuation | Employee Benefit Rates |
|---|---|---|---|
| Family Medical Leave Act (FMLA) | All benefits continue in force. Employee may contact HR Service Center to discontinue any benefits during the approved leave | None | Employee pays their normal employee premiums while on approved leave |
| FMLA Military Caregiver Leave | All benefits continue in force. Employee may contact HR Service Center to discontinue any benefits during the approved leave | None | Employee pays their normal employee premiums while on approved leave |
| FMLA Military Exigency Leave (regular or intermittent) | All benefits continue in force. Employee may contact HR Service Center to discontinue any benefits during the approved leave | None | Employee pays their normal employee premiums while on approved leave |
| FMLA Intermittent | All benefits continue in force. Employee may contact HR Service Center to discontinue any benefits during the approved leave | None | Employee pays their normal employee premiums while on approved leave |
| Medical Leave | All benefits continue in force. Employee may contact HR Service Center to discontinue any benefits during the approved leave | None | Employee pays normal employee premiums while on an approved leave |
| Personal Leave | All benefits continue in force except as specified in the next column. Employee may contact HR Service Center to discontinue any benefits during the approved leave | Life and Disability end 30 days following the month the leave starts | Employee pays their normal employee premiums for the first 30 days of the approved leave Beginning with the 31st day, the full monthly premium rate will apply for benefits remaining in force |
| Education | All benefits continue in force except as specified in the next column. Employee may contact HR Service Center to discontinue any benefits during the approved leave | Life and Disability end 30 days following the month the leave starts | Employee pays their normal employee premiums for the first 30 days of the approved leave Beginning with the 31st day, the full monthly premium rate will apply for benefits remaining in force |
| Medical Mission | All benefits continue in force except as specified in the next column. Employee may contact HR Service Center to discontinue any benefits during the approved leave | Life and Disability end 30 days following the month the leave starts | Employee pays their normal employee premiums for the first 30 days of the approved leave Beginning with the 31st day, the full monthly premium rate will apply for benefits remaining in force |
| Military Leave | All benefits continue in force except as specified in the next column. Employee may contact HR Service Center to discontinue any benefits during the approved leave | Life Disability ends immediately upon leave start | Employee pays their normal employee premiums while on approved leave |
| Worker's Compensation Leave | All benefits continue in force. Employee may contact HR Service Center to discontinue any benefits during the approved leave | None | Employee pays their normal employee premiums while on an approved leave Beginning with the 181st day, the Full Monthly premium rate will apply |

Employees are required to use eligible paid benefit time in increments of not less than what is required to exhaust existing benefit time banks over the period of the leave and not more than would generate 100% of their applicable salary. Benefit time must be exhausted to a zero balance before going unpaid. Depending upon the leave type and entity, benefit time is processed using a combination of PTO, Vacation, Sick, Personal, Old Saved Vacation, and STD supplement banks. In all cases the first 7 days of the leave requires payment of full standard hours using PTO (or UHMSO Vacation where PTO is not available).

## APPENDIX B

CHECK WITH GME OFFICE TO ENSURE YOU ARE USING THE CURRENT FORM

### APPLICATION FOR EXTRA DUTY WITH PAY ("Application")

This Application is based upon a template drafted by the UH Law Department as approved in June 2012. Blank lines should be appropriately filled in but the language cannot be modified in any way without Law Department approval. This template, if unchanged, does not require UH Law Department Approval. Each fully executed Application should be saved with each Resident's employment file, a copy sent to the GME office, and a copy uploaded to UH's then current contract management system as articulated in the applicable UH policy.

| Resident Information (completed by Resident) | Extra Duty Information (completed by Resident) |
|---|---|

Name: _____

Training Program Name: _____          Name of Site: _____

PGY Level: _____

Ohio License #: _____          Site Address: _____

DEA #: _____          _____

On Visa?:          Yes ☐*   No ☐          Schedule (if known):
**\*IF YES, RESIDENT IS NOT ELIGIBLE FOR EXTRA DUTY!**

| Day | Hours |
|---|---|
| Monday | _____ |
| Tuesday | _____ |
| Wednesday | _____ |
| Thursday | _____ |
| Friday | _____ |
| Saturday | _____ |

If Extra Duty is Internal, how many hours will be reported as Duty Hours per week? _____

Salary/pay[1]: $ _____ / ☐hour ☐day ☐month

Person/Co. Paying Resident ("Paymaster"): _____

Dates of Extra Duty: __/__/____ through __/__/____

Resident Signature: _____ Date:_____

1. Is Site Internal (work is on behalf of UH Case Medical Center)?   Yes ☐   No ☐

2. Is the Site External (on behalf of an employer other than UH Case Medical Center) and for another University Hospitals ("UH") employer?                                                     Yes ☐   No ☐

   _NOTE:_ If Extra Duty is for another UH employer, Resident must have a separate written contract to do the work. Please attach a copy to this form.

3. For all External Extra Duty, Resident must have Certificate of Insurance Coverage evidencing professional liability insurance coverage. Please attach a copy to this form.

4. Brief description of Extra Duty:
   _____
   _____
   _____
   _____

**Extra Duty that is not properly approved can result in the immediate termination of the Resident from their Training Program, and inappropriate approval of Extra Duty by the Program Director may also result in appropriate discipline of the Program Director in accordance with the applicable UH policies. Internal Extra Duty is considered a part of a resident's contract of employment with UH Case Medical Center.**

**By signing below, the Program Director certifies that they have confirmed with the UHHS Authorized representative (if other than themselves) that the Extra Duty pay is consistent with Fair Market Value in accordance with the requirements of UHHS Policy PT-5.**

Approved _____          Date_____

Name: _____

Title:     Program Director, _____

_____

[1] For Extra Duty performed on behalf of UHCMC, Resident should be paid according to the rates set forth in advance by the UHHS Authorized Representative as defined by UHHS Policy PT-5.

200653  v9
July 1, 2012

73

**CONFIDENTIAL**

UH000463