1

```
              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF OHIO
                        EASTERN DIVISION

                          - - -

   ALISON O'DONNELL,

              Plaintiff,
        vs.                      Case No. 1:16-cv-2450
                                 Judge Donald E. Nugent
   UNIVERSITY HOSPITALS
   HEALTH SYSTEM, et al.,

              Defendants.

                          - - -

              DEPOSITION OF JULIE A. CHESTER
                  Monday, August 7, 2017

                          - - -


        The deposition of JULIE A. CHESTER, a

   witness, called for examination by the

   Plaintiff under the Federal Rules of Civil

   Procedure, taken before me, Diane M. Stevenson,

   a Registered Diplomate Reporter, Certified

   Realtime Reporter, and Notary Public in and for

   the state of Ohio, pursuant to notice, at The

   Spitz Law Firm, 25200 Chagrin Blvd., Suite 200,

   Beachwood, Ohio, commencing at 8:58 a.m., the

   day and date above set forth.


                Stevenson Reporting Service, Inc.
            2197 Macon Court   Westlake, Ohio 44145
                 440.892.8600  diane@nls.net
```

PLAINTIFF'S
Exhibit 12

1       finish my question before you answer; I will

2       make sure to allow you to finish your answer

3       before my next question.  Okay?

4  A.    Yes.

5  Q.    If you need a break at any time, let me know.

6       Finally, I just want to make sure that you

7       understand my questions today.  The only way I

8       know whether or not you understand is if you

9       tell me that you don't understand it.  Does

08:59 10      that make sense?

11  A.    That makes sense.

12  Q.    So if you don't understand one of my questions,

13       will you let me know?

14  A.    I will let you know.

15  Q.    Can we agree, then, that if you answer my

16       question that you understood my question?

17  A.    Yes.

18  Q.    What is your present residential address?

19  A.    2867 Wind Field Drive, Medina, Ohio 44256.

08:59 20  Q.    I can't remember if you said it or not, what is

21       your middle name?

22  A.    Ann.

23  Q.    Ann?

24  A.    Ann.

25  Q.    With an E at the end, or no?

28

```
 1   A.    Yes.
 2   Q.    And complaints that she had against other
 3         physicians in that program, correct?
 4   A.    Correct.
 5   Q.    One of those individuals was Dr. Uli, correct?
 6   A.    I don't recall it was Dr. Uli.
 7   Q.    Who do you recall it being?
 8   A.    Dr. Nara -- I don't know how to pronounce her
 9         name.  It starts with an N.
10   Q.    Narasimhan?
11   A.    Correct.
12   Q.    So you recall Dr. O'Donnell was making
13         complaints about that physician?
14   A.    Correct.
15   Q.    And so you were dealing with that at the same
16         time you were dealing with her accommodation
17         requests?
18   A.    Yes.
19             (Plaintiff's Exhibit 1 was marked for
20         identification.)
21   Q.    I am handing you Plaintiff's Exhibit 1.  I
22         don't believe your name is on this email, but I
23         wanted to ask you some questions about it.
24         Okay?
25   A.    Okay.
```

1  A.  Correct, we would be in partnership with them.

2  Q.  Having read through this, does any of this

3      information or these allegations jog your

4      memory that you had conversations with

5      Dr. O'Donnell about any of these issues?

6  A.  I mean, Dr. O'Donnell did raise issues that she

7      wasn't being treated fairly, so yes, some of

8      these resonate.

9  Q.  A lot of this stuff in here references Dr. Uli.

09:57 10     You don't recall any conversations with

11      Dr. O'Donnell where she ever raised issues with

12      Dr. Uli?

13  A.  I don't recall any specific conversations, no.

14  Q.  Do you recall any complaints that she made

15      against any physicians other than against?

16      Dr. Narasimhan?

17  A.  I don't recall, no.

18          (Plaintiff's Exhibit 3 was marked for

19      identification.)

09:58 20  Q.  Handing you what I have marked as Exhibit 3,

21      the first page of Exhibit 3, is this a document

22      that you provided to Dr. O'Donnell regarding

23      her request for accommodation?

24  A.  I signed it, so yes.

25  Q.  I mean, is this a template, standard document

```
 1   A.   Correct.

 2   Q.   You got that in an email from him, correct?

 3   A.   I don't recall the exact mode of communication.

 4   Q.   Well, I can show it to you.

 5   A.   Sure.

 6   Q.   Do you know if you received that information

 7        from anyone other than Dr. Uli?

 8   A.   I do not recall.

 9   Q.   All right.  So in terms of the request for

10:09 10        reasonable accommodation, Dr. O'Donnell did

11        everything that she was required to do to

12        formally request that accommodation, correct?

13   A.   Correct.

14   Q.   So it is not your position that her request was

15        somehow defective or incomplete and that is why

16        she was denied accommodation, correct?

17   A.   Correct.

18   Q.   Do you know who Valerie Jaggie is?

19   A.   Yes.

10:09 20   Q.   Who is Valerie?

21   A.   She is an HR manager that works on my team.

22   Q.   So at the time, this would have been March

23        2012, would she have been one of your direct

24        subordinates?

25   A.   I would have to go back and check her exact
```

1     meeting?  Tell me what happened.

2  A.  Again, I don't remember all the specifics, but

3     I know she did raise a number of issues.  And

4     then, typically, like any other HR issue that

5     would come forward, we wanted to make sure that

6     we would take some time to look into all her

7     concerns, interview any appropriate parties if

8     we needed to, and get back to her with some

9     kind of resolution.

10:19 10  Q.  All right.  So out of this meeting did you

11     interview any employees?

12  A.  I do remember speaking with faculty members at

13     the time.  I don't recall their exact, who they

14     were, but I do remember speaking with Dr. Uli,

15     for sure, and Dr. Narasimhan, Dr. N, whatever.

16        Those two specifically I recall, but there

17     could have been others, I just don't remember.

18  Q.  After you spoke with these individuals, did you

19     follow up with Dr. O'Donnell and speak with her

10:20 20     again about any of these concerns?

21  A.  I don't recall exactly what happened after

22     that, but I am sure that I followed up with her

23     to get a resolution of her complaints.

24  Q.  What was the resolution of her complaints?

25  A.  There was no evidence to support that she was

1    discussion on Wednesdays."

2         So that would cover the bulletin number in

3    Exhibit 8.

4 Q.   Okay, so you understand that those are

5    referring to the same thing?

6 A.   Part of what is Exhibit 8 on the sixth bullet,

7    yes, so in terms of participating, teaching

8    others.

9 Q.   But the words "actively participate," as it is

10:37 10    described by Dr. Uli in Exhibit 8 are not found

11    in relation to those two sentences you just

12    read, correct?

13 A.   I don't see the exact words, no.

14 Q.   It simply says that you have to have -- you

15    have to be able to maintain interpersonal

16    relationships with other members of the health

17    team, utilize contributions of others,

18    supervise and teach effectively, and then to

19    systemically cover --

10:38 20 A.   The study topic assigned for that week and

21    review the information with the attending

22    endocrinologist during the one-hour group

23    discussion on Wednesdays.

24 Q.   On Wednesdays, okay.  So if we look at that

25    second one where it says that you have to study

57

```
 1        the material and review the information with
 2        the attending endocrinologist during one-hour
 3        group discussion on Wednesday, that is saying,
 4        A, that you need to know the material that you
 5        are going to be talking about, correct?
 6   A.   Correct.
 7   Q.   And then that you have to be able to discuss it
 8        with -- during these one-hour group
 9        discussions, correct?
10   A.   Correct.
11   Q.   It doesn't say anything about how that
12        discussion has to take place, whether it is
13        spontaneous or whether it is, you know, a
14        monologue by the fellow or if it is a question-
15        and-answer session between the physician and
16        the fellow, none of it, it doesn't specify,
17        correct?
18   A.   It doesn't specify, no.  But I think part of
19        being a physician, especially in a fellowship
20        program, they are preparing you to
21        independently review cases and articulate the
22        cases in front of others --
23   Q.   Does it say it in there?
24   A.   -- to teach.
25   Q.   It doesn't say it in there, correct?  I just
```

58

```
 1        want you to answer my question.
 2    A.  It doesn't specifically, verbatim, say it, no.
 3    Q.  And you are not a physician, correct?
 4    A.  Correct.
 5    Q.  All right.  So you don't know whether it would
 6        be more helpful to have a question-and-answer
 7        session or to just have the fellow
 8        spontaneously be able to give a rundown of what
 9        they learned, correct?  That depends on what
10:40 10  the fellow wants; is that right?
11    A.  Correct.
12    Q.  Or it depends on what the physician wants, I
13        should say, correct?
14    A.  I am sorry, can you repeat the question?
15    Q.  Well, that information could be conveyed in
16        multiple ways, correct?
17    A.  What information?
18    Q.  What the fellow has learned.
19    A.  You would have to ask the pediatric
10:40 20  endocrinology department.
21    Q.  Okay.  So there is nothing in Exhibit 9 that
22        states that it is an essential function of the
23        job for a fellow to have to openly speak about
24        a topic in front of everyone else in an active
25        way that is without being called upon or
```

59

1     without being asked a question, none of that is

2     in there, correct?

3  A.   It is not specifically in the document.  But,

4     again, that is the purpose of the fellowship

5     program.  So fellows come out of their

6     fellowship able to function independently.

7  Q.   How do you know what the purpose of the

8     fellowship program is?

9  A.   Working with the graduate medical education

10:41 10    department, there are a number of programs, and

11     obviously, we are trying to produce and make

12     sure that all of our residents and fellows are

13     successful in the program.

14  Q.   You would agree with me that what is in

15     Exhibit 8, what Dr. Uli came up with in March

16     of 2012 for the essential functions of the job

17     is different than what is in Exhibit 9,

18     correct, several differences?

19  A.   Are you talking about March 22nd on this

10:41 20    exhibit?

21  Q.   Yes.

22  A.   The words are not exactly the same.

23  Q.   And, once again, during this time when

24     Dr. O'Donnell was requesting her accommodation,

25     you understood that her accommodation request

60

| | |
|---|---|
| 1 | was not that she not be required to participate |
| 2 | in these sessions, it was that her performance |
| 3 | wouldn't be evaluated based on how she did in |
| 4 | these spontaneous, unrehearsed speaking |
| 5 | engagements at these conferences, correct? |
| 6 A. | Repeat that question again. |
| 7 Q. | Your understanding of her accommodation request |
| 8 | was not that she not be required to participate |
| 9 | in these discussions, but rather that she not |
| 10:42 10 | be evaluated in a setting where it was an |
| 11 | unrehearsed, non-question-and-answer session? |
| 12 A. | She didn't want to participate in the |
| 13 | conversations, in the case studies. |
| 14 Q. | I am not asking what she wanted. I am talking |
| 15 | about what her accommodation request said and |
| 16 | what it asked for. It asked that she not be |
| 17 | evaluated, correct? |
| 18 A. | I would have to go back and look at it |
| 19 | specifically. |
| 10:43 20 Q. | You can look at it. |
| 21 A. | Yes, she requested that "I would not like to be |
| 22 | evaluated." |
| 23 Q. | Okay. And the only reason why you understood |
| 24 | that to be an essential function is because |
| 25 | Dr. Uli said it was an essential function as of |

1       March 22, 2012, that she actively participate

2       in these educational sessions, correct?

3  A.    Correct.

4  Q.    But you had never seen the words "actively

5       participate in educational sessions" or "take

6       an active role in educating students, nurses,"

7       you have never seen that in any other job

8       description related to the pediatric

9       endocrinology fellow, correct?

10:44 10  A.    Correct, other than what is listed in the

11       Exhibit 9.

12  Q.    Okay.  And I think we have gone through it.  I

13       don't think the word "active" even appears in

14       this document unless I have missed it.  Did you

15       come across the word "active" or "actively

16       participates" in this document as it relates to

17       anything?

18  A.    I will trust your judgment.  I didn't go

19       through it.

10:44 20  Q.    Well, I want to make sure that you read it so

21       that we have it on the record.  I mean, the

22       document speaks for itself, but it is not in

23       there, is it?

24  A.    I don't see it.

25  Q.    Do you know whether Dr. O'Donnell was given

   1          the night before, or someplace in between,

   2          correct?

   3  A.    Yes.

   4  Q.    And that would be your choice because you have

   5          the information, you can choose when to start

   6          to study for that exam or not, right?

   7  A.    Yes.

   8  Q.    But chances are you are going to prepare

   9          yourself to the level that you feel you need to

10:56 10          prepare yourself to be able to do well on that

  11          exam?

  12  A.    Correct.

  13  Q.    Have you ever had a situation in your

  14          professional career or in college where your

  15          counterparts were given three weeks to study

  16          for an exam or three weeks to complete an

  17          assignment and you were given -- you were told

  18          about it 24 hours before it was due?

  19  A.    In the work environment, I mean, I can't think

10:56 20          of a project that we have been given similar

  21          work just because there are only a couple of

  22          us, so we have unique areas that we are

  23          accountable for, and we don't have the luxury

  24          of all having the same work to do.

  25  Q.    If you and one of your counterparts are

|     |     |     |
| --- | --- | --- |
| 1 |  | competing for a promotion and it is whoever |
| 2 |  | does the best job in this presentation is going |
| 3 |  | to get the promotion and your counterpart is |
| 4 |  | told that he or she has four weeks to prepare |
| 5 |  | this presentation, you get 24 hours the night |
| 6 |  | before, are you at a disadvantage in that case? |
| 7 | A. | I would think so. |
| 8 | Q. | It is not equitable, correct? |
| 9 | A. | Correct. |
| 10 | Q. | It puts you at a disadvantage, at least as to |
| 11 |  | the amount of time that you would have to |
| 12 |  | prepare your work and prepare the quality of |
| 13 |  | your work, correct? |
| 14 | A. | Correct. |
| 15 | Q. | If a fellow in the fellowship department at UH |
| 16 |  | complains, makes a complaint that he or she |
| 17 |  | gets their clinical assignments 24 hours in |
| 18 |  | advance of having to see those patients, |
| 19 |  | whereas his or her counterparts are receiving |
| 20 |  | those assignments a week, two weeks, three |
| 21 |  | weeks in advance, would you agree that that |
| 22 |  | fellow who is receiving only the 24-hour notice |
| 23 |  | is being put at a disadvantage? |
| 24 | A. | I mean, I can't comment because I don't know |
| 25 |  | how the work is assigned specifically within |

10:57 (line 10)
10:58 (line 20)

1         the pediatric --

2   Q.    Well, this is a hypothetical.

3   A.    Hypothetically, I can't respond because I don't

4         know, again, how each program may be different,

5         but I don't know how the work is assigned.

6   Q.    You don't think that that is common sense

7         that somebody who --

8   A.    Not necessarily.

9             MR. CAMPBELL:    I thought you told

10:58 10         her she wasn't allowed to guess about being a

11         doctor before when you asked her about the

12         speaking.

13             MR. BEAN:      No, I am asking --

14         I mean, this is a common sense question.  At

15         least, I think it is common sense.  You can

16         disagree with me, of course.

17   Q.    In any job, I am using the example of a fellow

18         at UH, but if you receive an assignment 24

19         hours in advance, and you have to go see a

10:59 20         patient and you have to know that patient's

21         chart and you have to know your course of

22         treatment and what you are going to do when you

23         see that patient, and you are getting that

24         information 24 hours in advance versus somebody

25         that has gotten it two weeks in advance, does

1           cooperate while continuing to violate my

2           rights," correct?

3    A.     Correct.

4    Q.     All right.  So after receiving this email, do

5           you know if you had any follow-up conversations

6           with Dr. O'Donnell about the status of her

7           complaints or assurances about what was going

8           to be done or not be done?

9    A.     Again, I don't recall specifically what

11:06 10    occurred after this email.

11   Q.     During any conversation with Dr. O'Donnell, did

12          she ever talk to you about research projects

13          that she was working on or was required to do

14          as a fellow in the fellowship?

15   A.     I do recall that she was assigned a research

16          project, but that is about it.

17   Q.     Did she ever talk to you about any dissimilar

18          treatment she felt she was receiving in regards

19          to her research project?

11:07 20   A.     Again, I don't recall the specifics.

21   Q.     I am assuming you are not aware of the research

22          project requirements that a fellow has to

23          complete as part of their fellowship?

24   A.     No, I am not aware.

25   Q.     And, similarly, you are not aware whether or

88

1          reason?

2    A.    No.   Typically, that goes to our corporate

3          health department where you have medical

4          professionals talking to medical professionals.

5    Q.    Do you know if anyone from the corporate health

6          department had any discussions with Dr. Adan

7          about the accommodation request or

8          Dr. O'Donnell's medical conditions?

9    A.    I don't know.

11:24 10   Q.    You never received any supplemental

11         documentation from anyone from Dr. Adan's

12         office giving additional information or

13         clarification on issues, correct?

14   A.    Right.   Not that I am aware of, no.

15   Q.    Did you ever have any discussions with

16         Dr. O'Donnell regarding modifying her request

17         for accommodation or changing it somehow or an

18         alternative to what she was asking for that

19         possibly could have assisted her?

11:25 20   A.    I don't recall any conversations with

21         Dr. O'Donnell.

22   Q.    Do you know if anyone from the corporate health

23         department ever had any discussions with

24         Dr. O'Donnell about her accommodation request

25         as it related to either modifying it or a

1     different alternative as to what she was

2     requesting?

3  A.   I don't know.

4  Q.   Are you familiar with the term *interactive*

5     *process* when it comes to disability

6     accommodations?

7  A.   Yes.

8  Q.   Describe to me what your understanding is of

9     the interactive process.

11:26 10  A.   Sitting down with the employee and discussing

11     what their restrictions are and what they are

12     asking or requesting for an accommodation.  And

13     then, as the employer, we, obviously, would

14     evaluate that request to see if we could

15     accommodate or not accommodate.

16  Q.   Do you understand the interactive process to

17     include exploring not just the specific

18     accommodation requested by the employee, but

19     exploring possible alternatives or

11:26 20     modifications to the request if it would

21     accommodate and not be an undue burden to the

22     employer?

23  A.   Yes.

24  Q.   Do you believe that was done in Dr. O'Donnell's

25     case?

90

```
 1   A.    Again, I don't recall and I don't remember any
 2         of the specifics on her request.
 3   Q.    In that third paragraph, it starts with "The
 4         essential functions of your position as a
 5         fellow in the pediatric endocrinology program
 6         include attendance at all weekly divisional
 7         conferences."
 8               So let's start with that.  It was
 9         required, at least according to this document,
10         that she be in attendance at all weekly
11         divisional conferences.  Have you ever been
12         told that she failed to show up for one of
13         these conferences?
14   A.    I don't recall.
15   Q.    Once again, the issue, regardless of maybe what
16         she would have wanted in a perfect world, the
17         issue that she was asking for and it is
18         reiterated in the bullet point again, was not
19         that she somehow be excused from attending
20         these conferences, it went towards her
21         evaluation of her having to speak at these
22         conferences, correct?
23   A.    Correct.
24   Q.    So the fact that it was essential for her to
25         attend the conferences, that wasn't necessarily
```

11:27 (line 10)
11:28 (line 20)

-Stevenson Reporting Service, Inc.  440.892.8600-

111

1    CERTIFICATE

2    State of Ohio,          )
                             ) SS:
3    County of Cuyahoga.)

4        I, Diane M. Stevenson, a Registered
     Diplomate Reporter, Certified Realtime
5    Reporter, and Notary Public in and for the
     state of Ohio, duly commissioned and qualified,
6    do hereby certify that the within-named
     witness, JULIE A. CHESTER, was by me first duly
7    sworn to testify the truth, the whole truth and
     nothing but the truth in the cause aforesaid;
8    that the testimony then given by her was by me
     reduced to stenotypy in the presence of said
9    witness, afterwards transcribed by means of
     computer-aided transcription, and that the
10   foregoing is a true and correct transcript of
     the testimony as given by her as aforesaid.

11

12       I do further certify that this deposition
     was taken at the time and place in the
13   foregoing caption specified, and was completed
     without adjournment.

14       I do further certify that I am not a
15   relative, employee or attorney of any party, I
     am not, nor is the court reporting firm with
16   which I am affiliated, under contract as
     defined in Civil Rule 28(D), or otherwise
17   interested in the event of this action.

18       IN WITNESS WHEREOF, I have hereunto set
     my hand and affixed my seal of office at
     Westlake, Ohio, the 5th day of November 2017.

19

20   

21                          Diane M. Stevenson, RDR, CRR
                            Registered Diplomate Reporter
22                          Certified Realtime Reporter
                            Notary Public in and for
23                          The State of Ohio

24

25   My Commission expires December 9, 2020.

**Matthews, Alison**

To...
Cc...
Bcc...
　　　Subject:　　FW: meeting
Attachments:

---

**From:** Hoyen, Claudia
**Sent:** Wed 2/15/2012 9:19 AM
**To:** Matthews, Alison
**Subject:** RE: meeting

Allison,

I am sorry you are feeling this way. I am happy to meet with you, but we will need to include Jerry Shuck and Will Rebello at this point as well. I will reach out to them to get something set up. I am out of town next week until Thursday. Thanks, Claudia

**Claudia Hoyen, M.D.**

Assistant Professor of Pediatrics, Case Western Reserve University/SOM

T 216.844.3644 F 216.844.8362 P 32427

claudia.hoyen1@UHhospitals.org

Confidential Quality Assurance Peer Review Report Privileged Pursuant to O.R.C. Sections 2305.24, 2305.25, 2305.251 and 2305.252

---

**From:** Matthews, Alison
**Sent:** Wednesday, February 15, 2012 8:29 AM
**To:** Hoyen, Claudia
**Subject:** meeting



I would like to set up a meeting with you regarding my concerns about my program. Dr. Uli has failed to honor his commitments to me and has again resumed his bullying behavior. I am very disappointed that instead of facilitating my education, he is thwarting it; and I fear that he is attempting to sabotage my future career. I am sorry to continue to bother you with such unpleasantness, but I have not been able to get any justice within my department. My schedule is generally flexible next week.

The Pediatric Endocrinology fellowship program continues to behave in a manner that is unfair and undermines my progress. Dr. Uli has refused to abide by our agreements from October, 2011. Specifically he has made no effort to do the following:

1) Provide objective measures of achievement
2) Give monthly written evaluations
3) Give immediate feedback

When, I inquired about his lack of compliance, Dr. Uli became defensive and dismissive. Furthermore, he has made it impossible for me succeed in the program because he constantly changes the rules and expectations:

Initially, he told me that I needed to work on my medical knowledge. I have devoted hundreds of hours into studying various texts in preparation for the in-training exam. However, he told me on 2/29/12, that he was not interested in my in-service exam score because it 'only measures my knowledge'.

Next, I was told that my clinic notes weren't complete enough. However, my notes were not any different from the other fellow notes. Despite this, I have made an effort to expand my notes but I am still accused of writing incomplete notes. Furthermore, I have been told that it takes me 'months' to dictate my charts. This is blatantly untrue. As of July 2011, I never leave clinic without all my dictations complete. This is easily verified. (Furthermore, all the other fellows do not dictate all their charts the same day)

In addition, a patient D.W. saw Dr. Narasimhan on 7/19/11 and she did not dictate the chart . He was then scheduled to see me on 9/8/11. Dr. Narasimhan said that she would see the patient by herself. She again did not dictate the chart and kept the paper chart in her possession. When the patient came to see me on 12/20/11. I did not have any information about him. Furthermore, it now appears that I did not dictate the 9/8/11 visit, even though I never saw the patient that day.

In addition, Dr. Uli claims that I am unable to come up with a plan when treating my clinic patients. I always have a plan for my patients and it is a very rare exception that an attending alters my plan.

Dr. Uli said that I was not meeting fellowship requirements because I have not yet taken my pediatric board exam. (I am taking the exam in October 2012). Furthermore, ABP requirements state that I have 5 years from the time of residency completion to take the exam. I am well within that window. When I choose to take the exam is none of Dr. Uli's concern as long as I comply with the ABP requirements.

I have been accused of being 'uninterested' in the weekly divisional conference. I am always present and arrive in a timely manner to the conference (which is not true of all the fellows). However, my voice tends to get lost in the chaos of screaming that often ensues. Furthermore, I have explained to Dr. Uli that my anxiety disorder makes it very difficult to shout out answers in disorganized forum, and I proposed alternative ways to demonstrate my knowledge. He rejected my suggestions and failed to provide other options despite the fact that Social Anxiety is a diagnosis protected by the Americans with Disabilities Act. *For really required accommodation.*



PLAINTIFF'S EXHIBIT 2 CHESTER PENGAD 800-631-6989

Sometimes, the secretaries accidently forward patient messages to the attending instead of the fellow who saw the patient. Often the attending does not call the patient back. Whenever this has happened to me, I have been blamed for not knowing that the patient called and calling them. Whenever I receive patient messages, I call them back within one business day.

Perhaps most concerning, is that the department is retaliating against me for seeking the help of GME. Since the initial meeting in October 2011, several attending complained that I respond poorly to feedback. I have always taken feedback with the spirit that it is given. I am grateful for constructive criticism and use it to grow; however, I report abuse to the proper authorities.

UH000112

CONFIDENTIAL

**Confidential employee related medical information.**

March 22, 2012

Alison Matthews
13700 Shaker Boulevard
Cleveland, OH 44120

**Re: Request for Reasonable Accommodation**

Dear Alison:

On **March 19, 2012**, you informed William Rebello, Manager, Graduate Medical Education of a disability and/or medical condition and requested an accommodation(s) in order to perform the essential functions of your position. You completed the ADA Reasonable Accommodation Form which will allow us to engage in an interactive process and to discuss your disability and/or medical condition with you.

University Hospital complies with the American with Disabilities Act (ADA), the American with Disabilities Amendments Act (ADAAA), and all other applicable laws. In order for us to evaluate your request for an accommodation, we will need following items from you:

1. *Complete the attached Authorization to Release Medical Information Form.* This will allow us to communicate with your health care provider/physician. Please provide a copy of this authorization to your health care provider/physician.

2. *Have your health care provider/physician complete the attached Heath Care Provider/Physician Certification Form.* Please have your treating health care provider/physician complete the Heath Care Provider Certification Form and describe how your medical condition/disability affects your ability to perform the essential functions of your position. This form can be sent directly to Mary Wilson, Patient Care Advocate in our Corporate Health Department, 11100 Euclid Avenue, Mail Stop: 6029, Cleveland, OH 44106

3. *Confidentiality Statement.* All employee medical information is treated as confidential by University Hospitals. Medical information is maintained separately from an employee's personnel file. Specific medical information is not shared with an employee's manager or supervisor. Managers and supervisors will only be informed of the nature of the accommodation(s) and/or restriction(s) needed. As such, we ask that you not discuss your medical condition with your manager or supervisor.

Once we have received the above information, we will evaluate any restriction(s) and/or accommodation(s) request and respond to you accordingly.

Should you have any questions, please do not hesitate to contact me at 216-844-3426.

Sincerely,

*Julie Chester*

Julie Chester
Director, Human Resources

PLAINTIFF'S EXHIBIT
3
PENGAD 800-631-6989
CHESTER

CONFIDENTIAL

O'Donnell 198

CONFIDENTIAL

**Please answer the following the questions to help us determine whether the above named employee has a qualifying disability and whether the employee needs a reasonable accommodation in order to perform the essential functions of his/her position.**

1. Does the employee have disability that substantially limits one or more major life activities?   Yes ☒ No ☐

   If yes, describe the disability and any limitation(s) in detail?

   SOCIAL PHOBIA
   DIFFICULTIES IN UNKNOWN SOCIAL
   SITUATIONS

2. Does the employee use any mitigating measures (e.g., medications, assistive technologies, etc.) Yes ☒ No ☐

   If yes, how does the mitigating measure affect the disability?

   IV's helping to decrease the symptoms.

3. Does the disability affect the employee's ability to perform any one of the essential functions of the position? Yes ☒ No ☐

   If yes, please describe the impact on the person's ability to perform any specific essential function(s). PUBLIC SPEAKING AS CASE CONFERENCE, SPECIALLY UN-REHEARSED

4. Are there any restriction(s) and/or accommodation(s) that would allow the employee to perform the essential functions of the position? Yes ☒ No ☐

   If yes, please list the restriction(s) and/or accommodation(s). I would recommend not to evaluate employee performance on case conference, particularly in rehearsed.

5. Is the need for accommodation likely to be temporary or permanent?
   Temporary ☐ Permanent ☒ probably decreasing the rest of the fellowship.

   If temporary, how long do you estimate that the need for the restriction(s) and/or accommodation(s) will last? The employee is actively seeking help for her symptoms and is very motivated in her treatment. She has made some progress already.

Signature of Health Care Provider/Physician

Date: 5/3/12

**Manson, Marcie**

| | |
|---|---|
| **From:** | Gersper, Rachel |
| **Sent:** | Monday, March 19, 2012 2:15 PM |
| **To:** | Matthews, Alison |
| **Cc:** | Jaggie, Valerie |
| **Subject:** | FW: program concerns |

Alison,

At your convenience can you please call me?  I am the HR Generalist supporting your area and I would
like to setup a time for us to meet (either via phone, or in person).

Thank you.
**Rachel M. Gersper, SPHR**
HR Generalist

University Hospitals Physician Services
11100 Euclid Avenue
Mail Stop MCCO 6036
Cleveland, OH 44106
Phone: (216) 844-7641
Fax: (216) 201-4593

**From:** Jaggie, Valerie
**Sent:** Monday, March 19, 2012 11:15 AM
**To:** Gersper, Rachel
**Subject:** FW: program concerns

Rachel,
I believe this is your area.  Can you please reach out to Allison?
Thanks,
Valerie

*Valerie Jaggie*
Senior HR Generalist
University Hospitals
Case Medical Center
MCCO - 6th Floor
11100 Euclid Avenue
Cleveland, OH 44106
216.844.0358 Phone
216.201.4504 Fax
36996 Pager

**From:** Matthews, Alison
**Sent:** Sunday, March 18, 2012 8:24 PM
**To:** Jaggie, Valerie
**Subject:** program concerns

I was given your name by Diana Rini. I am a fellow in the Pediatric Endocrinology department and I have
experienced multiple episodes of bullying and inequitable treatment by some members of the faculty
since October of 2010. I spoke to somebody in HR regarding this problem in October 2011, however, I do
not remember her name. At that time, it appeared that the situation was improving, however, things have
again become unacceptable. I would like to make an appointment to discuss this situation further- please
let me know who I need to speak to.

Thank you,
Allison Matthews



3/21/2012



**From:** Chester, Julie
**Sent:** Wednesday, March 21, 2012 9:48 AM
**To:** Matthews, Alison
**Subject:** RE: program issues

I am actually on vacation from 4/2 – 4/11. Are you comfortable waiting until 4/12 or I could have you meet with one of my team members the week of 4/2/12. Let me know.

Thanks!

Julie

*Julie Chester, PHR*
Director, Human Resources
University Hospitals Case Medical Center
11100 Euclid Avenue
Cleveland, OH 44106
Mail Stop: MCCO 6036
216-844-3426 Office
216-983-3070 Fax
julie.chester@UHhospitals.org

---

**From:** Matthews, Alison
**Sent:** Tuesday, March 20, 2012 7:37 PM
**To:** Chester, Julie
**Subject:** RE: program issues

Thanks for your reply. My schedule is full for the rest of the week (and I am on vacation the following week). I am flexible anytime the week of April 2 (except 10-12 on Wednesday). Hopefully we can find some time to meet then. Please let me know your availability.



3/21/2012

UH000348

Thanks,
Allison

---

**From:** Chester, Julie
**Sent:** Tue 3/20/2012 4:51 PM
**To:** Matthews, Alison
**Subject:** RE: program issues

Hi Alison. I received your Request for Accommodation form this afternoon.

I would like to handle your other concerns since you haven't had any correspondence with Rachel to date. I will obtain your email from Rachel and set up some time to discuss. What days/times works best for you?

Thanks!

Julie

*Julie Chester, PHR*
Director, Human Resources
University Hospitals Case Medical Center
11100 Euclid Avenue
Cleveland, OH 44106
Mail Stop: MCCO 6036
216-844-3426 Office
216-983-3070 Fax
julie.chester@UHhospitals.org

---

**From:** Matthews, Alison
**Sent:** Tuesday, March 20, 2012 2:32 PM
**To:** Chester, Julie
**Subject:** program issues

I have completed the accommodation request form and I will drop it off this afternoon. However, I am also concerned about the bullying I am continuing to endure in my program. Although the perpetrators seemed to have changed their behavior when we met in October, they are now using more subtle ways to undermine my progress and treat me unfairly. I have mentioned my concerns to Rachel Gersper via e-mail, but we have not had a chance to speak yet. Should I continue to sort this out with her, or would you like handle this issue as well since you are familiar with the situation?

Thanks,
Allison Matthews

3/21/2012

UH000349



**From:** Uli, Naveen
**Sent:** Thursday, March 22, 2012 5:37 PM
**To:** Rebello, William
**Cc:** Kaminski, Beth
**Subject:** RE: Job Description for Pediatric Endo Fellow

Will:
Here is a list of what I consider essential functions of a fellow in pediatric endocrinology:

- Obtain focused history; perform directed physical examination; formulate and prioritize differential diagnoses based on patient information, current scientific evidence and sound clinical judgment on all patients seen in the out-patient clinics and in-patient consultation service.

- Precept all patients with a member of the attending faculty in a timely manner, discussing clinical findings and incorporating results of all available ancillary investigations.

- Counsel patients and their families regarding diagnostic and management plans. Communicate clinical impression and results of investigations to patients and their families effectively and at the appropriate developmental/educational level. Be a strong advocate for quality patient care and identify appropriate resources to address patient needs. Take ownership and responsibility for ongoing patient care.

- Maintain accurate, timely, complete and legible medical records.

- Acquire sound foundation of knowledge with adequate scope and depth in the various subspecialty diagnoses, including basic science and clinical endocrinology. Use self-reflection to identify areas of knowledge deficits, utilize available resources and demonstrate initiative in consistent self-directed learning. Demonstrate critical thinking skills in evaluating medical literature.

- Actively participate in all educational sessions of the division, with adequate preparation on assigned topic presentations. Take an active role in educating medical students, residents, nurses and other medical personnel.

- Seek opportunities to strengthen knowledge and skills. Accept feedback appropriately and act on areas identified for improvement.

- Actively seek opportunities and collaborate with members of the faculty on Quality Assessment and Quality Improvement projects.

- Engage in clinical or basic science research project with substantive scholarly exploration, including

3/23/2012



PLAINTIFF'S EXHIBIT
8
CHESTER
PENGAD 800-631-6989

hypothesis development, execution of the project and preparation of manuscript for presentation and publication.

- Demonstrate compassion and respect for others, sensitivity and responsiveness to others' needs, productive work habits and ability to function effectively with other members of the health care team.

- Act with honesty and integrity, engage in ethical medical practices.

- Develop the knowledge, clinical abilities, interpersonal and communication skills to function effectively in the role of a sub-specialty consultant.

I hope this is adequate.

Thanks,
Naveen

---

**From:** Rebello, William
**Sent:** Thursday, March 22, 2012 2:53 PM
**To:** Uli, Naveen
**Subject:** RE: Job Description for Pediatric Endo Fellow

Can you narrow this down to the essential functions of a fellow in your program.

Will Rebello, MBA
Manager, Graduate Medical Education
Ph: 216-844-3889
Fax: 216-844-1949

---

**From:** Uli, Naveen
**Sent:** Wednesday, March 21, 2012 2:01 PM
**To:** Rebello, William
**Subject:** RE: Job Description for Pediatric Endo Fellow

I do not have a "job description", per se, but last year, I developed a document titled "Expectations of Fellows", which I recently updated. I have attached this document. Let me know if this is sufficient.

Naveen Uli

---

**From:** Rebello, William
**Sent:** Wednesday, March 21, 2012 12:34 PM
**To:** Uli, Naveen
**Cc:** Dunsworth, Rebecca
**Subject:** FW: Job Description for Pediatric Endo Fellow

Can you send us something?

Will Rebello, MBA
Manager, Graduate Medical Education
Ph: 216-844-3889
Fax: 216-844-1949

3/23/2012

UH000345

**From:** Chester, Julie
**Sent:** Tuesday, March 20, 2012 5:14 PM
**To:** Rebello, William
**Subject:** Job Description for Pediatric Endo Fellow

Do you have?  If no, can you or the program director list the essential job functions?

*Julie Chester, PHR*
Director, Human Resources
University Hospitals Case Medical Center
11100 Euclid Avenue
Cleveland, OH  44106
Mail Stop: MCCO 6036
216-844-3426 Office
216-983-3070 Fax
julie.chester@UHhospitals.org

UH000346

# PEDIATRIC ENDOCRINOLOGY
## FELLOWSHIP GOALS

### Overall Clinical Goals

1) To develop an understanding of the physiology of normal endocrine and metabolic function.
2) To develop a clear perception of embryological development and the effect of genetic, endocrine and metabolic factors throughout normal and abnormal development.
3) To understand the pathophysiological implications of states of endocrine excess, deficiency, and/or imbalance in childhood and adolescence.
4) To develop the ability to apply the endocrine knowledge in the delivery of care to patients of diverse ethnic, cultural, and economic backgrounds.
5) To develop an approach to patient care that emphasizes a questioning and critical approach to current practices and develops skills of continued self-education.

### General Clinical Competence Goals

Gathering data by history - Develops history along clinically relevant lines, identifies pertinent data. Uses open-ended questions. Adapts vocabulary to socio-cultural and educational status of historian. Recognizes and responds to nonverbal and attitudinal cues.

Gathering data by physical examination - Interprets physical findings accurately. Repeats examination when findings are equivocal or obscure. Respectful of patient's modesty.

Gathering data by laboratory studies - Understands the indications for blood tests and endocrine stimulation tests. Considers cost in selecting laboratory studies. Understands the role of radiology studies in evaluating endocrine patients.

Assessing data and arriving at a diagnosis - Formulates sound diagnostic hypotheses. Has the ability to correctly interpret endocrine test results.

Managing problems and maintaining health - Is effective and efficient in choosing course of management. Keeps assessment of patient and management plan current. Uses anticipatory guidance appropriately. Is prompt to respond to emergencies.

Interpersonal relationships with patients and families - Establishes rapport with patient and family. Demonstrates a caring attitude toward patients and families. Explains working diagnosis and management effectively.

Interpersonal relationships with other members of the health team - Utilizes contributions of others in total patient care. Supervises and teaches effectively.

Work habits and personal qualities - Demonstrates personal honesty. Seeks to update knowledge in the interest of current patients' problems. Demonstrates appropriate initiative, energy, and commitment in patient care. Is able to make decisions promptly and appropriately when reasonable risk of uncertainly or error must be accepted.


PLAINTIFF'S
EXHIBIT
9
CHESTER

## Inpatient and Outpatient Medical Content Goals

The following areas of endocrine disorders need to be mastered in patients ranging in age from newborn to young adult. To assure coverage of all the topics, the book *Pediatric Endocrinology* by Mark Sperling is the textbook that is used to define the core pediatric endocrinology curriculum. To systematically cover the material, the fellows study the topics assigned for that week and review the information with the attending endocrinologists during a one hour group discussion on Wednesdays. Since there are 21 chapters to be covered, the core curriculum is completed over an 18 month period, in order to allow for in-depth discussion.

> Short stature including constitutional delay
> Anterior pituitary hormone physiology, including growth hormone deficiency
> Posterior pituitary hormone physiology, including diabetes insipidus
> Hypothalamic regulation of hormonal secretion
> Thyroid hormone physiology including secretion and metabolism
> Adrenal gland physiology, including secretion and metabolism
> Androgen and estrogen metabolism
> Sexual differentiation and development
> Calcium, phosphorus, and vitamin D metabolism
> Parathyroid gland physiology
> Fluid and electrolyte metabolism
> Diabetes Mellitus, insulin dependent and non-insulin dependent
> Hypoglycemia and other disorders of carbohydrate metabolism

A detailed listing of these conditions is available in the Content Outline of the 1996 Pediatric Endocrinology Subspecialty Examination.

## Research Rotation Goals

1) Develop an area of research expertise that can evolve into an independently funded research career.
2) Master laboratory techniques necessary for the chosen area of research.
3) Develop the ability to critically read the literature in the chosen area of research.
4) Develop the ability to write research data for publication in peer reviewed journals.
5) Become familiar with the components of a NIH grant application.

**Matthews, Alison**

To...
Cc...
Bcc...
   Subject:     FW: program Issues
Attachments:

---

**From:** Matthews, Alison
**Sent:** Wed 4/25/2012 12:24 PM
**To:** Chester, Julie
**Subject:** RE: program Issues

He cancelled the meeting at the last minute. I will definitely ask for a representative when he reschedules.

Thanks for your help,
Allison

---

**From:** Chester, Julie
**Sent:** Wed 4/25/2012 12:09 PM
**To:** Matthews, Alison
**Subject:** RE: program Issues

If noone else is present, please ask for another representative to attend with you.

---

**From:** Matthews, Alison
**Sent:** Wednesday, April 25, 2012 12:07 PM
**To:** Chester, Julie
**Subject:** RE: program Issues

It did not sound like it was a monthly feedback meeting. He cc'd Claudia Hoyen and Beth Kaminski (assistant program director), but I don't think they will be in attendance.

-Allison

---

**From:** Chester, Julie
**Sent:** Wed 4/25/2012 11:51 AM
**To:** Matthews, Alison
**Subject:** RE: program issues



PENGAD 800-631-6989

PLAINTIFF'S
EXHIBIT
10
CHESTER

So this is not your monthly meeting to review progress?  Anyone else present?

-----Original Message-----
From: Matthews, Alison
Sent: Wednesday, April 25, 2012 11:44 AM
To: Chester, Julie
Subject: RE: program issues


Around noon

-----Original Message-----
From: Chester, Julie
Sent: Wed 4/25/2012 10:19 AM
To: Matthews, Alison
Subject: RE: program issues

Alison - I left a message with our Corporate Health department to see if they have received your paperwork.

I have a scheduled meeting with Dr. Uli in May.  I have not spoken to him at this time.  What time is your meeting today?

---

From: Matthews, Alison
Sent: Wednesday, April 25, 2012 9:14 AM
To: Chester, Julie
Subject: RE: program issues
Importance: High

I was just checking to see if you received the documents from my doctor regarding accommodations. Also, I wanted to let you know that Dr. Uli sent me an email at nearly midnight last night telling me I must meet him today for "updates on my fellowship". Although I do not want to jump to conclusions, this has been the method he has used in the past to get me to meet him so that he could bully and mistreat me. As I mentioned during our meeting, although I have not suffered any abuse recently, the harassment occurred in cycles in the past; and I am very concerned that he is preparing to resume his bad behavior now. I will keep you updated.

Thanks,

Allison Matthews

---

From: Chester, Julie
Sent: Fri 3/23/2012 2:34 PM
To: Matthews, Alison
Cc: Chester, Julie
Subject: RE: program issues

Great - I will see you Thursday, April 12th at 1 p.m.

Julie Chester, PHR

Director, Human Resources

O'Donnell 129

University Hospitals Case Medical Center

11100 Euclid Avenue

Cleveland, OH  44106

Mail Stop: MCCO 6036

216-844-3426 Office

216-983-3070 Fax

julie.chester@UHhospitals.org <mailto:julie.chester@UHhospitals.org>

---

From: Matthews, Alison
Sent: Wednesday, March 21, 2012 2:02 PM
To: Chester, Julie
Subject: RE: program issues

I am ok with waiting until 4/12. I am available anytime that day.

-Allison

---

From: Chester, Julie
Sent: Wed 3/21/2012 9:47 AM
To: Matthews, Alison
Subject: RE: program issues

I am actually on vacation from 4/2 - 4/11.  Are you comfortable waiting until 4/12 or I could have you meet with one of my team members the week of 4/2/12.  Let me know.

Thanks!

Julie

Julie Chester, PHR

Director, Human Resources

University Hospitals Case Medical Center

11100 Euclid Avenue

Cleveland, OH  44106

Mail Stop: MCCO 6036

216-844-3426 Office

O'Donnell/192

216-983-3070 Fax

julie.chester@UHhospitals.org <mailto:julie.chester@UHhospitals.org>

From: Matthews, Alison
Sent: Tuesday, March 20, 2012 7:37 PM
To: Chester, Julie
Subject: RE: program issues

Thanks for your reply. My schedule is full for the rest of the week (and I am on vacation the following week). I am flexible anytime the week of April 2 (except 10-12 on Wednesday). Hopefully we can find some time to meet then. Please let me know your availability.

Thanks,

Allison

From: Chester, Julie
Sent: Tue 3/20/2012 4:51 PM
To: Matthews, Alison
Subject: RE: program issues

Hi Alison. I received your Request for Accommodation form this afternoon.

I would like to handle your other concerns since you haven't had any correspondence with Rachel to date. I will obtain your email from Rachel and set up some time to discuss. What days/times works best for you?

Thanks!

Julie

Julie Chester, PHR

Director, Human Resources

University Hospitals Case Medical Center

11100 Euclid Avenue

Cleveland, OH  44106

Mail Stop: MCCO 6036

216-844-3426 Office

216-983-3070 Fax

julie.chester@UHhospitals.org <mailto:julie.chester@UHhospitals.org>

Page 1 of 1

**Matthews, Alison**

<u>To</u>...

<u>Cc</u>...

<u>Bcc</u>...

**Subject:**     FW: follow-up

**Attachments:**

---

**From:** Matthews, Alison
**Sent:** Fri 5/11/2012 4:03 PM
**To:** Chester, Julie
**Subject:** follow-up

Thank you for taking the time to speak with me this afternoon. However, I am a bit concerned that nothing seems to be resolving. When I first reported Dr. Uli to GME, he pretended to be very concerned and willing to change his behavior, but he continued to treat me just as badly as before. Furthermore, he blatantly ignored the guidelines that GME set for him. It sounds to me that Dr. Uli is now trying to do the same thing again. While it may be inconvenient for him to alter the schedule so that I do not work with Dr. Narasimhan; it does not sound to me like he acknowledged the problem, nor does he seem interested in making it stop. (His excuse that the new attendings will not be working here next year is a complete lie.)  I am willing to go the mediation route, but at this point I really need some assurance that I will not continue to be mistreated. It is my right to work in an environment free of bullying and harassment but I have been badly victimized by my program. (This past Monday (5/7/12) I was forced to endure more bullying by Dr. Narasimhan as she attempted to discredit and humiliate me in front of my patients.) I know that you are working hard to resolve this situation, but I want to be sure that the situation is actually fixed instead of Dr. Uli pretending to cooperate while continuing to violate my rights.

Thanks,

Allison Matthews

*No Response received*



PENGAD 800-631-6989
PLAINTIFF'S
EXHIBIT
11
CHESTER

June 14, 2012

Alison Matthews, M.D.
ADDRESS

**RE: Request for Reasonable Accommodation**

Dear Dr. Matthews:

I am writing in response to your request for an accommodation to perform the essential functions of your position.  Your health care provider's certification dated May 13, 2012, states that you have the following restrictions and/or need the following accommodations:

- Not to evaluate your performance in Case Conference, particularly unrehearsed for the rest of your fellowship.

We have discussed with you these restriction(s) and/or accommodation(s) requests on several occasions in an effort to evaluate whether University Hospital Case Medical Center (UHCMC) can reasonably provide an accommodation to you that will allow you to perform the essential functions of your position.

The essential functions of your position as a fellow in the Pediatric Endocrinology Program include attendance at all weekly divisional conferences; contributing as a participant in the discussions; and playing an increasing role in running the conferences.  As a fellow, it is essential to be able to engage in discussions spanning a wide range of endocrine disorders of broad scope and of sufficient depth, as it assists in developing competency and proficiency in managing complex endocrine disorders, and allows the attendings to monitor progress in the program and the fellow's ability to practice independently and without direct supervision.  The fellow's participation in the case studies and discussions is used to evaluate the fellow and determine program progress, knowledge base, and decision making ability in conjunction with clinical skills.

After a careful review of your request, we have determined that we are unable to provide you with a reasonable accommodation at this time because the conference participation is an essential function of your position, and the attendings must have the ability to evaluate the fellows in this milieu as noted above.

**PLAINTIFF'S EXHIBIT**
*14*
*CHESTER*
PENGAD 800-631-6989

UH000328

Since we are unable to permanently accommodate you reasonably in your current position for the length of your fellowship, you will begin a leave of absence beginning July 1, 2012, which is the start of the fellowship year. However since your health care provider reported that you are currently undergoing treatment and showing some progress, UHCMC will continue your medical benefits for the initial _____ months of your leave of absence.  Our hope is that you continue to progress and can return to the fellowship program.  In order to provide you time to fully consider this letter and its impact on your fellowship, UHCMC will continue to temporarily provide the requested accommodation until the end of the current fellowship year, June 30, 2012.

Should you have any questions, please contact me at 216-844- 3426.


Sincerely,


Julie Chester

2012-Jun-27 12:17 PM UHHS 2168448750



**University Hospitals**

*June 22, 2012*

Alison Matthews
13700 Shaker Boulevard Apt. 210
Cleveland, OH  44120

Dear Alison:

On June 20, 2012, an FMLA or Medical Leave of Absence request for Employee - Serious Health Condition was received in HR Services.  This leave is to begin on July 1, 2012.  FMLA/Medical Leave of Absence is provisionally approved contingent upon receipt of the *Certification of Physician or Practitioner* form by Corporate Health. You will have 15 days in which to provide this form to Corporate Health.  Please fax the completed *Certification of Physician or Practitioner* form to your Corporate Health office by the following date: **July 10, 2012.**  Your entity's Corporate Health office fax number is located at the bottom of the form.  If Corporate Health has not received the information by this date, your leave request will be denied.  Once your leave request has been approved or denied by Corporate Health, you will receive communication from the HR Wellness Center outlining Corporate Health's decision.  If you have already provided this form to Corporate Health, please disregard this request.

The following information and forms are provided in this communication:

- A copy of policy *HR-19 – Family and Medical Leave of Absence (FMLA).*
- A copy of policy *HR-70 – Leaves of Absence.*
- A *Certification of Physician or Practitioner* form to be filled out and returned to your entity specific Corporate Health office.
- A *Return to Work Authorization* form to be filled out and returned to your entity specific Corporate Health office a minimum of 2 business days PRIOR to your return to work.  <u>Your supervisor will delay your return to work date until the form is provided.</u>
- A copy of the *Family and Medical Leave (FMLA) Tip Sheet for Employees.* Please refer to this document for a listing of your rights, duties, and responsibilities for those absences covered under Federal FMLA leave.
- Disability Management Services' *Filing for Your Short-Term Disability Benefits* flyer (if applicable).

If you have any questions please contact the HR Wellness Center at 1-877-HR1-Place (1-877-471-7522).  For any medical concerns regarding your leave, please contact your Corporate Health office.

Sincerely,

HR Wellness Center
University Hospitals



PLAINTIFF'S
EXHIBIT
*15*
CHESTER

**O'Donnell 81**