1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


ALISON O'DONNELL,

      Plaintiff,

vs.                    CASE NO. 1:16-cv-2480
                        JUDGE DONALD C. NUGENT

UNIVERSITY HOSPITALS HEALTH
SYSTEM, et al.,

      Defendants.

- - - -

Deposition of DR. PAUL MINNILLO, taken as if upon cross-examination before Sarah Lane, a Notary Public within and for the State of Ohio, at The Spitz Law Firm, 25200 Chagrin Boulevard, Beachwood, Ohio at 8:06 a.m. on Tuesday, October 10, 2017, pursuant to notice and/or stipulations of counsel, on behalf of the Plaintiff in this cause.

- - - -

Stevenson Reporting Service, Inc.
2197 Macon Court
Westlake, Ohio 44145
440.892.8600  diane@nls.net

**PLAINTIFF'S**
Exhibit 14

13

1   A.  Joseph Calabrese.

2   Q.  What was Mr. -- is it Dr. Calabrese?

3   A.  Doctor, yeah.

4   Q.  What was Dr. Calabrese's affiliation with UH?

5   A.  He's an M.D. He's program director of the mood

6       disorders program, and that's a special niche and a

7       subspecialty under the umbrella of psychiatry. We

8       see a lot of complex cases, mood disorders, anxiety

9       that aren't necessarily just typical.

08:19  10   Q.  All right. So when you started in 2008 with UH

11      what was your job title?

12   A.  Staff psychologist/senior instructor. We have an

13      appointment with Case Western Reserve Medical

14      School. We do some teaching as well, so at that

15      point I was senior instructor/staff psychologist.

16   Q.  So you had a teaching component to your job and

17      also a clinical?

18   A.  Yes. Mostly clinical, a little bit of teaching.

19   Q.  Has your job changed since 2008?

08:20  20   A.  Yeah. I'm assistant professor, so I got a bump

21      there academically. Should I also mention that I

22      teach at John Carroll University?

23   Q.  When did you start teaching at John Carroll?

24   A.  2008. I still teach there. That's just an adjunct

25      on the side.

27

1     disorder?
2  A.  Yeah. I want to make sure -- I want to say yes,
3     but I want to be able to look in here and, you
4     know -- as a general rule of thumb I always -- is
5     always to get to the root, and I call it the fruit.
6     So where does this come from and how does it
7     manifest day to day? So yes, I would have spent
8     ample time trying to figure out where some of this
9     anxiety comes from.

08:39

10  Q.  Okay. All right. And we can go through each one
11     of these. So during the initial evaluation you
12     mentioned the DSM code, the 300.23.
13  A.  Yes.
14  Q.  Which you said is for anxiety?
15  A.  Social anxiety.
16  Q.  Social anxiety. Now, is there any kind of scaling
17     system that ranks a person's social anxiety on a
18     level of one to ten or any other marking system
19     like that?

08:40

20  A.  That system would not be for diagnosis, but for
21     treatments, and it's not necessarily a necessary
22     protocol, but it could be a helpful gauge into
23     where you're at and how you're doing. So it could
24     be an earmark for us in therapy, but there is -- I
25     mean, you can say mild, moderate, severe and

35

|   |   |   |
|---|---|---|
| 1 |   | during the entire -- at any point during the entire |
| 2 |   | time that you saw Dr. Matthews where, you know, she |
| 3 |   | gave a general description of how this condition |
| 4 |   | just affects her, I mean, you know, her day-to-day |
| 5 |   | activities? |
| 6 | A. | My heart went out to Alison. I had a lot of |
| 7 |   | empathy for her, how I perceived it as very |
| 8 |   | pervasive, very profound. I remember feeling like |
| 9 |   | Alison was in a cage, like this anxiety was like a |
| 10 |   | cage that she couldn't get out of. I had a sense |
| 11 |   | that she suffered deeply in this anxiety. |
| 12 | Q. | And that was based on your interactions with her? |
| 13 | A. | Yes. |
| 14 | Q. | Do you recall, once again -- I mean, we'll go |
| 15 |   | through the notes and maybe it's mentioned |
| 16 |   | somewhere in there, but do you recall her generally |
| 17 |   | ever talking about her having -- well, let me ask |
| 18 |   | you generally. |
| 19 |   | With somebody who has generalized or social |
| 20 |   | anxiety is trouble sleeping usually -- |
| 21 | A. | Oh, yeah. |
| 22 | Q. | -- a symptom? |
| 23 | A. | Oh, yes. Trouble falling, staying asleep, getting |
| 24 |   | up too early. It wreaks havoc on that aspect of |
| 25 |   | life. |

74

09:50

09:51

1 disorder that falls on the DSM?
2 A. That's what we do, yeah.
3 Q. Okay. But they'd have to see a psychiatrist if
4 they wanted to get put on a certain medication for
5 it?
6 A. Yeah.
7 Q. We talked about, during several of your sessions,
8 one of the goals being -- you know, early on it
9 looked like Dr. Matthews was having some struggle
10 accepting the fact that this is what she has and
11 she's got to learn how to cope with it more than
12 you don't take a pill and you're cured from social
13 or generalized anxiety, correct?
14 A. Yes.
15 Q. And in your experience, are these types of
16 disorders ones that the patient's going to deal
17 with, at least to some degree, for the rest of
18 their life?
19 A. Yes. And that's -- you know, it's interesting
20 because when you move from a control avoidance
21 strategy to an acceptance, the anxiety does kind of
22 sort of go down a little bit. But, you know, I've
23 been teaching 12 years. I get anxious the first
24 day. I don't sleep that day before; I sleep three
25 hours. I say, "Let's get through this."

78

1   A.   Oh. I don't think so. I'm not sure, but those two
2       fit squarely into what, I think, we were working
3       on.
4   Q.   Okay. So based on your treatment of her,
5       regardless if she was previously diagnosed or not,
6       would you diagnose Dr. Matthews as someone who
7       suffers from social anxiety disorder?
8   A.   Sure.
9   Q.   And someone -- would you diagnose her as someone
10      who suffers from generalized anxiety disorder?
11   A.   Yes.
12   Q.   Would you diagnose her as somebody who has a social
13      phobia?
14   A.   That doesn't sit with me because I think the bases
15      are covered with the first two.
16   Q.   Okay. And any other -- during the course of
17      treatment with her, any other diagnoses that you
18      gave her, considered for her? You didn't diagnose
19      her with depression or anything, did you?
20   A.   I don't think so. I don't think so. It wouldn't
21      surprise me if she would be depressed trying to
22      work with all of this stuff, but that wasn't the
23      focus of our work.
24             MR. BEAN: I don't have any further
25      questions.

09:57 (at line 10)
09:58 (at line 20)

109

1 Q. Okay. In fact, she saw you, we talked about it, 39
2 times and she didn't stop seeing you because you
3 told her she didn't need to see you anymore?
4 A. **That is correct.**
5 Q. And her anxiety could be debilitating at times?
6 A. **Yes.**
7 Q. It could be disabling to her at times?
8 A. **That's my interpretation.**
9 Q. In fact, if we look at a note from Dr. Adan on
10:35
10 4/26/2010, she states, "Still severe social
11 anxiety, disabling." Do you disagree with that
12 assessment?
13 A. **No. I think she suffered through many aspects of**
14 **her life. Suffered.**
15 Q. And you were asked some questions by Mr. Campbell
16 about whether you questioned, you know, the
17 legitimacy of her condition or whether she was
18 seeking medication. Is there anything about
19 Dr. Matthews' comments to you or her body language
10:36
20 or impressions to you in your observations as a
21 licensed medical professional, did she come off
22 fake or disingenuous about her condition in any
23 way?
24 A. **In the time that I worked with her, I did not feel**
25 **that way.**

Stevenson Reporting Service, Inc.    440.892.8600

113

1       C E R T I F I C A T E

2    State of Ohio,      )
                          ) SS:
3    County of Cuyahoga. )

4         I, Sarah Lane, a Notary Public in and for the state of Ohio, do hereby certify that the within-named witness, DR. PAUL MINNILLO, was sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given was by me reduced to stenotypy in the presence of said witness, afterwards transcribed by means of computer-aided transcription, and that the foregoing is a true and correct transcript of the testimony so given as aforesaid.

          I do further certify that this deposition was taken at the time and place as specified in the foregoing caption, and that I am not a relative, counsel, or attorney of either party, that I am not, nor is the court reporting firm with which I am affiliated, under a contract as defined in Civil Rule 28 (D), or otherwise interested in the outcome of this action.

          IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Cleveland, Ohio, on this day, October 18, 2017.


          _____
          Sarah Lane, Notary Public
          My commission expires December 18, 2021.