IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

- - -

ALISON O'DONNELL,

Plaintiff,

vs.

Case No. 1:16-cv-2450
Judge Donald E. Nugent

UNIVERSITY HOSPITALS HEALTH SYSTEM, et al.,

Defendants.

- - -

DEPOSITION OF ROSE A. GUBITOSI-KLUG, M.D.
Tuesday, August 15, 2017

- - -

The deposition of ROSE A. GUBITOSI-KLUG, M.D., a Defendant herein, called for examination by the Plaintiff under the Federal Rules of Civil Procedure, taken before me, Diane M. Stevenson, a Registered Diplomate Reporter, Certified Realtime Reporter, and Notary Public in and for the state of Ohio, pursuant to notice, at The Spitz Law Firm, 25200 Chagrin Blvd., Suite 200, Beachwood, Ohio, commencing at 9:51 a.m., the day and date above set forth.

Stevenson Reporting Service, Inc.
2197 Macon Court Westlake, Ohio 44145
440.892.8600 diane@nls.net

PLAINTIFF'S
Exhibit 15

So most people will go the clinician-educator path. I mean, they are going to primarily see patients, inpatient/outpatient, and then have some role in the education of medical students, residents, fellows down the line, a more prominent role.

I was, actually, probably the last full research fellow that went through our program and was on a training program grant and did more, you know, more research in the lab because of my background with a Ph.D., so there is that track, and there are other ways to promote a fellow through that track.

But most applicants are clinician-education. I remember Alison wanting to do clinician-educator long term.

Q. You mentioned this research project, which was a requirement specific, under like adult endocrinology fellowships, it is specific to pediatric endocrinology fellowships, correct?

A. Yes.

Q. That is a requirement that a fellow, by the end of their three years, must meet to have that research project that they have developed?

A. Correct, correct. So they have to -- you know,

they have to write, do a write-up on their research project, demonstrating it is a meaningful work product. What did they learn?

So, quite frankly, if they did a chart review, meaning they didn't recruit new patients, they had a question and they sought IRB approval, or Institutional Review Board approval, to look back in patient's charts and to pull this information and analyze the data, that is a sufficient work product that they could write up that experience, and that is great.

That is what many fellows do, whether they use their own patient charts or they use national databases, there are national databases like NHANES, et cetera, where they can extract data and analyze it. That is great as long as they made a hypothesis, listed their questions and their aims and done that development.

Others want to do a small pilot study where they recruit patients and ask surveys on nutrition and its relationship to exercise and diabetes, and that is fine too.

We let the fellows tell us what they are

intensive care unit are there for months. So there is definitely a pool of patients on the sign-out that are patients who have been there for some time, so you are inheriting these consults or these follow-up patients.

All of the new ones, though, tend to be, typically, new onset diabetes.

Q. When a new fellow is first starting out, say is in their first week of hospital coverage, what resources do they have if they need assistance? Could they reach to you or another faculty member if they have an issue and they don't feel comfortable?

A. Oh, yes, absolutely. You know, we all anticipate in that first week that they are going to need a lot more support. It is a whole new system.

Back then we didn't have the electronic medical record, so there was at least not that hurdle. But where are the charts? Where are the patients? The numbering system on the floor at Rainbow are a little unusual, so you might have 600 rooms, but it is Rainbow the third floor, but it is 3-612.

So just orienting them. And the senior

Dr. O'Donnell has commented, commented what?

A. No, I thought in the allegations I had read something about not --

Q. You are failing to assist her?

A. Failing to assist her, yes.

Q. Do you disagree with that allegation?

A. I think it has been many years, so I can't imagine that I didn't, because I do that routinely with all of the new fellows.

10:42 But I don't remember the instance in particular as to what she was asking for assistance for.

Q. Do you participate at all in the process of clinic assignments or clinic scheduling for the new fellows?

A. No. That would be under the privy of the fellowship directors.

Q. Do you have any personal knowledge as to the timing of when a clinic schedule or schedule of

10:42 assignments is given to a fellow in terms of how far in advance would he or she know when they are going to be assigned to a specific clinic?

A. Yes, I will only comment that that has continuously been a work in progress. We would

they get older."

So, I mean, there are a lot of discussions, a lot of different cases that can come up.

Q. All right. So if Dr. O'Donnell testified that oftentimes these Wednesday conferences would sort of devolve into outright shouting matches including cussing and other things --

A. What?

11:06 Q. -- you wouldn't agree with that?

A. I would not agree with that.

Q. Okay. When did you learn that Dr. O'Donnell had an anxiety disorder?

A. I only became aware of that as we have been going through these proceedings.

I always wondered if Alison -- you know, during her initial interview, again, I thought she interviewed very well. There was maybe a little bit of what I would say is a stutter to 11:07 her voice at times, but that was just anxiousness, trying to impress.

You know, you are in that situation where you are trying to impress the faculty because you are eager to train, and that sort of thing.

And then subsequently, in fellowship,

again, she might start a presentation and have kind of a stutter or a little bit of speech slurring, but never did we not get through.

Like, you know, we do case reviews in my office if we are on inpatient service, you know, again, before they go and usually see the patient and then come and will talk to us, and we will go through the history together, see if there are any other questions we need to ask, come up with a treatment plan together, and then go back to see the patient family and give our final recommendations.

She might be anxious, stutter a little bit in the beginning, but never did not get through a meeting together. She never was not able to respond to my questions or in any way, again, couldn't complete our session, et cetera, couldn't complete the discussion. We always completed.

If I felt like her -- we always give the fellow the chance to say first what they would do. And then we say, "Well, I agree with that, but I probably would also check X, Y, Z."

And then we come up with a comprehensive plan in the end together. So on Wednesdays,

And if someone is not participating as much, we might encourage them the first time to say, "Okay, what else do you want to know, Alison?" And that sort of thing.

Q. Okay.

A. So she may have been a little more quiet, but I think she is more reserved by nature, as well.

Q. How did she compare in these Wednesday conferences to the other first-year fellow in terms of her being an active participator during these conferences?

Were they about the same because they were both in their first year, or were they different?

A. I don't remember them being -- I don't remember them being strikingly different. So we are watching them, how they engage, which a lot of it can be personality in these discussions when they are not presenting.

And then the big thing is when they are presenting can they go from the patient and then seamlessly into the physiology and then to the in-depth discussion? Can they lead us down this entire path?

That is when we, especially in someone who

document.

A. I have not seen this before, Exhibit 5.

Q. So, obviously, that was something you were made privy to at any point during Dr. O'Donnell's time with the fellowship, correct?

A. Correct. I don't see a date. But no, I have never seen this before.

Q. Did you become aware at some point during Dr. O'Donnell's fellowship that she was making complaints, specifically against Dr. Uli and some other faculty members, that she was being harassed and discriminated against?

A. I was aware of some complaints. I wasn't aware of the details of the complaints or, yeah, the depth of the allegations, I guess you would say, or the comments.

(Plaintiff's Exhibit 29 was introduced for identification.)

Q. I am going to hand you Exhibit 29, which is a letter that I had asked Dr. Uli about. Tell me whether you have ever seen that before.

A. So Exhibit 29 I have not seen before.

Q. Do you know who Julie Chester is?

A. I do not know Julie.

Q. Have you ever spoken to Julie Chester?

A. I don't believe so.

Q. Did you ever, between 2010 and 2012 when Dr. O'Donnell left the fellowship, did you ever have any communications with anyone from UH, HR or employee relations, about any harassment or discrimination complaints that she had against any of your faculty members and the fellowship?

A. No. Again, I had heard that there had been some complaints, but I did not know any of the details.

11:43

Q. And you were never interviewed or questioned about it?

A. I don't remember ever being interviewed about it, no.

Q. Now, earlier we were talking about the research projects, and you started to go into a few of the ideas that Dr. O'Donnell had presented or had wanted to pursue, correct?

A. Yes.

11:43

(Plaintiff's Exhibit 28 was introduced for identification.)

Q. I am going to hand you what I have previously marked as Exhibit 28. Let me know when you have had a chance to review it.

A. Okay, I have reviewed Exhibit 28.

projects."

Let me stop there. She then goes on to say that she feels she is not being given the same opportunities as previous fellows.

At this point after she had come with two ideas that she was told that she wouldn't be able to pursue for the reasons stated, did you suggest that she work on a project with another fellow?

11:50 A. So yes. You know, this is very typical, and I think, unfortunately, this is August of her second year, so a whole year has gone by. We usually like that final have selected the research project by the end of the first year, so we are kind of over, past that schedule.

They have a limited time, especially then, at the -- typically, there is six months of pretty intense clinical, then two years of clinical/research, and then another six months 11:50 at the end as a senior fellow, very intense clinical where they are really kind of running the show on rounds and being almost a junior faculty member.

So this is a critical time here in August of 2011 that she get a project. The IRB is the

but you don't have all the details.

I mean, you are asked when you are on service to quickly come up with a differential and to make management decisions. And that is what we have to prepare them for.

Again, they may not be on service when said case comes in, but these conferences are their ability to experience the realm. And you really have to be. I mean, it is a requirement to be an academic physician.

12:07

Q. Sure. And she says in here that she is inviting questions, correct?

A. She does.

Q. So, I mean, that suggests to me --

A. And we do, we did.

Q. That suggests to me that her issue was not being cold-called upon and being unable to answer the questions. It suggests that maybe she is not always the first one to be the gunner in the lecture room to answer the question. Instead, she is inviting you to, essentially, call her out to say, you know, if two questions have gone by and maybe she hasn't been the first one to: "I know," then on the third question, specifically just call on her,

12:08

"Dr. O'Donnell, you haven't chimed in yet, so what do you specifically think about this?"

A. Correct. And I am sure we did that.

Q. Yes. And that is something that you could do, correct, and that you did do?

A. We could do and we did do.

Q. Okay. At that point, I mean, whenever Dr. O'Donnell was called on in one of these Wednesday conferences, was there ever a time where she said, "No, I am not going to answer that question" or "I am refusing to participate"?

A. I don't remember her ever refusing to participate. I remember her giving answers that, again, at this point, were not at the level of questions that we would expect of a fellow.

Or she would say, "You know, I would have asked what So and So asked; I don't have any new questions." She never evaded asking, but she may have not had anything new to ask, when we all felt there were definitely questions that needed to be clarified.

Because many times the cases are presented, as I said, in an unknown fashion.

CERTIFICATE

State of Ohio, )
) SS:
County of Cuyahoga.)

I, Diane M. Stevenson, a Registered Diplomate Reporter, Certified Realtime Reporter, and Notary Public in and for the state of Ohio, duly commissioned and qualified, do hereby certify that the within-named witness, ROSE A. GUBITOSI-KLUG, M.D., was by me first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by her was by me reduced to stenotypy in the presence of said witness, afterwards transcribed by means of computer-aided transcription, and that the foregoing is a true and correct transcript of the testimony as given by her as aforesaid.

I do further certify that this deposition was taken at the time and place in the foregoing caption specified, and was completed without adjournment.

I do further certify that I am not a relative, employee or attorney of any party, I am not, nor is the court reporting firm with which I am affiliated, under contract as defined in Civil Rule 28(D), or otherwise interested in the event of this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Westlake, Ohio, the 9th day of November 2017.

Diane M. Stevenson, RDR, CRR
Registered Diplomate Reporter
Certified Realtime Reporter
Notary Public in and for
The State of Ohio

My Commission expires December 9, 2020.