```
  1           IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OHIO
  2                      EASTERN DIVISION

  3                          - - -

  4      ALISON O'DONNELL,

  5                Plaintiff,
           vs.                      Case No. 1:16-cv-2450
  6                                 Judge Donald E. Nugent
         UNIVERSITY HOSPITALS
  7      HEALTH SYSTEM, et al.,

  8                Defendants.

  9                          - - -

 10          DEPOSITION OF SUMANA NARASIMHAN, M.D.
                  Tuesday, August 29, 2017
 11
                             - - -
 12

 13          The deposition of SUMANA NARASIMHAN, M.D.,

 14      a Defendant herein, called for examination by

 15      the Plaintiff under the Federal Rules of Civil

 16      Procedure, taken before me, Diane M. Stevenson,

 17      a Registered Diplomate Reporter, Certified

 18      Realtime Reporter, and Notary Public in and for

 19      the state of Ohio, pursuant to notice, at

 20      Vorys, Sater, Seymour & Pease LLP, 200 Public

 21      Square, Suite 1400, Cleveland, Ohio, commencing

 22      at 6:45 p.m., the day and date above set forth.

 23

 24
                  Stevenson Reporting Service, Inc.
 25      2197 Macon Court    Westlake, Ohio 44145
               440.892.8600   diane@nls.net
```

PLAINTIFF'S
Exhibit 16

| | | |
|---|---|---|
| 1 | | that every Monday we had to do a presentation |
| 2 | | to our faculty after being on call the previous |
| 3 | | weekend, that weekend. So it is not an |
| 4 | | unrealistic expectation at all. |
| 5 | Q. | Did Dr. O'Donnell ever speak to you about you |
| 6 | | assigning her a presentation and she didn't |
| 7 | | know about it until very close in time? |
| 8 | A. | No, not that I recall. Not that I recall. |
| 9 | | I mean, if somebody is unprepared, it is |
| 10 | | not like it is a -- it is not -- our fellowship |
| 11 | | was very collaborative in the sense that if |
| 12 | | somebody was not prepared for a presentation, |
| 13 | | they would say, "Hey, I can't do it today," |
| 14 | | well, that is okay, "Pick another day. Or if |
| 15 | | you are not prepared, let us know." |
| 16 | | It is not that something is going to |
| 17 | | happen if you don't come up with that |
| 18 | | presentation. Of course it is not the greatest |
| 19 | | thing, but it is not like you couldn't say you |
| 20 | | had a reason to get out of something. We all |
| 21 | | do, things come up. |
| 22 | Q. | Do the fellows get vacation days? |
| 23 | A. | Yes. |
| 24 | Q. | So they are allowed to go on a vacation if they |
| 25 | | plan it out? |

```
 1  A.    I am sure, I had nothing to do with that, so I
 2        don't know that.
 3  Q.    Did you ever have any discussions with
 4        Dr. O'Donnell about doing any work or
 5        performing any work while she was gone on
 6        vacation?  Do you recall that?
 7  A.    I don't specifically recall that.
 8  Q.    Now, when you are seeing patients sometimes
 9        and, hopefully, patients will arrive on time
10        and in a perfect world they will arrive on time
11        and you can see them when you are supposed to?
12  A.    They never do.
13  Q.    Sometimes -- well, you know better than me,
14        sometimes they don't or a lot of times they
15        don't.  Are you aware of any type of policy or
16        even just a practice for yourself, is there a
17        time limit, if a patient doesn't show up by a
18        certain time, does it go from, "Okay, I will
19        see them" versus "Okay, look, they are going to
20        have to reschedule because they were this
21        late"?
22  A.    This is human, we are dealing with humans and
23        moms and kids here.  We all have policies.  The
24        hospital may have a policy of 20 minutes.  So
25        but here is a mom, for example, who has driven
```

|   |    |   |
|---|----|---|
| 1 |    | around in the parking lot for 15 minutes trying |
| 2 |    | to find a parking spot, so she came 25 minutes |
| 3 |    | late. Am I going to refuse to see her? No. |
| 4 | Q. | What if they are an hour late? |
| 5 | A. | It depends on the kid. I mean, in |
| 6 |    | endocrinology, I have had patients, believe me, |
| 7 |    | this is a hard thing in medicine, there is no |
| 8 |    | hard and fast thing. The other day somebody |
| 9 |    | came literally an hour late, like you said, an |
| 10 |   | hour late. I was ready to say, "I can't see |
| 11 |   | them." |
| 12 |   | But then my front desk told me, "You know |
| 13 |   | they drove two hours to come here, and they got |
| 14 |   | lost in traffic." |
| 15 |   | I get it. I am not going to tell them to |
| 16 |   | drive back two hours just because they came |
| 17 |   | late. It is part of what -- it is very |
| 18 |   | dependent. I mean, the hospital is not going |
| 19 |   | to say, "You have to see them." |
| 20 |   | But, then again, we don't go into medicine |
| 21 |   | because we always stick by these policies or |
| 22 |   | whatever. We serve. |
| 23 | Q. | Do you ever recall a situation where you |
| 24 |    | instructed Dr. O'Donnell to see a patient who |
| 25 |    | was about an hour and a half late to their |

```
 1          scheduled visit?
 2   A.     I don't recall specifics.
 3   Q.     So you don't know whether that happened or not?
 4   A.     I don't know if it happened or not.  People
 5          come late, they get put in rooms late.  It is
 6          part of our normal life.
 7   Q.     Did you ever discuss research projects with
 8          Dr. O'Donnell?
 9   A.     I was not her mentor.
10   Q.     So is that no, you didn't?
11   A.     I didn't precept any research projects with
12          her.
13   Q.     Did you ever discuss any topics with her before
14          she might have --
15   A.     I think we all --
16   Q.     -- stayed on a project?
17   A.     We all sort of -- that is also part of normal
18          fellowship where we get to know what our
19          fellows do.  Say, "Hey, what is your interest?
20          What excites you?  Where do you want to go?
21          Hey, this is a great research question.  This
22          would make a fantastic research project."
23          Right?
24              So it is just a part of discussion.  But
25          it doesn't mean we are saying, "That is your
```

```
 1         and So.  But that just shows that we are
 2         working closely.
 3   Q.    Did you ever refer to Dr. O'Donnell as "Alison"
 4         in front of patients?
 5   A.    I am sure I did.
 6   Q.    Did she ever express any displeasure with that?
 7   A.    No.
 8   Q.    Do you know someone or did you know a fellow or
 9         a medical professional by the name of Alicia
10         Lowes?
11   A.    Yes.
12   Q.    What was Ms. Lowes -- is she a doctor?
13   A.    Yes.
14   Q.    What was her position?  Was she a fellow?
15   A.    Yes.
16   Q.    Did you become aware at some point during
17         Dr. O'Donnell's fellowship that she made some
18         complaints about you?
19              MR. CAMPBELL:     Who is "she,"
20         Lowes or O'Donnell?
21              MR. BEAN:         Dr. O'Donnell.
22   Q.    That Dr. O'Donnell made complaints about you?
23   A.    Not specifically, no.
24   Q.    Do you know who Julie Chester is?
25   A.    So this complaint portion was when she was --
```

```
 1  A.  No.
 2          (Plaintiff's Exhibit 11 was introduced for
 3          identification.)
 4  Q.  I am handing you what I previously marked as
 5      Exhibit 11.  This is an e-mail from
 6      Dr. O'Donnell to Julie Chester.
 7  A.  I don't know who is Julie Chester.
 8  Q.  I will represent to you she is an HR individual
 9      at UH.
10  A.  Okay.
11  Q.  Just take a look at it.  I am just going to ask
12      you about some of the content.
13  A.  I was not aware of this.
14  Q.  Okay.  So you see that your name is mentioned
15      in this document, correct?
16  A.  Yes, I do see that.
17  Q.  And it looks like Dr. O'Donnell says, "While it
18      may be inconvenient for him," being Dr. Uli,
19      "to alter the schedule so that I do not work
20      with Dr. Narasimhan..."; is that correct?
21  A.  Yes.
22  Q.  "...Narasimhan, it does not sound to me like he
23      acknowledged the problem nor does he seem
24      interested in making it stop."
25          By this point, this is May of 2012 when
```

```
 1          because she already says, "...it makes it
 2          difficult for me to just shout out answers.
 3          Therefore, I invite you to ask me more
 4          questions."
 5               So I said, "Oh, this is great.  So that
 6          means we can ask her questions.  Maybe that is
 7          the way to get her --" that is how I interpret
 8          that e-mail as, "Therefore, I invite you to ask
 9          me questions."
10   Q.     Okay.  So did you think her request -- I mean,
11          would you agree with me that in this e-mail she
12          is telling the faculty, "Look, these are some
13          issues that I think I am having.  Here is why,
14          and here is my proposal to help fix it"?
15   A.     She is basically saying, "Don't assume that
16          because I am silent that I am ignorant, but ask
17          me questions, and I will answer."  That is what
18          I read from this.
19   Q.     So, I mean, whether you read this now or
20          whether you read it then, did that seem like an
21          acceptable alternative that, okay, if she is
22          not -- maybe she is not going to be the first
23          one to shout out answers, but if we can ask her
24          questions, then that will be suitable?
25   A.     Like an invitation to ask questions.
```

1  Q.   So you were okay with that?
2  A.   I was happy to ask her questions.
3  Q.   Okay. When she says that "I plan to make more
4       than the required number of presentations," was
5       that something that she could do or was that
6       not feasible for her to do extra presentations?
7  A.   I don't know what the required number of
8       presentations was. I don't know if there was
9       something finite, a required number.
10 Q.   After receiving this e-mail, at any point did
11      you ever speak with her about whether or not
12      she could do additional presentations as a way
13      to show her knowledge or show her willingness
14      to participate?
15 A.   Not that I recall.
16 Q.   After you received this e-mail, do you recall
17      any conversation you had with the other faculty
18      members who were included on it about what is
19      in this e-mail?
20 A.   I don't know if we had a meeting right after
21      that or anything. We had normal fellow review
22      meetings. And I remember very clearly we were
23      all very concerned about Dr. Matthews.
24 Q.   Well, was there any -- I mean, you just said
25      that you would have been -- that you were

```
 1        appointment?
 2   A.   They are not schedulers, so they shouldn't be
 3        rescheduling.  But sometimes if somebody
 4        doesn't show up for an appointment, sometimes
 5        we would call and say, "Hey, what happened
 6        today?  We missed you at the appointment."  And
 7        that is not -- that is normal.  I do that all
 8        the time sometimes.
 9   Q.   So would that be a fellow's job or would that
10        be a secretary/nurse, front desk person's type
11        of job to call a patient to reschedule them if
12        they missed an appointment?
13   A.   There are two parts of that.  One is call the
14        patient, the other is reschedule.  Scheduling
15        is not a fellow's or an attending's job.
16   Q.   What about --
17   A.   We don't reschedule patients routinely.
18        Sometimes, if someone hasn't shown up, I will
19        call them and say, "Hey, you know --"  Suppose
20        somebody it is really important for them to
21        come, for example a badly controlled diabetic,
22        or somebody on really important medicine, a
23        very young child, for example, some high-risk
24        situation.
25             If I don't see them in clinic, I get
```

```
 1        party to your client, then you do it.
 2             MR. BEAN:           That is why I
 3        marked it confidential anyway.
 4             MR. CAMPBELL:       Who marked it
 5        confidential?
 6             MR. BEAN:           We did when we
 7        produced it.  I mean, we have a protective
 8        order in this case, right?
 9           So, I mean, obviously it would be subject
10        to that, anyway, but that is fine if we want to
11        err on the side of that, we don't have to make
12        it an exhibit on the record.
13   Q.   I just want to ask you -- I don't even care
14        about the rest of this.  I mean, I want to ask
15        you about:  Is this your handwriting on the
16        sticky note?
17   A.   Yes.  And what I mean by that is patient did
18        not show --
19   Q.   Hold on.  I just want to ask you:  This is your
20        handwriting, correct?
21   A.   Yes.
22   Q.   And you are telling Dr. O'Donnell that a
23        patient didn't show up and that you want
24        Dr. O'Donnell to call and follow up with the
25        patient?
```

On 6/4/2012, multiple people were sitting in the lunch room at Westlake clinic. Alison Matthews still had one chart left and it was around 12:15pm. Dr. Sumana Narasimhan was the one attending available eating her lunch and leafing through a magazine. Alison asked her to precept her diabetic chart. Dr. Sumana stated that Alison would have to find someone else. Alison replied that the other two attendings were busy. At that moment Dr. Sumana led Alison out of the lunch room. One of the nurses in the room asked, "Why won't Sumana precept Alison's patient? I have never seen that before!" A few minutes later, Dr. Sumana returned to her lunch and magazine.

*Alicia Lowes*

Only heard Allison's side of the story
"Wanted to help out a friend" - so Alicia signed this document



PLAINTIFF'S EXHIBIT 40 NARASIMHAN

UH000378