```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF OHIO
 2                        EASTERN DIVISION

 3                            - - -

 4       ALISON O'DONNELL,

 5                 Plaintiff,
         vs.                        Case No. 1:16-cv-2450
 6                                  Judge Donald E. Nugent
         UNIVERSITY HOSPITALS
 7       HEALTH SYSTEM, et al.,

 8                 Defendants.

 9                            - - -

10           DEPOSITION OF WILLIAM R. REBELLO
                  Friday, August 18, 2017
11
                              - - -
12

13         The deposition of WILLIAM R. REBELLO, a

14   Defendant herein, called for examination by the

15   Plaintiff under the Federal Rules of Civil

16   Procedure, taken before me, Diane M. Stevenson,

17   a Registered Diplomate Reporter, Certified

18   Realtime Reporter, and Notary Public in and for

19   the state of Ohio, pursuant to notice, at The

20   Spitz Law Firm, 25200 Chagrin Blvd., Suite 200,

21   Beachwood, Ohio, commencing at 9:07 a.m., the

22   day and date above set forth.

23

24
                 Stevenson Reporting Service, Inc.
25          2197 Macon Court    Westlake, Ohio 44145
                440.892.8600   diane@nls.net
```

PLAINTIFF'S
Exhibit 17

| | | |
|---|---|---|
| 1 | A. | I believe in 2009. |
| 2 | Q. | Any other education? |
| 3 | A. | No. |
| 4 | Q. | So did you go straight from high school to |
| 5 | | undergrad and then straight to your master's? |
| 6 | A. | No. Straight from high school to undergrad. |
| 7 | | Then I took probably 12, 13 years off, and then |
| 8 | | did the master's degree. |
| 9 | Q. | You said 2009 for the master's? |
| 09:19 10 | A. | Yes. |
| 11 | Q. | I am sorry, I was thinking 1999. |
| 12 | A. | Yeah. |
| 13 | Q. | Okay. How long was the master's program, two |
| 14 | | years, three years? |
| 15 | A. | Two years. |
| 16 | Q. | Are you presently employed with UH? |
| 17 | A. | Yes. |
| 18 | Q. | What is your current job? |
| 19 | A. | Manager of graduate medical education office at |
| 09:19 20 | | Cleveland Medical Center. |
| 21 | Q. | How long have you held that position? |
| 22 | A. | 15 years. |
| 23 | Q. | So since 2002? |
| 24 | A. | Correct. |
| 25 | Q. | Is that right? |

```
 1              inpatient one, our outpatient EMR, National
 2              Patient Safety Goals, accreditation standards,
 3              so that is the first part, orientation.
 4                    And then the second part is a live
 5              orientation where we bring in presenters to
 6              talk about specific subjects.  You know, like
 7              benefits would be one.
 8                    This year we did a bus tour around
 9              Cleveland to show, you know, local resources
10              for the community.  Each year we do something a
11              little bit different depending on surveys that
12              we do to see what residents, incoming
13              residents, want to know.
14     Q.       Let's talk about Dr. O'Donnell.  Did you know
15              Dr. O'Donnell prior to her joining the
16              fellowship at UH?
17     A.       No.
18     Q.       How did you first come to meet her?
19     A.       Well, she was probably at orientation, but I
20              don't remember specifically meeting her because
21              at these orientations there are between 100 and
22              150 incoming residents or fellows.
23                    But I do recall that she came to my office
24              with a complaint.
25     Q.       So she was likely involved in these general
```

|    |    |                                                                   |
|----|----|-------------------------------------------------------------------|
| 1  |    | early orientations that all the new-hires or                      |
| 2  |    | all the individuals would have to go through                      |
| 3  |    | this orientation go through?                                      |
| 4  | A. | Correct.                                                          |
| 5  | Q. | And those would be things like you talked                         |
| 6  |    | about, accreditation, maybe some presenters,                      |
| 7  |    | stuff about benefits, stuff like that, correct?                   |
| 8  | A. | Correct.                                                          |
| 9  | Q. | You don't provide any orientation specific to                     |
| 10 |    | the fellowship, what she is going to be doing,                    |
| 11 |    | substance-wise, in the fellowship, correct?                       |
| 12 | A. | No, each program does that.                                       |
| 13 | Q. | Now, did you have any interaction with                            |
| 14 |    | Dr. O'Donnell between potentially during one of                   |
| 15 |    | these orientations and when she came to you                       |
| 16 |    | with a complaint?                                                 |
| 17 | A. | Not that I recall.                                                |
| 18 | Q. | Did she come to you with a complaint more than                    |
| 19 |    | once or just one time?                                            |
| 20 | A. | I believe she came to my office twice.                            |
| 21 | Q. | Let's talk about the first time. Do you recall                    |
| 22 |    | when that was?                                                    |
| 23 | A. | I don't know the exact date. I thought it was                     |
| 24 |    | sometime maybe in September of her first year                     |
| 25 |    | in the program.                                                   |

```
 1  Q.    Is your office in the same -- or I guess let me
 2        ask you this generally -- strike that.
 3              Where is your office at?
 4  A.    I am in the Lakeside Building, sixth floor,
 5        Suite 6223.
 6  Q.    How did Dr. O'Donnell contact you?  Did she
 7        come see you in person or did she call you on
 8        the phone?
 9  A.    She came in person.
10  Q.    Unannounced?
11  A.    Correct.
12  Q.    And you were at the office that day?
13  A.    Yes.
14  Q.    She came to your office and had a conversation
15        directly with you?
16  A.    Correct.
17  Q.    Just the two of you?
18  A.    Yes.
19  Q.    And tell me everything that you can recall
20        about that first conversation.
21  A.    I can't recall much.  I just remember that she
22        came to my office, she was carrying a very
23        thick binder.  She said that she was having
24        problems in the program.  It was very
25        nonspecific at that time.
```

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | Did she show you anything in this binder? |
| 3 | A. | She opened the binder and was just reading from it because I think she had taken notes before she wanted to meet with me. |
| 6 | Q. | Did she show you anything in the binder? |
| 7 | A. | I believe she pulled out some papers. It was about -- it had patient names, I believe, in it, and it had to do with times she had written notes or dictated notes, or something. |
| 11 | Q. | Was one of her complaints regarding client notes or progress notes and how she was writing them versus what she was being told by the others? |
| 15 | A. | I don't know if it was the substance of the note or the timing of the note. Because there is a requirement to complete your notes in timely manner, most of the time it is within 24 hours. |
| 20 | Q. | Do you know what the specific requirements in terms of notes were for the fellows? |
| 22 | A. | No, not -- no, I don't. But, in general, the hospital requirement is within 24 hours. |
| 24 | Q. | You don't know if that is what Dr. Uli or anyone else in the fellowship was requiring of |

| | | |
|---|---|---|
| 1 | | the fellows or not?  That is just generally how |
| 2 | | it works? |
| 3 | A. | That is just a general requirement.  And her -- |
| 4 | Q. | Did she indicate whether she was under that |
| 5 | | requirement or some other requirement in terms |
| 6 | | of timeliness of her notes? |
| 7 | A. | Yes, I think she felt that her notes, like her |
| 8 | | notes were being done at the same time any |
| 9 | | other fellows were, but she was being told that |
| 09:32 10 | | she wasn't doing her notes at the same time as |
| 11 | | other fellows. |
| 12 | Q. | So one of the concerns, at least she expressed, |
| 13 | | was in regards to timeliness of turning in |
| 14 | | notes related to clients? |
| 15 | A. | Yes, yes. |
| 16 | Q. | Or related to patients, right? |
| 17 | A. | Yes. |
| 18 | Q. | And her complaint was that the timeliness of |
| 19 | | her notes was at least the same as the other |
| 09:33 20 | | fellows? |
| 21 | A. | Yes, it was comparable. |
| 22 | Q. | Did she talk about substance of notes at all |
| 23 | | and whether or not she was being criticized for |
| 24 | | the substance of her notes? |
| 25 | A. | She may have.  I am not 100 percent certain. |

|    |    |                                                                   |
|----|----|-------------------------------------------------------------------|
| 1  |    | Maybe the -- because I can't judge the                            |
| 2  |    | substance of a note; I don't have any clinical                    |
| 3  |    | background.  But I don't know if it was the                       |
| 4  |    | length of her notes or the detail of her note                     |
| 5  |    | compared to some other residents' -- or                           |
| 6  |    | fellows' note.                                                    |
| 7  | Q. | Was she directing her complaints, any of the                      |
| 8  |    | complaints she made to you that day, at anybody                   |
| 9  |    | specific, any of the physicians?                                  |
| 09:34 10 | A. | I believe Dr. Uli.                                            |
| 11 | Q. | Anyone else?                                                      |
| 12 | A. | Not that I can recall.                                            |
| 13 | Q. | So she brought up the timeliness of patient                       |
| 14 |    | notes, possibly the substance, you are not sure                   |
| 15 |    | about that.  What about -- what else did she                      |
| 16 |    | raise as an issue?                                                |
| 17 | A. | I believe that was it at that time.                               |
| 18 | Q. | How long was this meeting with Dr. O'Donnell?                     |
| 19 | A. | Probably less than 45 minutes, I would say.                       |
| 09:34 20 | Q. | Did she give you any documents to keep?                       |
| 21 | A. | Not that I recall.                                                |
| 22 | Q. | Did you take any notes during this meeting?                       |
| 23 | A. | No, I couldn't find any notes from back then                      |
| 24 |    | because usually I put them in her file.  I                        |
| 25 |    | pulled her file from archives when I saw the                      |

| | | |
|---|---|---|
| 1 | | subpoena, but there were no notes in there. |
| 2 | Q. | What direction, if any, did you give her at |
| 3 | | this meeting in terms of her complaints, what |
| 4 | | she should do next, or anything like that? |
| 5 | A. | Meet with -- I wasn't sure that she had met |
| 6 | | with the program director or anybody else in |
| 7 | | the faculty to go back and find out what they |
| 8 | | required her to do. |
| 9 | | She seemed kind of confused about -- like |
| 09:35 10 | | I couldn't -- at that first meeting I didn't |
| 11 | | understand why she was there, exactly, and how |
| 12 | | I could help her at that point. |
| 13 | Q. | So you directed her back to Dr. Uli? |
| 14 | A. | Correct. |
| 15 | Q. | What did she say when you did that? Did she |
| 16 | | reject that idea? Did she say, "Okay"? |
| 17 | A. | I don't recall how she took that. |
| 18 | Q. | How did she seem during the meeting? Was she |
| 19 | | combative with you? Was she talking/speaking |
| 09:36 20 | | calmly? How was her demeanor? |
| 21 | A. | Yeah, she was calm. I mean, she -- all I |
| 22 | | remember was her walking in with this big |
| 23 | | binder. A lot of -- like her lab coat with a |
| 24 | | lot of papers in both pockets. |
| 25 | | But she was calm. She wasn't combative. |

1      conversation the second time.
2 A. She was still having problems in the program.
3      I remember her using -- then she told me that
4      she felt she was being discriminated against.
5      I asked her how. And the word she kept using
6      was "insidious," but she couldn't give me
7      anything specific as to how she was being
8      discriminated against.
9 Q. Did she mention her race at all during this
10      conversation?
11 A. Yes. I mean, she said she was being
12      discriminated against because she is African-
13      American.
14 Q. Did she mention any medical conditions,
15      anxiety, or anything else?
16 A. Yes. She said that she had social anxiety
17      disorder and it was part of the American
18      Disabilities Act.
19 Q. When did this -- you said this was about four
20      months later. Do you know -- I think you said
21      you think it --
22 A. I think it was --
23 Q. You think the first one was around about
24      September of 2010 or 2011?
25 A. I thought it was 2011.

| | | |
|---|---|---|
| 1 | Q. | So in terms of her saying she was being treated |
| 2 | | differently based on the fact that she was an |
| 3 | | African-American versus the other fellows, she |
| 4 | | then described that as insidious behavior and |
| 5 | | didn't give you any further specific examples |
| 6 | | of differential treatment? |
| 7 | A. | Not that I can recall. |
| 8 | Q. | Did she give you -- can you recall any more |
| 9 | | specific examples she gave you about |
| 10 | | differential treatment based on her race, any |
| 11 | | examples she provided? |
| 12 | A. | No, not based on her race. |
| 13 | Q. | And then she also mentioned that she had social |
| 14 | | anxiety disorder and referenced the ADA, |
| 15 | | correct? |
| 16 | A. | Correct. |
| 17 | Q. | So tell me how she -- was that the same thing; |
| 18 | | did she say, "I am being treated differently |
| 19 | | based on the fact that I have this condition"? |
| 20 | | Or how did she communicate that to you? |
| 21 | A. | No, she just told me that she had social |
| 22 | | anxiety disorder and that it was difficult for |
| 23 | | her in the environment that was there because |
| 24 | | of the pressure from the attendings to speak up |
| 25 | | like on rounds or on at conferences. |

| | | |
|---|---|---|
| 1 | Q. | Tell me, from what you can recall, what had |
| 2 | | prompted Dr. Uli to just call you, "Hey, do you |
| 3 | | have a second? I want to tell you about some |
| 4 | | performance issues that Dr. O'Donnell is |
| 5 | | having." |
| 6 | | I mean, was it just out of the blue or did |
| 7 | | he preface it by saying, "Here is why I want to |
| 8 | | talk about this"? |
| 9 | A. | Probably -- I am 100 percent sure it was |
| 09:58 10 | | because of the e-mail I sent asking for that |
| 11 | | job description. And I think Dr. O'Donnell |
| 12 | | already told him that she had a disability. |
| 13 | Q. | Was this the first time Dr. Uli had ever |
| 14 | | communicated to you any alleged performance |
| 15 | | deficiencies that Dr. O'Donnell had in the |
| 16 | | program? |
| 17 | A. | I believe so, yeah, at that point. |
| 18 | Q. | Had anyone else, other than Dr. Uli, ever |
| 19 | | communicated to you that Dr. O'Donnell had |
| 09:59 20 | | performance issues in the program other than |
| 21 | | Dr. Uli up to this point? |
| 22 | A. | No, I didn't know any of the other faculty. |
| 23 | Q. | And you hadn't spoken with any of the other |
| 24 | | faculty about Dr. O'Donnell? |
| 25 | A. | No, I didn't -- I don't know the faculty over |

CERTIFICATE

State of Ohio,       )
                     ) SS:
County of Cuyahoga.  )

I, Diane M. Stevenson, a Registered Diplomate Reporter, Certified Realtime Reporter, and Notary Public in and for the state of Ohio, duly commissioned and qualified, do hereby certify that the within-named witness, WILLIAM R. REBELLO, was by me first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by him was by me reduced to stenotypy in the presence of said witness, afterwards transcribed by means of computer-aided transcription, and that the foregoing is a true and correct transcript of the testimony as given by him as aforesaid.

I do further certify that this deposition was taken at the time and place in the foregoing caption specified, and was completed without adjournment.

I do further certify that I am not a relative, employee or attorney of any party, I am not, nor is the court reporting firm with which I am affiliated, under contract as defined in Civil Rule 28(D), or otherwise interested in the event of this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Westlake, Ohio, the 7th day of November 2017.



Diane M. Stevenson, RDR, CRR
Registered Diplomate Reporter
Certified Realtime Reporter
Notary Public in and for
The State of Ohio

My Commission expires December 9, 2020.