# EXHIBIT A

# Transcript of the Testimony of
# **Alison O'Donnell**

**Date:** August 4, 2017

**Case:** Alison O'Donnell v. University Hospitals Health System, et al.



**Cleveland Reporting Partners, LLC**
(216) 459-7880
scheduling@clereporting.com
clereporting.com

**Alison O'Donnell**
**8/4/2017**

Page 14

```
 1       A.    Yes.
 2       Q.    I assume speaking in groups would include
 3   speaking publicly to a group?
 4       A.    Yes.
 5       Q.    As well as a group discussion?
 6       A.    Right.
 7       Q.    I just want to understand the triggers.
 8   With that, are you able to do those things if you
 9   take your Ativan or no?
10       A.    Mostly, I'm able to.
11       Q.    Mostly able to?
12       A.    Yes.
13       Q.    When you say mostly able to, meaning
14   what?
15       A.    Meaning the situation is so intense that
16   sometimes medication alone won't do it.
17       Q.    Okay.
18             So sometimes you say, I just -- simply,
19   that is something I can't do?
20       A.    Right.
21       Q.    How about, just so I understand what your
22   restrictions are, I guess.  If I said, Hey, I've
23   got a hundred physicians, I want you to come out
24   and give a presentation to, for an hour, is that
25   something you could do?
```

**Alison O'Donnell**
**8/4/2017**

Page 15

1      A.     If I was comfortable with the topic and

2    if the audience was civil and respectful of my

3    presentation, yes.  But if they're going to be

4    heckling me and yelling and screaming, then

5    probably not.

6      Q.     How about if I said that we're going to

7    sit down and we're all going to talk about -- I've

8    got ten physicians and we're all talking about our

9    careers, and I want you to come in and we're all

10   going to talk about the pluses and minuses of

11   being a doctor, could you do that?

12     A.     I would not enjoy it, but I probably

13   could make it through.

14     Q.     Okay.

15            How about if something happened -- this,

16   obviously, is a physician, no different than a

17   lawyer.  Sometimes we want everything to work

18   great, but sometimes an issue could come up with a

19   patient or something like that.

20            How about if we said, Hey, Dr. O'Donnell,

21   we want you to come in.  We've got the parents of

22   the child, we've got their attorney, we've got our

23   attorneys, and we're all going to talk about what

24   you did and what you didn't do.  In that meeting,

25   they're going to ask you questions.

**Alison O'Donnell**
**8/4/2017**

Page 25

1   put the dates of your fellowship.  I saw it

2   started, can we say July 1, 2010?

3        A.    That's reasonable.

4        Q.    Although you didn't have a second

5   contract, I take it that your -- you went on a

6   leave of absence, and I'm not saying that you

7   asked for it, but you went on a leave of absence

8   from July 1, 2012, right?

9        A.    That's correct.

10        Q.    And then you eventually resigned.  I want

11   to put that in so we have it for the record.

12                   -  -  -  -  -

13             (Thereupon, Deposition Exhibit 3,

14             December 16, 2012 Resignation

15             Letter, was marked for purposes of

16             identification.)

17                   -  -  -  -  -

18        Q.    You eventually -- if we look at Exhibit

19   3, you eventually resigned on December 16, 2012,

20   right?

21        A.    Correct.

22        Q.    So if we put the time frames of the UH

23   fellowship, we're talking July 1, 2010 through

24   December 16, 2012, right?

25        A.    That's correct.

**Alison O'Donnell**
**8/4/2017**

Page 27

1    testimony was, when we were talking about

2    paragraph 2, that when she says, in the last one

3    to two years it became more intense, you said

4    there was some work issues.

5         A.    Not so much work issues.  But being a

6    physician is a stressful job, and being

7    unmedicated just became a lot for me.  So that's

8    why I decided to go back on the medication.

9         Q.    Did you -- I guess, without the

10   medications, did you have restrictions?  Were you

11   not able to give speeches?  Or what were you able

12   to do or not do?

13        A.    Well, that job didn't require me to give

14   speeches.

15        Q.    Okay.

16              But was there anything that you couldn't

17   -- was there anything, without the medication,

18   that you couldn't do?  Would you, for example, not

19   be able to talk in a group setting?

20        A.    No.  But once again, that wasn't required

21   of me.  But I wouldn't have been able to do it if

22   they had asked me to.

23        Q.    Okay.

24              So let's look at her third paragraph, and

25   it goes through a little bit of the -- some of

**Alison O'Donnell**
**8/4/2017**

Page 31

1    apply for accommodations?

2         A.    Yes.

3         Q.    And then the accommodations were denied

4    and you were placed on leave?

5         A.    Yes.

6         Q.    Is Dr. Rosenberg's summary a good summary

7    of, I guess, at least, the disability-related

8    issues at UH?

9         A.    I'd say it's a very bare-bones summary.

10   There's a lot more to it.

11        Q.    Okay.  And we'll get into it.

12             And, I guess, when I look at it, I guess

13   I would say, it looks to me as if -- is the

14   accomodation, you ultimately asked for, through

15   your physician or, otherwise -- I'll read.  It

16   says, "She told them that she had an anxiety

17   disorder and requested they ask her questions to

18   test her knowledge and allow her to do a

19   presentation rather than speaking up."

20             Did I read that right?

21        A.    Yes.

22        Q.    Is that what you were asking to do?

23        A.    I did ask for that, but that wasn't my

24   formal accomodation request.

25        Q.    What was it?

**Alison O'Donnell**
**8/4/2017**

Page 32

1      A.      Prior to that I had asked them for this.

2      Q.      Okay.

3              What was your formal accomodation

4      request, if you recall?

5      A.      Not to grade me -- from what I recall.

6      I'm sure there's more to it than I'm remembering.

7      But from what I recall, it was not to grade me for

8      my impromptu speech during the departmental

9      conferences, and to not grade me down for being

10     quiet.

11             And then, I believe, it was offered that

12     I could do other things to prove my knowledge and

13     participate in other ways within the conference.

14     Q.      Who?  You offered or they offered?

15     A.      I offered.

16     Q.      You offered.  Okay.

17             Now, the fourth paragraph says that you

18     have a long history of generalized anxiety

19     disorder and panic disorder; is that true?

20     A.      That's her diagnosis.  I'm not sure.

21     Q.      You're not sure?

22     A.      Yes.

23     Q.      So she's diagnosed you with generalized

24     anxiety disorder and panic disorder?

25     A.      Yes.  I definitely have the generalized

**Alison O'Donnell**
**8/4/2017**

Page 33

1    anxiety.  I'm not sure about the panic disorder.
2    However, she's the professional.
3        Q.    And she says it's a long history of them
4    both.  She told you that not only do you have
5    those two diagnoses, but she believes you've had
6    them for a long time?
7        A.    She has told me that.
8        Q.    Has she told you what she means by panic
9    disorder?
10       A.    That I can have -- my anxiety can get so
11   severe that it can present as a panic attack.
12       Q.    Okay.
13             What's an SSRI?
14       A.    Selective serotonin reuptake inhibitor,
15   which is class of medications like Zoloft and some
16   of the other medications commonly prescribed for
17   anxiety.
18       Q.    Okay.
19             And it says you've done better with the
20   change to your new job in an urgent care center.
21   And, I guess, let me just ask you, since leaving
22   UH, December 2012.  Let's go through, you've been
23   at Akron Children's for how long?
24       A.    Since April 1 of this year.
25       Q.    And before that?

**Alison O'Donnell**
**8/4/2017**

Page 34

 1     A.    Immediately after I was placed on leave,
 2  I signed up with a locum tenens, a temporary
 3  agency, and they placed me with a company called
 4  ONE Health Ohio, who hired me on that following
 5  spring.  And I stayed there until February 10 of
 6  this year.
 7     Q.    Of 2017?
 8     A.    That's correct.
 9     Q.    Okay.
10           And did they only have you at ONE Health
11  Ohio or where were you at?
12     A.    That was the only place I was at.
13     Q.    So I take it that she's saying the change
14  in new job had improved.  Were you having problems
15  at ONE Health Ohio?
16     A.    No.  It just was a very poorly-run
17  company and I was overloaded with work.
18     Q.    And, I guess, my question is:  Was it
19  causing the anxiety or was it just simply you
20  didn't like the job?
21     A.    I would say, mostly, I just didn't like
22  the job.
23     Q.    Okay.
24           So let me ask you then -- I've seen
25  Dr. Rosenberg -- and I think I understand, but

**Alison O'Donnell**
**8/4/2017**

Page 36

```
 1        A.    They don't have those at Akron
 2   Children's.
 3        Q.    Okay.
 4              So Akron Children's, it's physicians who
 5   are caring for the patients?
 6        A.    That's correct.
 7        Q.    And do you have any work restrictions at
 8   Akron Children's?
 9        A.    No.
10        Q.    So you don't have any type of -- there's
11   nothing that comes up that you have to say, Hey, I
12   don't want to deal with that?
13        A.    Well, I did inform them of my disability
14   at the time of my employment and they've
15   accommodated me without me having to make any
16   specific requests.
17        Q.    And, I guess, did you do that in writing
18   or orally?
19        A.    Both.
20        Q.    Both.  Okay.
21              So tell me, in general, if I'm hiring you
22   to come in as a physician and I'm your supervisor,
23   tell me what you're going to tell me about your
24   disability and restrictions?
25        A.    I'd say that I have generalized anxiety
```

**Alison O'Donnell**
**8/4/2017**

Page 37

1   disorder.  It's a chronic condition.  It affects

2   several of my major life functions.  Some of the

3   most common functions that it affects are my

4   speech, my ability to concentrate, and sometimes

5   think and communicate.

6          My symptoms are sometimes triggered by

7   certain activities, such as speaking in large

8   groups, meeting new people, or disagreeing with

9   somebody, tend to be my major triggers.  I can get

10  some physical symptoms from those.  I'm currently

11  on medication that helps mitigate these symptoms,

12  but in certain situations, my anxiety can get

13  difficult.

14     Q.    Okay.

15          Now, if I'm your supervisor, I guess, the

16  first thing I'm going to say is, Well, sometimes

17  with children, you could have some parents who are

18  very interested in their care, needless to say,

19  right?

20     A.    Yes.

21     Q.    Sometimes you could have a parent that is

22  a lawyer or somebody who is just argumentative who

23  might come in and say, Why are you doing that or

24  why don't you do something else, right?

25     A.    Yes.

**Alison O'Donnell**
**8/4/2017**

Page 38

1      Q.    What are you going to do if you have --
2   or what have you done if you have a situation
3   where you're caring for my child, I come in and I
4   say, Well, Dr. O'Donnell, we've been to three
5   physicians, I'm so upset about this.  I can't
6   believe you're not going to give him this
7   medication?
8          I mean, what do you do when a parent
9   starts getting argumentative with you?
10     A.    Generally, one-on-one, I'm okay.  With
11  patients and parents, I really haven't had that
12  same kind of issue.  I've generally been able to
13  diffuse the situation, calm them down, and most of
14  the time get them on my -- at least agree with the
15  plan.
16     Q.    How about if your supervisor called in
17  and said, Hey, we have a problem and I've got some
18  of your coworkers here and we all want to talk
19  about some problems.
20          Are you going to be able to deal with
21  that situation?
22     A.    I've never really had that situation,
23  besides the fellowship.
24     Q.    Are you able to -- I see from these that
25  sometimes if somebody is raising -- I guess, if

**Alison O'Donnell**
**8/4/2017**

Page 39

```
 1    somebody says, Hey, I don't think you performed
 2    well or I disagree with you, does that cause
 3    anxiety?
 4         A.    It can, to a degree.  Sometimes.
 5         Q.    Okay.
 6               And, I guess, what do you do -- do you
 7    say I'm just not going to participate in that or
 8    what would happen?
 9         A.    No, I would do my best to participate.
10         Q.    Okay.
11               So today at Akron Children's, you don't
12    think you have any restrictions?
13         A.    No.
14         Q.    You haven't had any issues that have come
15    up?
16         A.    No.
17         Q.    Now, let's talk about -- and, I guess,
18    with benefits, $230,000 salary, your benefits are
19    what?  Medical and 401K?
20         A.    Medical, dental.  I'm sure there's a
21    retirement plan there, but I'm not sure exactly.
22         Q.    Is the insurance through you or your
23    husband?
24         A.    Both.  I'm insured -- me and my son are
25    under mine.  And Akron Children's requires my
```

**Alison O'Donnell**
**8/4/2017**

Page 40

1    husband to carry his own, and he's secondary on

2    ours.

3         Q.    So that's Akron Children's.  So you

4    advise them of your disability, but you don't have

5    any work restrictions and it's never come up?

6         A.    Correct.

7         Q.    So let me talk about your employment at,

8    I'm just going to call it Ohio Health, okay?

9         A.    Okay.

10         Q.    So Ohio Health from February -- well,

11    actually, it was from 2012, right?

12         A.    Um-hum.

13         Q.    Through 2017?

14         A.    Well, technically.  I worked there, but I

15    wasn't their employee in 2012.

16         Q.    I get it.  I know.  I'm just calling it

17    Ohio Health.

18         A.    Sure.

19         Q.    You were assigned there by a temporary

20    agency?

21         A.    Yes.

22         Q.    What were you doing for Ohio Health?

23         A.    I was acting as a general pediatrician.

24    I just saw children in the office as an outpatient

25    only.

**Alison O'Donnell**
**8/4/2017**

Page 41

1      Q.    Okay.

2            And where was your location?

3      A.    Initially, they had me moving to several

4    locations within their organization.  I was in

5    Warren, Youngstown, and Alliance.  But eventually

6    I was just in Warren.

7      Q.    And, I guess, with that, as to what was

8    your rate of pay when you left?

9      A.    When I left, I can't remember exactly,

10   but I want to say it was approximately 165,000.

11     Q.    How about when you started?

12     A.    It was significantly less than that, but

13   I can't remember exactly.

14     Q.    Over 100,000?

15     A.    Yes.

16     Q.    Did you have benefits?

17     A.    Yes.

18     Q.    And did you have problems at Ohio Health?

19     A.    Not directly.  Towards the end, the

20   company was making some decisions, which I felt

21   was unethical for the patients, so that was one of

22   the things that prompted me to leave.

23     Q.    Like what, just in general?

24     A.    They had some old vaccines that they

25   wanted to give to the patients and were

**Alison O'Donnell**
**8/4/2017**

Page 42

1    misconstruing them as the new and updated version.

2    And would tell the parents that the child was

3    getting the new vaccine, but would really be

4    getting an old one.

5        Q.    Okay.

6              And then as to Ohio Health, did you have

7    any restrictions while you were there?

8        A.    Not for my anxiety, no.

9        Q.    And did you have any problems with your

10   anxiety at Ohio Health?

11       A.    I did have anxiety symptoms, but I was

12   able to function at my job.

13       Q.    When you say anxiety symptoms, meaning

14   what?

15       A.    I would sometimes stumble over my words,

16   have difficulty getting out what I wanted to say,

17   sweating, tremoring, shortness of breath, nausea.

18       Q.    So you worked there, then, for five

19   years.  You didn't need any accommodations.

20       A.    Right.

21       Q.    Okay.

22              So, I guess, just on this, at the

23   beginning, I know that you certainly have read

24   some of the law because you're telling me about

25   your major life activities and all that kind of

**Alison O'Donnell**
**8/4/2017**

Page 44

1      Q.     I mean, I might like to argue with them
2    about it and say you're crazy, but nobody is going
3    to really enjoy that, right?
4      A.     Right.
5      Q.     And then if you do get into a difficult
6    situation, again, nobody is going to enjoy that,
7    right?
8      A.     That's correct.
9      Q.     And, I guess, if I look at it, today
10   you're what, 32?
11     A.     No, I'm 39.
12     Q.     39.  Okay.  So, really, for 29 years, you
13   went through life without any medications, right?
14     A.     Yes, but I was definitely impaired
15   without it.
16     Q.     But at those points in time, you weren't
17   seeing a psychiatrist, right?
18     A.     That's correct.
19     Q.     You weren't seeing counselling every day,
20   right?
21     A.     That's correct.
22     Q.     Did you have any care for your first 29
23   years as to any of these issues?
24     A.     Yes.  I mean, I will preface this by
25   saying, my parents, even though they're doctors,

**Alison O'Donnell**
**8/4/2017**

                                                          Page 48

 1    to get actual treatment, I take it, was when you
 2    were in the residency program?
 3         A.    It was.
 4         Q.    So you had gone through high school,
 5    undergrad, and medical school, right?
 6         A.    Yes.
 7         Q.    And you were able to get through all of
 8    those and presumably excel.  You went to residency
 9    at Cleveland Clinic, right?
10         A.    That's correct.
11         Q.    I assume to match there wasn't easy,
12    right?
13         A.    I don't know.
14         Q.    You don't know.  Okay.
15               You don't think that was a good match or
16    no?
17         A.    I was very happy with the match, but I
18    honestly can't tell you whether or not --
19         Q.    What medical school did you go to?
20         A.    I went to Case Western.
21         Q.    So you went to Case Western.  And so for
22    29 years you get through with no medication.  Then
23    you get to the residency.  And I'm assuming the
24    residency, at that time, there were times that you
25    had to answer questions or speak up in group

**Alison O'Donnell**
**8/4/2017**

Page 51

1      Q.    Okay.

2            Did you have any accommodations or

3      restrictions during the residency program?

4      A.    No official accommodations, but my

5      attendings recognized that I had some form of

6      anxiety going on, and they accommodated me for it.

7      Q.    How so?

8      A.    They recognized that -- they were the

9      ones who suggested I go get evaluated because of

10     my symptoms.  And they would recognize when I was

11     starting to have anxiety issues and would offer me

12     breaks, if necessary.

13     Q.    Meaning what -- I guess, with the

14     attending, just so I understand the residency.

15     Were there times when they would have you give

16     treatment to a patient?

17     A.    Oh, no.  I was able to always perform my

18     clinical duties.  Like, for instance, if I was

19     presenting something, and they saw that, maybe, I

20     was getting a bit too anxious, they would say,

21     Take a breath, relax, and then try again.

22     Q.    I'm just trying to understand the

23     residency program.  Is there times when they would

24     watch you or be with you when you gave treatment?

25     A.    Generally, no.

**Alison O'Donnell**
**8/4/2017**

Page 55

1   Cleveland Clinic residency, you were prescribed

2   the medication?

3       A.    Yes.

4       Q.    And so let me ask you as to that.  Was

5   there -- did you ever get any documented

6   performance issues during the residency program?

7       A.    Not that I remember.

8       Q.    Any oral issues about, Hey, these are

9   problems and we need to be able to fix them?

10      A.    Well, all residents get that.  I mean,

11  that's part of the residency.  They point out the

12  mistakes that you're making and you're expected to

13  correct them.

14      Q.    Well, how about as to these issues, about

15  being able to speak in groups or answer questions

16  or give discussions in front of a group?

17      A.    I don't remember.

18      Q.    Did those come up?  You don't remember.

19      A.    No.

20      Q.    If you were to, I guess -- if we were to

21  get that file or look to anybody, you don't

22  remember if there was any, like, performance plans

23  or anything that was of a disciplinary nature?

24      A.    I don't believe so.

25      Q.    You don't believe so.

**Alison O'Donnell**
**8/4/2017**

Page 73

1          A.     Um-hum.

2          Q.     Was that every year or just year one?

3          A.     Every year.  I wouldn't even say classes.

4    It's more like we have our divisional conference.

5    I can't even remember exactly, I want to say maybe

6    twice a month or once a month, we had a fellows

7    only session, with one attending, where we would

8    go over some things with a textbook.

9          Q.     Okay.

10                Did you have group meetings once a week?

11         A.     The divisional conference was the group

12   meeting.

13         Q.     Okay.

14         A.     But that was the entire department.

15         Q.     What is the Wednesday conference?

16         A.     That's the departmental conference, where

17   the entire department, the attendings, fellows,

18   nurses, other people within the department meet

19   together and, in theory, discuss patients and go

20   over educational topics.

21         Q.     How long is that departmental meeting?

22         A.     I can't remember.  It was more than an

23   hour but I don't remember how long.

24         Q.     So everybody comes in, and is there an

25   agenda, or do they just start going through

**Alison O'Donnell**
**8/4/2017**

Page 77

1      Q.     Had to do it to the residents, at times?

2      A.     At times, yes.

3      Q.     And you had to do it on the Wednesday

4    meetings, in the departmental meetings, to talk

5    about what you're doing and ask questions of

6    others?

7      A.     The departmental meetings were a little

8    bit different but yeah.

9      Q.     Where was it that you said that you were

10   quiet?  Was it the departmental meetings?

11     A.     It was the departmental meetings.

12     Q.     Okay.

13            And so I take it, the departmental

14   meetings, how many people were in the department?

15     A.     It kind of depends on who planned on

16   showing up that week.  But it could be up to -- I

17   don't know exactly.  But I'm going to guess,

18   maybe, 20, 30 people.

19     Q.     20 or 30.  And the fellows are just six

20   of those 20 or 30?

21     A.     That's correct.

22     Q.     But I'm assuming a fair amount of it is

23   these departmental meetings are to get the fellows

24   to be trained and to be part of the department?

25     A.     I say that's one of the reasons.  I don't

**Alison O'Donnell**
**8/4/2017**

Page 84

1    the record.  It says, "Even when they are not

2    presenting, fellows are expected to contribute as

3    active participants in the discussions."

4           I read that right?

5    A.    You did.

6    Q.    What do you agree or disagree with?

7    A.    I disagree that that was ever part of the

8    requirements of the program.  In fact, I think

9    this was put in here after I voiced my concerns

10   about participating due to my anxiety, and that

11   was put in after the fact.

12   Q.    Well, let me ask you about that.  Because

13   I think -- I believe at the beginning of this

14   deposition, you told me that one of the, I guess,

15   performance issues, at least in their view, that

16   the physicians who were part of the program raised

17   with you was that you were being too quiet during

18   these sessions, right?

19   A.    Correct.

20   Q.    So I guess I would say, if you're in

21   these sessions, and when you're not presenting,

22   you're being quiet.  And then your evaluators are

23   saying, Dr. Matthews, you're being too quiet, we

24   need you to speak up.  That would seem, to me, to

25   support the fact that they did, at least in their

**Alison O'Donnell**
**8/4/2017**

Page 85

1     view, believe that you needed to speak up and talk

2     during it, right?

3             MR. BEAN: Objection. You can answer.

4       A. I wouldn't say that I needed to. I'm

5     sure they would have liked me to, but that wasn't

6     an essential function of my job at that point.

7       Q. Okay.

8             Well, I guess I would say, you didn't

9     believe it, but you were even asking them to take

10    that away, right? You told them, Don't grade me

11    on being quiet, right?

12       A. Yes. Because it wasn't an essential job

13    function.

14       Q. Well, I guess I would say, you understand

15    that there are parts of it, when you go through a

16    fellowship program, some of your fellows may think

17    they're the greatest pediatric endocrinologist

18    that ever walked the earth, but they have to get

19    through and meet the standards that are presented

20    by those physicians, right?

21       A. To a degree. There are some things that

22    probably rub certain physicians the wrong way that

23    they're doing, but it's not a deal-breaker for the

24    program. And this is one of those things.

25       Q. Well, I guess I would say this, I might

**Alison O'Donnell**
**8/4/2017**

Page 87

1      Q.    Well, you know that they graded you on

2   it, right?

3      A.    I know that, yes.

4      Q.    You know that they said that you were

5   being too quiet, right?

6      A.    Yes.

7      Q.    So you know that they believed, at least,

8   that being quiet and not raising issues was not

9   satisfactory, right?

10     A.    I don't know if they believed that or if

11  that was just another way that they chose to -- or

12  an easy target for them.

13     Q.    Well, let me ask you, there were six

14  fellows.  Were any of the other six completely

15  quiet if they weren't presenting?

16     A.    Yes.

17     Q.    All the time?

18     A.    Much of the time.

19     Q.    Much of the time.

20     A.    In fact, some of them didn't even show up

21  to the conference.

22     Q.    Okay.

23           Well, I guess I would say, when they were

24  there, did others just sit there and just say, I'm

25  not going to speak?

**Alison O'Donnell**
**8/4/2017**

Page 90

1    when you asked for the accommodations.  And you

2    made a formal request.  I'm going to show it to

3    you --

4        A.    Yes.

5        Q.    -- just before this.  And as part of that

6    formal request, you had to go get some medical

7    documents, right?

8        A.    Um-hum.

9        Q.    It wasn't any accomodation you asked for.

10   You had to show it was medically necessary, right?

11       A.    That's correct.

12       Q.    And they then did their investigation and

13   said, What are the essential functions of this

14   job?  Would you expect them to do that?

15       A.    Well, yes.  I don't expect them to create

16   essential functions of the job.  I think they

17   should look at the document that they already had.

18       Q.    Well, certainly, you would expect, if

19   they were going to, in good faith, review

20   Dr. Matthews' request for accomodation, or anybody

21   else, that they would look into what are truly the

22   essential functions, right?

23       A.    I would assume they already know those.

24       Q.    Well, I guess I would say, yeah, I might

25   already know those, but I might need to put down

**Alison O'Donnell**
**8/4/2017**

Page 94

1    your research be more unique to you and not pick

2    up somebody else's research, right?

3         A.    Correct.

4         Q.    So you were trying to say, I want more of

5    this, right?  So what else, if we look at this,

6    would you say --

7         A.    Same thing, Page 335, it's just more of,

8    this was not formalized when I was there.

9         Q.    Okay.

10              Well, if we looked at this, what

11   expectations do you believe, if we look at A, B,

12   C, D, we go through all the expectations, which

13   ones -- and I'm just going to ask you, let's just

14   assume for this, I'm not asking you to concede

15   these are the essential functions.

16              But let's just say that you and I are

17   sitting down in 2012, and I said, Dr. Matthews,

18   this is what I believe are the functions of the

19   fellowship program.  What do you need to be

20   accommodated in?  Why don't you go through and

21   tell me which of these things you needed

22   accommodations, and what type of accommodations.

23        A.    I would say that for the departmental

24   conference --

25        Q.    Section E?

**Alison O'Donnell**
**8/4/2017**

1      A.    E, yes.  That I definitely can attend.  I

2   can contribute through formal presentations, but

3   there needs to be some accomodation for my

4   spontaneous contributions during other times of

5   the program.

6      Q.    How about, can you respond to spontaneous

7   questions?

8      A.    Yes.  And I asked for that, actually.

9      Q.    So you could give a statement.  I thought

10  you said that these were somehow hostile or

11  somehow --

12     A.    Oh, yes, they were very hostile.  But

13  that was still better than -- let me back up.

14  What would happen during these conferences was

15  they would start off somewhat organized, and

16  towards the end, all the attendings would just be

17  yelling and screaming, sometimes cussing at each

18  other.

19          For some reason, they wanted me to speak

20  up in the middle of this and try to contribute,

21  and I just could not do that.  That would have

22  made my anxiety way too bad.  So I asked them,

23  since I can't do this, if you want to know what I

24  know, ask me a direct question.  And Dr. Uli

25  refused to do it.  He said, I just needed to learn

**Alison O'Donnell**
**8/4/2017**

Page 100

1              (Thereupon, Deposition Exhibit 6,

2              March 22, 2012 Letter From Julie

3              Chester, was marked for purposes of

4              identification.)

5                   -  -  -  -  -

6      Q.    Okay.

7              So handing you what's been marked as

8      Exhibit 6.  And this looks, to me, as if this was

9      the formal request for accomodation.

10     A.    That's correct.

11     Q.    And so we get a request for accomodation

12     and this is the medical -- Page 2 is the medical

13     documentation that you submitted, right?

14     A.    Yes.

15     Q.    Okay.

16             So you asked for an accomodation and they

17     -- and do you have a problem with UH saying, Give

18     us medical documentation to support it?

19     A.    They never asked me that, but, yes, I

20     don't have a problem with it.

21     Q.    Well, I think if you look at this letter,

22     March 22, they're saying, You need to give us a

23     release and you need to give us some information

24     to support it, right?

25     A.    Let me see.  Where do you see that?

**Alison O'Donnell**
**8/4/2017**

Page 101

```
 1      Q.    Well, complete the attached
 2   authorization --
 3      A.    Yes, which I did.
 4      Q.    Okay.
 5            Have your health care provider complete
 6   the attached health care --
 7      A.    Yes, which she did.
 8      Q.    Obviously, they're saying, We trust what
 9   you're saying, but we need to see what your
10   physician is saying.
11      A.    Yes.
12      Q.    So you don't have a problem with that,
13   right?
14      A.    No.
15      Q.    So let's see.  So the answers are -- and
16   did you agree with what your physician said here?
17      A.    I would say so, yes.
18      Q.    So let's go through.
19            "Does the employee have a disability that
20   substantially limits one or more major life
21   activities?"  And your physician answered yes,
22   right?
23      A.    Correct.
24      Q.    And what are they?  Social phobia and
25   difficulties in unknown social situations; is that
```

**Alison O'Donnell**
**8/4/2017**

Page 108

1    this, you had to do certain things and you

2    expected UH to do certain things, as well, right?

3        A.    I don't know what their responsibility

4    would have been.  But, yes, I was doing certain

5    things.

6        Q.    Well, I guess I would say, you would

7    expect that UH, if you're HR, you spoke with Julie

8    Chester, right?

9        A.    I did.

10       Q.    And you expect Julie Chester is going to

11   say, Well, what are the essential functions of the

12   fellow program, Dr. Uli, right?

13       A.    I don't know what her job would have

14   been.  I just know that I was applying for

15   accommodations at that point.

16       Q.    You had no idea what UH should have been

17   doing or anything like that?

18       A.    No.

19       Q.    Then as we get to the end, it says, "The

20   employee is actively seeking help for her

21   symptoms, and is very motivated in her treatment.

22   She has made some progress already."

23             Did I read that right?

24       A.    I believe so.

25       Q.    Who was your treating physician, at this

**Alison O'Donnell**
**8/4/2017**

Page 109

1   point, May 2012?

2       A.    It was Francoise Adan, who is a

3   University Hospitals psychiatrist.

4       Q.    Okay.

5           How long had you been seeing that

6   psychiatrist?

7       A.    Approximately -- I can't remember

8   exactly, but it was the duration of fellowship and

9   even before that.  So probably three or four

10  years.

11      Q.    Okay.

12          So we get the accomodation request.  Is

13  Exhibit 6, is that a correct statement of what

14  accommodations you were asking for?

15      A.    That is correct.

16      Q.    Okay.

17          So when I look at it, it says -- I guess

18  I would say, are you saying just don't be graded

19  on that, that you would participate?  Or don't be

20  graded on it and you're not going to

21  participate --

22      A.    I said I would participate.  Just don't

23  grade me on that.  And I offered to do other

24  things.  It's not part of this document, but I

25  offered to do other things in addition to that to

**Alison O'Donnell**
**8/4/2017**

Page 110

1    make up for my lack of grading in that regard, so

2    they would have other opportunities to grade me.

3         Q.    Okay.

4              MR. BEAN:  Let's take a break, Dave,

5    before we get into that.

6              MR. CAMPBELL:  That's fine.

7              (Recess taken.)

8                    -  -  -  -  -

9                 (Thereupon, Deposition Exhibit 7,

10                March 2012 Emails, was marked for

11                purposes of identification.)

12                    -  -  -  -  -

13        Q.    So you've been handed what's been marked

14   as Exhibit 7.  We looked through the dates, and it

15   looks like from that date -- this is right around

16   the time, March 22, 2012, when you were formally

17   asking for the accomodation, right?

18        A.    I believe so, yes.

19        Q.    And when we see from Naveen Uli, U-L-I,

20   that's the Dr. Uli you've been talking about,

21   right?

22        A.    It is.

23        Q.    And I see William Rebello, and that's

24   Mr. Rebello who is here today, right?

25        A.    Correct.

**Alison O'Donnell**
**8/4/2017**

Page 111

 1    Q.    And let me ask you, with Mr. Rebello, how

 2    much contact did you have with Mr. Rebello?

 3    A.    I'd say minimal.  I met him maybe two or

 4    three times during the course of this incident.

 5    Q.    Did you talk to him about the

 6    accommodations?

 7    A.    No, not about the accommodations.

 8    Q.    What did you talk to him about?

 9    A.    I complained to him -- I initially went

10    to graduate medical education about the

11    discrimination and abuse I was suffering in my

12    fellowship program.

13    Q.    Okay.

14          When do you think that took place?

15    A.    Approximately, I would say the fall of

16    2011.

17    Q.    I guess, tell me then, what were you --

18    what was your complaint at that point?

19    A.    There were numerous.  Would you like me

20    to go through it all?

21    Q.    Yeah.

22    A.    Okay.

23          So from the very beginning, I was treated

24    differently from the rest of the trainees in the

25    fellowship program.  I noticed that all the other

**Alison O'Donnell**
**8/4/2017**

Page 112

1    fellows had their own clinic, and they would have

2    their clinic schedule at least a month in advance,

3    sometimes more.

4            I was called sometimes with less than 24

5    hours' notice and sent to clinic.  This gave me

6    inadequate time to prepare and made it very

7    difficult to get my work done properly.

8            In addition, I was denied a formal

9    orientation process at the start of my fellowship.

10   Whereas, all the other fellows were oriented

11   properly.  And that made it very difficult for me

12   to know what to do and to get it done

13   appropriately.

14           I was also required to cover another

15   fellow's clinic if they were absent, which no

16   other fellow was required to do.  Once again,

17   caused difficulties with my schedule, made it hard

18   for me to plan, hard for me to get my work done.

19           So I noticed I was having this disparate

20   treatment.  I didn't like it.  It was making my

21   anxiety worse, so I spoke to Dr. Uli about this

22   in, approximately, the late summer, early fall of

23   2010.

24           And at that point, I told him about my

25   anxiety disorder and explained that this disparate

**Alison O'Donnell**
**8/4/2017**

Page 113

1   treatment was unfair and was making my anxiety

2   worse.  That was when he told me that my anxiety

3   was nothing, I would just have to get over it.

4   And he proceeded to discriminate against me even

5   more and, instead of accommodating my disability,

6   he discriminated against me.

7          He would, at that point, started accusing

8   me of having poor performance, even though he was

9   grading me on an arbitrary scale and much harsher

10  than the other fellows.  Then around that

11  wintertime, that would have been 2010 to 2011,

12  Dr. Narasimhan decided that I needed to come work

13  at her place and see her patients for her, which

14  no other fellow was required to do.

15         Other fellows had their own patient load.

16  I was seeing an attending's patients, which was

17  totally different from everybody else.  Not only

18  that, she expected me to work on my vacation.

19  She, in fact, called me at my house while I'm on

20  vacation and asked me why I wasn't seeing her

21  patients.

22         When I explained to her that I was on

23  vacation, she proceeded to yell at me, berate me,

24  and tell me that I needed to be at clinic anyway.

25  She would also use this time to try and discredit

**Alison O'Donnell**
**8/4/2017**

Page 114

1    me and embarrass me in front of the patients.

2           The way the clinic should work is, I

3    would go into the room, I would see the patient,

4    come out of the room and discuss my plan with her,

5    and we would come up with a plan together and go

6    back in the room where I present the plan to the

7    patient.

8           Even though she had approved the plan

9    outside of the room, she would tell me that I had

10   the plan wrong when I would explain it to the

11   patient.  And she had a habit of

12   asking you a bunch of questions, completely

13   irrelevant to the patient, and then would not stop

14   asking questions until I got one wrong, and then

15   would proceed to yell at me in front of the

16   patient.  She also called me by my first name in

17   front of patients, whereas all the other fellows

18   were referred to as doctor when patients were

19   present.

20          Another time she scheduled an

21   interdepartmental conference.  Not just the

22   endocrinology department, but other departments

23   were involved, as well, and told them that I would

24   be giving a formal presentation during that time.

25   However, she failed to tell me about that.

**Alison O'Donnell**
**8/4/2017**

Page 115

1    Fortunately, somebody else mentioned the

2    presentation to me, otherwise I would have arrived

3    at the conference completely unprepared and would

4    have looked unprofessional and incompetent in

5    front of a huge audience.

6           So by that spring, I became tired of this

7    and it was, once again, making my anxiety very

8    high.  So I went to Dr. Uli, on two separate

9    occasions that spring.

10   Q.    That spring would have been -- just so we

11   can put the year, that would have been 2011?

12   A.    2011, correct.

13   Q.    Okay.

14   A.    And so I told Dr. Uli about this and he

15   failed to do anything about it.  He told me people

16   have different personalities, and it was my job as

17   a fellow to deal with that.  And he continued to

18   treat me badly and discriminate against me.

19          Specifically, he told me I wasn't working

20   on a research project, even though I had met with

21   him on multiple occasions to discuss my research.

22   He also, along with Dr. Gubitosi-Klug, tried to

23   force me into taking a helping role or an

24   assisting role with another fellow's research

25   project, instead of having my own.  And this was

**Alison O'Donnell**
**8/4/2017**

Page 117

1       Q.      -- like you just told me?

2       A.      Right.

3       Q.      What did Mr. Rebello do?

4       A.      He referred me to HR and then he also

5    referred me to the head of graduate medical

6    education.

7       Q.      And HR, you went and told them the same

8    things, and they told you they would investigate?

9       A.      Yeah.  They said, We don't investigate --

10   sorry.  We don't discriminate against anybody.

11   And are you sure this is happening to you?  And,

12   obviously, this can't be happening, essentially.

13   And I don't know if any investigation ever took

14   place, but I know nothing ever changed at that

15   point.

16      Q.      You said you also went to the graduate

17   medical --

18      A.      Graduate medical education.

19      Q.      Okay.

20              And that's how you got around to say,

21   Hey, let's ask for an accomodation?

22      A.      Not immediately.  The first time I met

23   with the head of the department, Dr. Jerry Shuck,

24   and he met with me and Dr. Uli, and he set forth

25   some plans and rules that Dr. Uli was to follow.

**Alison O'Donnell**
**8/4/2017**

Page 118

1          And Dr. Uli agreed to those in the

2     meeting, but refused to follow them afterwards.

3     And he continued to treat me badly and

4     discriminate against me.  And at that point, it

5     escalated his behavior in the Wednesday

6     conferences where he would -- and other

7     attendings, too, would interrupt my formal

8     presentations, try to discredit my work, and

9     overall just sabotage my performance.

10          So at that point, I returned back -- by

11    that time, it was probably early spring, late

12    winter, early spring of 2012, went back to

13    graduate medical education and explained how this

14    was really making my anxiety spike up and I was

15    tired of being discriminated against, and this was

16    unacceptable.  And that was when Dr. Shuck told me

17    that I should apply for accommodations through HR.

18      Q.    Okay.

19          So let me ask you with Mr. Rebello, it

20    sounds like, at the very least we can agree, he

21    sent you to HR?

22      A.    He did.

23      Q.    In order to formally present your

24    complaint of discrimination, right?

25      A.    Yes.

**Alison O'Donnell**
**8/4/2017**

Page 121

```
 1       A.    Sumana, S-U-M-A-N-A.

 2       Q.    S-U-M-A-N-A?

 3       A.    Yes.  Narasimhan, N-A-R-A-S-I-M-H-A-N.

 4       Q.    So those two are tied for number one bad

 5  guys?

 6       A.    Yes.  And then close behind is Rose

 7  Gubitosi-Klug.

 8       Q.    Rose -- spell that.

 9       A.    G-U-B-I-T-O-S-I, K-L-U-G.

10       Q.    Close behind.  Anybody else?

11       A.    There are other people who did minor

12  things here and there, but I think that would be

13  petty.  They influenced the rest of the department

14  to treat me badly, but I think those are the

15  instigators.

16       Q.    Did any of these three bad guys, did any

17  of them use any racial slurs?

18       A.    Slurs, no.  But insensitive language,

19  yes.

20       Q.    Well, I'll ask you at the end about any

21  of those things.

22             Was there any racial slurs?

23       A.    No.

24       Q.    Was there anything as to -- aside from

25  you need to work through your anxiety.  Was there
```

**Alison O'Donnell**
**8/4/2017**

Page 122

1    any slurs, I guess, towards your --

2         A.    They didn't say work through it; they

3    said get over it.

4         Q.    Okay.

5               Was there any slurs?

6         A.    No.

7         Q.    I guess, just in terms of any

8    inappropriate comments, and I understand that you

9    say, Hey, they asked you to do things that you

10   thought were maybe -- but any inappropriate

11   comments, tell me that.

12        A.    Inappropriate?  Yes.  One thing that he

13   told me -- Dr. Uli told me, that African American

14   people have wild, unruly hair.  Then, also, both

15   Dr. Uli and Dr. Gubitosi-Klug told me that not

16   having a research project, normally, isn't

17   something they do for fellows, but for people like

18   me it's appropriate.

19        Q.    Anything else?

20        A.    I'm sure there's more, but I don't

21   remember.

22        Q.    Dr. Uli, I guess, on the hair, how did

23   that come up in conversation?  I have to believe

24   there was some context to that.

25        A.    Yes.  There was a patient who, she was

**Alison O'Donnell**
**8/4/2017**

Page 123

1    going through puberty a little bit too early and

2    estrogen products can sometimes do that.  And so

3    Dr. Uli asked me the race of the child, and I said

4    she was African American.  And he said, Oh, well,

5    that's because African American people have such

6    wild, crazy, unruly hair, they use products that

7    have estrogen in them and that can sometimes cause

8    early puberty.

9        Q.    So he was giving, I guess, in an unartful

10    way, he was giving a reason for the puberty early,

11    right?

12        A.    Right.  However, that description was

13    completely unnecessary and inappropriate.

14        Q.    Well, I guess I would say, certainly the

15    description of saying maybe a cause for this early

16    puberty was certainly relevant, right?

17        A.    I don't see how unruly hair is cause for

18    -- is relevant, no.  The hair products -- he could

19    have simply said the hair products that tend to be

20    used in that community tend to cause puberty.

21        Q.    Okay.

22            Well, if he would have said the hair

23    products typically used by African Americans, you

24    would be telling me that's inappropriate, as well,

25    right?

**Alison O'Donnell**
**8/4/2017**

Page 124

1      A.     No.

2      Q.     Well, I guess I would say, I understand

3   -- what he, I guess, was ultimately getting at --

4   the meat of that was there was a medical reason

5   for the -- in his medical opinion, do you agree or

6   disagree with him that the early puberty was

7   caused by the hair product?

8      A.     It could very well have been.  I don't

9   know.

10     Q.     So you didn't have any medical reason to

11  say Dr. Uli was wrong --

12     A.     No.

13     Q.     He gave one of his reasonable opinions on

14  it, and you didn't necessarily disagree, right?

15     A.     I didn't disagree that the product could

16  have caused it.  I disagreed with his description

17  of the hair.

18     Q.     And I guess I would say, with that, if I

19  was an endocrinologist, I would probably ask to

20  have warnings on those hair products, right?

21  Because there could be negative side effects to

22  those hair products.

23     A.     I don't know.  That's not part of our job

24  description to talk to the FDA about labeling.

25     Q.     I understand.  But I guess I would say,

**Alison O'Donnell**
**8/4/2017**

Page 139

1    not?

2        A.    It's indirect.  Not to evaluate your

3    performance in case conference.  I could be

4    evaluated, just not the unrehearsed part.

5        Q.    So then it goes into the -- based on this

6    letter, UH believes that's an essential function

7    of your position, do you agree?

8        A.    I disagree.  But, yes, according to this

9    letter, that's what they believe.

10       Q.    And then UH ultimately said, because this

11   is an essential function, you're saying you can't

12   do that essential function, we're going to put you

13   on a leave of absence?

14       A.    Correct.

15       Q.    And that's when we talk about, from July

16   1, 2012 on, you didn't have any contact with the

17   fellowship program?

18       A.    Nothing that I can remember.

19       Q.    Okay.

20             Were you trying to return?  What was your

21   plan?  When they put you on the leave of absence

22   July 1, what was the plan?

23       A.    The plan was to try and return.

24       Q.    How so, though, is what I'm saying?  Was

25   it to try and return because you thought you could

**Alison O'Donnell**
**8/4/2017**

Page 140

1    then start doing the unrehearsed?

2        A.    No.   To get my accommodations that were

3    due to me and to return to the fellowship program.

4        Q.    So it was really just simply saying, you

5    didn't expect that you were going to be able to do

6    the unrehearsed.  You wanted them to change it

7    through legal means, essentially, is what you

8    decided?

9        A.    I don't know about the legal means.  But,

10   yes, I wanted them to give me the accommodations

11   that were appropriate for my condition, and I

12   wanted to return to the fellowship program.

13                   -  -  -  -  -

14              (Thereupon, Deposition Exhibit 9,

15              June 22, 2012 Letter, was marked for

16              purposes of identification.)

17                   -  -  -  -  -

18       Q.    And it looks like, again, I know you

19   didn't ask for it, but it looks like they did put

20   you on a medical leave of absence or at least an

21   approved leave of absence.  So if you were able to

22   return to the program, you would restart the

23   fellowship program, right?

24       A.    I don't know about that.

25       Q.    Well, you were on a leave, and at this

**Alison O'Donnell**
**8/4/2017**

Page 141

1    point in time you had actually resigned to be out

2    of the program, right?

3        A.    No, I had not resigned at that point.

4        Q.    I mean, obviously, when you resigned that

5    meant something.  You were still part of the

6    program in July 2012, even though you weren't an

7    active participant, right?

8        A.    Okay.

9        Q.    Right?

10       A.    I assume so.  I don't know.

11       Q.    Obviously, they gave you an approved

12   leave of absence.  It wasn't like they said, We're

13   terminating you and we can't accommodate you and

14   we're terminating you.

15           They said, We're going to put you on

16   leave, and as you said, you were going to continue

17   to try to see if you could get those

18   accommodations -- I guess, get the accommodations

19   you requested or somehow something changed, right?

20       A.    Correct.  Although, this does not state

21   that the leave of absence was approved.  This is

22   telling me the steps I have to do to get this

23   leave of absence, which I did not do since I

24   didn't request the leave of absence.

25       Q.    Oh, you didn't follow through and do any

**Alison O'Donnell**
**8/4/2017**

Page 142

1    of that?

2        A.    No, because I did not want a leave of

3    absence.  I did not have any reason to be taking a

4    medical leave of absence.  I needed my

5    accommodations and to continue with my education.

6        Q.    Did you expect that they terminated you?

7    Or what was the expectation in response to that?

8        A.    No, at the time I had an attorney in

9    discussions with them to try and get them to come

10   to an agreement.

11       Q.    I don't know about the attorney.  But you

12   decided that you weren't going to do what they

13   requested for the leave?

14       A.    Yes.  I was instructed not to.

15       Q.    Okay.

16             I don't want to know --

17             MR. BEAN:  I mean, it was -- I think it

18   was Mr. Erwin.

19       Q.    I don't want to know --

20             MR. BEAN:  Yeah.  Don't talk about any

21   instructions you were given or anything else.

22             THE WITNESS:  Okay.

23             MR. BEAN:  Tell him that you can't answer

24   that.

25             THE WITNESS:  Okay.

**Alison O'Donnell**
**8/4/2017**

Page 152

 1    stuff post, and wrap up with that?

 2            MR. BEAN:  I'll do whatever everyone else

 3    wants to do.

 4            THE WITNESS:  I'm fine with either.

 5            MR. BEAN:  I mean, is this a natural

 6    breaking point?

 7            MR. CAMPBELL:  I would think now is

 8    probably the time to take -- if we're going to

 9    take a lunch break, I'd say now.

10            (Recess taken.)

11       Q.    So when we left, we were going to talk

12    about performance.  I guess, you had the break.

13            Is there anything you want to add, or

14    anything else, or are we all set to go?

15       A.    Not that I can think of at this time.

16       Q.    Thanks.

17                    -  -  -  -  -

18                (Thereupon, Deposition Exhibit 11,

19                Remediation Plan For Alison

20                Matthews, was marked for purposes of

21                identification.)

22                    -  -  -  -  -

23       Q.    So I've handed you what's been marked as

24    Exhibit 11.  I think this is one of the documents

25    you provided.

**Alison O'Donnell**
**8/4/2017**

Page 153

1          A.     It looks like it is, yes.

2          Q.     And I saw it, it was also -- without the

3     handwriting, it was something we provided to you.

4     And it looked like, on this left-hand column, did

5     you keep a notebook?  Or how were these kept?  Was

6     that by you or --

7          A.     Yes, I kept a notebook.

8          Q.     Is this you or your counsel?  Is this

9     something that you kept?

10         A.     Well, I made it and provided it to

11    counsel.

12         Q.     What did you do, like, keep a notebook of

13    all the documents or all the performance

14    documents?  Or what did you do?

15         A.     I kept a notebook of everything I could

16    -- once I saw things weren't going well, I kept

17    everything that I remembered to.

18         Q.     It looks to me that this was given to you

19    in June 2011.

20         A.     Yes.

21         Q.     Well, I see that first sentence, "I met

22    with Alison Matthews on June 29, 2011."

23         A.     Although, Dr. Uli does have a habit of

24    making documents prior to the fact and putting

25    dates on them.  So I don't know if it was actually

**Alison O'Donnell**
**8/4/2017**

Page 173

1           So now we're going into evaluation two.

2    This is Michaela Koontz is the evaluator.  And the

3    first one, I'm not certain who that first

4    evaluator was.  It looks like an N. W something.

5           Do you know who that first evaluator was?

6      A.    I don't know.

7      Q.    The second one is Dr. Koontz.  And we're

8    looking at Dr. Koontz.  Did you have problems with

9    Dr. Koontz?

10     A.    Dr. Koontz just didn't know me very well.

11   I might have worked with her on one occasion for a

12   couple hours.

13     Q.    So if we look at the first patient care,

14   it looks like we're 50 to 75 percent of the time.

15           Do you think that that is where your

16   other fellows were falling, 50 to 75 percent of

17   the time?

18     A.    I don't know.

19     Q.    You don't know.  I thought you knew

20   everything about what the other fellows were

21   doing.

22     A.    I know what was being treated fairly and

23   unfairly.  I know where I was being treated

24   differently.

25     Q.    Let's look at medical knowledge.  Next

**Alison O'Donnell**
**8/4/2017**

Page 174

1    page of Dr. Koontz.  And if we look at medical

2    knowledge, Dr. Koontz has a number of very

3    negative evaluations, correct?

4        A.    It appears so, yes.

5        Q.    And practice-based learning, very

6    negative.  And then again, though, it's somewhat

7    surprising, interpersonal communication skills are

8    your highest area.

9             Did I read that right?

10       A.    That's what that says right there.

11       Q.    So it would seem that, certainly, your

12   meeting in the group discussions, at this point,

13   did not appear to be the key concern?

14       A.    These weren't based on group discussions,

15   however.

16       Q.    Well, interpersonal skills, if you had

17   anxiety and weren't able to do it, I think there

18   would be some issues there.

19            The next one is Teresa Zimmerman.  With

20   Zimmerman, it looks like -- did you work a lot

21   with Zimmerman or no?

22       A.    I worked a fair amount.  I wouldn't say a

23   lot.

24       Q.    She's unable to evaluate a number of

25   things, but she does give you, probably, your

**Alison O'Donnell**
**8/4/2017**

Page 175

1    highest marks on Page 1.  She has some additional

2    comments on Page 2, which I think are out of

3    order.  But if you look at Page 3, she has a few,

4    again, medical knowledge, there's a few areas that

5    are very low.  Practice-based learning are very

6    low.

7              And then if you look at it, again,

8    interpersonal communication skills, which I would

9    expect, if they were discriminating against you

10   based on your disability, would be zero, zero,

11   zeros.

12             But these are all fairly high, right?

13   A.    They appear to be high.  However, these

14   aren't based on the conferences.  This is based on

15   my ability to work with patients, and I can

16   discuss with a patient and go through their charts

17   very well.

18   Q.    Well, I would think that if there was

19   anything here about you being in those meetings

20   and that was the issue that they were marking you

21   down on, that's where it would be.

22   A.    No, because if you read it, it says,

23   "Communicates effectively with patients and

24   families."  Then it says something about medical

25   records.  This is all about patient care.  This

**Alison O'Donnell**
**8/4/2017**

Page 178

1      A.     They believed many things because I

2    wasn't speaking up in the meetings.

3      Q.     Well, I guess, when I look at this, were

4    you satisfied with your evaluations or

5    dissatisfied?

6      A.     I was dissatisfied.

7      Q.     So can we agree that the evaluation --

8    most certainly -- I guess, let's put yourself in

9    Dr. Uli's shoes.  If he sees this, do you think it

10   would be appropriate for him, if the faculty are

11   reporting these -- and presumably, he's worked

12   with the faculty, many of these members, many

13   years.  They've evaluated many fellows over many

14   different years.

15          Do you think that it was appropriate that

16   he sat down with you and tried to say, Here's a

17   plan to improve for the next year's evaluation?

18     A.     I would say it would have been

19   appropriate had he not been the primary one

20   discriminating against me this entire time.

21          By this time, I had informed him of my

22   disability, and he was the one who told me to get

23   over it.  He was also the one who I came to when

24   Dr. Narasimhan was making me do clerical work, see

25   her patients, despite the fact that nobody else

**Alison O'Donnell**
**8/4/2017**

Page 179

```
 1    had to.  And would make me look foolish in front
 2    of patients by calling me by my first name in
 3    front of them.
 4           And she would ask me various irrelevant
 5    questions in front of the patients with the sole
 6    purpose of embarrassing me.  She would schedule
 7    conferences and not tell me about them until the
 8    last minute, and then have me give a presentation
 9    so I could look bad.  So, no, I don't think this
10    was appropriate.
11       Q.   You don't think it was appropriate.  And
12    I guess I would say, it looks to me, from Exhibit
13    12, that the performance deficiencies that the
14    faculty were giving -- and not just one, but
15    several faculty members, and I've asked you about
16    the evil people, and you told me there was three.
17    There were a variety of faculty members, looks
18    like they had performance issues that were
19    broad-based.
20       A.   And as I told you, my anxiety definitely
21    contributed to my performance.  I'm sure I would
22    have done much better had my disorder been
23    accommodated appropriately.
24           However, I had to not only deal with my
25    disability, I had to deal with the fact that I was
```

**Alison O'Donnell**
**8/4/2017**

Page 180

1    being discriminated against within the program,

2    treated poorly, and, frankly, abused by many of

3    the faculty members.  So that affected my

4    performance, as well.

5        Q.    That did.  Okay.

6            So I take it from all of that, you do, at

7    least, admit that your performance was down, but

8    you blame it on other factors --

9        A.    I don't think it was as down as the

10   grading -- these are arbitrary grades.  But I

11   think I could have done better had I been at a

12   more supportive environment, that treated me

13   fairly and equitably to my peers.

14                    -  -  -  -  -

15            (Thereupon, Deposition Exhibit 13,

16            Performance Alert Notice, was marked

17            for purposes of identification.)

18                    -  -  -  -  -

19       Q.    Exhibit 13 looks like -- and you're

20   welcome to look through it.  But this one looks

21   like it was given to you just before your

22   accomodation request.  February 29, 2012.

23       A.    I don't believe that was the date.  But,

24   yes, it was given to me.

25       Q.    Well, do you agree it was in 2012?

**Alison O'Donnell**
**8/4/2017**

Page 181

1      A.     Yes.

2      Q.     Okay.

3             And from the -- if we look at the --

4      start on the back page.  It looks like this is

5      Dr. Uli's writing?

6      A.     It is.

7      Q.     And it says, in the second paragraph, I

8      believe it reads, "After reviewing its contents,

9      Dr. Matthews refused to sign it."

10            Do you agree with that?

11     A.     I do.

12     Q.     "She stated that she would consider a

13     six-month extension of her fellowship but refused

14     extension for 12 months."

15            Did I read that right?

16     A.     Yes.

17     Q.     So Dr. Uli, at the end of this, is

18     saying, We, as a faculty -- I guess, correct me if

19     I'm wrong.  We, as a faculty, see that there's

20     some deficiencies or performance areas that we

21     think could improve if we extend your fellowship.

22     A.     That's what he said.

23     Q.     Did you agree to extend it by six months?

24     A.     No.  I said I could possibly, if they can

25     show me objective measures of deficiency, and they

**Alison O'Donnell**
**8/4/2017**

Page 187

1  a fellow, and you always could do that, right?  I

2  mean, you could go make more money than $50,000 at

3  any point in this fellowship program, right?

4      A.    I could have.  However, I wanted to be an

5  endocrinologist and I was doing my job.  If I was

6  truly not doing what I was supposed to be doing, I

7  would have had no problem rectifying that.  And I

8  was making efforts to improve because everybody

9  has room for improvement.  However, I was not

10  nearly as terrible as they were saying, and they

11  were holding me to a much different standard than

12  my peers.

13      Q.    Well, you agree that this document, when

14  I look at it, and even at the end, they're saying,

15  "obtain certification in general pediatrics."

16      A.    Yes.  However, another fellow failed her

17  boards exam, and they didn't say a word to her

18  about that.  But just because I haven't sat for it

19  yet was the reason that they were coming after me.

20      Q.    Okay.

21           Could it be that they're looking at this

22  and they're saying, Dr. Matthews is having serious

23  issues.  And Dr. Matthews, we may do all this work

24  for Dr. Matthews and try to get her to the point,

25  and she won't even pass her boards.

**Alison O'Donnell**
**8/4/2017**

Page 196

1      A.    Well, shortly thereafter I was forced out

2    of the program, so I didn't have the opportunity

3    to follow them had I wanted to or not.

4      Q.    Were you planning on following them?

5      A.    I hadn't looked at them closely.  I

6    hadn't decided yet.  I mean, obviously, I wanted

7    to do as best as I could, so chances are I

8    probably would have, but I don't know.  I didn't

9    have the opportunity to decide one way or the

10   other.

11     Q.    And you think that the one accomodation

12   that you were speaking, was going to cure all of

13   those deficiencies that they said.

14           Is that your view?

15     A.    Not cure them.  But, first of all, I

16   disagree that all of those deficiencies was the

17   way they were.  But, yes, I think I would have

18   improved much better.  And if they had stopped

19   harassing and discriminating against me, I would

20   have had the opportunity to learn in a fair

21   environment and I would have flourished.

22     Q.    Okay.

23                 -   -   -   -   -

24           (Thereupon, Deposition Exhibit 14,

25           Summary of Group/Fellow Evaluations,

**Alison O'Donnell**
**8/4/2017**

Page 197

```
 1              was marked for purposes of
 2              identification.)
 3                   -  -  -  -  -
 4      Q.    You've been handed what's been marked as
 5    Exhibit 14.  This one looks like it's a summary of
 6    evaluations.  And try to go through and identify
 7    the group in comparison to you on many of these
 8    things.
 9              So this actually gives you what the group
10    was doing.  I guess it's going through all of your
11    interpersonal, group is average score of all --
12    fellows represented average score of all -- so
13    it's going through and giving you your performance
14    in relation to your peers, right?
15      A.    That's what the document appears, but I
16    don't know for sure.
17      Q.    You don't know for sure.
18              Did you think that your performance was
19    good or bad or did you just --
20      A.    Well, I think my performance, based on
21    these scales, couldn't be probably evaluated.  I
22    thought I was a competent physician, and I did the
23    best of my ability.  But I don't think these
24    grades represent any of that because I was being
25    graded by people who were actively discriminating
```

**Alison O'Donnell**
**8/4/2017**

Page 198

1    against me.

2          Furthermore, the testing is being -- the

3    results of the tests are muddled by my disability,

4    which has not been accommodated for.  So once

5    again, these aren't really compliant with the ADA.

6          Q.    Okay.

7          So can we agree that based upon the

8    percentages that have been put here, that you're

9    below the group on almost every one, if not every

10   one?

11         A.    That's what this looks like.

12         Q.    And if we get into the comment section,

13   there's a few positives, but a lot of them are --

14   like, medical knowledge, there's a number of

15   negatives on medical knowledge.  I mean,

16   explanation, you have two out of five on medical

17   knowledge, it looks like.  Many, many of these,

18   right?

19         A.    That's what it looks like.

20         Q.    And one of them, for example, "Speak up.

21   We don't know what you are thinking if you don't

22   share your differentials.  This is improving in

23   one-on-one meetings."

24         Did you agree or disagree with that?

25         A.    Yes.  Because as I mentioned, my anxiety

**Alison O'Donnell**
**8/4/2017**

Page 205

```
 1      Q.    -- a number of times throughout your
 2   employment?
 3      A.    I did.
 4      Q.    Okay.
 5            Early, often, and everything in between,
 6   right?
 7      A.    Correct.
 8      Q.    So now let's talk about your charge.  And
 9   the second paragraph there, in the particulars,
10   and this one says you complained, first of all, in
11   November of 2010, is that about right?
12      A.    That's approximately correct, yes.
13      Q.    May have been earlier?
14      A.    May have been earlier.  But it was in the
15   fall of 2010.
16      Q.    And then from there, there's lots of
17   complaints, right?
18      A.    Yes.
19      Q.    And it says here, "The other staff
20   doctors" -- when you say other staff doctors, are
21   you talking about the other five fellows?
22      A.    Let me see.  What paragraph are you
23   referring to, please?
24      Q.    It says, "Held to different standard by
25   staff doctors than white, Indian, and Asian
```

**Alison O'Donnell**
**8/4/2017**

Page 210

1      A.     Correct.

2      Q.     And then you said you applied for this

3    other position at another department.  "I was

4    asked by Marci Manson to resign."  I mean,

5    obviously -- I guess, let me ask you, I mean, you

6    understood that as the fellow if, for example --

7    let's say you're on a different type of leave --

8    you definitely could not be full-time at some

9    other position and be a fellow, right?  I mean,

10   you had to be a fellow full-time?

11     A.     Not necessarily, I wasn't acting as a

12   fellow at the time.

13     Q.     I understand.  But you told me that you

14   wanted to come back.  So if you were actively

15   working to be a fellow, it's pretty difficult to

16   be full-time in something else?

17     A.     However, at that time, it wasn't looking

18   very promising that I was going to get back.  I

19   did need employment.  I couldn't be unemployed for

20   an extended period of time, so I had to look for

21   other options.

22     Q.     Well, I guess what I'm saying is, it

23   certainly doesn't seem to me to be unreasonable to

24   say you need to make a decision.  If you're going

25   to go work full-time somewhere, you can do that,

**Alison O'Donnell**
**8/4/2017**

Page 211

1    it's just you can't be in the fellow program,
2    taking up a spot, and working full-time somewhere
3    else.
4         A.    Okay.
5         Q.    Right?
6         A.    That's correct.
7         Q.    So you made the decision, you said, I
8    need another job and I'm going to go get that job,
9    and I'll resign to go get a full-time job.
10        A.    No.  What happened was I started looking
11   at jobs to see -- basically weigh my options.
12   Ideally, I was going to get back into the
13   fellowship program, but since that wasn't looking
14   very promising, I had to look for other options to
15   support myself and my family.
16        Q.    Okay.
17               But you made the decision, I'd rather
18   work at Ohio Health, UH, or someplace full-time
19   than to continue to wait to get back into the
20   fellow program?
21        A.    No, because I didn't have any money
22   coming in.  I had to do something.  And since I
23   couldn't get back into the program, I was
24   essentially forced to find another job.
25        Q.    Okay.

**Alison O'Donnell**
**8/4/2017**

Page 227

1    right?

2         A.    Correct.

3         Q.    Everybody had to?

4         A.    Yes.  Although, they made mine different

5    from everyone else's.  But, yes, standards should

6    be met in the program.

7              MR. CAMPBELL:  Let's take a short break.

8    I think we're just about done here.

9              (Recess taken.)

10        Q.    Okay.

11             Let me just ask you a couple final

12   questions on this.  The witnesses -- your other

13   fellows, anybody else?

14        A.    Not that I know of at the time.

15        Q.    And if we talk about your -- just to

16   verify, from early 2013, you've been working

17   full-time, right?

18        A.    I believe so, yes.

19        Q.    And most certainly, if the fellowship

20   would have been extended by six months, or by

21   whatever amount of time, you earned more leaving

22   the fellowship program at Ohio Health than you

23   would have in the fellowship program, at least for

24   that period of time, right?

25        A.    I believe so, but I don't know off the

Allison Matthews
13700 Shaker Blvd. #210
Cleveland, OH 44120

12/16/2012

To Whom It May Concern:

I hereby tender my resignation from the Pediatric Endocrinology Fellowship program.

Thank You,

Allison Matthews



O'Donnell 333

CONFIDENTIAL

**Confidential employee related medical information.**

March 22, 2012

Alison Matthews
13700 Shaker Boulevard
Cleveland, OH 44120

Re: Request for Reasonable Accommodation

Dear Alison:

On March 19, 2012, you informed William Rebello, Manager, Graduate Medical Education of a disability and/or medical condition and requested an accommodation(s) in order to perform the essential functions of your position. You completed the ADA Reasonable Accommodation Form which will allow us to engage in an interactive process and to discuss your disability and/or medical condition with you.

University Hospital complies with the American with Disabilities Act (ADA), the American with Disabilities Amendments Act (ADAAA), and all other applicable laws.  In order for us to evaluate your request for an accommodation, we will need following items from you:

1. *Complete the **attached Authorization to Release Medical Information Form**.* This will allow us to communicate with your health care provider/physician.  Please provide a copy of this authorization to your health care provider/physician.

2. *Have your health care provider/physician complete the attached Heath Care Provider/Physician Certification Form*.  Please have your treating health care provider/physician complete the Heath Care Provider Certification Form and describe how your medical condition/disability affects your ability to perform the essential functions of your position.  This form can be sent directly to Mary Wilson, Patient Care Advocate in our Corporate Health Department, 11100 Euclid Avenue, Mail Stop: 6029, Cleveland, OH 44106

3. *Confidentiality Statement.*  All employee medical information is treated as confidential by University Hospitals.  Medical information is maintained separately from an employee's personnel file.  Specific medical information is not shared with an employee's manager or supervisor.  Managers and supervisors will only be informed of the nature of the accommodation(s) and/or restriction(s) needed.  As such, we ask that you not discuss your medical condition with your manager or supervisor.

Once we have received the above information, we will evaluate any restriction(s) and/or accommodation(s) request and respond to you accordingly.

Should you have any questions, please do not hesitate to contact me at 216-844-3426.

Sincerely,

Julie Chester
Director, Human Resources

DEPOSITION
EXHIBIT
PENGAD 800-631-6989

CONFIDENTIAL

O'Donnell 198

CONFIDENTIAL

Please answer the following the questions to help us determine whether the above named employee has a qualifying disability and whether the employee needs a reasonable accommodation in order to perform the essential functions of his/her position.

1.  Does the employee have disability that substantially limits one or more major life activities?   Yes ☒  No ☐

    If yes, describe the disability and any limitation(s) in detail?
    SOCIAL PHOBIA
    DIFFICULTIES IN UNKNOWN SOCIAL
                                        SITUATIONS

2.  Does the employee use any mitigating measures (e.g., medications, assistive technologies, etc.) Yes ☒  No ☐

    If yes, how does the mitigating measure affect the disability?
    IV's helping to decrease the symptoms.

3.  Does the disability affect the employee's ability to perform any one of the essential functions of the position? Yes ☒  No ☐

    If yes, please describe the impact on the person's ability to perform any specific essential function(s).  PUBLIC SPEAKING AS CASE
    CONFERENCE, SPECIALLY UN-REHEARSED

4.  Are there any restriction(s) and/or accommodation(s) that would allow the employee to perform the essential functions of the position? Yes ☒  No ☐

    If yes, please list the restriction(s) and/or accommodation(s). I would
    recommend not to evaluate employee
    performance on case conference, particularly
    unrehearsed.

5.  Is the need for accommodation likely to be temporary or permanent?
    Temporary ☐  Permanent ☒  probably during the rest of
    the fellowship.

    If temporary, how long do you estimate that the need for the restriction(s) and/or accommodation(s) will last?

    The employee is actively
    seeking help for her
    symptoms and is
    very motivated in her
    treatment. She has made
    some progress already.

Signature of Health Care Provider/Physician
Date: 5/3/12

CONFIDENTIAL                                        O'Donnell 199


University Hospitals
Case Medical Center


Rainbow Babies
& Children's Hospital


CASE WESTERN RESERVE
UNIVERSITY  1826

**Case Western Reserve University / University Hospitals Case Medical Center**
**UH Rainbow Babies & Children's Hospital**

FELLOWSHIP IN PEDIATRIC ENDOCRINOLOGY

REMEDIATION PLAN FOR ALISON MATTHEWS

I met with Alison Matthews on June 29, 2011 to discuss the following matters:

Clinical evaluations from 6 faculty members for the period January through June 2011 (NU, TZ, LC, DSK, MK, SN):
Deficiencies noted were as follows:
    Inadequate progress over her first year as a fellow in clinical knowledge and skills
    Need for more detail in collecting necessary clinical information and thinking through differential diagnoses
    Need for more detailed documentation of clinical information and decision making
    Need for timeliness in reviewing out-patient charts with attendings *( not all same )*
    Lack of engagement during divisional conferences
    Literature search and critical topic reviews need to be more detail-oriented and at the level of a fellow

*explained that anxiety disorder prevented engagement during conference*

Performance on the Sub-specialty In-Training Examination:
Score 46% (68 out of 146 questions)
    Well below national average (58 ± 8; n=82)

*Other fellows were told 1st year exam didn't matter*

Evaluation of topic presentation (levothyroxine treatment for urticaria):
Need to be more focused and detailed

Research project:
Need to finalize project on vitamin D status of newborns

*This was an impromptu presentation. Other fellows were graded on presentation they had time to prepare*

The remediation plan discussed was as follows:
1. Should put more attention to detail in clinical evaluations (history, examination, laboratory assessment, differential diagnoses, and management plans), documentation of chart notes and communications with families of patients and other staff.
2. Should prioritize chart reviews with attendings within 2-3 weeks of clinic encounter.
3. Expand knowledge base beyond Sperling textbook, seek review articles and primary literature.
4. In-depth topic reviews, paying attention to the methods sections of papers, statistical tools used and validity of conclusions reached.
5. Be more vocal during divisional conferences in case discussions and literature reviews. Should be an active participant.
6. Actively participate in textbook review sessions.
7. Over the next 2 weeks, write detailed background material for research project, with extensive literature review. Discuss with TZ, RGK, LC and myself.

*This was already done prior to this document*

\*\* *Assigned prepared evaluation — evaluation once.*

DEPOSITION
EXHIBIT
//
PENGAD 800-631-6989

O'Donnell 165

**Additional resources identified to assist Alison:**
1. I will meet with her once every 2 weeks (more frequently if she needs it or wants it) to discuss a variety of clinical cases in-depth.
2. Prep-Endo questions to help her with preparation for SITE and Boards. *This was never provided to me*

**How progress will be tracked:**
1. My own observations and input from other faculty regarding performance at and after clinics, during clinical on-call service and at divisional rounds.
2. Performance on the SITE in March 2012.
3. Input from divisional nurses and ward house-staff. *minimal contact with nurses.*

_____    Date: 08, 09, 2011

Naveen Uli, MD


I agree that I met with Dr. Uli and we discussed the above mentioned matters.


_Alison Matthews_    Date: 8 , 9 , 2011

Alison Matthews, MD


I agree to present cases/review topics during divisional conferences; however due to the hostile nature of these conferences in general, I feel it is un-reasonable (and not educational) to volunteer to speak when I am not presenting as this would be opening inviting verbal abuse from some faculty members.

Although I agree to comply with the above plan, my signature does not represent agreement with the listed deficiencies. In my opinion, the apparent lack of knowledge on my part is due to being a quiet person and not communicating effectively. I will work on my communication skills, but I strongly disagree with the opinion that my overall knowledge is lacking. I will participate in the individualized review sessions

And. complete the prep questions, but I will not accept any penalities or restrictions being placed upon me. as I feel that I have been wrongly accused and in general have been mistreated by this program. A detailed outline of my grievances is attached.

O'Donnell 167

UNIVERSITY HOSPITALS GRADUATE MEDICAL EDUCATION PROGRAMS
PERFORMANCE ALERT NOTICE

Resident: ALISON MATTHEWS     Program: PEDIATRIC ENDOCRINOLOGY

This Performance Alert Notice is to officially inform you of our concern regarding your performance as a resident. Based upon information provided by members of the faculty, your performance in the following marked competencies and/or your conduct has been identified as marginal or unsatisfactory.

☐ **PATIENT CARE.** Resident does not consistently provide patient care that is compassionate, appropriate, and effective for the treatment of health problems and the promotion of health. Resident is expected to:
  ☐ communicate effectively and demonstrate caring and respectful behaviors when interacting with patients and their families
  X **gather essential and accurate information about his/her patients**
  X **make informed decisions about diagnostic and therapeutic interventions based on patient information and preferences, up-to-date scientific evidence, and clinical judgment**
  X **develop and carry out patient management plans**
  ☐ counsel and educate patients and their families
  ☐ use information technology to support patient care decisions and patient education
  ☐ perform competently all medical and invasive procedures considered essential for the area of practice
  ☐ provide health care services aimed at preventing health problems or maintaining health
  ☐ work with health care professionals, including those from other disciplines, to provide patient-focused care

☐ **MEDICAL KNOWLEDGE.** Resident does not consistently demonstrate knowledge about established and evolving biomedical, clinical, and cognate (e.g., epidemiological and social-behavioral) sciences and the application of this knowledge to patient care. Resident is expected to:
  X **demonstrate an investigatory and analytic thinking approach to clinical situations**
  X **know and apply the basic and clinically supportive sciences which are appropriate to his/her discipline**

☐ **PRACTICE-BASED LEARNING AND IMPROVEMENT.** Resident is not able to consistently investigate and evaluate this/her patient care practices, appraise and assimilate scientific evidence, and improve his/her patient care practices. Resident is expected to:
  ☐ analyze practice experience and perform practice-based improvement activities using a systematic methodology
  X **locate, appraise, and assimilate evidence from scientific studies related to his/her patients' health problems**
  ☐ obtain and use information about own population of patients and the larger population from which his/her patients are drawn
  X **be responsive to feedback on performance**
  ☐ apply knowledge of study designs and statistical methods to the appraisal of clinical studies and other information on diagnostic and therapeutic effectiveness
  ☐ use information technology to manage information, access on-line medical information, and support his/her own education

1


DEPOSITION
EXHIBIT
13


EXHIBIT
C

☐ facilitate the learning of students and other health care professionals

☐ **INTERPERSONAL AND COMMUNICATION SKILLS.** Resident does not consistently demonstrate interpersonal and communication skills that result in effective information exchange and teaming with patients, their patients families, and professional associates. Resident is expected to:

    ☐ create and sustain a therapeutic and ethically sound relationship with patients

    ☐ use effective listening skills and elicit and provide information using effective nonverbal, explanatory, questioning, and writing skills

    X **work effectively with others as a member or leader of a health care team or other professional group**

☐ **PROFESSIONALISM.** Resident does not consistently demonstrate a commitment to carrying out professional responsibilities, adherence to ethical principles, and sensitivity to a diverse patient population. Resident is expected to:

    X demonstrate: respect, compassion and integrity; a responsiveness to the needs of patients and society that supercedes self-interest; accountability to patients, society, and the profession; and a commitment to excellence and on-going professional development

    ☐ demonstrate a commitment to ethical principles pertaining to provision or withholding of clinical care, confidentiality of patient information, informed consent, and business practices

    ☐ demonstrate sensitivity and responsiveness to patients' culture, age, gender, and disabilities

☐ **OTHER ESSENTIAL ATTRIBUTES NOT BEING MET THAT ARE NECESSARY TO ACHIEVE QUALIFICATION IN CHOSEN SPECIALTY**

    X Obtain certification in general pediatrics by the American Board of Pediatrics

2

**Program Director comments regarding specific marginal or unsatisfactory performance:**

1. Alison has continued to have difficulty obtaining a complete history, and difficulty formulating a comprehensive assessment and differential and plan, in a consistent manner with every patient she encounters in the in-patient and clinic setting.
2. Although she has steadily improved her fund of endocrine knowledge, she is not functioning at the level of a second year fellow.
3. Sometimes her interpretations of clinical data and laboratory investigations are incomplete.
4. She continues to have difficulty communicating clearly to families and co-workers.
5. Maintenance of patient records and reporting of lab results continue to be unacceptably delayed.
6. She does not respond well to constructive criticism and recommendations for improvement.

**Program Director Recommendations:**

A. Based on the evaluations received from members of the faculty for the period July – December 2011, the specific areas that need attention are as follows:

1. Obtaining complete patient history, formulating comprehensive assessment and plan.
2. Appropriate interpretation of data, based on clinical information and results of investigations ordered.
3. Broadening differential diagnoses by strengthening endocrine fund of knowledge and applying it consistently.
4. Timely completion of charts, with appropriate addenda, reflecting results of ancillary investigations, timely communication with referring physicians.
5. Communication with patients needs to be comprehensive, incorporating information from clinical interactions, laboratory and radiologic data, and after discussing with supervising attending.
6. Positive responsiveness to constructive criticism and recommendations for improvement.
7. Active participation in weekly case conferences and textbook tutorials.
8. Seek opportunities to perform in-depth reviews and presentations on a wide range of endocrine topics.
9. Board certification examination in general pediatrics to be taken in the fall of 2012.

B. Clinical evaluations were discussed at a meeting by members of the faculty on 2/2/2012. Several attendings noted the effort Alison had been putting over the past several months, with improvement in her knowledge base. The consensus, however, was that she is not performing at the level expected of a second year fellow in pediatric endocrinology. The program director and members of the faculty recommend extending her fellowship by 12 months (new completion date will be June 30, 2014). This will allow adequate time for Alison to develop the core competencies that are mandatory to become eligible for sub-specialty certification by the American Board of Pediatrics.

C. We encourage Alison to pursue all opportunities to strengthen her clinical skills and knowledge in the basic science and clinical aspects of pediatric endocrinology. This includes printed and online resources that are available in the division, department and institution. In addition, members of the faculty are available for one-on-one sessions, if Alison wants to continue them.

D. Alison needs to demonstrate continued improvement in her core competencies on her bi-annual faculty evaluations. In addition, I (program director) will seek input from members of the faculty who supervise her in-clinics and on the endocrine in-patient service. Advancement to the next year of training is contingent upon demonstration of satisfactory progress, as assessed by members of the attending faculty and program director by February 2013. Certification of satisfactory completion of fellowship training will also be based on consensus of the divisional faculty.

3

**Resident & Program Director Acknowledgement:**

On this date, I have met with the Program Director regarding my performance in the residency training program. I have read this Performance Alert Notice and the above recommendations by the Program Director. I understand that failure to correct these areas of marginal/unsatisfactory performance could result in any or all of the following: failure of a specific rotation, failure to advance to the next year of training, academic deficiency and remediation, probation, or possible termination of residency training. I understand that this is not a disciplinary action and no appeal is available to me.

_____          _____
Resident Signature                                           Date

_____          _____
Program Director Signature                               Date

Original to **permanently** remain in Resident's file; copy to the Resident.

L:\1994\RFM Performance Alert Notice Form 072506.doc

( 2/29/2012 )

    I discussed this Performance Alert with Dr Alison Matthews in presence of Dr Beth Kaminski.
    After reviewing its contents, Dr Matthews refused to sign it. She stated that she would consider a 6 month extension of her fellowship, but refused extension for 12 months.

4

Summary of Group/Fellow Evaluations

Page 1 of 11

# Summary of Group/Fellow Evaluations
## Fellow Clinical Evaluation (v.1)

University Hospitals
Health System
University Hospitals of Cleveland

### UHC - Division Pediatric Endocrinology

Print Report | Back to Menu

Report Date Range: 02/01/2011 - 02/29/2012
Rotation Name: Endocrinology

Report Date/Time: 3/26/2012 2:52:15 PM

Competency = Average score on competency for selected Fellows
Group = Average score of all FPGY6 represented
Total = Average score of all FPGYs

Interpersonal and Communication Skills - Category Summary (2.52, 52.4%)

| Question: | A.Matthews.5 | Group | Total |
|---|---|---|---|
| Fellows must demonstrate interpersonal and communication skills that result in effective information exchange with patients and colleagues | | | |
| Communicates effectively with patients and families<br><br>Scale of 1-5 (See Bottom) | 2.60 (n=5)<br>52.0% | 3.20 (n=10)<br>64.0% | 3.63 (n=19)<br>72.6% |
| Maintains accurate, timely, complete and legible medical records<br><br>Scale of 1-5 (See Bottom) | 1.80 (n=5)<br>36.0% | 2.80 (n=10)<br>56.0% | 3.26 (n=19)<br>65.2% |
| Use appropriate language at the proper developmental level/educational level for patient, care givers, and family members<br><br>Scale of 1-5 (See Bottom) | 3.00 (n=5)<br>60.0% | 3.30 (n=10)<br>66.0% | 3.68 (n=19)<br>73.6% |
| Communicates with patient and caregiver in the appropriate setting<br><br>Scale of 1-5 (See Bottom) | 3.00 (n=5)<br>60.0% | 3.40 (n=10)<br>68.0% | 3.63 (n=19)<br>72.6% |
| Communicates with referring providers through face-to-face meetings, dictated letters and, if warranted, phone calls in a concise and timely fashion<br><br>Scale of 1-5 (See Bottom) | 2.40 (n=5)<br>48.0% | 2.78 (n=9)<br>55.6% | 3.33 (n=18)<br>66.6% |
| Identifies self and other members of the health care team & explains roles<br><br>Scale of 1-5 (See Bottom) | 3.00 (n=4)<br>60.0% | 3.33 (n=9)<br>66.6% | 3.50 (n=18)<br>70.0% |
| Uses effective listening skills to elicit information<br><br>Scale of 1-5 (See Bottom) | 3.00 (n=5)<br>60.0% | 3.40 (n=10)<br>68.0% | 3.58 (n=19)<br>71.6% |
| Overall performance rating for this competency.<br>Please provide additional comments. | 2.20 (n=5)<br>44.0% | 3.00 (n=10)<br>60.0% | 3.42 (n=19)<br>68.4% |

https://www.myevaluations.com/Reports/Admin/FE/SummaryGroup.asp



DEPOSITION
EXHIBIT
4



EXHIBIT
D

Summary of Group/Fellow Evaluations

### Skills of 1-5 (See Bottom)

- Alison has worked over the past couple of months to improve her chart turn around time. Goal should be to-precept with faculty member within two weeks of seeing the patient.
- Alison needs to endorse her history taking and be more thorough with her evaluation. She needs to pay more attention to detail. Her letters are intermittent while others on these charts, she continues to take too long to get letters out to primary physicians following subspecialty clinic visit. Patients have also stated that they are not being informed about test results in a timely fashion.
- I am not identifying missing information from history that I must inquire about with the parents upon Dr. Matthews presents cases to me. Parents have been satisfied with the communications they receive from Dr. Matthews since I do not receive queries from them at the visits or afterwards. Completion of the faculty review of post-encounter dictations is taking 3-6 weeks - this is similar to the other fellows though it would be more ideal to have these completed in the 2-4 week range.
- Needs to improve timeliness of reviewing charts and communicating with referring providers. This has improved steadily.

### Medical Knowledge - Category Summary (2.29, 45.8%)

| Question: | AMatthews5 | Group | Total |
|---|---|---|---|
| Fellows must demonstrate knowledge about established and evolving biomedical, clinical and epidemiological sciences and the application of this knowledge to patient care | | | |
| Demonstrates sound foundation of knowledge for each of the subspecialty diagnoses we see | 1.80 (n=5) 36.0% | 2.90 (n=10) 58.0% | 3.11 (n=19) 62.2% |
| *Scale of 1-5 (See Bottom)* | | | |
| Understands unique challenges experienced by children and families with chronic diseases | 3.20 (n=5) 64.0% | 3.40 (n=10) 68.0% | 3.42 (n=19) 68.4% |
| *Scale of 1-5 (See Bottom)* | | | |
| Understands basic and clinical science underpinnings of endocrine axes and endocrine disorders | 2.00 (n=5) 40.0% | 2.80 (n=10) 56.0% | 3.05 (n=19) 61.0% |
| *Scale of 1-5 (See Bottom)* | | | |
| Facilitates education of students and other health care professionals | 2.25 (n=4) 45.0% | 2.88 (n=8) 57.6% | 3.18 (n=17) 63.6% |
| *Scale of 1-5 (See Bottom)* | | | |
| Identifies areas for improvement of self-knowledge and demonstrates a willingness to be a life-long learner | 2.60 (n=5) 52.0% | 3.40 (n=10) 68.0% | 3.53 (n=19) 70.6% |
| *Scale of 1-5 (See Bottom)* | | | |
| Critically evaluates current medical information | 2.40 (n=5) 48.0% | 3.10 (n=10) 62.0% | 3.21 (n=19) 64.2% |
| *Scale of 1-5 (See Bottom)* | | | |
| Applies knowledge with attention to clinical outcome, cost-effectiveness, risk benefit, and patient preference | 2.25 (n=4) 45.0% | 3.11 (n=9) 62.2% | 3.17 (n=18) 63.4% |
| *Scale of 1-5 (See Bottom)* | | | |
| | 1.80 (n=5) | 2.90 (n=30) | 2.95 (n=19) |

Summary of Group/Fellow Evaluations

| | 36.0% | 58.0% | 59.0% |
|---|---|---|---|
| Overall performance rating for this competency. Please provide additional comments. | | | |

Scale of 1-5 (See Bottom)

- Alison continues to be eager to learn. She, again, has potential over the next few months, and I encourage her to continue this increased effort to enhance competence.
- Alison does not participate in conferences and comes underprepared and disengaged from didactic conferences. When she presents a topic, it is usually a superficial review, and rarely at the level expected of a second year fellow. When asked to form a differential diagnosis, she is unable to come up with an exhaustive list. I have seldom double check for her knowledge base. During Fellow Board review sessions, when in a small group, informal sessions, she stays quiet and does not participate. I have rarely seen her take initiative to teach residents or medical students on the team. She functions at the level of a pediatric resident and not at the level of a fellow in pediatric endocrinology.
- For "Foundation of knowledge in each diagnosis" - I estimate that she has competent knowledge in 50-70% of diagnoses and the limitations are in diagnoses that she has not had clinical exposure to as a result of their rare occurrence. In the 2nd year, I would be aiming for competent knowledge to be in ~80% of areas and beginning to focus on details and rarer conditions. She is, however, able to identify these areas of weakness and is working at building knowledge in those areas. Main opportunity to assess teaching skills with residents/med students is when on hospital service which only occurred during 1st week of July 2011 - so don't feel can assess. On patient by patient basis have found situations in which have discussed aspects of knowledge that needed to be added to clinical considerations but often these are details that are not directly related to the "chief complaint" or reason for followup.
- Alison has improved her medical knowledge, but needs to expand her understanding of basic science underlying endocrine disorders.

### Patient Care and Procedural Skills - Category Summary (2.50, 50.0%)

| Question: | AMatthews5 | Group | Total |
|---|---|---|---|
| Fellows must be able to provide patient care that is compassionate, appropriate and effective for the treatment of health problems and the promotion of health | | | |
| Obtains a focused history for each of the specialty diagnoses we see | 2.40 (n=5) 48.0% | 3.00 (n=10) 60.0% | 3.37 (n=19) 67.4% |
| Scale of 1-5 (See Bottom) | | | |
| Utilizes medical literature and information technology to inform and support patient care decisions and to educate patients | 2.60 (n=5) 52.0% | 3.30 (n=10) 66.0% | 3.42 (n=19) 68.4% |
| Scale of 1-5 (See Bottom) | | | |
| Obtains appropriate laboratory and radiographic studies to evaluate differential diagnoses and establish final diagnosis | 2.60 (n=5) 52.0% | 3.20 (n=10) 64.0% | 3.26 (n=19) 65.2% |
| Scale of 1-5 (See Bottom) | | | |
| Obtains results of laboratory and radiographic studies in a timely fashion | 2.20 (n=5) 44.0% | 2.70 (n=10) 54.0% | 3.21 (n=19) 64.2% |
| Scale of 1-5 (See Bottom) | | | |
| Accurately interprets test results, including results of endocrine stimulation tests | 2.20 (n=5) 44.0% | 2.90 (n=10) 58.0% | 3.11 (n=19) 62.2% |
| Scale of 1-5 (See Bottom) | | | |
| Demonstrates ability to read bone age X-rays | 3.00 (n=2) 60.0% | 3.50 (n=6) 70.0% | 3.38 (n=13) 67.6% |
| Scale of 1-5 (See Bottom) | | | |
| Obtains a directed physical examination for each of the specialty diagnoses we seen, incorporating necessary endocrine-specific | 3.00 (n=5) 50.0% | 3.40 (n=10) 68.0% | 3.53 (n=19) 70.6% |

Summary of Group/Fellow Evaluations

elements.

| Scale of 1-5 (See Bottom) | | | |
|---|---|---|---|
| Formulates and prioritizes a differential diagnosis based on patient information, current scientific evidence and sound clinical judgment | 2.20 (n=5) 44.0% | 3.00 (n=10) 60.0% | 3.21 (n=19) 64.2% |
| Scale of 1-5 (See Bottom) | | | |
| Synthesizes evidence in making therapeutic decisions and employs the therapeutic management of choice for a given working diagnosis | 2.20 (n=5) 44.0% | 3.00 (n=10) 60.0% | 3.21 (n=19) 64.2% |
| Scale of 1-5 (See Bottom) | | | |
| Provides appropriate health maintenance and preventative measures based on age, gender, risk factors, and developmental stage | 3.00 (n=4) 60.0% | 3.33 (n=8) 66.6% | 3.56 (n=18) 71.2% |
| Scale of 1-5 (See Bottom) | | | |
| Identifies appropriate community resources to address patient needs | 2.75 (n=4) 55.0% | 3.11 (n=9) 62.2% | 3.28 (n=18) 65.6% |
| Scale of 1-5 (See Bottom) | | | |
| Counsels and educates patients and families regarding diagnostic and management plans | 2.80 (n=5) 56.0% | 3.20 (n=10) 64.0% | 3.58 (n=19) 71.6% |
| Scale of 1-5 (See Bottom) | | | |
| Overall performance rating for this competency. Please provide additional comments: | 2.00 (n=5) 40.0% | 3.00 (n=10) 60.0% | 3.21 (n=19) 64.2% |
| Scale of 1-5 (See Bottom) | | | |

- I have noticed improvement in Alison's differentials in one on one meetings, but when presented with "new to her" cases in conference, she is still hesitant to offer a detailed differential. I encourage to be less shy about her thoughts and to demonstrate her competency!
- Alison needs to be more detail oriented and develop the skills and knowledge base to form a broad differential for the diagnoses we see. I am concerned that she sometimes leaves out vital pieces of information, for example, she left out the height and weight on a patient we were consulting on for failure to thrive.
- In the areas in which she has sound knowledge she is competent with history and management. There have been occasions in which interpretation of labs have been more superficial or inexact relative to my expectation which have no serious implications for the patient's care but result in inadequate communication with the referring physician. In each situation, it has been discussed with Dr. Matthews during the chart review and completion of the dictation - and will continue to be monitored by me to confirm that this has been mastered.
- Alison needs to be consistent in discussing all aspects of a patient's history toward generating a broad differential diagnosis on every patient she encounters. She also should discuss with her attendings, laboratory investigations and radiologic studies in a timely manner, before communicating test results and recommendations to patients and their families.
- 

Practice-Based Learning and Improvement - Category Summary (2.62, 52.4%)

| Question: | AMatthews5 | Group | Total |
|---|---|---|---|
| Fellows must be able to investigate and evaluate their patient care practices, appraise and assimilate scientific evidence and improve patient care practices | | | |
| Critically evaluates current scientific literature using principles of evidence-based medicine | 2.50 (n=4) 50.0% | 3.22 (n=9) 64.4% | 3.28 (n=18) 65.6% |

Summary of Group/Fellow Evaluations

| | | | |
|---|---|---|---|
| *Scale of 1-5 (See Bottom)* | | | |
| Accepts feedback appropriately and acts on areas identified for improvement | 2.40 (n=5) 48.0% | 3.10 (n=10) 62.0% | 3.53 (n=19) 70.5% |
| *Scale of 1-5 (See Bottom)* | | | |
| Uses information technology to manage information, access on-line medical information and support own education | 3.00 (n=5) 60.0% | 3.50 (n=10) 70.0% | 3.68 (n=19) 73.6% |
| *Scale of 1-5 (See Bottom)* | | | |
| Obtains information from their own patient population and the larger population from which their patients are drawn to formulate decisions | 2.80 (n=5) 56.0% | 3.30 (n=10) 66.0% | 3.47 (n=19) 69.4% |
| *Scale of 1-5 (See Bottom)* | | | |
| Acquires knowledge through utilization of appropriate resources (e.g. texts/literature, attendings, electronic sources, conferences) | 2.80 (n=5) 56.0% | 3.30 (n=10) 66.0% | 3.58 (n=19) 71.6% |
| *Scale of 1-5 (See Bottom)* | | | |
| Seeks opportunities to strengthen deficits in knowledge and skills | 2.80 (n=5) 56.0% | 3.20 (n=10) 64.0% | 3.47 (n=19) 69.4% |
| *Scale of 1-5 (See Bottom)* | | | |
| Applies knowledge of study designs and statistical methods to the appraisal of clinical studies and other information on diagnostic and therapeutic effectiveness | 2.33 (n=3) 46.6% | 3.00 (n=7) 60.0% | 3.19 (n=16) 63.8% |
| *Scale of 1-5 (See Bottom)* | | | |
| Overall performance rating for this competency. *Please provide additional comments:* | 2.20 (n=5) 44.0% | 3.00 (n=10) 60.0% | 3.26 (n=19) 65.2% |
| *Scale of 1-5 (See Bottom)* | | | |

- It is very difficult to provide Alison with feedback, as she does not seem to be open to any suggestions. As a second year fellow, I would expect her to be polishing the skills she acquired as a first year fellow, but instead, I still find her struggling with the basics.
- This core competency implies ability to independently recognize one's deficits and correct them. The initial recognition of deficits required feedback from the faculty in the fall but, subsequently, Dr. Matthews sought feedback from me regarding her performance and mastery of the endocrine knowledge base, then identified areas of weaknesses she wanted to correct followed by studying topics independently then spending hours of additional one-on-one discussion time with me to systematically master the identified deficits. She has also obtained additional textbooks and manuscripts to expose herself to the same subject matter from different angles. This process is ongoing. Evidence-based current lit review is best assessed during journal club presentations and endocrine sections and I will leave that assessment to my colleagues.
- Needs to perform literature reviews in more depth. Needs more initiative and active participation at our weekly case conferences and textbook chapter review.

### Professionalism - Category Summary (2.65, 53.0%)

| Question: | AMatthews5 | Group | Total |
|---|---|---|---|
| Fellows must demonstrate a commitment to professional responsibilities, adherence to ethical principles, and sensitivity to a diverse patient population | | | |

Summary of Group/Fellow Evaluations                           Page 6 of 11

| | | | |
|---|---|---|---|
| Demonstrates compassion and respect for others<br><br>*Scale of 1-5 (See Bottom)* | 3.40 (n=5)<br>68.0% | 3.70 (n=10)<br>74.8% | 3.89 (n=18)<br>77.8% |
| Demonstrates sensitivity and responsiveness to patients' culture, ethnicity, age, gender, and disabilities<br><br>*Scale of 1-5 (See Bottom)* | 3.60 (n=5)<br>72.0% | 3.80 (n=10)<br>76.0% | 3.95 (n=19)<br>79.0% |
| Acts with honesty and integrity<br><br>*Scale of 1-5 (See Bottom)* | 2.80 (n=5)<br>56.0% | 3.40 (n=10)<br>68.0% | 3.79 (n=19)<br>75.8% |
| Engages in ethical medical practices<br><br>*Scale of 1-5 (See Bottom)* | 3.00 (n=4)<br>60.0% | 3.44 (n=9)<br>68.8% | 3.83 (n=18)<br>76.6% |
| Demonstrates productive work habits including punctuality, effective time management, initiative and organization<br><br>*Scale of 1-5 (See Bottom)* | 2.00 (n=5)<br>40.0% | 2.70 (n=10)<br>54.0% | 3.26 (n=19)<br>65.2% |
| Works effectively with other members of the health care team<br><br>*Scale of 1-5 (See Bottom)* | 2.80 (n=5)<br>56.0% | 3.40 (n=10)<br>68.0% | 3.74 (n=19)<br>74.8% |
| Takes ownership and responsibility for patient care<br><br>*Scale of 1-5 (See Bottom)* | 2.80 (n=5)<br>56.0% | 3.30 (n=10)<br>66.0% | 3.74 (n=19)<br>74.8% |
| Responds positively to constructive criticism<br><br>*Scale of 1-5 (See Bottom)* | 2.20 (n=5)<br>44.0% | 3.00 (n=10)<br>60.0% | 3.47 (n=19)<br>69.4% |
| Understands role of peer review as it relates to professional accountability<br><br>*Scale of 1-5 (See Bottom)* | 2.40 (n=5)<br>48.0% | 2.89 (n=9)<br>57.8% | 3.07 (n=15)<br>61.4% |
| Understands role of expected professional behavior of a consultant<br><br>*Scale of 1-5 (See Bottom)* | 2.20 (n=5)<br>44.0% | 3.00 (n=10)<br>60.0% | 3.37 (n=19)<br>67.4% |
| Demonstrates a commitment to on-going professional development through regular attendance at conferences and reading medical literature<br><br>*Scale of 1-5 (See Bottom)* | 2.60 (n=5)<br>52.0% | 3.00 (n=10)<br>60.0% | 3.58 (n=19)<br>71.6% |
| Fellow responds to pages and calls in a timely manner<br><br>*Scale of 1-5 (See Bottom)* | 3.00 (n=5)<br>60.0% | 3.20 (n=10)<br>64.0% | 3.58 (n=19)<br>71.6% |

Summary of Group/Fellow Evaluations

| | 2.00 (n=5) 40.0% | 2.60 (n=10) 52.0% | 3.32 (n=19) 66.4% |
|---|---|---|---|
| Fellow is timely in Patient follow-up | | | |
| Scale of 1-5 (See Bottom): | | | |
| Overall performance rating for this competency. Please provide additional comments: | 2.43 (n=6) 48.6% | 3.10 (n=10) 62.0% | 3.37 (n=19) 67.4% |
| Scale of 1-5 (See Bottom) | | | |

- Alison is improving in this area as well.
- It is difficult to work with Alison. I am not yet able to trust that she will do the right thing while on service with her. She is not open to constructive criticism.
- Dr. Matthews has faced the challenges of her knowledge acquisition with grace and determination. She appears to enjoy her interactions with patients and families, who in turn have seemed to respect her. She also exhibits intellectual curiosity and ability to prioritize the process of further acquisition of knowledge upon a foundation.
- Has been more responsive to feedback. Improve turnaround time of chart notes.

| System-Based Practices - Category Summary (2.97, 59.4%) | A.Matthews5 | Group | Total |
|---|---|---|---|
| Question: | | | |
| Fellows must demonstrate an awareness of and responsiveness to the larger context and system of health care to provide care that is of optimal value | | | |
| Practices cost-effective health care and resource allocation that does not compromise quality of care. Considers cost benefit analysis in providing clinical care | 3.00 (n=4) 60.0% | 3.25 (n=8) 65.0% | 3.25 (n=16) 65.0% |
| Scale of 1-5 (See Bottom) | | | |
| Advocates for quality patient care and assists patients in dealing with system complexities | 3.00 (n=4) 60.0% | 3.33 (n=9) 66.6% | 3.56 (n=18) 71.2% |
| Scale of 1-5 (See Bottom) | | | |
| Utilizes clinical guidelines/care paths effectively when appropriate | 3.00 (n=5) 60.0% | 3.40 (n=10) 68.0% | 3.47 (n=19) 69.4% |
| Scale of 1-5 (See Bottom) | | | |
| Is familiar with documentation criteria for different levels of care | 2.80 (n=5) 56.0% | 3.10 (n=10) 62.0% | 3.11 (n=19) 62.2% |
| Scale of 1-5 (See Bottom) | | | |
| Recognizes potential conflicts of interest between individual patients and their health care organizations and advocates on the patient's behalf | 3.00 (n=3) 60.0% | 3.29 (n=7) 65.8% | 3.38 (n=16) 67.6% |
| Scale of 1-5 (See Bottom) | | | |
| Understands how types of medical practice and delivery systems differ from one another, including methods for controlling health care costs and allocating resources | 3.00 (n=3) 60.0% | 3.29 (n=7) 65.8% | 3.19 (n=16) 63.8% |
| Scale of 1-5 (See Bottom) | | | |
| Overall performance rating for this competency. Please provide additional comments: | 3.00 (n=5) 60.0% | 3.30 (n=10) 66.0% | 3.16 (n=19) 63.2% |

Summary of Group/Fellow Evaluations

Scale of 1-5 (See Bottom)

- Cannot recall any socially or economically challenged patients for which I observed how Dr. Matthews handled the situation.

**Overall Summary**

| Question: | AMatthews5 | Group | Total |
|---|---|---|---|
| Rate this fellow's performance on the clinical performance as expected for his/her level of training. | 1.00 (n=5) 33.3% | 1.80 (n=10) 60.0% | 2.16 (n=19) 72.0% |

AMatthews5:Alison has made consistent effort to improve her performance all around!
Areas of strengths:

Scale of Free Form (See Bottom)

AMatthews5:Expand endocrine knowledge base
Areas for growth and development:

Scale of Free Form (See Bottom)

AMatthews5:Close the gap on outpt chart turn around time and push to give detailed differentials of endocrine disorders
Goals for next 6 months:

Scale of Free Form (See Bottom)

AMatthews5:not performed by me
Patient encounter observed in its entirety on (Please provide a date. Required at least once/year):

Scale of Free Form (See Bottom)

| Should this fellow's performance receive special review by the Pediatric Endocrinology Education Committee? | Yes(n=5) No(n=0) | Yes(n=5) No(n=4) | Yes(n=5) No(n=12) |
|---|---|---|---|

Scale of 5=Yes/1=No/3=NA (See Bottom)

**Comments Section:**

**Alison Matthews**

Additional Comments:
Explanation for a score of 2 out of 5 for Interpersonal and Communication Skills: chart notes are delayed from visit times...up to one month or more; need to be certain to add addendums to medical chart notes
Explanation for a score of 2 out of 5 for Medical Knowledge: Speak up! We don't know what you are thinking if you don't share your differentials! This is improving in one on one meetings...
Explanation for a score of 2 out of 5 for Medical Knowledge: Continue your progress in this area....you are closing the gap.
Explanation for a score of 2 out of 5 for Medical Knowledge: This skill set is developing....
Explanation for a score of 2 out of 5 for Medical Knowledge: Competency is improving with time.

Summary of Group/Fellow Evaluations

Explanation for a score of 2 out of 5 for Patient Care and Procedural Skills: Keep up with lab results so that subsequent testing is performed to a lag in communication medications not started

Explanation for a score of 2 out of 5 for Patient Care and Procedural Skills: Developing...remember to get baby in the context of the patient.

Explanation for a score of 3 out of 5 for Patient Care and Procedural Skills: Alison's working diligently in this area.

Explanation for a score of 2 out of 5 for Patient Care and Procedural Skills: Continue to work on this over the next few months.

Explanation for a score of 2 out of 5 for Patient Care and Procedural Skills: Keep working hard...you are progressing!

Explanation for a score of 2 out of 5 for Professionalism: Timeliness is improving...

Explanation for a score of 2 out of 5 for Interpersonal and Communication Skills: Work to communicate with team more effectively.

Explanation for a score of 2 out of 5 for Professionalism: I encourage Alison to accept comments and more call

Explanation for a score of 2 out of 5 for Practice-Based Learning and Improvement: improving

Explanation for "Meeting Expectations" score for Overall/Summary: Alison's improved in this area overall.

Explanation for "Meeting Expectations" score for Overall/Summary (FEA20070): There has been a noticeable improvement in Alison's work, and I think with recognition she will reach her goals.

Explanation for a score of Yes out of YN for Overall/Summary: There has been a noticeable improvement in Alison's work, and I think with more time she will reach her goals.

Additional Comments:
Explanation for a score of 2 but out of 5 for Interpersonal and Communication Skills: See comments
Explanation for a score of 1 out of 5 for Interpersonal and Communication Skills: see comments
Explanation for a score of 1 out of 5 for Interpersonal and Communication Skills: see comments
Explanation for a score of 1 out of 5 for Interpersonal and Communication Skills: see comments
Explanation for a score of 1 out of 5 for Medical Knowledge: see comments
Explanation for a score of 2 out of 5 for Medical Knowledge: see comments
Explanation for a score of 1 out of 5 for Medical Knowledge: see comments
Explanation for a score of 1 out of 5 for Medical Knowledge: see comments
Explanation for a score of 1 out of 5 for Medical Knowledge: see comments
Explanation for a score of 1 out of 5 for Patient Care and Procedural Skills: see comments
Explanation for a score of 2 out of 5 for Patient Care and Procedural Skills: see comments
Explanation for a score of 1 out of 5 for Patient Care and Procedural Skills: see comments
Explanation for a score of 1 out of 5 for Patient Care and Procedural Skills: see comments
Explanation for a score of 2 out of 5 for Patient Care and Procedural Skills: see comments
Explanation for a score of 1 out of 5 for Patient Care and Procedural Skills: see comments
Explanation for a score of 1 out of 5 for Patient Care and Procedural Skills: see comments
Explanation for a score of 2 out of 5 for Patient Care and Procedural Skills: see comments
Explanation for a score of 2 out of 5 for Practice-Based Learning and Improvement: see comments
Explanation for a score of 1 out of 5 for Practice-Based Learning and Improvement: Needs to be more active in researching and critically reviewing literature.
Explanation for a score of 1 out of 5 for Practice-Based Learning and Improvement: see comments
Explanation for a score of 1 out of 5 for Practice-Based Learning and Improvement: see comments
Explanation for a score of 1 out of 5 for Practice-Based Learning and Improvement: see comments
Explanation for a score of 2 out of 5 for Practice-Based Learning and Improvement: see comments
Explanation for a score of 1 out of 5 for Practice-Based Learning and Improvement: see comments
Explanation for a score of 1 out of 5 for Professionalism: see comments
Explanation for a score of 1 out of 5 for Professionalism: see comments
Explanation for a score of 1 out of 5 for Professionalism: see comments .
Explanation for a score of 1 out of 5 for Professionalism: see comments
Explanation for a score of 1 out of 5 for Professionalism: see comments
Explanation for a score of 2 out of 5 for Professionalism: see comments
Explanation for a score of 2 out of 5 for Professionalism: see comments
Explanation for "Below Expectations" score for Overall/Summary (FSA30070): Alison still works at the level of a first year fellow.
Explanation for a score of Yes out of YN for Overall/Summary: I am very concerned about Alison's performance, her knowledge base and her professionalism.

Additional Comments:
Explanation for a score of 2 out of 5 for Interpersonal and Communication Skills: Although prior to Fall 2011 had greater than 8 week delay in reviewing some charts with me and now is within 3-4 weeks after actual patient visit, still I feel that it should be within 3-4 weeks of the visit that report on actual visit be reviewed and signed because irrespective of whether patient has obtained recommended lab studies ordered at the time of the visit.
Explanation for a score of 2 out of 5 for Medical Knowledge: The key word is "each". For those problems that are rare or not personally seen by Dr Muirhead to this date, there has been need to lay the foundation with regard to diagnostic workup, interpretation and some basic science knowledge.
Explanation for a score of 2 out of 5 for Medical Knowledge: Discussion of supervised cases has suggested deficits or failure to recognize complete differential for specific areas such as metabolic bone disease, lipid disorders and aspects of delayed puberty that may reflect hypothalamic dysfunction. Quackas of knowledge suggests deficits in knowledge of new technology details and fine details of diabetes and its complications are also not fully understood.
Explanation for a score of 2 out of 5 for Medical Knowledge: Previous conference presentations have not necessarily included recent manuscript publications but rather summaries tied or review articles thus can't assess knowledge such recent info. This may not yet be occurring due to the need in form a solid foundation within which to contextualize new knowledge being published.
Explanation for a score of 2 out of 5 for Medical Knowledge: Limitations to application of knowledge are primarily due to limitation in knowledge, however, their are examples in which information was not critically assessed before interpreting its meaning for a given patient (i.e. delayed menses relative to single value of LH, FSH and estradiol).
Explanation for a score of 2 out of 5 for Medical Knowledge: Additional comments are sufficient explanation.
Explanation for a score of 2 out of 5 for Patient Care and Procedural Skills: Key word is "each" as discussed above. At times history of current illness a bit too focused while review of systems too comprehensive - these can potentially affect efficiency said only rarely have potential adversity

to patient care.
Explanation for a score of 2 out of 5 for Patient Care and Procedural Skills: Can't recall examples in which she was able to discuss a case
and demonstrate that she had done a thorough review or sought multiple texts to address patient care decisions. I am not aware of any distribution
of educational information beyond the verbal explanation to patients OR in didactics beyond this material already produced with one section by Dr.
Nussbaum and diabetes mini-lectures.
Explanation for a score of 2 out of 5 for Patient Care and Procedural Skills: Examples that come to mind include above summary of delayed
ingress patient.
Explanation for a score of 2 out of 5 for Patient Care and Procedural Skills: I have no further additional comments.
Explanation for "Below Expectations" score for Overall Summary (FEA30070): At stated elsewhere, I am of the opinion that at this stage
there should be a mastery of the textbook of concepts including matching along with evidence of meticulousness and precision with the clinical
information and interpretation. The systematic explanation of why and how this should be done begin to be explained to her in November and due
to her infrequent clinics relative to my rotation I have not had sufficient opportunity/passage of time to observe improvement. The decrease in
turnover time between visit and discussion with me will also afford more opportunities to model and teach these aspects of "clinical performance"
but are likely to require at least 3 months longer.
Explanation for a score of Yes out of Y/N for Overall Summary: I feel that it is very important for the full committee to read the detailed
observations that I have recorded above rather than merely reviewing the scores in order to get a full sense of my assessment of her knowledge
and performance at this stage in her training.

---

Additional Comments:
Explanation for a score of 2 out of 5 for Interpersonal and Communication Skills: Needs to improve turnaround time of chart notes and
discussion of patient test results.
Explanation for a score of 2 out of 5 for Interpersonal and Communication Skills: improve turnaround time for communicating with referring
providers.
Explanation for a score of 2 out of 5 for Interpersonal and Communication Skills: Turnaround time of charts and communications.
Explanation for a score of 2 out of 5 for Medical Knowledge: Needs to expand on clinical knowledge of endocrine physiology and
pathophysiology and management of the various pediatric endocrine disorders.
Explanation for a score of 2 out of 5 for Medical Knowledge: Needs to expand her understanding of the basic science of pediatric endocrine
disorders.
Explanation for a score of 2 out of 5 for Medical Knowledge: Literature review needs to be performed consistently with more depth and scope.
Explanation for a score of 2 out of 5 for Medical Knowledge: Alison has steadily improved her knowledge in pediatric endocrinology, but is still
below what is expected for her training level.
Explanation for a score of 2 out of 5 for Patient Care and Procedural Skills: Needs to discuss lab and radiology tests with her attending in a
more timely manner, so as to improve efficiency of clinical care.
Explanation for a score of 2 out of 5 for Patient Care and Procedural Skills: Alison has steadily improved, but is still below what is expected for
her training level.
Explanation for a score of 2 out of 5 for Practice-Based Learning and Improvement: Literature review needs to be more critical and in depth.
Explanation for a score of 2 out of 5 for Practice-Based Learning and Improvement: Needs to work on being more critical of literature.
Explanation for a score of 2 out of 5 for Professionalism: Needs to make turnaround time of charts more efficient.
Explanation for a score of 2 out of 5 for Professionalism: Turnaround time of charts.
Explanation for "Below Expectations" score for Overall Summary (FEA30070): Alison is making steady improvement across all core
competencies. However, she is still below what is expected at her training level.
Explanation for a score of Yes out of Y/N for Overall Summary: I will discuss Alison's clinical evaluations with other members of the divisional
faculty.

---

Additional Comments:
Explanation for a score of 2 out of 5 for Interpersonal and Communication Skills: Seems to be working on improving communication, but
complex endocrine diagnoses require clear explanations which Alison sometimes has difficulty with.
Explanation for a score of 2 out of 5 for Interpersonal and Communication Skills: Has sometimes taken months to complete dictations and
edit transcriptions.
Explanation for a score of 2 out of 5 for Interpersonal and Communication Skills: Dictations themselves are very brief and do not always
convey what she is thinking, especially in the assessment section.
Explanation for a score of 2 out of 5 for Medical Knowledge: Endocrine knowledge seems below average from what I can tell. Does not often
contribute to differential diagnosis during case discussions in conference.
Explanation for a score of 2 out of 5 for Medical Knowledge: Assessments in her clinic and consult notes are brief without detailed differentials.
Does not yet convey thorough understanding of endocrine.
Explanation for a score of 2 out of 5 for Medical Knowledge: Should be more active in daily rounds.
Explanation for a score of 2 out of 5 for Medical Knowledge: Presentations in conference have been somewhat basic without delving into
details which she should address at the fellow level.
Explanation for a score of 2 out of 5 for Medical Knowledge: Overall needs to work on developing a sound fund of endocrine knowledge and be
able to demonstrate her knowledge through oral or written means.
Explanation for a score of 2 out of 5 for Patient Care and Procedural Skills: Sometimes has trouble interpreting complex lab results.
Explanation for a score of 2 out of 5 for Patient Care and Procedural Skills: Often has very limited differentials.
Explanation for a score of 2 out of 5 for Patient Care and Procedural Skills: Does not always seek literature.
Explanation for a score of 2 out of 5 for Patient Care and Procedural Skills: Grade 3.
Explanation for a score of 2 out of 5 for Patient Care and Procedural Skills: Needs to be more effective in communicating plans to families.
Explanation for a score of 2 out of 5 for Patient Care and Procedural Skills: Efficient at obtaining history and physical. Often misses key
history points such as family or social history, at least in her inpatient consults. Needs to work on developing complete
differentials.
Explanation for a score of 2 out of 5 for Practice-Based Learning and Improvement: Presentations and reviews of medical literature are often
superficial and basic.
Explanation for a score of 1 out of 5 for Practice-Based Learning and Improvement: She agrees to work on areas for improvement, but has
been very upset and angry when these are suggested.
Explanation for a score of 2 out of 5 for Practice-Based Learning and Improvement: Often seems uninterested in weekly conference and
does not actively participate.
Explanation for a score of 2 out of 5 for Practice-Based Learning and Improvement: needs to actively acquire more knowledge.

## Summary of Group/Fellow Evaluations

Explanation for a score of 2 out of 5 for Practice-Based Learning and Improvement: Have not seen evidence of this in her practice.
Explanation for a score of 2 out of 5 for Practice-Based Learning and Improvement: Needs to develop knowledge base, expand differentials and read to improve her expertise.
Explanation for a score of 3 out of 5 for Professionalism: Grade is 3.
Explanation for a score of 2 out of 5 for Professionalism: poor response to feedback.
Explanation for a score of 2 out of 5 for Professionalism: Has taken months to complete charts. Several patients have called multiple times for lab results without response.
Explanation for a score of 2 out of 5 for Professionalism: Does not always work effectively with nurses and secretaries.
Explanation for a score of 2 out of 5 for Professionalism: Several patients have called multiple times for lab results without response.
Explanation for a score of 1 out of 5 for Professionalism: Does not respond well to constructive criticism. Has become angry and defensive.
Explanation for a score of 1 out of 5 for Professionalism: Has not responded well to peer review.
Explanation for a score of 1 out of 5 for Professionalism: Has not always responded appropriately to requests for consultations.
Explanation for a score of 2 out of 5 for Professionalism: Attends conference but is not active.
Explanation for a score of 2 out of 5 for Professionalism: Has taken months to complete charts. Several patients have called multiple times for lab results without response.
Explanation for a score of 2 out of 5 for Professionalism: Does not respond well to feedback. Not timely in patient communication.
Explanation for a score of 2 out of 5 for System-Based Practices: Documentation is often too brief for the level of care being provided.
Explanation for a score of 2 out of 5 for System-Based Practices: Grade is 3.
Explanation for "Below Expectations" score for OverallSummary (FEA30070): Details noted above in each section. Needs better fund of knowledge, communication skills and interaction with patients and team.
Explanation for a score of Yes out of Y/N for OverallSummary: Details noted above in each section. Needs better fund of knowledge, communication skills, and interaction with patients and health care team.

| Statistical Analysis Based on a Scale of 1-5 | | | | | |
|---|---|---|---|---|---|
| n | Std Dev | Median | Mean | Variance | High & Low |
| 5 | 0.83 | 3 | 2.61 | 0.68 | 5 & 1 |

**MULTIPLE SCALES:**

- Line Text Area (100 Character Limit)
- Medium Text Area
- No Answer Scale (Blank)
- Proficiency Level One
- Performance Scale
- Qualitative Assessment (Two)
- Yes/No-EW (Yes)

This document contains confidential peer review information to be used in the assessment of the quality of the delivery of healthcare. This document and the information in it are confidential and should not be distributed outside the relevant review committees.

A confidential report prepared for UHC - Division Pediatric Endocrinology. Copyright © 1998-2012 MyEvaluations.com