# EXHIBIT C

```
           IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF OHIO
                      EASTERN DIVISION

                          - - -

   ALISON O'DONNELL,

              Plaintiff,
        vs.                        Case No. 1:16-cv-2450
                                   Judge Donald E. Nugent
   UNIVERSITY HOSPITALS
   HEALTH SYSTEM, et al.,

              Defendants.

                          - - -

           DEPOSITION OF NAVEEN K. ULI, M.D.
                   Monday, August 7, 2017

                          - - -
```

The deposition of NAVEEN K. ULI, M.D., a Defendant herein, called for examination by the Plaintiff under the Federal Rules of Civil Procedure, taken before me, Diane M. Stevenson, a Registered Diplomate Reporter, Certified Realtime Reporter, and Notary Public in and for the state of Ohio, pursuant to notice, at The Spitz Law Firm, 25200 Chagrin Blvd., Suite 200, Beachwood, Ohio, commencing at 12:07 p.m., the day and date above set forth.

```
             Stevenson Reporting Service, Inc.
          2197 Macon Court    Westlake, Ohio 44145
                 440.892.8600   diane@nls.net
```

1    Dr. O'Donnell about her being able to speak up
2    or be more involved with these Wednesday
3    conferences and she said, "Well, I am shy," and
4    then she talked about her background and talked
5    about -- said she has social anxiety, what was
6    your response to that?
7 A.  Well, that was a big discussion among our own
8    faculty as to how can they accommodate that.
9    And all the faculty and me believe, and to this
10   day believe, that that is a critical part of
11   fellowship training for many reasons.
12       One, it tells us the depth of a person's
13   thinking of a certain problem, we can evaluate
14   that, and that allows us to evaluate the
15   fellow's critical thinking skills, the depth of
16   knowledge, the approach to clinical medicine,
17   and their problem-solving skills, which are an
18   integral part of fellowship training, both for
19   training and for us to evaluate how they are
20   doing in terms of their various competencies
21   during the fellowship training.
22       And secondly, communication is a critical
23   aspect of a role of a consultant once you get a
24   job.  So we thought that that was really
25   important and we couldn't really excuse her

|   |   |   |
|---|---|---|
| 1 |   | you discuss other possible alternatives of |
| 2 |   | evaluation other than what I would call the |
| 3 |   | cold-calling approach and where you just pose a |
| 4 |   | question? |
| 5 |   | Did you consider whether or not she could |
| 6 |   | receive the same education and be evaluated in |
| 7 |   | the same way if she was allowed to have some |
| 8 |   | preparation as to these questions before being |
| 9 |   | cold-called? |
| 10 | A. | No, because that is the expectation of all |
| 11 |   | fellows because that is a critical function of |
| 12 |   | a consultant. |
| 13 | Q. | Did you consider whether or not she could have |
| 14 |   | been cold-called on or given or have these |
| 15 |   | questions raised either by you or another |
| 16 |   | faculty member maybe in a more private setting |
| 17 |   | instead of being in this larger environment? |
| 18 | A. | No. |
| 19 | Q. | Would that have been -- would that have been a |
| 20 |   | successful way to evaluate her knowledge on |
| 21 |   | these issues? |
| 22 | A. | I don't think so, because you -- and that is a |
| 23 |   | critical function for training and for function |
| 24 |   | as an endocrinologist, because you might be |
| 25 |   | with a patient and, as you visit the patient, |

|    |    |    |
|---|---|---|
| 1  |    | the patient parent asks you questions, and you |
| 2  |    | would be forced to answer there right then, and |
| 3  |    | there is no time to go back and say, "I will |
| 4  |    | answer this later." |
| 5  | Q. | I am sorry, go ahead. |
| 6  | A. | Training and function as a consultant requires |
| 7  |    | that kind of a back and forth and being able to |
| 8  |    | answer questions in the moment. |
| 9  | Q. | Were you ever the attending in the clinic who |
| 10 |    | would assist Dr. O'Donnell in those settings |
| 11 |    | that we talked about where she would see a |
| 12 |    | patient, come into the room and talk to the |
| 13 |    | treating physician?  Was that ever you in that |
| 14 |    | role? |
| 15 | A. | Sometimes, yeah.  Since we are six, seven of us |
| 16 |    | at that time, it would have been any one of us. |
| 17 | Q. | But sometimes you were in this role? |
| 18 | A. | Sometimes I would be. |
| 19 | Q. | And then you would talk to her and both of you |
| 20 |    | would go back in together and further treat the |
| 21 |    | patient or advise the patient? |
| 22 | A. | Yes. |
| 23 | Q. | I mean, outside of these Wednesday conferences, |
| 24 |    | this specific setting, did you ever observe |
| 25 |    | Dr. O'Donnell having trouble answering |

```
 1               So it was a balancing act.
 2   Q.   Who was the person who communicated?  You said
 3        the research manager.  Who was that?
 4   A.   I believe it was either Dr. Zimmerman or
 5        Dr. Koontz, Michaela Koontz.
 6               (Plaintiff's Exhibit 32 was marked for
 7        identification.)
 8   Q.   I am going to hand you what I have marked as
 9        32.  This is an e-mail on February 12, 2012,
10        from Dr. O'Donnell to, it looks like, pretty
11        much the whole faculty?
12   A.   Yes.
13   Q.   Correct?
14   A.   Yes.
15   Q.   "Subject:  Wednesday conference."  It says,
16        "Dear Faculty, it has come to my attention that
17        many of you wish for me to speak more during
18        Wednesday conferences and are interpreting my
19        silence as ignorance.
20               "However, my cultural/religion, learning
21        style, shyness and anxiety make it extremely
22        difficult for me to shout out answers."
23               Is this the document you are referring to
24        where she first mentioned cultural/religion,
25        shyness and anxiety?
```

1 A. No, I had a personal meeting way before this
2   where she mentioned it.
3 Q. Where she had brought these up?
4 A. Yes, especially her family upbringing is that
5   people are not allowed to speak out of turn is
6   what she specifically told me.
7 Q. It says, "Therefore, I invite you to ask me
8   questions. In addition, I intend to make more
9   than the required number of presentations, (a
10  very interesting topic I am excited to present
11  on 2/22). Hopefully, this is a compromise to
12  suit everybody's needs.
13      "I believe that a training program should
14  take into account a variety of learning styles,
15  not everyone learns the same way. If you have
16  any suggestions how we can work to solve this,
17  please let me know."
18      Did you speak with Dr. O'Donnell about
19  this e-mail or about what she was proposing in
20  this e-mail?
21 A. I don't recall. I can't remember.
22 Q. Did you speak with any of the faculty members
23  about this e-mail and about Dr. O'Donnell,
24  saying that she invited questions and that she
25  planned to make more than the required number

|    |    |    |
|----|----|----|
| | 1 | of presentations, and that she was trying to |
| | 2 | look for a compromise that would suit |
| | 3 | everybody's needs? |
| | 4 | Did you discuss any of that with faculty |
| | 5 | members and whether that was something that |
| | 6 | could be done, couldn't be done, anything like |
| | 7 | that? |
| | 8 | A. We had multiple faculty meetings, but I don't |
| | 9 | know what time frame, were those before or |
| 03:23 | 10 | after. I believe we had at least one or two |
| | 11 | more after this where the unanimous opinion was |
| | 12 | that you cannot not grade, not evaluate her, on |
| | 13 | the other aspects of the Wednesday conferences. |
| | 14 | There couldn't be a substitute. |
| | 15 | We needed in-the-moment questions and |
| | 16 | answers and how people respond to that to |
| | 17 | really gauge how well the person understands |
| | 18 | the subject and how well one is able to |
| | 19 | communicate. |
| 03:24 | 20 | (Plaintiff's Exhibit 33 was marked for |
| | 21 | identification.) |
| | 22 | Q. Handing you what I have marked as 33, this is a |
| | 23 | performance alert notice for Alison Matthews. |
| | 24 | Dr. O'Donnell, in the pediatric endocrinology |
| | 25 | program. Did you prepare this document? |

|   |    |   |
|---|---|---|
| 1 |   | of that, I was not aware of the diagnosis. Up |
| 2 |   | until that time it was just not made clear to |
| 3 |   | me that it was a medical diagnosis, it was |
| 4 |   | social anxiety. |
| 5 | Q. | Would your actions have changed if she had used |
| 6 |   | the word "general anxiety disorder" during any |
| 7 |   | of your conversations? |
| 8 | A. | Well, we would have gotten feedback from the |
| 9 |   | psychologist as to what the treatment |
| 10 |   | modalities are, but still would require her to |
| 11 |   | participate in the Wednesday conferences |
| 12 |   | because that is an essential, integral part of |
| 13 |   | the fellowship training. |
| 14 |   | And without us getting feedback, there is |
| 15 |   | no other way we will be able to gauge the |
| 16 |   | competence of a fellow in communication and |
| 17 |   | knowledge and patient care other than putting |
| 18 |   | on the spot and having to be able to do that. |
| 19 |   | But we will be open to any suggestions |
| 20 |   | that the psychologist would have for us in |
| 21 |   | terms of how can you help a person learn better |
| 22 |   | and be able to function in that role? |
| 23 | Q. | Obviously, then, you never had any discussions |
| 24 |   | with Dr. Adon, her treating physician -- |
| 25 | A. | No. |

```
 1  Q.    -- for the disorder during Dr. O'Donnell's time
 2        at the fellowship?
 3  A.    Not at all.
 4  Q.    You did learn at some point, because you had
 5        meetings about it, that she had formally
 6        requested an accommodation?
 7  A.    Yes.
 8  Q.    Were you told or shown any documentation as to
 9        what accommodation she was requesting?
10  A.    Yes, there were two main accommodation
11        requests.  One was that she should be excused
12        from being evaluated and graded during the
13        Wednesday conferences, which I took back to our
14        faculty, and they said that that cannot be done
15        because that is an integral and essential part
16        of fellowship training.  And our ability to
17        evaluate a fellow, that is a major part of how
18        we evaluate fellows.
19              The second request that we got for
20        accommodation was that she be allowed to work
21        exclusively with two of the junior-most faculty
22        because she was much more comfortable working
23        with them, and not have to work with any of the
24        senior faculty.  And the junior faculty did not
25        involve me, it was two of the most junior
```

|   |    |                                                        |
|---|----|--------------------------------------------------------|
| 1 |    | during the accommodation process about whether         |
| 2 |    | that could be an adequate alternative to               |
| 3 |    | evaluating her based on a different set or a           |
| 4 |    | different method of questioning her?                   |
| 5 | A. | We did, we discussed alternatives.  If we              |
| 6 |    | didn't evaluate her based upon the Wednesday           |
| 7 |    | conferences, how else can we evaluate those            |
| 8 |    | specific aspects?  And we said:  That is               |
| 9 |    | impossible to do.                                      |
| 03:42 10 | Q. | Well, and specifically in her request there is |
| 11 |    | a mention -- do you recall it stating that she         |
| 12 |    | was looking to be evaluated or not evaluated           |
| 13 |    | regarding unrehearsed instances of speaking or         |
| 14 |    | unrehearsed presentations?                             |
| 15 | A. | Yes, again, that is something we can't do              |
| 16 |    | because when you see a patient it is                   |
| 17 |    | unrehearsed.  And when you get a consultation          |
| 18 |    | request, it is unrehearsed.                            |
| 19 |    | And when you have to see a patient in the              |
| 03:43 20 |    | pediatric ICU at 3:00 and the patient is        |
| 21 |    | critically ill, it is unrehearsed, it cannot be        |
| 22 |    | rehearsed.                                             |
| 23 |    | So we need to be able to figure out:  Is               |
| 24 |    | she able to think critically on a sick child?          |
| 25 |    | And you need unrehearsed, in-the-moment                |

1  response and on her own as well as responding
2  to questions that I might ask her.
3 Q. Now, some components of the Wednesday
4  conferences could be rehearsed or prepared for,
5  correct?
6 A. Absolutely.
7 Q. Because you had told or employees were
8  informed, if they were given a presentation
9  ahead of time, that they might be graded on
10 that evaluation -- or graded on that
11 presentation?
12 A. Yes.
13 Q. So they would have known beforehand, correct?
14 A. Plus, they have assigned topic presentations
15 which the schedules are made weeks and months
16 in advance. So they have a topic presentation
17 to give on, say, September 15th.
18    And then the fellow chooses what topic he
19 or she wants to prepare on. And they do a
20 PowerPoint, they go in-depth, and they have all
21 the time and the opportunity to do an in-depth
22 look into that topic and then do a
23 presentation. So those are, certainly,
24 rehearsed.
25 Q. Now, I know you testified that you were not

```
 1                guessing.
 2     Q.    And it looks like on the bottom left of most of
 3           these pages it looks like it might be referring
 4           to a version or v9, and then it says, "July 1,
 5           2012"?
 6     A.    Yes.
 7     Q.    Is that indicating when this was last updated,
 8           this version of the manual?
 9     A.    I would guess so.
10     Q.    You are not sure?
11     A.    I am not sure.  I don't know how often they
12           update these.
13                      MR. BEAN:         Let's take a
14           break.  I just have to go through stuff.  I am
15           through my documents, so I should be pretty
16           close.
17                      (Brief recess.)
18     Q.    Let me know when you are ready, Doctor.
19     A.    Just one moment.  I will e-mail my folks at
20           Westlake.
21     Q.    Did you ever have a conversation with
22           Dr. O'Donnell or make a comment towards her
23           that you felt that people of African descent
24           had hair that is wild and unruly?
25     A.    Nope.  That all comes from a clinical case
```

1  where before coming to Cleveland I worked for
2  three years in Brooklyn, New York, and my boss
3  there told me that there is big contingent of
4  Caribbean immigrants there.
5      And being a pediatric endocrinologist,
6  there is one thing that I had to realize, that,
7  culturally, the Caribbean population, the women
8  used hair products that had placental extracts
9  in them. And so when we get a patient
10 referred, a girl, a young girl with breast
11 development, premature breast development, you
12 have to ask about, specifically ask, if the
13 family uses hair products that have placenta in
14 them.
15     And he said only in his career he has had
16 multiple such presentations, and so you have to
17 know your cultural background of your patients,
18 otherwise you cannot do a good job, and you are
19 going to miss critical information.
20     That was a point that I was trying to make
21 to Dr. O'Donnell, that when you have referral
22 of a patient with African descent referred to
23 you for early development of breasts in a girl,
24 you specifically have to ask the question
25 whether the family uses cosmetics, hair

| | | |
|---|---|---|
| 1 | | products that have placental extracts in them. |
| 2 | Q. | So is it your testimony that you did make that |
| 3 | | comment, but that was your explanation as to |
| 4 | | why had you made it, or you didn't make the |
| 5 | | comment? |
| 6 | A. | I didn't make the comment specifically about |
| 7 | | the hair, but I know exactly where that comes |
| 8 | | from, from a discussion of a particular |
| 9 | | patient. |
| 04:05 10 | Q. | Did you use the word wild and unruly -- |
| 11 | A. | No. |
| 12 | Q. | -- to refer to African-American's hair? |
| 13 | A. | No, not at all. Not at all. |
| 14 | Q. | Were there ever any occasions where you |
| 15 | | instructed Dr. O'Donnell to cover another |
| 16 | | fellow, go cover their clinic or cover their |
| 17 | | assignments because that fellow was unable to |
| 18 | | go? |
| 19 | A. | I might have. And that is, again, no different |
| 04:06 20 | | than we do for other fellows. |
| 21 | Q. | So you may have? |
| 22 | A. | Might have, yeah. |
| 23 | Q. | Can you think of a specific time? |
| 24 | A. | I can't think of a specific, no. But that |
| 25 | | happened many times where a fellow who was |