IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Alison O'Donnell, | ) | CASE NO.: 1:16 CV 2480 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| University Hospitals Health System, et al., | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the Court on the Defendants' Motion for Summary Judgment. (ECF #25). For the reasons that follow, Defendants' Motion for Summary Judgment is granted.

## FACTS[1]

Plaintiff Alison O'Donnell brings this action against Defendants University Hospitals Health System ("UH"), Dr. Naveen Uli, Dr. Sumana Narasimhan, Dr. Rose Gubitosi-Klug and William Rebello alleging claims of Failure to Accommodate in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112 et seq., (Count I); Disability Discrimination in violation of the ADA (Count II); Retaliation based on Disability Discrimination in violation of the ADA (Count III); Race Discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., (Count IV); Retaliation based on Race Discrimination in violation of Title VII (Count V); Disability Discrimination in violation of Ohio

---

[1]

Except as otherwise cited, the factual summary is based on the Complaint and the parties' statements of fact. Those material facts which are controverted and supported by deposition testimony, affidavit, or other evidence are stated in the light most favorable to the non-moving party.

Rev. Code § 4112 (Count VI); Retaliation based on Disability Discrimination in violation of §4112 (Count VII); Race Discrimination in violation of §4112 (Count VIII); Retaliation based on Race Discrimination in violation of §4112 (Count IX) and Aiding and Abetting in violation of §4112.02(J) against Defendant Rebello.[2]

Plaintiff is an African American physician. She entered U.H's three year fellowship in Pediatric Endocrinology on June 1, 2010. (Compl. ¶¶ 28-30) The Fellowship Program trains physicians for academic-related careers in Endocrinology and gives licensed physicians the opportunity to become board-certified pediatric endocrinologists. (Plaintiff's Aff. ¶1)  Only two applicants are accepted into the Fellowship Program each year, and in general, six fellows are in the Program at any one time.(Plaintiff's Dep. p. 69) During Plaintiff's time in the Fellowship program, Dr. O'Donnell was the only African American in the program, while the rest of the fellows were Indian, Asian and Caucasian. (See Plaintiff's Dep. p. 208; Compl. ¶¶ 28-32)

At the time that Plaintiff was admitted to the Fellowship Program, the Program was run by seven UH faculty members including the three remaining individual defendants. In order to successfully complete the Fellowship Program,  the physicians who run the Fellowship Program, including the individual defendants, have to certify that the fellows completed the requirements of the program, which are national standards. All fellows must meet those standards in order to complete the Fellowship Program. (Plaintiff's Dep. p. 63-65) The seven faculty members work closely with the fellows as teachers and in overseeing patient care. (Plaintiff's Dep. p. 70-71) In addition, the faculty members conduct annual performance evaluations and advise fellows when

---

[2]
On December 12, 2017, the parties filed a Stipulated Dismissal of Count X of the Complaint and all claims against Defendant William Rebello. (ECF #30)

2

performance issues arise. (Plaintiff Dep. Ex. 12) There is a long list of expectations that fellows are expected to meet including treating patients, consulting with other pediatric physicians on Endocrinology issues, self-education of assigned topics, attending and participating in educational and administrative meetings and research. (See Plaintiff Dep. Ex. 5).

In June of 2011, following Plaintiff's first year in the Fellowship Program, Plaintiff was advised that she had serious performance issues and was given a Remediation Plan. (Plaintiff Dep. Ex. 11) The Remediation Plan detailed the deficiencies in Plaintiff's performance noted by seven faculty members for the period from January through June 2011 along with seven steps that Plaintiff should take to remediate her performance issues. The Remediation Plan was signed by Dr. Uli and Plaintiff on August 9, 2011. The copy of the Plan, attached as Exhibit 11 to Plaintiff's deposition, has notes apparently added by Plaintiff which state her issues with the fairness of her evaluation and her position that she will not accept any penalties or restrictions being placed upon her as she feels that she has been "wrongfully accused and in general have been mistreated by this program." (Id.)

Before she began the Fellowship Program, Plaintiff was diagnosed with social anxiety disorder and social phobia by Dr. Francoise Adan, her treating psychiatrist, on July 2, 2009. Plaintiff was treated intermittently by Dr. Adan from July 2009 through January, 2013 and was prescribed anxiety medications Lexapro and Klonopin. Plaintiff experienced "physical symptoms of anxiety around social situations, heart racing, sweating, speaking fast, poor concentration, mind going blank and jittery." (Adan Dep. p 22) Plaintiff's disorder impacted both her personal and professional life. (Id. at p 27) While treating with Dr. Adan, Plaintiff began counseling with Dr. Paul Minnillo, a UH staff psychologist. Dr. Minnillo testified that Plaintiff's anxiety disorder

was "very pervasive, very profound." (Minnillo Dep. p. 35) Plaintiff states that early in her fellowship she disclosed her social anxiety disorder to Dr. Uli. (Plaintiff Aff. ¶ 3) Dr. Uli said that at the time he met with Plaintiff about the Remediation Plan, she had not disclosed that she had been diagnosed with a social anxiety disorder but had mentioned that she had social anxiety and that her innate shyness and social anxiety as well as her cultural upbringing prevented her from speaking out of turn. (Uli Dep. p. 111)

Plaintiff states that after she disclosed to Dr. Uli that she suffered from social anxiety disorder she was treated differently from other fellows. Plaintiff contends that the different treatment included receiving less time for orientation than other fellows; being assigned a presentation without prep time; being forced to complete work while on a pre-excused vacation day; being forced to see patients who were over an hour late to appointments despite protocol to have patient reschedule; being referred to by Dr. Narasimhan by her first name in front of patients instead of Dr. Mathews[3]; given clinical assignments with less notice than other fellows; being required to directly reschedule patient appointments; being accused of not writing patient notes or charts timely or thoroughly when Plaintiff's notes were more detailed than notes provided by Dr. Uli; and her ideas from research project were rejected and she was advised to work with another fellow on her project. (Plaintiff Aff. ¶¶ 4-16)

On September 29, 2011, Plaintiff sent a letter to Dr. Uli complaining about unspecified transgressions against Plaintiff by Dr. Uli and the Fellowship program and threatened to take the matter to higher authorities if a work environment free from harassment, fear of retaliation and undue stress was not provided for her. (Uli Dep. Ex. 29) Apparently not satisfied with Dr. Uli's

---

[3]Plaintiff's last name at that point in time was Mathews. (Plaintiff Aff. ¶ 8)

response, in October 2011 Plaintiff complained of disparate treatment to William Rebello, the manager of graduate medical education. (Plaintiff's Aff. ¶ 17) Plaintiff states that she complained a second time to Mr. Rebello and gave him a written summary of the disparate treatment taken against her. (Id. at ¶ 18; ECF #31-6) She told Mr. Rebello that she believed she was being discriminated against based on her race and mentioned her social anxiety disorder. (Rebello Dep. p. 27-28.) Mr. Rebello referred Plaintiff to the human resources department and also to Dr. Jerry Shuck, the head of the Graduate Medical Education Department. (Plaintiff's Dep. p. 117)

On February 11, 2012, Plaintiff sent an email to Claudia Hoyen, in UH's human resources office, with a copy to Mr. Rebello stating that she was concerned that the Fellowship program was not complying with her Remediation Plan as she was not receiving a monthly evaluation and immediate feedback. She stated that she felt that the program was trying to make it so unpleasant for her that she would leave. (Uli Dep. Ex. 31) Ms. Chester from human resources testified that she met several times with Plaintiff to discuss her concerns with her treatment by Program faculty and that she or others in the human resources department investigated all of Plaintiff's complaints and determined that none of them were substantiated. (Chester Dep. pp. 106-109).

Plaintiff sent an email to the faculty of the program on February 12, 2012, stating that it had come to her attention that the faculty wanted her to speak more during Wednesday conferences and were interpreting her silence as ignorance. She told them that her "culture/religion, learning style, shyness and anxiety make it extremely difficult for me to just shout out answers. Therefore, I invite you to ask me questions." In addition she told them that she planned to make more than the required number of presentations and hoped that this compromise

would suit everyone's needs. (Uli Dep. Ex. 32)

The program faculty determined that Plaintiff's progress was deficient and in late February 2012, Plaintiff was given a Performance Alert Notice because her performance was identified as marginal or unsatisfactory. The performance alert identified deficiencies in patient care, medical knowledge, practice based learning and improvement, interpersonal and communication skills, professionalism and failure to obtain certification in general pediatrics. While the faculty noted the effort that Plaintiff had been putting in, with improvement in her knowledge base, the consensus was that she was not performing at the level expected of a second year fellow and recommended that her fellowship be extended by 12 months to allow adequate time for Plaintiff to develop the mandatory core competencies required for sub-specialty certification. (Plaintiff's Dep. p. 180, Ex. 13) In a note written on the bottom of Exhibit 13 dated February 29, 2012, Dr. Uli states that he discussed the performance alert with Plaintiff and after reviewing its contents, she refused to sign it. She told him she would consider extending her fellowship for six months but would not extend for a year. (Id.) The performance alert was also based upon a summary of group/fellow clinical evaluation which compared Plaintiff's performance reviews to her peers in the Fellowship Program. (Plaintiff's Dep. Ex. 14) The summary demonstrates that Plaintiff's evaluations were significantly below her peers in almost every performance category evaluated. (Id.)

Plaintiff submitted a formal request for disability accommodation to UH in March 2012. (Plaintiff Aff. ¶ 21) An ADA Health Care Provider/Physician Certification form, with a summary of the essential functions for Plaintiff's fellowship program, was provided to Plaintiff for submission to her physician. (Adan Dep. Ex. 48) On May 3, 2012, Dr. Adan signed the

6

Certification form stating that Plaintiff had a disability that substantially limits one or more major life activities. Dr. Adan circled the following essential function:

> Actively participate in all educational sessions of the division, with adequate preparation on assigned topic presentations. Take an active role in educating medical students, residents, nurses and other medical personnel.

Dr. Adan wrote that Plaintiff's social phobia and difficulty in unknown social situations affected Plaintiff's ability to perform an essential function of her position, in that it affects her ability to speak publicly in case conference, specifically when un-rehearsed. Dr. Adan suggested a permanent accommodation of not evaluating Plaintiff on case conference, particularly when un-rehearsed.(Id.)

The Program faculty believes that the weekly department meetings attended by all attending physicians, faculty, fellows and nurses, are essential to the Fellowship Program because high level Pediatric Endocrinology cases are analyzed and the group analysis provides the faculty with the ability to determine the educational level of fellows. (Uli Dep. p. 115, 158-59; Narasimhan Dep. p. 83-84; Gubitosi-Klug Dep. p. 59) Because the weekly department meetings are critical to patient care and the educational development of fellows, the evaluation of fellows based upon their participation in the weekly meetings is an essential function of the fellowship program. Based upon the faculty's review of the accommodation request, by letter dated June 14, 2012, UH denied Plaintiff's request for an accommodation because case "conference participation is an essential function of [Plaintiff's] position as a fellow and the attendings must have the ability to evaluate the fellows in this milieu." (Plaintiff's Dep., Ex. 8)

The June 14 letter also advised Plaintiff that since UH was unable to permanently

accommodate Plaintiff in her current position, Plaintiff will begin a leave of absence on July 1, 2012. As Dr. Adan reported that Plaintiff was currently undergoing treatment and showing some progress, there was hope that Plaintiff would continue to progress and return to the Program. (Id.)

Plaintiff did not return to the Fellowship Program and sought other employment. Plaintiff states that she was hired by UH Ashtabula Pediatrics and scheduled to start on December 1, 2012. In order to take that job, Plaintiff was required to resign from the Fellowship Program. (Plaintiff Aff ¶¶ 26-28) Plaintiff submitted her resignation letter on December 16, 2012. (ECF #31-Ex. 8) Thereafter, on January 17, 2013, Dr. Nochomovitz, President of UH Physician Services, notified Plaintiff that her Memorandum of Understanding regarding joining UH Ashtabula Pediatrics was rescinded because there was no longer a need for another pediatrician at that site. (ECF #31, Ex. 9) After leaving the Fellowship Program Plaintiff has worked as a physician for One Health Ohio and Akron Children's Hospital. (Plaintiff Dep. at 33-34)

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on May 1, 2013.[4]

## STANDARD OF REVIEW

Summary judgment is appropriate when the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The burden of showing the absence of any such "genuine issue" rests with the moving party:

---

[4]
The Court has been unable to find a copy of the charge filed by the Plaintiff with the EEOC or any probable cause finding or right to sue letter issued by the EEOC. The Defendants' brief references the May 1, 2013 filing date and Plaintiff does not dispute the filing date.

[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex v. Catrett*, 477 U.S. 317, 323 (1986) (citing FED. R. CIV. P. 56(c)). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. The court will view the summary judgment motion in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of their case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Accordingly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (citing *Anderson*, 477 U.S. at 252). Moreover, if the evidence presented is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citations omitted). In most civil cases involving summary judgment, the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252.

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmover. The nonmoving party may not simply rely on its pleadings, but must "produce

evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995). FED. R. CIV. P. 56(e) states:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

The Federal Rules identify the penalty for the lack of such a response by the nonmoving party as an automatic grant of summary judgment, where otherwise appropriate. *Id.*

In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## ANALYSIS

Defendants assert that they are entitled to summary judgment on Plaintiff's federal claims because they are barred by the applicable limitations period. Further, even if some claims are timely, Defendants argue that Plaintiff's disability and race discrimination claims as well as any retaliation claims fail as a matter of law.

### A. Limitations

Moving first to Defendant's limitations argument, Defendant asserts that the limitations period has expired for Plaintiff's federal claims. Under Title VII, a complainant must file a charge with the EEOC within 180 days of the alleged discriminatory conduct, or 300 days if the plaintiff notifies a parallel state agency of her charge. 42 U.S.C. § 2000e-5; 29 U.S.C. § 626(d)(1). Here, Plaintiff was placed on leave effective July 1, 2012 and she submitted her

resignation on December 16, 2012. Plaintiff had no contact with the Program after July 1, 2012.
(Plaintiff Dep. p. 139) Plaintiff filed her charge of discrimination with the EEOC on May 1,
2013. All employment actions, except for Plaintiff's resignation, occurred more than 300 days
before she filed her charge with the EEOC. Thus, Defendants assert that all of Plaintiff's federal
claims, except for constructive discharge, must be dismissed as the Court cannot consider any
claims of alleged discrimination occurring before July 5, 2012, which is 300 days prior to
Plaintiff's EEOC filing[5]. See *Hout v. City of Mansfield, Ohio*, 550 F.Supp.2d 701, 718-19 (N.D.
Ohio 2008) ("Pursuant to *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 108–09, 122
S.Ct. 2061, 153 L.Ed.2d 106 (2002), . . . the Court determines the Plaintiffs may file suit on
events that fall outside the 300-day limitation period for filing a charge with the EEOC only for
events alleging "hostile work environment claims." *Id.* at 110, 122 S.Ct. 2061.") In *Morgan,
supra*, the Supreme Court explained that "discrete discriminatory acts are not actionable if time
barred, even when they are related to acts alleged in timely filed charges." (Id. at 113, 122 S.Ct.
2061) "The rationale behind the 'discrete act' rule is that when a plaintiff is harmed by a discrete
act, he should be aware of it; '[t]o permit him to wait and toll the running of the statute simply by
asserting that a series of separate wrongs were committed ... would be to enable him to defeat the
purpose of the time-bar, which is to preclude the resuscitation of stale claims.' " *Walia v.
Napolitano*, 986 F. Supp. 2d 169, 179 (E.D.N.Y. 2013), *on reconsideration in part* (Feb. 4,
2014)(citations omitted.)

---

[5]

In another section of their motion, Defendants argue that Plaintiff was not constructively
discharged, thus there was no adverse employment action within the 300 day time frame.
The Court will address the constructive discharge issue presently.

11

Plaintiff counters that the continuing violations doctrine exception to the three hundred day statute of limitations is applicable in this case. Plaintiff alleges that Defendants' acts in placing her on a leave of absence and failing to grant her requested accommodation constitute continuous violations which toll the deadline of an EEOC charge until the end date of the wrongful conduct.

Plaintiff's argument runs afoul *Morgan* which eliminates the continuing violation theory for discrete acts of discrimination, outside of the context of hostile work environment harassment claims. *Morgan, supra*, 536 U.S. 101, 122.[6] Further, the adverse acts at issue here, placing Plaintiff on leave and the refusal to provide the requested accommodation, constitute discrete acts which occurred on the day that they happened. *See Walia, supra*, 986 F.Supp.2d at 179-180 (collecting cases)(placing plaintiff on leave is a "discrete act" and "the rejection of a proposed accommodation is a single completed action when taken"); *Elmenayer v. ABF Freight Sys., Inc.*, 318 F.3d 130, 135 (2d Cir. 2003) ("The rejection of a proposed accommodation is a single completed action when taken ...[a]lthough the effect of the employer's rejection continues to be felt by the employee for as long as he remains employed.") As such, there is no continuing violation and except for the alleged constructive discharge, all claimed adverse employment

---

[6]

While a second category of continuing violations, involving a longstanding and demonstrable policy of discrimination, was not implicated by *Morgan* and remains viable, it is not applicable here. *See Sharpe v. Cureton*, 319 F.3d 259, 268-69 (6th Cir. 2003). To establish this category of continuing violation, "a [plaintiff] must demonstrate something more than the existence of discriminatory treatment in his case....The preponderance of the evidence must establish that some form of intentional discrimination against the class of which plaintiff was a member was the company's standing operating procedure." *Sharpe*, 319 F.3d at 268-69(citations omitted).

actions occurred outside the 300 day limitations period. However, since the Court has no admissible evidence of the filing date of the EEOC charge, the federal claims will not be dismissed on this basis alone. In any event, the statute of limitations on the corresponding state law claims is six years, thus, all claims will be addressed on the merits.

## B. Disability claims

Plaintiff alleges claims of failure to accommodate and disparate treatment disability discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. § 12112 ("ADA") and Ohio Revised Code § 4112.02.[7] The ADA prohibits discrimination against "a qualified individual with a disability because of the disability" 42 U.S.C. § 12112(a). Courts use slightly different frameworks in analyzing failure to accommodate cases and disparate treatment cases. Each claim will be addressed in turn.

### 1. Failure to Accommodate.

The ADA specifically defines one aspect of "discriminating against a qualified individual on the basis of disability" to include "not making reasonable accommodations to the known

---

[7]

In Ohio, courts use federal law to analyze disability discrimination and race discrimination claims under the Ohio Revised Code §4112. *See Rosebrough v. Buckeye Valley High School*, 582 Fed. Appx. 647, 650 (6th Cir.2014)(Because disability discrimination under Ohio law is treated similarly to discrimination under the ADA, we review plaintiff's state and federal claims solely under the ADA analysis.); *Brenneman v. MedCentral Health System*, 366 F.3d 412, 418 (6th Cir. 2004)(will analyze discrimination claims under §4112 and the ADA under federal ADA analysis); *Plant v. Morton Intern., Inc.*, 212 F.3d 929, 939 (6th Cir. 2000)(Ohio handicap discrimination law is similar to the ADA, thus it is appropriate to look to federal law when interpreting analogous law under Rev. Code § 4112); *Carter v. University of Toledo*, 349 F.3d 269, 272 (6th Cir.2003)(Title VII employment discrimination claim and state law employment discrimination claim under §4112 considered together under Title VII framework because Ohio's requirements are the same as under federal law.) Accordingly, Plaintiff's federal and state law disability and race discrimination claims will be analyzed under federal law.

physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C.A. § 12112(b)(5)(A). Most discrimination claims involve indirect evidence and courts use the *McDonnell Douglas* burden shifting analysis to analyze those claims. Failure to accommodate claims, however, fall within the category of cases in which the employer relies on the employee's disability in its decision making and thus, are analyzed under the direct evidence framework. *Kleiber v. Honda of America Mfg., Inc.*, 485 F.3d 862, 868-69 (6th Cir. 2007). Under the direct evidence framework:

> (1) The plaintiff bears the burden of establishing that he or she is disabled. (2) The plaintiff bears the burden of establishing that he or she is "otherwise qualified" for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged "essential" job requirement eliminated; or (c) with a proposed reasonable accommodation. (3) The employer will bear the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer.

*Id.* at 869 (citation omitted). In this case, Defendants contend that Plaintiff is not disabled and further that the accommodation requested by Plaintiff eliminated an essential element of the Fellowship Program and thus was unreasonable.

Defendants argue that Plaintiff has failed to meet the first element because she does not have a disability. The ADA, as amended in 2008 by the ADA Amendments Act ("ADAAA"), ADA Amendments Act, Pub. L. No. 110–325, 122 Stat. 3553 (effective September 25, 2008) expressly broadens the scope of the ADA, making the "primary object of attention in cases brought under the ADA ... whether covered entities have complied with their obligations and

14

whether discrimination has occurred, not whether the individual meets the definition of disability." 29 C.F.R. § 1630.1(c)(4). The ADAAA defines disability with respect to a person as "(a) a physical or mental impairment that substantially limits one or more major life activities of such individual; (b) a record of such an impairment; or (c) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Major life activities include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A); *Moates v. Hamilton Cty.*, 976 F. Supp. 2d 984, 991–92) (E.D. Tenn. 2013)

Thus, to determine if plaintiff meets the first prong of her prima facie case, the Court must determine if Plaintiff's diagnosed social anxiety disorder is a qualifying disability that substantially limits one or more major life activities. The Court must make an individualized inquiry to determine what effect the claimed impairment has on the life of the individual claiming the protection of the ADA. *Cotter v. Ajilon Servs.*, 287 F.3d 593, 598 (6th Cir.2002).

According to the exhibits produced in conjunction with Defendants' motion for summary judgment, Plaintiff was diagnosed with Social Anxiety Disorder on July 7, 2009 by Dr. Adan. She recommended starting her on Lexapro and eventually adding Klonopin. Plaintiff was referred for follow up with P. Minnillo, Ph.D. Plaintiff saw Dr. Adan and Paul Minnillo regularly during the rest of 2009 and 2010 and less frequently in 2011. Plaintiff's last appointment with Dr. Minnillo was on May 27, 2011. The last medical record for Dr. Adan (at least in the somewhat random exhibits given to the Court) indicates that she did a "30 minute med check and brief psycho" on September 6, 2011, although in her deposition she states that from her records it looked like Plaintiff came in on May 3, 2012 (Ex. 49) and then did not come in until January

15

2013, for what apparently was her last appointment with Dr. Adan. While Defendants assert, without any support, that Plaintiff's "social phobia" is not a disability, both her treating physician and psychologist agree that Plaintiff's social anxiety disorder is a disability, resulted in physical responses from Plaintiff, required significant medication and impacted her personal and professional life. The medical professionals agree that her condition substantially limited one or more of her major life activities. Defendants offer no medical support for their contrary position, only that Plaintiff was able to complete medical school and residency without special accommodation and is able to practice medicine since the Fellowship Program without accommodation. The fact that Plaintiff has been able to complete her education, with the exception of the Fellowship, and to maintain work as a physician does not necessarily mean that her diagnosed disability did not substantially limit one or more of her major life activities during the period in question here. Thus, in accordance with the change of focus under the AAADA, the evidence submitted by Plaintiff satisfies the first element of the framework.

Next, Defendants argue that Plaintiff agreed that her disability prevented her from completing an essential function of the Fellowship Program which required fellows to actively participate in all educational sessions of the division, with adequate preparation on assigned topic presentations and take an active role in the education of medical students, residents, nurses and other medical personal. Further, Plaintiff's requested accommodation, that she not be evaluated based on performance at the weekly departmental meetings, eliminated an essential function of the Fellowship Program and thus, was unreasonable. Plaintiff's burden includes showing both that she proposed an accommodation and that the proposed accommodation was reasonable. *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202 (6th Cir. 2010). A "reasonable

16

accommodation" may include "job restructuring [and] part-time or modified work schedules." *Id.* at § 12111(9)(B). But it does *not* include removing an "essential function [ ]" from the position, for that is *per se* unreasonable. *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 761 (6th Cir. 2015) *citing Brickers v. Cleveland Bd. of Educ.*, 145 F.3d 846, 850 (6th Cir.1998).

In this case, the Defendants reviewed Plaintiff's accommodation request and determined that it sought to eliminate an essential function of the Fellowship Program. The faculty of the Program agreed that evaluation of a fellow's participation in the departmental conferences was critical to the Program and that participation in the weekly conferences provided the faculty with the ability to determine the educational level of the fellows. As such, Defendants determined that the requested accommodation was unreasonable and could not be granted. However, since Dr. Adan noted on the ADA Request for Reasonable Accommodation that "the employee is actively seeking help for her symptoms and is very motivated in her treatment...[and] has made some progress already," Defendants offered an alternative accommodation of allowing Plaintiff to take leave and resume her position when she was able. However, Plaintiff discontinued her treatment with Dr. Adan and Dr. Minillo and sought alternative employment.

Plaintiff contends that her requested accommodation did not eliminate an essential function of the Fellowship program because the list of essential functions for the Fellowship Program submitted to the Human Resources department by Dr. Uli in response to Plaintiff's request for an accommodation was not the same as the Fellowship Program Goals that she was given at the beginning of the Fellowship. The active participation in educational sessions was added by Dr. Uli at a later date. Regardless of when the active participation requirement was added to Fellowship essential functions, the fact remains that the faculty needed some basis to

evaluate the fellows. All of the Fellowship Program faculty agreed that active participation in the weekly departmental meetings were a critical part of the Fellowship Program and the educational process. All faculty agreed that fellows must be evaluated based upon their participation in the weekly meetings.

The Code of Federal Regulations enumerates seven non-exclusive factors to weigh in determining if a function is "essential" to a position:

> (1) an employer's judgment that the function is essential; (2) written job descriptions; (3) the amount of time on the job devoted to performing the function; (4) the consequences of not requiring the employee to perform the function; (5) terms in a relevant labor agreement; (6) the work experience of those who have held the position in the past; and (7) the current work experience of those who hold similar jobs.

29 C.F.R. § 1630.2(n)(3). Moreover, the Sixth Circuit has noted that the determination of what is an essential function of a position "should be based upon more than statements in a job description and should reflect the actual functioning and circumstances of the particular enterprise involved." *Brown v. Chase Brass & Copper Co.*, 14 F. App'x 482, 489 (6th Cir. 2001) (citation omitted.) Analysis of the CFR factors leads to the conclusion that evaluating a fellow's active participation in departmental meetings is an essential function of the Program. The faculty assert that it is essential; one of two written job descriptions state that it is essential; the fellows spend significant time every week in the departmental meetings and/or preparing for them; the faculty attend and participate in the meetings and are able to gain a collaborative perspective on the a fellow's knowledge and experience; and all past fellows of the Fellowship Program have been evaluated on their participation in weekly departmental meetings. Plaintiff's limited focus on one list of Fellowship goals does not overcome the other significant and more important

18

evidence demonstrating the essential need to evaluate fellows based on their active participation in departmental meetings. While recognizing that the inquiry into whether a function is essential is highly fact specific, "nothing prevents a court from resolving a summary judgment motion on the basis of such a fact-specific determination when the evidence before the court pertinent to essentiality does not conflict, insofar as the non-moving party has failed to create a genuine issue of material fact." *Id.* Based upon the evidence before the Court, evaluation of a fellow's active participation in weekly departmental meetings is an essential function of the Fellowship Program. As such, Plaintiff's requested accommodation removing that essential function was unreasonable.

Plaintiff also contends that Defendants failed to engage in the interactive process with Plaintiff in order to find an acceptable accommodation. When an employee requests reasonable accommodation under the ADA, the employer must engage in an informal, interactive process with the employee with a disability in need of the accommodation. 29 C.F.R. § 1630.2(o)(3). The informal interactive process is mandatory in the Sixth Circuit. *Kovac v. Superior Dairy, Inc.*, 998 F. Supp.2d 609, 619 (N.D. Ohio 2014)(citation omitted.). Defendants contend that they did engage in an interactive process with the Plaintiff. The faculty members discussed the role of the weekly departmental meetings and determined that there was no alternative for participation and evaluation of a fellow's performance in the weekly conferences. Plaintiff was offered an alternative accommodation, to be placed on leave to focus on treatment to work towards coming back to the Fellowship Program when she was able. "Though the employer need not 'propose a counter accommodation in order to participate in the interactive process in good faith[,]'doing so 'may be additional evidence of good faith.' *Jakubowski*, 627 F.3d at 203(citations omitted)." *Id.*

at 620. Plaintiff's actions in stopping treatment and seeking employment demonstrate that she did not accept Defendant's alternate accommodation. "Although an employee is not required to accept an offered accommodation, if an individual rejects a reasonable accommodation, the individual will no longer be considered a qualified individual with a disability." *Hedrick v. Western Reserve Care System*, 355 F.3d 444, 457 (6th Cir. 2004). Because Plaintiff proposed an unreasonable accommodation and refused an alternative reasonable accommodation, her claim for failure to accommodate fails as a matter of law.

### 2. Disparate treatment

In Count II of her Complaint Plaintiff alleges a disability discrimination claim under the ADA based upon disparate treatment. Specifically, she alleges that she was disabled, but fully competent to perform her duties in the Fellowship Program but was treated less favorably than other non-disabled fellows and was constructively discharged because of her disability. (Complaint ¶¶ 145-149)[8]

Both sides agree that the *McDonnell Douglas* burden shifting analysis is appropriate here where indirect or circumstantial evidence is used as evidence of discrimination. Under the *McDonnell Douglas* framework Plaintiff must first establish a prima facie case of discrimination. If she does that, the burden shifts to Defendants to present a non-discriminatory reason for the adverse action it took against her. If Defendants succeeds in presenting a non-discriminatory

---

[8]

Count II also alleges that she was constructively discharged for the alternate reason that Defendant regarded her as disabled. Plaintiff has not pressed that argument and there is no evidence that Defendants perceived her to be disabled and treated her as if she was disabled. In any event, the prima facie tests for both claims overlap.

20

reason for the adverse action it took against her, Plaintiff must identify evidence from which a

reasonable jury could conclude that Defendants' proffered reason is pretextual. *Rosebrough v.*

*Buckeye Valley High School,* 582 Fed. Appx. 647, 651 (6th Cir. 2014) (citations omitted). At all

times, the plaintiff bears the ultimate burden of persuasion. *Monette v. Elec. Data Sys. Corp.,* 90

F.3d 1173, 1186 (6th Cir. 1996), *abrogated on other grounds by Lewis v. Humboldt Acquisition*

*Corp., Inc.,* 681 F.3d 312, 317 (6th Cir. 2012(en banc).

     In order to establish her prima facie claim of disparate treatment disability discrimination

under the ADA, a plaintiff must show the following five elements:

    (1) he or she is disabled;

    (2) is otherwise qualified for the job, with or without reasonable accommodation;

    (3) suffered an adverse employment decision;

    (4) the employer knew or had reason to know of his or disability, and

    (5) a similarly situated non-disabled employees were treated more favorably.

*Rosebrough,* 582 Fed. Appx. at 651(citations omitted.)

     The first two elements of the prima facie case have been addressed above where the Court

concluded that Plaintiff is disabled within the meaning of the ADA but is not qualified for her

fellowship position with or without a reasonable accommodation. However, even if Plaintiff

could establish the second element, she also has not established that she suffered an adverse

employment action. An adverse employment action is "a materially adverse change in the terms

of [the employee's] employment." *Kocsis v. Multi–Care Mgmt., Inc.,* 97 F.3d 876, 885 (6th

Cir.1996). The Sixth Circuit advises that:

     A "bruised ego" or a "mere inconvenience or an alteration of job
     responsibilities" is not sufficient to constitute an adverse

employment action. *Id.* at 797. Adverse employment actions are typically marked by a "significant change in employment status," including "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.*, at 798 (quoting *Burlington Indus. v. Ellerth.* 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)).

*Spees v. James Marine, Inc.,* 617 F.3d 380, 391 (6th Cir.2010).

Plaintiff alleges that she has suffered multiple adverse employment actions, including being denied reasonable accommodation, being placed on an involuntary leave of absence, and finally her constructive discharge. However, as discussed above, Plaintiff's requested accommodation was not reasonable and was properly denied by Defendants and her placement on leave was appropriate because both Plaintiff and her treating physician agreed that she could not perform an essential function of her fellowship. The only remaining potential adverse action is Plaintiff's allegation that she was constructively discharged.

To demonstrate a constructive discharge, the plaintiff must show that (1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person; (2) the employer did so with the intention of forcing the employee to quit; and (3) the employee actually quit. *Hurtt v. Int'l Servs., Inc.,* 627 F. App'x 414, 420 (6th Cir. 2015) *citing Savage v. Gee,* 665 F.3d 732, 739 (6th Cir.2012). To determine whether the first prong is met, a court should consider the following factors, relevant singly or in combination:

(1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

22

*Logan v. Denny's. Inc.*, 259 F.3d 558, 569 (6th Cir. 2001). Review of the evidence in this case shows that Plaintiff was not demoted, her salary was not reduced, her job responsibilities were not reduced, she does not allege that she was reassigned menial or degrading work, the supervising faculty did not change, and she was not offered continued employment on less favorable terms. While Plaintiff may contend that some of the alleged different treatment– being required to reschedule some patient appointments on one occasion, being asked to cover an attending's patients at clinic on one occasion and other minor complaints– constitutes "badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation"-- none of the alleged different treatment would objectively be sufficient to encourage resignation.

Rather than focus on any of the factors enumerated above, Plaintiff asserts that she was placed in a "no win" situation because "how could she recover from a "life-long" and "disabling" anxiety disorder and return to work without the reasonable accommodation that she requested?" While the Sixth Circuit has held that with respect to the second prong of the constructive discharge test, "a complete failure to accommodate, in the face of repeated requests, might suffice as evidence to show the deliberateness necessary for constructive discharge," there is no evidence of a "complete failure" here. *See Hurtt*, 627 Fed.Appx. at 421 citing *Talley v. Family Dollar Stores of Ohio, Inc.*. 542 F.3d 1099, 1109 (6th Cir. 2008). As explained at length above, Plaintiff's accommodation request was not reasonable. Her doctor informed UH that Plaintiff could not perform an essential function of her position and that her requested accommodation was to remove the essential function. As such, UH was justified in denying the unreasonable accommodation request. Further, Plaintiff's treating physician wrote that Plaintiff was working

23

on treatment and was seeing some improvement. While Plaintiff may feel that she will always have debilitating symptoms, the medical information supplied to UH indicated that Plaintiff may be able to resume her position. As such, UH accommodated her disability and acknowledged inability to complete the Fellowship Program by placing her on leave with the option of returning if able. While Plaintiff states that she felt she had no option but to look for other employment, from Defendants' point of view based on the information given to them by Plaintiff and her physician, they were giving Plaintiff an option to return if able-- not offering that option to Plaintiff with the intention of forcing her to resign.[9]

Rather, Defendants argue that Plaintiff voluntarily resigned to obtain full time employment as a physician. As such she was not constructively discharged. This argument is bolstered by the evidence that Plaintiff did not seek medical attention (or continue to see her former physician or psychologist) to work on her social anxiety disorder and she made no attempt to return to the Fellowship Program. Rather, almost immediately after being placed on leave, Plaintiff made the decision to spend her time on leave seeking full-time employment outside of the Fellowship Program. The fact that an employee remains on the job or on leave with his employer while looking for alternate employment negates any claim that the employment situation was so intolerable as to constitute a constructive discharge. *See Guyton v. Novo Nordisk, Inc.*, 151 F.Supp.3d 1057, 1090-1091 (C.D.Cal. 2015) (Summary judgment in favor of

---

[9]

In these circumstances, where Plaintiff agrees that she could not perform an essential function of her position because of her disability and her disability is not resolved while on leave, termination of the employee does not violate the ADA. *See, Gamble v. JP Morgan Chase & Co.,* 689 Fed.Appx. 397, 403 (6th Cir. 2017*); Wheeler v. Jackson National Life Ins. Co.*, 159 F.Supp.3d 828, 855 (M.D. Tenn. 2016)

employer on plaintiff's constructive discharge claim is appropriate where employee, who was on leave after complaining of discrimination by employer, did not resign until he secured new employment demonstrating that employment was not so intolerable as to amount to constructive discharge.); *accord Regis v. Metropolitan Jewish Geriatric Center*, 2000 WL 264336 at \*12 (E.D. N.Y. January 11, 2000); *Wagner v. Sanders Assoc. Inc.*, 638 F.Supp. 742, 745-46 (C.D. Cal. 1993). Based upon the evidence presented in this case, Plaintiff was not constructively discharged. Plaintiff has failed to establish her prima facie case of disparate treatment disability discrimination. Moreover, even if the Court would presume that Plaintiff had established her prima facie case, Defendants have offered non-discriminatory reasons for its denial of Plaintiff's unreasonable accommodation request and for placing Plaintiff on leave. Plaintiff has not offered any evidence to show that these reasons were pretextual. Defendants' Motion for Summary Judgment on Plaintiff's disparate treatment disability claim is granted.

### 3. Retaliation

Plaintiff asserts claims of retaliation under the ADA, Title VII and § 4112. Ohio Revised Code § 4112.02(I) and Title VII and the ADA prohibit retaliatory actions against employees who oppose, report, or participate in investigations involving conduct that allegedly violates those statutes. *See Sessin v. Thistledown Racetrack, LLD*, 187 F.Supp.3d 869, 878 (N.D. Ohio 2016). "Retaliation claims are treated the same whether brought under the ADA or Title VII or § 4112." *Barrett v. Lucent Techs., Inc.*, 36 Fed.Appx. 835, 840 (6th Cir.2002) (citing *Penny v. UPS*, 128 F.3d 408, 415 (6th Cir.1997)); *Sessin*, 187 F.Supp.3d at 878. In cases where a plaintiff relies on circumstantial evidence of retaliation, the *McDonnell Douglas* burden shifting framework applies. *Rorrer v.City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014). To establish a *prima facie*

25

case for retaliation a plaintiff must demonstrate that: (1) she engaged in protected activity (under the ADA, Title VII or § 4112), (2) the activity was known to the employer, (3) she thereafter suffered an adverse employment action, and (4) a causal link exists between the protected activity and the adverse employment action. *Id.*, 743 at 1046; *Cole v. Taber*, 587 F. Supp. 2d 856, 873 (W.D. Tenn. 2008) *citing Clark v. City of Dublin, Ohio*, 178 Fed.Appx. 522, 525 (6th Cir.2006); *see also Kuriatnyk v. Township of Bazetta, Ohio*, 93 Fed.Appx. 683, 686 (6th Cir.2004), *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir.2000). Once this showing is made the defendant must articulate a legitimate nonretaliatory reason for its action before the burden shifts back to plaintiff to show that the proffered reason was not its true reason but merely a pretext for retaliation. The burden of persuasion remains with the plaintiff throughout. *Harris v. Metro. Gov't of Nashville & Davidson Cty.*, 594 F.3d 476, 585 (6th Cir. 2010).

In this case, Plaintiff engaged in protected activity by complaining to UH that she was discriminated against on the basis of her disability and her race. Accordingly, all parties agree that Plaintiff has fulfilled the first two elements of the prima facie test—at least as to her disability. Defendants argue that even if you consider being placed on leave and then resigning as adverse employment actions, Plaintiff has failed to provide any evidence that there was a causal link between her complaints and the alleged adverse actions. "To establish a causal connection, a plaintiff must proffer evidence sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir.2007); *Anderson v. ProCopy Techs., Inc.*, 23 F. Supp. 3d 880, 893 (S.D. Ohio 2014).

In this case, Plaintiff and her treating physician notified UH that Plaintiff could not perform an essential function of her position. Plaintiff's accommodation request that the essential

function of the Fellowship Program be eliminated was properly rejected by UH. Plaintiff was properly placed on leave while she was unable to perform an essential function of the Fellowship Program. Based upon her physician's statement that Plaintiff was working on her social anxiety and making progress, UH offered to let Plaintiff return when she was able. Since the Court has already determined that the rejection of Plaintiff's unreasonable accommodation request and the placement of Plaintiff on leave did not violate the ADA and also that she was not constructively discharged, it follows that these same asserted adverse actions do not constitute retaliation for Plaintiff's protected activity. However, even if the Court presumes that Plaintiff has established a prima facie case, Defendants have articulated a legitimate nonretaliatory reason for its actions. In response Plaintiff has offered no evidence to show that Defendants' articulated non-retaliatory reasons for its actions were a pretext for retaliation. Accordingly, Defendants' are entitled to summary judgment on Plaintiff's retaliation claims.[10]

### 4. Race Discrimination

Plaintiff alleges that she was treated differently than other fellows in her Fellowship Program because of her race in violation of Title VII and § 4112.[11] Because there is no direct

---

[10]

While Plaintiff has alleged retaliation claims based upon race in violation of Title VII, there has been no briefing or evidence submitted by Plaintiff to support any claim that she suffered an adverse employment action because of her race or that any complaint she made about her race resulted in retaliatory action. In any event, her retaliation claims under Title VII fails for the same reason as her ADA retaliation claim.

[11]

Most of Plaintiff's complaints of different treatment occurred outside of the 300 day limitations period under Title VII and would not be considered in a Title VII claim. However, the statute of limitations for a disparate treatment race discrimination claim under Ohio law is six years. As such, all of Plaintiff's alleged acts of disparate treatment would be considered. *See Berryman v. SuperValu Holdings, Inc.*, 2010 WL 1257854 at *8 (S.D. Ohio March 31, 2010) Again, the parties agree that courts analyze disparate

27

evidence of race discrimination here, the parties agree that the *McDonnell Douglas* burden

shifting framework is applicable. In describing that framework the Sixth Circuit explains:

> Where, as here, a case is at the summary judgment stage, "the
> plaintiff must submit evidence from which a reasonable jury could
> conclude both that she has established a prima facie case of
> discrimination and that the defendant's legitimate,
> nondiscriminatory reason for its action, if any, is pretext for
> unlawful discrimination." To establish a prima facie case of
> disparate treatment, a plaintiff must show that 1) she is a member
> of a protected class; 2) she was subjected to an adverse
> employment decision; 3) she was qualified for the position; and 4)
> she was replaced by a person outside the protected class, or treated
> differently than similarly situated non-protected employees.

*Vaughn v. Louisville Water Co.*, 302 F. App'x 337, 345 (6th Cir. 2008) *quoting Vincent v. Brewer*

*Co.*, 514 F.3d 489, 494 (6th Cir. 2007). Plaintiff fails to meet the second and third elements of the

prima facie case based upon the analysis discussed previously. Most particularly, Plaintiff has

not suffered an adverse employment action under Title VII and Ohio law. An adverse

employment action is "a significant change in employment status, such as hiring, firing, failing to

promote, reassignment with significantly different responsibilities, or a decision causing a

significant change in benefits." *Baxter Healthcare Corp.*, 533 F.3d at 402 (quoting *Burlington*

*Indus. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)). It must be "more

disruptive than a mere inconvenience or alteration of job responsibilities." *Michael v. Caterpillar*

*Fin. Servs. Corp.*, 496 F.3d 584, 594 (6th Cir.2007). The only employment actions that could be

termed "adverse employment actions" under this precedent are Plaintiff's placement on leave and

her alleged constructive discharge. However, as discussed above, Plaintiff was placed on leave

because both Plaintiff and her treating physician agreed that she could not perform an essential

---

treatment claims under Title VII and Ohio law using the same framework. (*See Id.* at *10)

28

function of her position and her resignation from the Fellowship Program in order to pursue full time employment elsewhere did not constitute a constructive discharge. As such there is no other employment action identified by Plaintiff that amounts to an adverse employment action.

Moreover, even if the Court presumed that Plaintiff has established a prima facie case of disparate treatment race discrimination, Plaintiff has not offered evidence from which a reasonable jury could conclude that the Defendants' legitimate, nondiscriminatory reasons for its action in placing Plaintiff on leave or Plaintiff's voluntary resignation is pretext for unlawful discrimination. As such, Defendants are entitled to summary judgment on Plaintiff's race discrimination claims.

## CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment (ECF #25) is granted.

IT IS SO ORDERED.

DONALD C. NUGENT
UNITED STATES DISTRICT JUDGE

DATED: April 3, 2018